## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Brooks M. Witzke, | ) | C.A. No. _____ |
| | ) | |
| Plaintiff, | ) | Non-Arbitration |
| | ) | Demand for Jury Trial |
| v. | ) | |

JUSTICES OF THE SUPREME COURT OF DELAWARE,
Collins J. Seitz, Jr.,                 )
James T. Vaughn, Jr.,              )
Tamika R. Montgomery-Reeves,    )
Gary F. Traynor,                    )
Karen L. Valihura,               )
          and,
MEMBERS OF THE DELAWARE BOARD OF BAR EXAMINERS
Jennifer C. Wasson,             )
Randolph K. Herndon,         )
                        )
          Defendants.    )

## VERIFIED COMPLAINT

Plaintiff Brooks M. Witzke ("Plaintiff") brings this action for Injunctive and Declaratory Relief and related claims pursuant to the Federal Civil Rights Statute 42 U.S.C. §1983, the Privileges and Immunities Clause of U.S. Const. art. IV, §2, cl. 1, the Dormant Commerce Clause of U.S. Const. art. I, § 8, cl. 3, the Equal Protection Clause of U.S. Const. Amendment XIV, §1, and the Substantive Due Process Clause of U.S. Const. Amendment XIV.

## INTRODUCTION

### $2.6 BILLION Dollars A Year and "The Delaware Way:" This Lawsuit Represents A Modern-Day David and Goliath Battle

The right to pursue one's calling free from discrimination and harassment is a fundamental American right. Under the Constitution, a state cannot erect barriers that prevent qualified professionals who live in another jurisdiction from practicing their trades. This has been a fundamental principle in our society since ancient times. In 1798, Andrew Jackson and

others petitioned against a Tennessee state law requiring one-year residency within the state prior to bar admission, asserting that it was "inconsistent with the spirit of the federal constitution which declares that citizens of the United States shall be entitled to all the privileges and immunities of citizenship in the several states." Pratt, Book Review, 41 VAND. L. REV. 667, 671 (1988) (*quoting* J. ELY & T. BROWN, LEGAL PAPERS OF ANDREW JACKSON 102 (1987)).

This case represents a true David and Goliath story in modern times. Plaintiff, a young, inexperienced attorney representing himself, is taking on the greatest, most powerful, and most corrupt giant to ever exist. Indeed, the corruption in this case is so pervasive and systemic that even *this Court* has been complicit in—and has curtailed its own admissions rules to advance—Defendants' unlawful discrimination.

Consequently, Plaintiff is going to expose corruption so deep-seated that even the judge presiding over this case will abandon his or her neutral role to frantically and desperately search for some way to aid the Defendants in eluding their day of reckoning. Undoubtedly, the judge will—like dogma—rubber stamp any (and I mean *any*) boilerplate defense raised by Defendants, regardless of how patently frivolous or inapplicable, and will do so without following the precedent established by the system of justice we have in this Country. Plaintiff states this opinion without running afoul of the ethical rules because this is exactly what Judge Richard G. Andrews did several months ago in another similar lawsuit brought against five of the same Defendants to this case. In *Abbott v. Mette*, Civil Action No. 20-cv-131-RGA, 2021 U.S. Dist. LEXIS 58015 (D. Del. Mar. 26, 2021), the Defendants asserted their (usual) boilerplate claim of *Younger* Abstention and Judge Andrews ate it up like a hungry blue muppet on a cookie binge without conducting the analysis he was required to do by law. A widely accepted exception to

*Younger* is when the plaintiff alleges that the attorney-disciplinary proceedings were "taken in bad faith or for the purpose to harass." *Bishop v. State Bar of Tex.*, 736 F.2d 292, 294 (5th Cir. 1984)(when attorney alleges that bar disciplinary proceedings were taken in bad faith and to harass, *Younger* Abstention is inapplicable). Plaintiff has read the complaint filed by the plaintiff in *Abbott*, and the complaint clearly alleged bad faith and harassment.

It is unavoidable that this case is going to end up in front of the Third Circuit Court of Appeals and will then be appealed to the Supreme Court of the United States. In fact, this case will not receive an impartial review until this case hits the United States Supreme Court.

Defendants have a unique revenue-generating monopoly (their very own exclusive "cash-cow") which is specific to Delaware and not replicated by any other state in this Country. Because it is the corporate capital of the world, the State of Delaware makes approximately **$2.6 billion dollars a year**—over one-third (1/3) of the State's annual income—from its legal industry. And, the Defendants are not even the slightest bit shy about their overt efforts to exclude out-of-state attorneys and prohibit them from interfering with Defendants' corrupt cash-cow.  As this Complaint will demonstrate, just like Defendants' endless power and financial resources enable them to target certain practicing attorneys, their admissions rules—which are glaringly unconstitutional—also enable them to arbitrarily vet applicants to the Bar in ways that violate the Constitution.

Recently, one of Defendants' paragons, a well-connected Delaware Judge presiding over a defamation case, took it upon himself to revoke the *pro hac vice* admission of a non-resident attorney *sua sponte* not due to any violation of the rules of professional conduct—or any lawful reason for that matter—but due to the fact that the attorney did not mesh with what the judge described as the Delaware Way.  *Page v. Oath Inc*., 2021 Del. Super. LEXIS 27, *6, 2021 WL

82383. From what the opinion shows, after the judge took it upon himself to review the attorney's social media posts, the judge revoked the admission of this qualified non-resident attorney for no reason other than the fact that the attorney was a supporter of President Donald Trump during the 2020 election result dispute. *Id*.

### *Plaintiff Is Going to Slay The Giant And Open Up The Floodgate That Will Forever Change The System of Justice We Have In This Country*

This lawsuit will disembowel the corruption currently plaguing this Nation. All of the major corruption in this Country is enabled by, protected by, and has its roots in, Delaware. The Defendants shield the corruption through their corporate law system and exclusive admissions rules, which in turn benefits the Defendants—as well as the entire State of Delaware—with a $2.6 billion dollar a year money spinner they pocket at the exclusion of the other 49 states.

Currently, the most evil and corrupt organizations in this Country get a free-pass from culpability because of Defendants' unconstitutional admissions rules. Defendants control who gets into their Bar, as well as who stays in their Bar, which is always limited to those who are either working in a home-grown corporate law firm, or those employed by the public sector (such as a public defender or deputy attorney general). As we have seen, the *pro hac vice* requirements for Delaware are overly restrictive and require the vouching and full-time participation of Delaware local counsel. This severely frustrates the administration of justice in this Country because it places unnecessary barriers on the claims which can be brought against the corrupt organizations currently infecting our Nation. Corporations can only be sued where there is personal jurisdiction, which will always be their state of incorporation.

The largest asset manager in the world, BlackRock Inc., best known for its iShares brand of exchange-traded index funds, has $7 trillion under management. Index pioneer Vanguard Group Inc. has $5.6 trillion. These companies together hold about 80% of all indexed money and

are "the most important players in corporate America." *See* Mclaughlin, D. (2020, January 9). *The Hidden Dangers of the Great Index Fund Takeover*. Bloomberg Businessweek. Retrieved October 26, 2021, from https://www.bloomberg.com/news/features/2020-01-09/the-hidden-dangers-of-the-great-index-fund-takeover.

BlackRock and Vanguard own and control the major media outlets, the social media outlets, as well as the pharmaceutical giants that are currently pumping the COVID-19 vaccine into Americans. BlackRock and Vanguard are Delaware-incorporated companies that indulge in the U.S. financial oasis Delaware offers in its tax loopholes, exclusive bar, and corporate-friendly court system. *See Hartsel v. Vanguard Gp., Inc.* , No. 5394-VCP, 2011 Del. Ch. LEXIS 89 (Ch. June 15, 2011).

These companies are also controlled by the notorious George Soros—a festering malignancy in our Country—who purchased a majority of their stock with his investment company, Soros Fund Management LLC. *See* Ablan, J. (2018, August 14). *Soros Fund Management Adds Popular Tech Names, Blackrock In Second Quarter*. Thompson Reuters. Retrieved October 26, 2021, from https://www.reuters.com/article/us-investment-funds-soros-fund-mgmt/soros-fund-management-adds-popular-tech-names-blackrock-in-second-quarter-idUSKBN1KZ2KF. A fact that will likely make the reader cringe is that Soros Fund Management LLC is also incorporated in Delaware, and it too indulges in the illegitimate protections Defendants provide:

| Entity Details | | | |
|---|---|---|---|
| | **THIS IS NOT A STATEMENT OF GOOD STANDING** | | |
| File Number: | 2679102 | Incorporation Date / Formation Date: | 10/31/1996 (mm/dd/yyyy) |
| Entity Name: | SOROS FUND MANAGEMENT LLC | | |
| Entity Kind: | Limited Liability Company | Entity Type: | General |
| Residency: | Domestic | State: | DELAWARE |

**REGISTERED AGENT INFORMATION**

| Name: | THE CORPORATION TRUST COMPANY | | |
|---|---|---|---|
| Address: | CORPORATION TRUST CENTER 1209 ORANGE ST | | |
| City: | WILMINGTON | County: | New Castle |
| State: | DE | Postal Code: | 19801 |
| Phone: | 302-658-7581 | | |

Defendants' top illuminati and showpiece, President Joseph R. Biden Jr., is presently taking efforts to strip this Nation of its liberty by strongarming Americans into getting the COVID-19 vaccine. In fact, his administration has now opened doors for our Nation's children to be injected with this new mystery substance—as if the pharmaceutical companies benefiting from these vaccines have such a good track record of placing the safety of men, women, and children before the lure of commercial profits.

The top vaccine manufacturers—AstraZeneca, Moderna, Novavax, and Pfizer—are all incorporated in Delaware and in the event that innocent parties are harmed by these vaccines, the perpetrators will be shielded by Defendants' unconstitutional admissions rules, just like George Soros' company. Because personal jurisdiction applies to these characters, any person or child harmed will be at the mercy of whether a Delaware Attorney will take (or agree to strictly oversee) the case, which is unlikely to happen due to Defendants' unconstitutional vetting.

This lawsuit will open up the floodgate. Soon, the Delaware Bar will be open to every qualified applicant that wants to become licensed, regardless of their residency. Delaware will have applicants from all 50 states that will not be subjected to Defendants' durational-residency requirements. Similarly, the Defendants will be forever enjoined from their selective and

arbitrary targeting of applicants and attorneys in ways that violate the Constitution. Soon, Delaware will be a melting pot filled with qualified professionals that will not be subjected to fear or intimidation; attorneys and bar applicants will be answerable only for actions which violate the rules of professional conduct--not their likelihood of hindering Defendants' economic interests.

### *Nutshell Overview of This Lawsuit For Organization and Clarity*

In a nutshell, this Complaint is comprised of five (5) separate parts:

A. Under 42 U.S.C. §1983, Plaintiff seeks a Temporary Restraining Order ("TRO") and Preliminary Injunction relating to unconstitutional delay. Plaintiff further seeks monetary damages against the specified Defendants for their needless delays imposed intentionally and in bad faith and their intentional sabotaging of Plaintiff's admissions process in ways that violate Plaintiff's constitutional rights;

B. Under the Privileges and Immunities Clause of U.S. Const. art. IV, §2, cl. 1, issue a preliminary injunction, permanent injunction, and declaratory relief invalidating four of Defendants' admissions rules specified in this Complaint;

C. Under the Dormant Commerce Clause of U.S. Const. art. I, § 8, cl. 3, issue a preliminary injunction, permanent injunction, and declaratory relief invalidating four of Defendants' admissions rules specified in this Complaint;

D. Under the Equal Protections Clause of U.S. Const. Amendment XIV, issue a permanent injunction and declaratory relief invalidating four of Defendants' admissions rules specified in this Complaint; and

E. Under the Substantive Due Process Clause of U.S. Const. Amendment XIV, and using the rational basis review test, issue a permanent injunction and declaratory relief invalidating four of Defendants' admissions rules specified in this Complaint.

## THE PARTIES

1.      Plaintiff Brooks M. Witzke is an Idaho resident, a citizen of the United States, a lawyer, a graduate of an ABA accredited law school, and he successfully passed the Delaware Bar Exam in July of 2019.

2.       Defendant Collins J. Seitz ("Seitz"), Jr. is a Delaware resident and the Chief Justice of the Delaware Supreme Court ("Supreme Court"). Seitz is being sued in his official capacity for prospective injunctive and declaratory relief under the *Ex Parte Young, 209 U.S. 123, 159-160 (1908)* exception to Eleventh Amendment immunity. *Accord Koslow v. Commonwealth of Pennsylvania,* 302 F. 3d 161, 168 (3rd Cir. 2002).

3.       Defendant James T. Vaughn, Jr. ("Vaughn") is a Delaware resident and a Justice of the Supreme Court. Vaughn is being sued in his official capacity for prospective injunctive and declaratory relief under the *Ex Parte Young, 209 U.S. 123, 159-160 (1908)* exception to Eleventh Amendment immunity. *Accord Koslow,* 302 F. 3d at 168.

4.       Defendant Tamika R. Montgomery-Reeves ("Montgomery-Reeves") is a Delaware resident and a Justice of the Supreme Court. Montgomery-Reeves is being sued in her official capacity for prospective injunctive and declaratory relief under the *Ex Parte Young, 209 U.S. 123, 159-160 (1908)* exception to Eleventh Amendment immunity. *Accord Koslow,* 302 F. 3d at 168.

5.       Defendant Gary F. Traynor ("Traynor") is a Delaware resident and a Justice of the Supreme Court. Traynor is being sued in his official capacity for prospective injunctive and declaratory relief under the *Ex Parte Young, 209 U.S. 123, 159-160 (1908)* exception to Eleventh Amendment immunity. *Accord Koslow,* 302 F. 3d at 168.

6.       Defendant Karen L. Valihura ("Valihura" and collectively referred to with Seitz, Vaughn, Montgomery-Reeves, and Valihura as the "5 Members") is a Delaware resident and a Justice of the Supreme Court. Valihura is being sued in her official capacity for prospective injunctive and declaratory relief under the *Ex Parte Young, 209 U.S. 123, 159-160 (1908)* exception to Eleventh Amendment immunity. *Accord Koslow,* 302 F. 3d at 168.

7.      Defendant Jennifer C. Wasson ("Wasson") is a Delaware resident and is the Chair of the Delaware Board of Bar Examiners ("DBBE"). The DBBE is a committee created by the Supreme Court for the purposes of executing the Supreme Court's orders and instructions relating to the admission of applicants to the Delaware Bar, as set forth in Del. Sup. Ct. R. 51. At all relevant times to this Complaint, Wasson acted under color of law as an agent or employee of the Supreme Court and is being sued individually and in her official capacity.

8.      Defendant Randolph K. Herndon ("Herndon") is a Delaware resident and committee member for the DBBE. Herndon also serves as the Panel Chairman for Plaintiff's bar admissions hearing. At all relevant times to this Complaint, Herndon acted under color of law as an agent or employee of the Supreme Court and is being sued individually and in his official capacity.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §1331, 1343(a)(3), 18 U.S.C. 1964, and 42 U.S.C. 1988 since this case arises under the laws of the United States and jurisdiction is expressly provided for all claims under 42 U.S.C. 1983, U.S. Const. art. IV, §2, cl. 1, U.S. Const. art. I, § 8, cl. 3, and U.S. Const. Amendment XIV. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

10.      Plaintiff is asking this Court to declare his rights and other legal relations under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

11.      Personal jurisdiction in this judicial district over the Defendants is proper because they all reside in the State of Delaware or have contacts with the State of Delaware, including offices, such that the exercise of personal jurisdiction will not offend the notions of fair play and substantial justice.

12.     Venue is proper in this Court pursuant 28 U.S.C. §1391(b) because the events giving rise to the suit occurred in this judicial District.

**STATEMENT OF FACTS**

**Defendants' Motive for Discrimination: $2.6 Billion Dollars a Year and Maintaining The Prerogative of Their Illegitimate Crown**

13.     The Supreme Court—the ultimate authority over the Delaware Bar—published a very detailed study in June 2019 addressing the financial gain the State derives from its legal industry and further detailed the need to keep the Bar small and exclusive by "fostering home-grown law firms" and preventing the influx of out-of-state law firms and attorneys that would otherwise come to Delaware to practice law.  For purposes of this litigation, the study is one of many pieces of evidence Plaintiff will present that is highly probative of Defendants' protectionist; discriminatory motives[1]. The study states, in relevant part:

Delaware is the corporate capital of the world because of its sophisticated business laws and highly respected judicial system. . . .

The legal industry contributes $2.4 billion to Delaware's economy, with legal sector jobs contributing to the state's gross domestic product at double the rate of other major sectors. While the legal industry contributed $1.74 billion directly through the industry itself, the multiplier effect of the industry provides an additional $731 million to the state's gross domestic product, as firms and employees make purchases in Delaware . . .

One of main reasons for this considerable economic impact is Delaware's ability to attract out-of-state business, which it does better than any other state except for New York. Wilmington is home to offices of 19 of the largest law firms in the country, a number unmatched by comparable or even larger cities . . .

The Delaware legal industry is part of, and prospers from, the state's "Corporate Franchise," Delaware's historic and unique role as the situs for the formation of public corporations. Over 60% of Fortune 500 companies are in Delaware, and

---

[1] During my second year of law school, my Constitutional Law Professor, Professor Mckay Cunningham, lectured the class that when challenging a law under strict scrutiny "you will never, in all of your career, find that smoking gun memorandum published by the government agency, it just never happens, you will have to do discovery." Well . . . I guess I showed him.

<u>Delaware courts serve as a center of corporate, bankruptcy, and intellectual property disputes</u> . . .

Comparing the legal industry in Delaware to that in other jurisdictions, the study also details the presence of Delaware offices for the world's top law firms, as well as the per capita employment created by the Delaware legal industry compared to that of other states . . .

Providing historical context for the evolution of this industry in Delaware, the study concludes this significant contribution is not mere happenstance. Instead, it is the result of **a deliberate and concerted effort of members of the legal industry, including attorneys and judges, together with members of the executive and legislative branches of Delaware government, to preserve and foster Delaware's status as a national legal center** . . .

The role the legal industry plays in making Delaware a hub for national commerce is exemplified by the extent to which the leading national law firms both locate and appear in Delaware. As a leading venue for corporate, commercial, patent, and bankruptcy law, **Delaware attracts law firms and individual attorneys from across the country**. Indeed, **Delaware attracts more out-of-state legal business than any comparably sized state**. As Chart 3 below illustrates, Delaware is only surpassed by New York as a provider of out-of-state legal services . . .

Each year, approximately **4,500 attorneys who are not active members of the Delaware Bar are admitted temporarily for the purpose of participating in particular cases**. Many of the cases in which they appear are directly related to Delaware's Corporate Franchise. The vast majority of these pro hac vice—a Latin phrase meaning "for this occasion or particular purpose"—admittees are from out-of-state, and their combined admission assessments contribute approximately **$1.7 million annually to the overall operating costs of the Supreme Court** and its regulatory agencies, which are known as the Arms of Court . . .

**This influx of out-of-state attorneys** is far more significant than the admission fees alone, as these attorneys—along with their staff, consultants and other members of their teams—generate additional revenue for Delaware's real estate, hospitality, and restaurant industries. To provide context, the study includes anecdotes from members of this broader community, including a large commercial relator who reveals that 85% of his company's tenants are law firms and a restaurant that reports 50% of its revenues are attributable to the patronage of the legal industry . . .

Delaware's success in **fostering home-grown firms** and attracting national firms and prominent co-counsel provides benefits that go beyond the legal sector and back-office industries . . .

Much of this revenue is generated from out-of-state sources and helps fund our schools, public safety, medical care for the poor, and other priorities. Specific

carve-outs for revenue also flow directly to city and county governments to support the services they provide.

Simply put, the robust tax revenue associated with the legal industry is not limited to the direct taxes from law firms and those working in this industry; it includes the revenue created by the Delaware Corporate Franchise, of which this industry is an integral part.

In the end, the study makes clear the contributions of the legal industry to the state are significant by almost any measure. **The study also cautions that maintaining Delaware's preeminence as a legal center and all the resultant benefits requires the consistent and thoughtful cooperation and support of several Delaware constituencies**. The industry is largely anchored in the well-supported view of decision-makers in the national and international business community that Delaware is the first choice for their corporate home and the first choice for the resolution of their most important disputes. **Other jurisdictions continually try to convince these same decision-makers otherwise. It is critical that industry representatives, the judiciary, elected officials, and policymakers continue to be vigilant in their efforts to keep Delaware first**.

This study, with its review of the history of the Corporate Franchise, **demonstrates that a continued commitment by the private legal sector, judiciary, and executive and legislative branches is required for Delaware to maintain its current prominence and continue to deliver the substantial benefits Delaware enjoys as a result.**

*See* Chief Justice Leo Strine, *The Contributions Of The Legal Industry To The Delaware Economy*. Study Published Jointly by the Delaware State Bar Association and the Delaware Supreme Court (June, 2019) https://www.dsba.org/resources/court-links/; *See also* **Exhibit A** (Emphasis added).

14.     The Supreme Court's study also indicates that, in addition to the financial benefit the *State* derives from the Bar's exclusivity, all private/individual members of the Delaware Bar benefit as well: "[a]ccording to the Delaware Department of Labor's most recent comprehensive study on Delaware wages, the annual mean wage among Delawareans employed in the 'legal' occupational group was $119,131—the fourth highest level in the country and more than double the statewide average of $52,203." *Id*. at 9. And "while Delaware's salaries within the legal occupation rank as the fourth highest in the country, Delaware ranks ***first*** in average salaries within the legal services industry due to comparatively high salaries of individuals in non-legal occupations, such as IT, within the legal industry." *Id*. at 9-10. (Emphasis added).

12

15.     In addition to what is noted in the study, Delaware's corporate attorneys—who just so happen to account for 95% of the DBBE's committee members—get additional profits from out of state attorneys who pay significant fees to have a Delaware Lawyer oversee their participation in a case *pro hac vice*. The study finishes off with a relevant addition indicating that the information provided does not include all the financial motives that exist for Defendants:

> [t]he legal industry perhaps has the largest impact on the economy of the state of Delaware, and the city of Wilmington . . . [i]t would be difficult to fully estimate the impact that the legal industry has on Delaware's economy. *Id*. at 21.

16.     The financial benefit and motivation for exclusivity has intensified in more recent years. Indeed, "[f]or most of the twentieth century, Delaware's advantage in corporate law was just that, an advantage in corporate law. This provided substantial benefits to the state, but they were far more limited than today." *Id*. at 33.

17.     Since the Supreme Court's 2019 publication, more of the Defendants' protectionist motives have come to light. The Five Members—the Defendants who approve the admissions rules for the Bar—are currently using their previous efforts at economic protectionism as justification for each member to get raises and line their own pockets with the proceeds! *See* **Exhibit B.**

18.     As the Five Members indicate in their 2019 study, the astronomical profits the State of Delaware derives are only possible as a result of exclusivity; keeping the Delaware Bar small and excluding out-of-state attorneys. Consequently, the Delaware Bar goes through *rigorous* measures to protect its own financial and pecuniary interests by intentionally creating and maintaining bar admissions rules with a protectionist—and discriminatory—purpose.

13

**The Admissions Rules Subject to This Complaint**

19.      The admissions rules being challenged in this action are four (4) separate bar

admissions rules that will be addressed individually herein. As stated previously, the Delaware

Bar is unlike any other bar in the Country, and perhaps the world. In Delaware, passing the

hardest bar exam in the Country is not the final hurdle to one's admissions process. In every

other state, passing the bar exam is the hard part.

20.      Once an applicant passes the Delaware Bar Exam, the applicant must complete at

least five (5) months of strenuous admissions requirements that require the applicant to be

physically present in the State of Delaware for at least fifty (50) hours per week. The

requirements must be completed within one year of passing the bar exam or the applicant's

passing score is erased. There are three separate admissions requirements addressed below.

21.      ***The Five-Month Clerkship Requirement*** ("Clerkship"):

That, as shall be certified by both the applicant and the applicant's Preceptor, the
applicant has served a clerkship in the State of Delaware under the <u>direct and
constant supervision</u> of a member of the Bar of this State qualified as set forth in
subparagraphs (i)-(iii) aggregating substantially full-time service for at least 5
months' duration, which period need not be continuous but which may not begin
prior to matriculation at a law school described in subparagraph (5) of paragraph
(a) of this Rule 52. For purposes of this Rule 52(a)(8), 5 months is 21 forty-hour
work weeks.
**(i) Law office/legal department. --** In the office of or under the direct and
constant supervision of the applicant's Preceptor, or under the direct and constant
supervision of such other member of the Bar of this State who is satisfactory to
the applicant's Preceptor and who has been a member of the Bar of this State for
at least 5 years;
**(ii) Law clerk. --** As a law clerk of a justice or judge of the courts of this State or
of a United States judge residing in Delaware; or

**(iii) Public office. --** In the office of the Department of Justice of the State of
Delaware, the office of the Public Defender of the State of Delaware, the office of
the United States Attorney for the District of Delaware, the office of the City
Solicitor of the City of Wilmington, the office of Community Legal Aid Society,
Inc., the office of Delaware Volunteer Legal Services, Inc. or in the office of a
related or similar organization approved by the Board upon the request of an

14

applicant, under the direct and constant supervision of a member of the Bar of this State who has been a member of the Bar of this State for <mark>at least 5 years.</mark>

Del. Sup. Ct. R. 52(a)(8). The Clerkship must be completed on Delaware soil for the applicant to be given credit; the Clerkship *may not* be completed in any other state other than Delaware. *See* **Exhibit C; Exhibit D; Exhibit E.**

22.     ***Checklist Of Legal Activities*** ("Checklist"):

That the applicant has performed such legal tasks and activities related to the practice of law in Delaware as the Board shall direct and furnish in the form of a checklist to all applicants for admission, with the completion of such tasks and activities to be certified by both the applicant and the applicant's Preceptor.

Del. Sup. Ct. R. 52(a)(9). The Checklist is a red herring. Although it may appear to be required for the educational benefit of applicants, the Checklist is actually comprised of twenty-six (26) different types of hearings in various Delaware Courts, all of which are vastly distinctive and cover areas of law that do not even involve attorney representation. *See* **Exhibit D**. To elaborate, the Checklist contains very specialized hearings that are infrequent, hard to catch, only happen once a month, and are spread across different parts of the State. This Checklist was created as a measure to strengthen the need for prolonged physical presence in the State and create difficulty for out-of-state persons to complete the requirements. The Checklist is comprised of hearings that an applicant must attend ***in person*** and the hearings are many times so elusive that Bigfoot himself would be jealous, such as the criminal trial in the Court of Common Pleas which almost never happens. Completing the Checklist is a full-time job in and of itself, in addition to the Clerkship one must do concurrently.

23.     ***10-Year Member- Preceptor Requirement*** ("Preceptor"), is a requirement so inviting of discrimination its very text broadcasts its own disingenuous roots:

That the applicant is vouched for by a member of the Bar of this State who shall have been a member of the Bar of this State for at least 10 years, and such person shall be designated as the Preceptor for such applicant.

Del. Sup. Ct. R. 52(a)(2). Additional regulations for the Preceptor requirement are set forth below in Delaware Board Rule 10 ("Del. BR 10").

### Del. BR 10: Qualifications and Duties of a Preceptor

**(a) Qualifications. --** An attorney is qualified to act as a preceptor if the attorney has been admitted to the Bar of the Supreme Court for at least ten (10) years prior to undertaking the duties of a preceptor, and if the attorney attends during the year in which the attorney serves as preceptor, or has attended within the previous three (3) years, a meeting of the preceptors held at such time or times as the Board may designate.

**(b) Duty to confer and monitor. --** A preceptor shall mentor an applicant with respect to civility, legal ethics, professionalism and the expected conduct and obligations of a member of the Bar. In order to confirm the applicant's compliance with the clerkship and checklist of legal activities requirements set forth in Supreme Court Rules 52(a)(8) and 52(a)(9), a preceptor shall confer on a frequent and regular basis with the applicant.

**(c) Duty to review. --** A preceptor must personally review the applicant's Application for Admission to the Delaware Bar ("Application") and First Affidavit of Completeness and discuss the Application and First Affidavit of Completeness with the applicant to the extent necessary to allow the preceptor to reasonably conclude that (1) the applicant has either (i) provided all information and documents required to be submitted with the Application or (ii) provided a reasonable explanation why missing information and documents have not been submitted and identified when the applicant expects the Board will receive the information or documents, (2) the information and documents disclosed in and with the Application are factually accurate, and (3) the First Affidavit of Completeness is factually accurate and contains no omission of any fact required to be disclosed.

**(d) Duty to certify. --** A preceptor shall have a duty to execute: (i) a Preceptor's Certificate, in the form made available by the Board, certifying to the Board on or before September 1 that the preceptor has complied with the requirements of paragraphs (a)-(c) of this Rule; and (ii) a Preceptor's Law Clerk Schedule Certificate, in the form made available by the Board, certifying to the Board at the appropriate time that the applicant has completed the 5 month (21 forty-hour work weeks) clerkship and checklist of legal activities requirements set forth in Supreme Court Rules 52(a)(8) and 52(a)(9) and reviewed the Statement of Principles of Lawyer Conduct in Supreme Court Rule 71.

Del. BR 10.

24.     To add insult to injury, the Preceptorship imposes other requirements upon an applicant's preceptor which are not contained in the rules cited in the preceding paragraphs. The Delaware Bar conducts one of the most extensive background investigations to ever be performed on an individual. In fact, one can obtain top secret Whitehouse security clearance with less vetting than what is performed by the Delaware Bar. Just the application to sit for the Bar is over 1,100 pages long! The extensive background is conducted by two (2) appointed members of Defendants' Board of Bar Examiners and does not involve the applicant's preceptor. However, the "Preceptor's Certificate" referenced in Del. BR 10(d) requires the preceptor to put their name and reputation on the line to attest that they have spent considerable time—in person—with the applicant, that they have done a background check on the applicant, and that the applicant possesses the requisite moral character to practice law in Delaware. *See* **Exhibit E**; **Exhibit F.** And, a preceptor that signs a certificate without first conducting this extensive inquiry—and cannot state the facts from which they formed the determination—is subject to being disciplined by the Delaware Office of Disciplinary Counsel. *See In re Dillon*, 176 A.3d 716 (Del. 2017); *In re Green,* 464 A.2d 881, 883 (Del. 1983).

### Delaware's Admission Rules Are Both Facially Invalid And Are Invalid Under The Discriminatory Impact and Discriminatory Intent Test

25.     The Clerkship, Checklist, and Preceptor requirements were originally enacted and are currently maintained for the protectionist purpose of burdening out-of-state citizens. The rules were created and are maintained for the express purpose of limiting the number of practicing attorneys in Delaware to those physically-present in the State in order to advance the economic benefit of the State, the individual members of the Bar who profit and pay taxes to the State, the Delaware Judiciary, and the local industries supporting the legal profession. The

purpose and effect of these Rules is neither to ensure legal competency—nor to advance any lawful purpose—but to exclude non-residents and thereby create a commercial monopoly for Delaware.

26.     The discriminatory purpose behind the rules is longstanding in Delaware history. For example, just look at this Continuing Legal Education ("CLE") course taught by Defendant Wasson—<u>The Chair of the Board of Bar Examiners who has waged a war of attrition against Plaintiff for the past two years</u>:



27.     The rules complained of have had vast, far reaching, and devastating impacts upon out-of-state attorneys and law firms who have wanted to become licensed in Delaware. Tens of thousands of otherwise qualified attorneys have been harmed from the inherent discrimination.

28.     As set forth in detail in the remaining sections of this Complaint, Plaintiff was one of the attorneys/applicants adversely impacted by the discriminatory admissions rules complained of and he has suffered a personal cognizable injury as a direct and proximate result.

29.     The rules complained of facially discriminate against out-of-state attorneys; it would be physically impossible for an out-of-state attorney from Idaho, for example, to complete

the admissions requirements absent relocation and prolonged physical presence in the State for a minimum of five (5) months. Non-resident attorneys would be required to give up their law practice and livelihood for these five months.

30.     It is also telling that the rules allow for persons to complete some (but not all) of the admissions requirements during law school. *See* Del. Sup. Ct. R. 52(a)(8). So who does this help? Who is physically located in Delaware during law school? The answer: (1) Delawareans that go to the Delaware Law School; and (2) law students who are Delaware residents and come home for the summer to stay with their parents. Where many preceptorships are completed by applicants unpaid, this provides further advantage to Delaware residents at the expense of nonresidents who cannot afford to work for free for five months with student loan payments and the need to earn a livelihood.

31.     Although the federal courts have invalidated state bar durational residency requirements over the past century, the Defendants' admission rules are of a *worse* stripe because they do not simply require one to declare residency in Delaware for five months, the rules actually strongarm applicants with a greater force by requiring them to be on Delaware soil continuously, for at least fifty (50) hours a week for at least five (5) months. The Clerkship is already a full-time requirement that one must be on Delaware soil for 40 hours a week for five months, but the burdensome Checklist requirements and the frequent in-person meetings with the preceptor (sufficient to build a trustful bond) *compound* this discriminatory impact. At minimum, one must be on Delaware soil for *at least* fifty (50) hours per-week for *at least* five (5) months. Put simply, Delaware imposes three admissions requirements that are not only a trojan horse for a durational residency requirement, but a durational residency requirement on steroids!

32.     The Rules complained of also have a directly adverse effect on interstate commerce by both prohibiting access to the interstate market and by imposing burdensome regulations on that market. Corporations and businesses from across the United States—whether incorporated in Delaware or hauled into Delaware for a dispute—would save hundreds of millions of dollars per year if they were not made to hire local-Delaware attorneys for corporate disputes. Similarly, non-resident attorneys and corporate law firms from across America would commercially benefit, substantially, if the Delaware admissions rules were not designed to burden non-residents from practicing law in the Delaware Courts.

33.     The Rules' requirements deny a nonresident attorney, who might be otherwise eminently qualified, the right to practice law on a multistate basis. Plaintiff is one of the persons wishing to engage in multistate practice who is being adversely impacted.

### Even if the Rules In Question Were Facially Neutral and Did Not Have A Discriminatory Impact and Intent, Strict Scrutiny Still Applies Because The Rules Are Discriminatorily Applied

34.     When reviewing whether a statute should be subjected to strict scrutiny, a law that appears to be neutral on its face can be applied in a different manner to different classes of persons. If the persons challenging the governmental action can prove that the government officials applying the law had a discriminatory purpose (and used discriminatory standards based on traits such as residency or economic protectionism), the law will be invalidated. *Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

35.     Focusing specifically on the <u>Preceptor</u> requirement, it is the worst of the three Rules. Defendants already impose oppressive burdens that each applicant must complete to be admitted with the <u>Clerkship</u> and <u>Checklist</u> requirements. But why is there the need to have a ten (10) year member of the Bar (a Preceptor) meet with the applicant frequently throughout the

process, oversee and review the entire application, ensure completeness of the Clerkship and Checklist, and to ensure that the applicant understands the traditions of the "Delaware Way?" Is not a man or woman who graduates from an ABA accredited institution and then passes the hardest bar exam in the world capable of filling out his or her own application?

36.     Additionally, one must also ask why the Preceptor is required to conduct his or her own investigation into the applicant's moral character, in addition to the investigation conducted by the two members of the DBBE—which is already the most extensive background investigation in the Country ever to be performed on a professional license applicant.

37.     The answer to these questions lies in the *Preceptor Certification*. In addition to strictly overseeing all aspects of the admissions process and application and certifying as to their completion, the Preceptor is also required to certify under oath that s/he has conducted an investigation of the applicant's moral character and that the Preceptor vouches—placing their name and reputation on the line at the risk of disbarment should they do so wrongly—that the applicant has the requisite moral character to practice law.

38.     Defendants have a longstanding ploy which has been used pervasively in the past against qualified applicants. Defendants will intentionally "scare off" an applicant's preceptor to thwart the applicant's admission by either: (1) finding some frivolous deficiency in the 1,100 page application and contending the Preceptor has not done his/her job; (2) telling the Preceptor negative things about the applicant and inferring that the Preceptor cannot sign the certificate in good faith; or (3) (most common) meeting with the Preceptor privately, buttering them up, and convincing them that they would be doing Defendants a favor if they withdrew from the application. Any practicing 10-year veteran in the State would accommodate Defendants' request in order to curry favor or avoid potential adversity with licensing authorities.

39.     In the first two instances referred to in the preceding paragraph, the Defendants meet with the Preceptor secretly—without the applicant's knowledge—and Defendants blatantly tell the Preceptor that they could be subject to bar discipline if they sign the certificate. After putting the fear of God in the Preceptor, including showing them Delaware cases where Preceptors were sanctioned, Defendants then propose that the Preceptor withdraw from the applicant's application to avoid the dilemma.

40.     After the Preceptor withdraws, Defendants contact the applicant and tell them "oh, your Preceptor bailed on you, that is too bad, you are on your own now and your application will be deemed 'incomplete' until you find a new Preceptor to sign off on the application." The thing is, once a preceptor has withdrawn from an applicant, it is almost *impossible* to get a replacement preceptor. It places a blackmark on the applicant indicating Defendants do not like them, and any 10-year member of the bar knows to avoid that applicant like the plague.

41.     Almost always, Defendants have scared the preceptor off when the applicant was just days or weeks shy of completing the Clerkship and Preceptorship, and there is normally only several months left before the applicant's passing score expires. It is Defendants' hope that the applicant's passing score expires and that the applicant simply gives up and moves on to another state.

42.     Defendants utilize this ploy to arbitrarily discriminate against applicants not based upon their competency to practice law, but based upon Defendants' protectionist objectives.

43.     In addition to the allegations made above, both the Preceptorship Requirement and the 5-Month Clerkship enable Defendants to closely observe an applicant for a full five months—prior to admission—while working in their choice of employment, which provides Defendants the opportunity to determine whether a passing applicant will work in a "home-

22

grown" corporate law firm or will choose to practice law out-of-state. If Defendants are of the impression that the applicant will likely practice law out-of-state after being admitted, then the Defendants use their admissions rules to intentionally sabotage the applicant's admission. The Defendants do not do this for resident-attorneys working for a Delaware law firm.

44.     Upon information and belief, all three of the admissions requirements subject to this Complaint have been secretly waivered for select applicants with connections to Defendants, such as those with families who are a part of Defendants' milieu, as well as those with families that are politically connected in Delaware.

### Even if Strict Scrutiny Was Inapplicable, The Admissions Rules Are *Still* Invalid Because They Are Not Rationally Related to a Legitimate Government Interest

45.     In addition to the Rules' invalidity under strict scrutiny, the rules are further invalid under rational basis review because they are not rationally related to any legitimate government purpose; they serve no lawful purpose other than as arbitrary tools to deprive persons of their livelihood without due process of law.

46.     Consider the following two quotes. Both come directly from our Nation's highest court: the Supreme Court of the United States:

> Irrespective of whether the practice of law is a "right" or "privilege," a person cannot be prevented from practicing law except for valid reasons, such practice not being a matter of the state's grace.

*SCHWARE v. Bd. OF BAR Exam'rs OF N.M.*, 77 S. Ct. 752, 753 (1957).

> The issue presented is justiciable. A claim of a present right to admission to the bar of a state and a denial of that right is a controversy. Moreover, the requirements of procedural due process must be met before a State can exclude a person from practicing law. A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment. As the Court said in *Ex parte Garland*, 4 Wall. 333, 379, the right is not "a matter of grace and favor."

*Willner v. Comm. on Character & Fitness*, 83 S. Ct. 1175, 1179-80 (1963)(internal citations and quotations omitted).

47.    The Defendants have taken these sacred rulings from our Nation's highest court and (metaphorically speaking) used them to wipe their rear-ends. Defendants act as if their right to arbitrarily impose oppressive burdens on select applicants for admission to the bar is a vestigial survival of the prerogative of the Crown.

48.    First and foremost, the purpose of the three admissions rules, according to Defendants, is as follows:

> The clerkship requirements are intended to make the clerkship a meaningful
> teaching mechanism to help insure [sic] that an applicant's preparation for
> admission includes a bona fide exposure to the practical aspects of law practice
> and the traditions of the Delaware Bar.

*See* **Exhibit F**; Delaware Supreme Court Justice Randy J. Holland. *The Delaware Clerkship Requirement: A Long-Standing Tradition.* The Bar Examiner. (November, 2009). https://courts.delaware.gov/forms/download.aspx?id=103428

49.    Assuming that Defendants' justification for the rules is truthful and candid, then the rules are not rationally related to a legitimate government purpose. Plaintiff found a case which determined, under rational basis review, the constitutionality of an admissions requirement which was similar—but *less* discriminatory—than the three subject to this Complaint:

> Aside from legal usage and practices, which are mostly learned in active legal
> practice, we find no rational relationship between "fitness or capacity to practice
> law" and a knowledge of "local custom." **Neither legal competence nor ethical
> fitness depends upon cultural provincialism**.

*Keenan v. Bd. of Law Exam'rs*, 317 F. Supp. 1350, 1359 (E.D.N.C. 1970)(Emphasis added).

## The History of Arbitrarily Targeting Solo Practitioners For Economic Protectionism—The Delaware Way

50.     Defendants' corruption is not limited to the targeting of bar applicants. The Delaware Bar has a longstanding practice of pursuing solo practitioners who do not fit into what they describe is "The Delaware Way." This is because the Defendants want to purge the Bar of any practitioner that does not practice in one of its elite corporate law firms and who may take their solo practice out-of-state. Every chief bar counsel for the Delaware Office of Disciplinary Counsel ("ODC") for the past decade has advanced this discriminatory practice.

51.     From 2011 to 2019, the ODC was headed by Jennifer-Kate Aaronson ("Aaronson"). Aaronson was caught red-handed trying to target attorney Richard Abbott ("Abbott"), a solo practitioner, and she was brought to justice. *See Abbott v. Del. State Pub. Integrity Comm'n*, No. N16A-09-009 FWW, 2018 Del. Super. LEXIS 99, at *3 (Super. Ct. Feb. 28, 2018)*; State ex rel. Abbott v. Aaronson*, No. N18M-01- 121 EMD, 2018 Del. Super. LEXIS 1950 (Super. Ct. June 12, 2018); *affirmed by State ex rel. Abbott v. Aaronson*, 206 A.3d 260 (Del. 2019). Aaronson's employment soon ended after being exposed.

52.     Aaronson's successor, Luke Mette ("Mette") was worse than Aaronson. Mette continued the same exact practice as Aaronson, which involved targeting solo practitioners for economic-protectionist purposes to advance The Delaware Way. Just like Aaronson, Mette tried to target Abbott with fabricated ODC charges and was sued and Mette's career at the ODC soon ended. *See Abbott v. Mette*, Civil Action No. 20-131-RGA, 2021 U.S. Dist. LEXIS 17913 (D. Del. Jan. 31, 2021); *Abbott v. Mette*, Civil Action No. 20-cv-131-RGA, 2021 U.S. Dist. LEXIS 58015 (D. Del. Mar. 26, 2021); *Abbott v. Vavala*, No. 2021-0409 JJC, 2021 Del. Ch. LEXIS 137 (Ch. June 30, 2021).

**About Stephanie Tsantes of The DBBE: A Vulnerable Woman Defendants Used To Execute Their Discriminatory Agenda**

53.     Tsantes is an attorney employed by the Delaware Office of Public Defender and also serves as an investigator for the DBBE.

54.     Tsantes has a troubling history which has given her a less than admirable reputation in the Delaware legal community. Plaintiff will stress, at the outset, that the purpose of this section is not to engage in *ad hominem* attacks, only to provide information relevant to why Ms.Tsantes was so manipulable to executing Defendants' unlawful demands. I mention this history only to put this case in context, and not in criticism of Ms. Tsantes for pursuing her cause.

55.     Tsantes has a history of prescription opiate and alcohol abuse, and she commonly initiates trouble for other attorneys as a method of improving her own self-image and confidence. Tsantes often points the finger thinking that doing so makes her come across as adhering to a stricter code of ethics than those she accuses.

56.     Tsantes has also struggled in her legal career, even prior to her battle with addiction. Plaintiff has reviewed dozens of cases Tsantes served as defense counsel in over the years but has been unable to locate a single trial where Tsantes was ever successful. In fact, Tsantes was once sued by her dentist and tried to represent herself. Upon information and belief, Tsantes chose to fight the suit, asked for a trial, and she attempted to represent herself. Ultimately, Tsantes had to pay her medical bill; losing the trial to the dentist's elderly secretary who had never set foot in a law school. *See* JP17-09-002158 - *Norman S Steward DDs vs. Stephanie Tsantes.* After losing miserably to the elderly secretary, Tsantes cried hysterically in the courthouse and had to be escorted out by the bailiff.

57.     Some time ago, Tsantes became enamored with the idea that she was qualified to become a judge despite her less than admirable reputation and her animosity with colleagues. Unfortunately, once she embraced this idea, she mounted herself on a hobbyhorse from which nothing has dislodged her.

58.     In fact, Tsantes sought three (3) judicial appointments during Plaintiff's application process and was obviously not considered for any of them.

59.     Tsantes has been so desperate for a position of authority that she often impersonates judicial officials. Because she volunteers for the DBBE, which is a branch of the Supreme Court, Tsantes goes around telling people that she is a "part time" or "volunteer" supreme court justice. Plaintiff has done a diligent search and has found no evidence that Tsantes has ever served in a judicial capacity in the State of Delaware, either in the past or in the present.

60.     Tsantes uses her position in the DBBE as her own personal tool so that she can ride her hobbyhorse against unsuspecting bar applicants. Tsantes intentionally tries to frustrate and sabotage the application process of selected applicants in order to advance Defendants' discriminatory purposes, as well as her own personal vices. Tsantes takes pleasure in exercising power over others and abusing any scintilla of authority she is given in order to boost her own judicial ambitions at the expense of others.

### Tsantes' Troubling History of Antagonizing Colleagues and Initiating Vexatious Bar Complaints Against Coworkers

61.     Tsantes has also engaged in a series of distasteful conduct to thrust herself into the limelight at the expense of her colleagues. Tsantes once initiated a vexatious ODC complaint against Attorney Richard Lyle, who was then her coworker, for a matter that was patently frivolous. *See In re Lyle*, 74 A.3d 654 (Del. 2013). Plaintiff—who earned the CALI Award in Professional Responsibility—has read the allegations Tsantes made and has determined that her

27

complaint had little, if any, basis in law or fact and if filed in any other jurisdiction would have been dismissed as unfounded, frivolous, and/or outside the scope of the rules of professional conduct. The only reason the case was pursued was because Lyle was a non-resident attorney from Georgia.

62.    In addition to the frivolous bar complaint she filed against Lyle, Tsantes has also initiated a multitude of other bar complaints against members of the Delaware Bar. These other complaints, like the one against Lyle, were patently frivolous and all were dismissed on their faces and never investigated. These quarrelsome and two-faced exploits have earned Tsantes a deplorable reputation among attorneys, judges, and members of the legal profession.

63.    The reason Plaintiff details Tsantes' history to demonstrate by way of relevant facts why Tsantes was so manipulable to Defendants' blatantly unconstitutional orders. The reason is that Tsantes would do *anything* Defendants asked if she believed that doing so would help her overcome her reputational shortcomings and provide her with a favorable preference in her judicial aspirations. The sole reason Tsantes volunteers for the DBBE in the first place is to advance her own judicial aspirations, and Defendants' decision to provide her with unrestricted access to—and the unrestricted power to obtain—an applicant's most private and sensitive matters is like giving an unstable monkey a loaded pistol.

64.    At all relevant times to in this Complaint, Tsantes was acting at the express direction and instruction of all the Defendants; she took no course of action other than what she was explicitly instructed.

### Plaintiff's Story- Plaintiff Graduates Law School In Idaho and Relocates to Delaware to Sit for The Delaware Bar Exam

65.    Plaintiff is a native to the State of Delaware. Since he was but a young boy, he always wanted to be an attorney and practice law. It has always been Plaintiff's dream to take the

cases that nobody else wants; to help the people nobody else wants to help. In fact, Plaintiff has recently relocated back to the State of Idaho where he has aspirations to get licensed to serve the Native American community by providing pro bono assistance on one of Idaho's Indian Reservations. Plaintiff wishes to do multistate practice.

66.     In 2016, Plaintiff was admitted to Concordia University School of Law in Boise, Idaho where he attended law school on a full scholarship. While at Concordia, Plaintiff set the law school record for the most CALI Awards ever earned by a full-time law student, and Plaintiff graduated third (3rd) in his class on May 4, 2019.

67.     Plaintiff has not always been an upstanding citizen, however. Plaintiff has a youthful record which is quite checkered in nature. Plaintiff at no time places into controversy his initial denial for admission to the Delaware Bar on the grounds of moral character. Plaintiff concedes there was a cause for concern to prompt a moral character inquiry. This Complaint focuses solely on the substantive and procedural due process violations that would have violated the rights of *any* applicant, regardless of their history, and not whether Defendants should have opened a moral character inquiry. The Constitution guarantees rights to all persons equally regardless of their history and/or the offenses for which they are accused.

68.     After finishing law school on May 4, 2019, Plaintiff decided to relocate to Delaware and sit for the Delaware Bar Exam, which he passed on the first take on July 29-31, 2019. Plaintiff's name was publicly posted by Defendants on the list of passing bar applicants for 2019.

69.     In September of 2019, Plaintiff began working at Gonser and Gonser Law Firm pursuant to the Clerkship and Preceptorship requirements. Under the Rules, a Preceptor may serve as both the Preceptor and the Clerkship supervisor, and an attorney working in that office,

Ashley Bickel, Esquire, was serving as both Plaintiff's Preceptor and Clerkship supervisor. Plaintiff did very well in Ms. Bickel's firm. He did so well that the owner of the firm offered Plaintiff a full-time job after admission to the Bar.

70.     In late September 2019, Plaintiff received an email from Tsantes and Robert H. Robinson, Esquire, ("Robinson") who were the two investigators Defendants assigned to Plaintiff's application. Tsantes and Robinson were the ones responsible for reviewing Plaintiff's application for completeness and for investigating Plaintiff's background.

### Plaintiff's Story (Cont.)- Defendants Use Their Unconstitutional Admissions Rules to Deprive Plaintiff of His Only Livelihood and Impose Needless Delay

71.     Upon information and belief, Plaintiff was targeted by Defendants before he even sat for the bar exam. Luke Mette, while serving as the current Chief Bar Counsel for the ODC, learned that Plaintiff was planning to sit for the Delaware Bar Exam before Plaintiff's graduation from law school. On or around March 2019, Mette called Wasson and informed her that if Plaintiff were to pass the bar exam, that she was to "**call him [Mette] right away**." After Plaintiff passed the bar exam, Wasson wasted no time calling Mette to obtain his instructions for Plaintiff's application.

72.     Upon information and belief, Mette told Defendant Wasson that the Defendants were to use the Defendants' admissions rules to sabotage Plaintiff's admission to the Bar. Specifically, Mette compared Plaintiff to Attorney Richard Abbott (what he referred to as a "Richard Abbott Junior"), indicated that Plaintiff was another "mule kick" like Abbott, was an "out-of-stater" coming to open his own law firm and taint the "Delaware Way," and Mette further stated that Defendants have a collective effort to purge the Bar of solo practitioners like Abbott. Before this phone call ended, Mette stated to Defendant Wasson "you are to do anything and everything you can to sabotage Mr. Witzke's admission to the Bar, is that understood?"

Defendant Wasson assured that the Defendants would execute Mette's orders by any means necessary.

73.     Of course, after hearing the message from Wasson, Tsantes was bootlicking Mette as hard as she possibly could and was willing to do <u>anything and everything</u> in her power to use the admissions rules to sabotage Plaintiff's admission to the Bar. Upon information and belief, Mette's instruction was conveyed to, and adopted by, all Defendants to this complaint and Defendants embarked on an express mission to sabotage Plaintiff's admission to the Bar not based upon his fitness or competency to practice law, but upon Plaintiff's status as an Idahoan who does not go along with The Delaware Way and who would threaten Defendants' protectionist objectives.

74.     On November 5, 2019, Plaintiff's first character and fitness interview was scheduled to take place with Tsantes and Robinson. Upon arrival, Tsantes informed Plaintiff that the interview would not take place because his application was incomplete and that Plaintiff needed to fix his application answers and supply additional materials. As stated previously, the application is so extensive it can encompass the entire world. It would have been impossible to know what alleged deficiencies Tsantes was referring to, so Plaintiff asked her what in the application was deficient. Tsantes responded: "It is not my job to go over your application with you so figure it out yourself."

75.     Throughout November and into early December of 2019, Plaintiff worked diligently on his application, adding detail and supporting documentation to his past disclosures.

76.     On December 5, 2019, Plaintiff wrote to Tsantes and Robinson advising them that he had cured any and all possible deficiencies and requested a second character and fitness interview. Despite repeated requests from Plaintiff throughout December 2019 and January

31

2020, Defendants would not schedule Plaintiff for his character and fitness interview and they ignored Plaintiff from December 5, 2019 until January 21, 2020, when Defendants finally sent to Plaintiff a letter scheduling the new character and fitness interview for February 12, 2020.

77.     This delay was not merely imposed without Plaintiff's consent. It was imposed notwithstanding Plaintiff's express wishes and multiple written protests that his admissions process move forward like Defendants were doing for other passing applicants similarly situated.

78.     On or about January 27, 2020, Plaintiff knew for certain that Defendants were engaging in a targeted scheme against him to thwart his admission to the Bar. Plaintiff was attending a Checklist activity with a fellow bar passer, Christopher Mancini ("Mancini") who passed the bar exam the same day as Plaintiff. Several days prior, on January 24, 2020, Mancini received registration information for the March swearing-in ceremony when Plaintiff did not. Mancini showed Plaintiff the email.

79.     On or about January 27, 2020 (same day), Plaintiff sent an email to Kelly-Phillips Parker ("Parker"), the Executive Director for The Board of Bar Examiners. Plaintiff asked Parker why he was not given the same invitation as the other passing bar applicant for the March swearing in ceremony and he further asked her to send him the invitation that was given to the similarly situated applicants. *See* **Exhibit G**. Parker advised that Plaintiff would not be given the same invitation as the other applicants because: "[y]our 2019 application is under review therefore you are not eligible to be included in the March admission ceremony at this time." *Id*.

80.     Parker's statements were knowingly false and made in bad faith. Both Mancini and Plaintiff were completing their admissions requirements together simultaneously; attending the same hearings on the same days and both Mancini and Plaintiff had not yet had their applications formally approved by Tsantes. Mancini and Plaintiff were *identically* situated with

the same amount of application completion as of January 24-27, 2020.

81.     Ironically, Plaintiff called Parker out on this and she offered absolutely no explanation. *Id.*

82.     Plaintiff finally had his character and fitness interview on February 12, 2020. During the interview, Tsantes and Robinson discussed several deficiencies in Plaintiff's application which were corrected immediately thereafter.

83.     On or about March 2, 2020 Tsantes and Robinson called Bickel, Plaintiff's then-Preceptor, and arranged for a *secret meeting* without Plaintiff's knowledge. That meeting took place on or about March 4, 2020. Present at the meeting was Bickel, Tsantes, Robinson, and a local attorney named Dennis Schrader, a non-DBBE member who practices legal ethics.

84.     During this March 4, 2020 meeting, Defendants' express objective was to convince Bickel to withdraw as Plaintiff's Preceptor in order to sabotage Plaintiff becoming admitted to the Bar. Upon information and belief, Tsantes, Robinson, and Shrader reviewed Plaintiff's (supposedly confidential) application and told Bickel that if she signed the Preceptor's Certificate, that she would be subject to discipline by the ODC.

85.     On March 5, 2020—with only **three days** left of the five-month clerkship—Bickel secretly withdrew from Plaintiff's application. The withdraw was approved by Wasson, who had orchestrated the entire fiasco. When Plaintiff asked Bickel why she withdrew, she responded "it is my law license that would be on the line." Bickel further added that Tsantes had specifically showed her prior precedent where a preceptor was disciplined by the bar for signing a certificate after the DBBE had asked the preceptor to withdraw. Tsantes and Robinson also showed Ms. Bickel recorded CLE lectures about the Preceptorship Requirement and the repercussions a Preceptor will sustain if they sign a certificate against the will of Defendants.

86.     Defendants' express purpose and objective was to manipulate Bickel into withdrawing so that Plaintiff's admissions process would be frustrated and could not move forward.

87.     On March 6, 2020, the day Plaintiff learned about Bickel's withdraw, he met with Tsantes and Robinson to ask why they were intentionally sabotaging Plaintiff's ability to practice his calling. Tsantes advised that because of her and Robinson's convincing, Bickel was afraid of being sanctioned by the bar if she signed Plaintiffs Preceptor Certificate. Robinson also confirmed this, and he further confessed that he and Tsantes—at the instruction of Wasson— made Bickel aware of Delaware precedent where a preceptor was sanctioned for signing a certificate against the will of Defendants[2].

88.     The "Preceptor Withdraw" tactic was not invented for Plaintiff. It is actually <u>a very common tactic that Defendants use to sabotage the admission of non-resident attorneys Defendants believe do not mesh with the "Delaware Way."</u> Discovery will verify that Defendants have done this before, and they have done it since.

### Plaintiff's Story (Cont.)- Defendants Frustrate Plaintiff's Ability to Obtain a Replacement Preceptor

89.     As previously stated in this Complaint, once a Preceptor drops an applicant, they are (metaphorically) given the mark of the beast. Plaintiff was no exception. Plaintiff tried and tried and tried to obtain a replacement preceptor to no avail. He heard it all from "I am not

---

[2] Since committing this heinous act, Robert H. Robinson was appointed to serve as the Superior Court Judge of Sussex County, Delaware. I am *disturbed* that those in the Delaware Bar with judicial aspirations—who take an oath to seek justice above all else—are so willing to sacrifice their integrity for the prospect of getting ahead. In this case, Tsantes and Robinson agreed to execute a horrific plan to deprive another person (Plaintiff) of the very constitutional rights each took an oath to protect, only so each could have a chance at obtaining a judicial appointment; a position of power and public trust requiring the uppermost grade of ethics and integrity.

subjecting myself to sanctions," "they [Defendants] have it out for you I do not want to be involved in that," to "I am not dealing with Chip Slanina for a lengthy appeals process."

90.     Plaintiff then contacted the Preceptor Bank and asked to be assigned a new preceptor. The Defendants intentionally assigned Plaintiff Preceptors that they knew either would not sign the certificate or could not sign the certificate. For example, one of the attorneys the Preceptor Bank assigned had not taken the preceptor course and was not registered as a preceptor. By law she could not sign the certificate. Plaintiff had two Preceptor Bank-assigned preceptors that asked to withdraw upon learning that Plaintiff's original preceptor had withdrawn.

91.     This went on for months and Plaintiff was through with Defendants' shenanigans. Plaintiff has always known that Delaware's admissions rules would not pass Constitutional muster and Plaintiff was now stuck between a rock and a hard place regarding his next steps.

### *Younger* Abstention? Don't Even Think About It. Plaintiff is "Younger," Sharper, and More Creative Than The Average Attorney

92.     Plaintiff was left with one of two choices: (1) seek injunctive and declaratory relief prohibiting the enforcement of the Preceptor and Clerkship requirements; or (2) endure it and try to find a new preceptor.

93.     Plaintiff knew he had an excellent case to seek injunctive relief. But, where moral character inquiries are so subjective, initiating a lawsuit would guarantee a denial to the Bar purely out of spite.

94.     Plaintiff has reviewed the filings in this Court by every Deputy Attorney General ("DAG") in Delaware's civil litigation unit. Plaintiff knows every trick, every ploy, and every defense the DAGs use to toss a case. Plaintiff learned that the Defendants are quite fond of using

35

the *Younger* Abstention Doctrine to get a case tossed out of this Court. This happened very recently in the previously referenced case of *Abbott, Supra,* 2021 U.S. Dist. LEXIS 58015, at *4.

95.    In *Abbott*, *Supra*, this Court rubber stamped the defendant's boilerplate *Younger* Abstention defense, finding "the Court cannot conclude that the Delaware attorney disciplinary proceedings will not **provide an adequate opportunity for Abbott to raise the substance of his federal claims** . . . [t]his Court 'should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary.'" *Id*. (Emphasis added).

96.    For a *Younger* Abstention Doctrine defense to prevail, a Plaintiff must have the ability to "raise the substance of [their] federal claims" in the state bar proceeding. *Id*.

97.    This is where Plaintiff got creative. If he was going to wait to file this action, he would need to somehow show that the DBBE would not have had the authority to, or otherwise been able to, afford an adequate remedy for Plaintiff's federal claims. Plaintiff had to show that he *would not* have the ability to raise them during his inevitable show cause hearing. Plaintiff set a bait for Defendant Wasson, the Chair of the DBBE, which she took hook, line, and sinker.

98.    On April 9, 2020, Plaintiff sent an official request to Defendant Wasson asking if the DBBE had the authority to handle grievances relating to the Preceptorship requirement because the delays were violating Plaintiff's procedural due process rights as established in *Law Students Civil Rights Research Council, Inc. v. Wadmond*, 401 U.S. 154, 174 (1971). *See* **Exhibit H**. On April 15, 2020, Ms. Wasson provided Plaintiff with a response that will shield

this lawsuit and guarantee this case makes it to trial:

RE: Ms. Wasson

Wasson, Jennifer C. <jwasson@Potteranderson.com>
Wed 4/15/2020 5:08 PM
To: Brooks Witzke <bwitzke@mail2.cu-portland.edu>
Cc: Phillips Parker, Kelly (Courts) <Kelly.Phillips.Parker@delaware.gov>; Tsantes, Stephanie A. (PDO)
<Stephanie.Tsantes@delaware.gov>

Dear Mr. Witzke,

The Board of Bar Examiners has reviewed your April 9, 2020 letter and considered your request that the
Board "waive the remaining Preceptor requirement and allow [your] application to the Delaware bar to
proceed to the next phase of the application process." The Delaware Supreme Court established the
preceptor requirement in Rule 52(a), including the condition that a preceptor "vouch for" each
applicant. The Board has neither the discretion nor the authority to modify the qualifications for
admission set forth in the Supreme Court Rules, so we are unable to grant your request for a waiver. If
the Board determines that you satisfy the other prerequisites for admission to the bar, you will need to
identify a preceptor who can meet the requirements of Rule 52(a). Notwithstanding your current lack of
a preceptor, the Board is continuing to review your application, so please be mindful of your ongoing
obligation to supplement. Thank you.

Regards,
Jennifer Wasson

*See* (**Exhibit I**)[3]. According to Defendants, the Board has no discretion or authority to determine,

amend, or adjudicate disputes relating to the admissions requirements subject to this Complaint

and therefore, it is a *literal impossibility* for Plaintiff to have had "an adequate opportunity . . . to

raise the substance of his federal claims" pursuant to this Court's ruling in *Abbott*.

### Plaintiff's Story (Cont.)- Plaintiff Finally Obtains A Replacement Preceptor, Gets The Certificate Signed, and Defendants Utilize Their Plan B

99.     After several months of persistence, Plaintiff was able to obtain a replacement

preceptor, John Robbert, Esquire. Mr. Robert is an elderly attorney and once he got to know

Plaintiff, he was won over. Plaintiff and Mr. Robbert instantly bonded and after taking the time

to get to know Plaintiff and understand Plaintiff's story, Mr. Robbert was comfortable signing

Plaintiff's Preceptor Certificate. Mr. Robbert signed Plaintiff's Preceptor Certificate on June 1,

---

[3] #mic drop.

2020, finally rendering Plaintiff's application complete and bringing Plaintiff's application process to a close.

100.    Plaintiff wasted no time, he uploaded the final certificate to his Application on June 2, 2020 and immediately emailed Tsantes to inform her that his application was now considered complete, that he does not consent to any further delay, and that Plaintiff needed the application process to move forward at all deliberate speed consistent with procedural due process.

101.    Tsantes responded that the Board would be in touch with Plaintiff soon to convey the next step of the process. Plaintiff respectfully reminded Tsantes, once again, that the Due Process Clause does not tolerate needless delay in relation to one's livelihood.

102.    June 2020 rolls by, and then July 2020, and on or about August 5, 2020 Plaintiff calls both Tsantes and Robinson to check on the status of his application. Plaintiff was able to reach Robinson and Plaintiff informed him once again that he did not consent to the delays being imposed and asked for the status of his application. Robinson said he did not know anything about the matter.

103.    Shortly thereafter, Plaintiff receives a call from Mr. Robbert. After Plaintiff's gentle attempts to be afforded procedural due process, Defendants called Mr. Robbert (not Plaintiff) and informed him that the Constitution does not apply to them because they represent the Supreme Court, that they will take however long they want to render a decision on Plaintiff's application, and that Plaintiff was not to contact the Board again about the status of his application.

104.    Finally, on August 28, 2020 Plaintiff received his notice of denial to admission to the Delaware Bar, issued by Defendant Wasson. The reasons for denial were based upon

Defendants' reasonable concerns regarding Plaintiff's checkered youth—which is not controverted by Plaintiff for purposes of this litigation. To reiterate, Plaintiff only grieves the unconstitutionality of the admissions rules as well as the needless delays that Defendant's imposed in bad faith.

**Plaintiff Retains The Respected Charles Slanina and Not Even *He* Is Able to Get The Defendants To Stop Their Needless Delays And *Jiggery Pokery***

105.    On September 10, 2020, Mr. Slanina entered his appearance on behalf of Plaintiff and requested a show cause hearing. Plaintiff retained Mr. Slanina and one of the main goals of the representation was for Mr. Slanina to expedite the matter, as by this point Plaintiff's admission had been drawn out for over a year.

106.    As this Complaint will detail, Mr. Slanina made reasonable good-faith efforts to expedite the matter but Defendants fought him at every turn by imposing every unconstitutional roadblock imaginable.

107.    Plaintiff was assigned a three (3) person panel for his show cause hearing. The Panel Chairman for Plaintiff's hearing was Defendant-Herndon, who verbally professed that he shared Mette's concern that Plaintiff will grow up to be "another Richard Abbott" if admitted to the Delaware Bar. Herndon is also close friends with Mette and has spearheaded a campaign and advocated to get Abbott thrown out of the Bar.

108.    Abbott's attorney discipline proceedings commenced November 8, 2021 and the Panel Chairman for this proceeding was Herndon. Herndon was assigned to both Plaintiff and Abbott's Bar proceedings not to act as a neutral decisionmaker, but as a tool to rig the outcome of each proceeding to rob both Plaintiff and Abbott of their livelihoods in violation of the Constitution.

109.    In fairness to Herndon, pursuant to the Supreme Court Rules and longstanding practices, his role as the Panel Chairman in Plaintiff's case was not functionally comparable to that of a judge. In Plaintiff's case Herndon served more so in the capacity of an advocate for the Board's interests.

110.    Plaintiff's show cause hearing was initially scheduled for November 11, 2020. Two weeks before this date, Defendants, through Herndon, postponed the hearing date without Plaintiff's authorization or consent. Defendants rescheduled the show cause hearing for December 18, 2020. Mr. Slanina made very clear to Defendants that Plaintiff did not consent to this delay and/or any further delay.

111.    On or about December 14, 2020, Herndon contacted Mr. Slanina and once again announced to him that Defendants were choosing to postpone Plaintiff's show cause hearing until January, 2021. Mr. Slanina protested and demanded an explanation. Defendants falsely claimed that the Presenter for the Board, Mackenzie Wrobel, had tested positive for COVID-19 and was hospitalized. Defendants could not produce a positive COVID-19 Test.

112.    Ms. Wrobel was *not* hospitalized with COVID-19 during the week of December 14, 2020, and Plaintiff has in his possession court records that prove it.

113.    At the insistence of Plaintiff, Mr. Slanina passionately protested the additional delay, and in response Defendants covenanted that they would provide Plaintiff with a show cause hearing no later than January, 2021.

114.    January 2021 came and went and Defendants ignored numerous pleas from Mr. Slanina to stop the delays and to schedule the show cause hearing. From January 2021, to April, 2021 Mr. Slanina worked tirelessly to get Plaintiff his due process hearing. Mr. Slanina wrote

correspondence after correspondence asking Defendants to schedule a show cause hearing as required by the Due Process Clause, but Defendants would not respond.

115.    Once the COVID-19 pandemic hit, Defendants viewed it as an unassailable excuse to justify their willful abdications which long preceded COVID-19's existence. Defendants tried to claim COVID-19 was prohibiting them from providing Plaintiff with a hearing and Mr. Slanina offered to conduct a virtual hearing via-zoom—which Courts all over the State were doing without issue—which the Board declined. Mr. Slanina also reminded Defendants that the COVID-19 pandemic was not prohibiting Defendants from providing full-blown hearings in attorney discipline cases, a fact which Defendants offered no explanation in response.

116.    In March 2021, it became so bad that Mr. Slanina wrote a letter to Defendant Wasson informing her of the issues and asking her to assign a new hearing panel and to remove Herndon from any future panel due to his dilatory tactics. Wasson declined, responding that panel members cannot be exchanged once they are assigned.

117.    Defendant Wasson's contention was a load of baloney, as when the hearing finally was held (as discussed below) the Board was able to change out a panelist just days before Plaintiff's show cause hearing when doing so suited its own purposes.

118.    Upon information and belief, all of the tactics used by Defendants to delay, stall, and frustrate Plaintiff's admissions process/proceeding, whether executed through Herndon or otherwise, where performed for the express purpose of needlessly delaying and frustrating Plaintiff's admissions process unlawfully and in bad faith. Herndon and Wasson in particular acted with the motive of sabotaging Plaintiff and causing him irreparable harm.

41

119.    After **two (2) whole years** of needless delay, humiliation, poverty, and living in turmoil, Plaintiff finally had enough. Plaintiff came to the realization that *he* would be the idiot if he continued to wait around thinking that the Defendants were going to honor their due process obligations.

120.    Plaintiff wrote a very thoughtful letter to the then-head of the Delaware Attorney General Civil Litigation Unit. Plaintiff explained the procedural due process violations which were occurring, and he sought to have the AG's office intervene in the matter so that Plaintiff did not have to seek injunctive relief from this Court to obtain the most basic of his due process rights.

121.    The AG's office compelled Defendants to stop the games and to schedule a show cause hearing once and for all. Finally, after two years of misery, Defendants scheduled Plaintiff a show cause hearing to take place on June 7, 2021.

122.    The show cause hearing did in fact take place on June 7, 2021. At the conclusion of the show cause hearing, the Panel Chair asked if the Board could have thirty (30) days to issue its findings of fact and conclusions of law. Plaintiff stipulated to thirty days and no more.

123.     As of the filing of this Complaint, the Defendants still have not issued a decision on Plaintiff's admission despite demands that they do so.

124.    On or about July 14, 2021, Plaintiff wanted to make certain that counsel for Defendants, the Delaware Attorney Generals Office, was informed that Plaintiff did not consent to the delays Defendants were imposing. Plaintiff wrote a letter to Kathleen Jennings, the Delaware Attorney General, as well as her Chief Deputy Attorney General, Alexander Mackler, informing them both that the needless delay was unconstitutional, provided the caselaw showing such, and he made clear—in writing—that he did not consent to the delays which have been

imposed either previously or in the present. Plaintiff sent the correspondences through certified mail and he verified receipt by both Ms. Jennings and Mr. Mackler.

125.    As of the filing of this Complaint, neither Ms. Jennings nor Mr. Mackler have responded to Plaintiff's correspondences. In addition to the letters, Plaintiff left messages via voicemail as well as with Ms. Jenning's staff, and he sent follow-up emails to Mr. Mackler which were not returned.

126.    In August of 2021, Plaintiff repeatedly protested the needless delays and demanded that Defendants issue a decision on his admission. Defendants stated that the thirty (30) days did not begin until they received the transcript from the show cause hearing, and that they still had not received it.

127.    On or about August 8, 2021 Plaintiff verified with the court reporter that the transcript had been sent to Defendants on June 19, 2021; only twelve (12) days after the show cause hearing on June 7, 2021.

128.    Defendants were confronted with the court reporter's certificate of service for the transcript and Defendants admitted that Kelly Phillips-Parker, in her capacity as an agent of Defendants, had intentionally concealed the transcript with the intention of further sabotaging Plaintiff. Ms. Parker claimed that she did so because she "did not like [Plaintiff]," "did not think he should be admitted," and that she was "feeling sore and a little tired" when she made the decision to do what she did.

129.    Upon information and belief, Ms. Parker was carrying out orders expressly given by Defendants, and she was never subjected to any discipline for her actions[4].

---

[4] Kelly Phillips-Parker heavily targets—for brutal persecution—bar applicants with histories of bankruptcy when Parker herself has a history of bankruptcy and financial irresponsibility. *See* 2:97bk29112, *KELLY ANNE PHILLIPS* US Bankruptcy Court for the District of New Jersey.

130.    After being caught red-handed trying to frustrate Plaintiff's admissions process and being vigorously pursued to issue a decision on Plaintiff's admission and to stop all of the needless delay, Herndon ordered as the Panel Chairman that each party to the proceeding file a proposed findings of fact and conclusions of law. Ms. Wrobel filed her version on or about August 27, 2021. Plaintiff submitted his proposed findings of fact and conclusions of law on or about September 17, 2021.

131.    As of the date of the filing of this Complaint, Defendants still have not issued a decision on Plaintiff's admission to the Bar despite over two years of tireless efforts for them to do so. Plaintiff has spent over two years and lost over $100,000.00 due to the violations of his procedural due process rights.

132.    On October 29, 2021 Plaintiff received a letter from Defendants, signed by Herndon, that is so infelicitous it makes Plaintiff sick to his stomach. In the letter, Herndon blatantly bears false witness by claiming that Plaintiff never turned in his proposed findings of fact and conclusions of law, Herndon demands an explanation, and finishes the letter by stating "[p]lease advise the Board Panel whether Applicant intents to continue to pursue his Application, and if so, provide the reason/s that the Applicant did not submit the response[5]." **Exhibit J.**

---

[5] Words cannot express how infuriating this is. I relocated across the country, passed the bar exam, spent over two years fighting with the Defendants to get a decision on my admission including spending a year completing all of Defendants' durational residency requirements (after Defendants did what they could to sabotage and frustrate the completion of) and fighting for over a year to obtain a show cause hearing and decision on my admission—which included me spending over $50,000.00 in legal fees while living in poverty because I had to work menial jobs as a result of not being licensed—endured extreme stress and anguish as a result of Defendants' 2+ year war of attrition, incurred financial harm due to 2+ years of lost income and inability to pay student loan debt, and I have had to sit in the penalty box for 2+ years watching my classmates flourish while I miss out on 2+ years of experience practicing my life's calling. I have paid tens of thousands of dollars just for Mr. Slanina to fight with Defendants to get them to stop this egregious violation of my due process rights and I have even had to enlist the help of my elected representatives who forced Defendants to give me a show cause hearing. After all this, Defendants have the audacity; the nerve, to refuse issuing a final decision and falsely claim I did not turn in a required submission and imply that I was giving up the pursuit of my life's calling. During the past two years they were causing this harm, each one of the Defendants were living lush at large earning a cushy income of well over $175,000.00 annually practicing their callings. And, not one of the Defendants has a morsel of regret or contrition about what they have done.

133.     On November 1, 2021, Mr. Slanina verified that Defendants received Plaintiff's proposed findings of fact and conclusions of law long before Herndon sent his inflammatory letter. Herndon's letter was simply another supplementary-bad faith action taken in advancement of Defendants' pervasive and long-standing mission to unlawfully delay, harass, sabotage, and frustrate Plaintiff's admissions process in ways that contravene the Due Process Clause of the United States Constitution.

134.     Upon information and belief, once Defendants receive a copy of this lawsuit, Plaintiff's admission to the Delaware Bar will be denied at which point Plaintiff has immediate plans to re-apply for the Delaware Bar and restart the admissions process all over again.

### The Injury to Plaintiff

135.     As of the filing of this Complaint, Plaintiff has been delayed **over two years** in his career. Plaintiff has suffered, and continues to suffer, injury including public and private humiliation, stigma, loss of income, loss of career opportunity and advancement, increase of student loan interest due to inability to pay, two years of lost experience in the practice of law, and other financial harm including the money and time spent relocating to sit for the Delaware Bar Exam, the cost of sitting for the exam, the cost of the bar-prep course, and the lost income Plaintiff forewent in order to complete Defendants' durational-residency requirements (which took close to a year as a result of Defendants' bad faith sabotaging). Plaintiff had to relocate across the Country and work for free to complete the durational residency requirements; a significant investment on his end.

136.     As a direct and proximate result of Defendants' intentional delays and other dilatory tactics, Defendants have needlessly increased Plaintiffs legal fees to tens of thousands of dollars more than would have costed absent the needless delays.

137.    The public and private humiliation Plaintiff has received has been life-altering. Plaintiff is so embarrassed about his situation that he does not even stay in contact with his beloved law school friends. Plaintiff is too embarrassed to tell them that he—the most promising student in their class—has never received a decision on his admission after two years.

138.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has had to seek psychological treatment for his extreme emotional distress and has incurred significant medical expenses.

139.    Plaintiff's injuries are concrete, particularized, and actionable regardless of whether Plaintiff is admitted to the bar tomorrow or denied outright. If Plaintiff is admitted to the bar, then he has still suffered the financial, emotional, and stigma consequences of a two-year delay. If he is denied admission to the bar totally—which is in-fact what is going to happen—then Plaintiff still has standing because he has immediate plans to re-apply for admission to Delaware, sit for the Delaware Bar Exam again, and complete all the admissions requirements all over again.

140.    Additionally, Plaintiff further maintains his standing in the event of denial because the delays have still caused him irreparable harm. If Plaintiff was denied two years ago, he would have been eligible to reapply to the bar the next year, and Plaintiff would have done so. Plaintiff has thus lost two years of time (and two bar exams) he would have utilized to get admitted to the Delaware Bar.

141.    Plaintiff's injury is ongoing to the present day and Plaintiff will suffer immediate; irreparable injury in the absence of Court-ordered relief. The Defendants still have not issued a decision on his admission to the Bar and Plaintiff has accepted a position which contractually requires him to be licensed in any state within six (6) months of being hired. Plaintiff needs a

decision on his admission immediately so that he can become admitted or start the process of appealing the decision to the Delaware Supreme Court. Or, in the alternative, Plaintiff needs to immediately know if Defendants will deny his admission so that he can start the lengthy and expensive process of trying to become admitted in another state. Upon the filing of this Complaint, Plaintiff has only one month until he starts his contractual position and Plaintiff needs an answer on his admission immediately or he risks losing his career.

### COUNT I- VIOLATION OF 42 U.S.C. §1983 VIOLATION OF PROCEDURAL DUE PROCESS (All Defendants)

142.    Plaintiff re-alleges and incorporates by reference all allegations and Paragraphs of this entire Complaint, above and below, as though fully set forth herein.

143.    Pursuant to 42 U.S.C. §1983, every person who under color of State law, custom, or usage, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution or laws of the United States shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

144.    This case involves Plaintiff's application to practice law; his profession. The United States Supreme Court has repeatedly held that states must adhere to the *most stringent* form of procedural due process when a state seeks to suspend, disbar, or deny a license to practice law. *SCHWARE v. Bd. OF BAR Exam'rs OF N.M.*, 77 S. Ct. 752, 753 (1957); *Willner v. Comm. on Character & Fitness*, 83 S. Ct. 1175, 1179-80 (1963); *Law Students Civil Rights Research Council, Inc. v. Wadmond*, 401 U.S. 154, 174 (1971); *Sokoloff v. Bd. of Med. Practice*, 2010 Del. Super. LEXIS 541, *18, 2010 WL 5550692.

145.    The most basic of these procedural due process requirements requires notice and an opportunity to be heard in a meaningful time and in a meaningful manner without delay. The

Due Process Clause also requires that a decision to suspend, disbar, or deny a professional license be issued promptly and without undue delay.

146.    As a mere applicant to the bar, Plaintiff has a liberty interest requiring adherence to the most stringent form of procedural due process. Plaintiff not only retains this liberty interest, but he also gained a property interest in his law license because he passed the bar exam, his name was published by the Defendants publicly on the passing applicants list, and he expended considerable resources to complete the durational residency requirements Defendants impose.

147.    For the past two (2) years, the Defendants have violated Plaintiff's procedural due process rights by imposing intentional and needless delay in bad faith. Plaintiff has repeatedly tried to get Defendants to adhere to the procedural due process clause and has even provided them with the caselaw to demonstrate the unlawfulness of Defendants' actions. Defendants have acted intentionally to sabotage and frustrate Plaintiff's admissions process in ways that violate the Due Process Clause.

148.    The Defendants violated Plaintiff's due process rights when they intentionally and in bad faith singled out his application for disparate treatment and refused to process it despite processing applications for applicants who were identically situated to Plaintiff.

149.    The Defendants violated Plaintiff's procedural due process rights when they intentionally and in bad faith used their unconstitutional admissions rules to frustrate his application process. Specifically, when Defendants goaded Plaintiff's preceptor to withdraw and then refused to provide Plaintiff with a replacement preceptor or to waive the Rule like they have done for other applicants similarly situated to Plaintiff.

150.    When Plaintiff finally was able to retain a replacement preceptor and complete his application process, the Defendants violated Plaintiff's procedural due process rights when they refused to issue an initial denial of Plaintiff's professional law license in a prompt and timely manner.

151.    When the Defendants finally issued the letter of denial, Plaintiff retained counsel and requested a prompt show cause hearing. The Defendants then violated Plaintiff's procedural due process rights by inflicting every disingenuous roadblock imaginable to keep Plaintiff from receiving a prompt show cause hearing. Plaintiff did not receive his show cause hearing for ten (10) months, despite copious protests and demands from his counsel. The Defendants repeatedly engaged in tactics to torture Plaintiff when they would schedule a show cause hearing and then reschedule it last minute for fictitious reasons. Defendants did this to run up Plaintiffs legal bills, to cause Plaintiff undue stress, and to make Plaintiff simply give up his pursuits to be admitted.

152.    After ten (10) months of delay, the Delaware Attorney General forced Defendants to give Plaintiff a show cause hearing.

153.    Even after Defendants were forced to give Plaintiff his show cause hearing at the demand of the Delaware Attorney General, the Defendants now simply refuse to issue a decision on Plaintiff's admission. The Defendants had 30 days under statute and it has now been over 160 days since the show cause hearing. This delay is unlawful and is a continuing violation of Plaintiff's procedural due process rights.

154.    All of these delays and unlawful actions were imposed without Plaintiff's consent and in the face of his direct protest.

155.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer irreparable financial harm, emotional harm, public and private humiliation,

damage to his career, and other cognizable injury. In the absence of Court-ordered relief, Plaintiff will suffer irreparable harm and loss of his present career.

WHEREFORE, Plaintiff requests that the Court (i) issue a temporary restraining order and preliminary injunction against Defendants COLLINS J. SEITZ, JR., JAMES T. VAUGHN, JR., TAMIKA R. MONTGOMERY-REEVES, GARY F. TRAYNOR, KAREN L. VALIHURA, JENNIFER C. WASSON, and RANDOLPH K. HERNDON ordering the Defendants to cease this unconstitutional delay and harassment and to issue a prompt decision on Plaintiff's admission to the Bar within five (5) days of the Court's Order; and (2) for Defendants JENNIFER C. WASSON and RANDOLPH K. HERNDON only, that this Court award:

A. All lawful damages in an amount to be determined, against Defendant Wasson and Herndon;

B. Compensatory damages;

C. Punitive damages in an amount sufficient to punish Wasson and Herndon and discourage them and others from engaging in similar conduct in the future;

D. Reasonable attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988;

E. Plaintiffs' cost in this action;

F. Pre and post-judgment interest;

G. Such other relief as this Court deems just and equitable; and

H. Trial by Jury.

## COUNT II- VIOLATION OF THE PRIVILEGES AND IMMUNITIES CLAUSE OF U.S. Const. art. IV, §2, cl. 1 (The Five Members)

156.    Plaintiff re-alleges and incorporates by reference all allegations and Paragraphs of this entire Complaint, above and below, as though fully set forth herein.

50

157.    Del. Sup. Ct. R. 52(a)(8), Del. Sup. Ct. R. 52(a)(9), Del. Sup. Ct. R. 52(a)(2), and Del. BR. 10 discriminate against the individual Plaintiff as well as all those similarly situated based exclusively on their status as nonresidents of the State of Delaware.

158.    The rules facially discriminate in violation of the Privileges and Immunities Clause because they require physical presence on Delaware soil for a durational period of at least fifty (50) hours a week for no less than five (5) months as a prerequisite to admission to the Delaware Bar. A successful applicant must complete this durational residency requirement within one year of passing the bar exam or their passing score will be lost.

159.    The Rules facially discriminate because they require a non-resident attorney to relocate and give up his/her out-of-state law practice for at least five months.

160.    The Rules facially discriminate because they prohibit a non-residents' ability to engage in a multi-state law practice.

161.    The Rules facially discriminate because they burden lawyers employed by multistate corporations that litigate in the Delaware Court of Chancery.

162.    In addition to the facial discrimination, the rules violate the Privileges and Immunities Clause because the rules have a discriminatory impact and a discriminatory intent. The discriminatory intent existed at the time the rules were first enacted; they were created for the express purpose of burdening non-residents and protecting the States' financial interests.

163.    The rules violate the Privileges and Immunities Clause because they are a proxy for arbitrary and discriminatory enforcement against non-resident attorneys and are discriminatorily applied by Defendants to burden and frustrate the admission of non-residents.

164.    The rules are not necessary to achieve a compelling government interest. The Defendants have no compelling justification for enacting and enforcing a bar admissions

program which discriminates against people on the basis of residence. Nonresident attorneys/bar applicants are not a particular source of legal incompetency or unscrupulous lawyering in Delaware, nor are they the source of any other local "evil" that the State may purport to remedy with their unconstitutional admissions rules.

165.    The Defendants' acts, practices, customs, laws, and rules, including the admissions rules subject to this Complaint, are not narrowly tailored to achieve a necessary and compelling government interest.

166.    Defendants have violated Plaintiff's right to engage in the practice of law as a nonresident as protected by the Privileges and Immunities Clause of, Article IV, §2, cl. 1 and subject to 42 U.S.C. §1983.

WHEREFORE, Plaintiff requests that the Court (i) declare that Del. Sup. Ct. R. 52(a)(8), Del. Sup. Ct. R. 52(a)(9), Del. Sup. Ct. R. 52(a)(2), and Del. BR. 10 violate the Privileges and Immunities Clause of the United States Constitution; (ii) issue a preliminary injunction prohibiting the Five Members from enforcing the rules; (iii) issue a permanent injunction prohibiting the Five Members from enforcing the rules; and (iv) award Plaintiff any other relief that the Court determines is appropriate.

## COUNT III-VIOLATION OF THE DORMANT COMMERCE CLAUSE OF U.S. Const. art. I, § 8, cl. 3 (The Five Members)

167.    Plaintiff re-alleges and incorporates by reference all allegations and Paragraphs of this entire Complaint, above and below, as though fully set forth herein.

168.    The Dormant Commerce Clause, like the Article IV Privileges and Immunities Clause and the Fourteenth Amendment Privileges or Immunities Clause, was designed to limit the extent to which states engage in economic protectionism. *See, e.g., C &A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994) (contending that "[t]he central rationale for the

rule against discrimination [in the dormant Commerce Clause] is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies, and retaliatory measures the Constitution was designed to prevent").

169.    By way of background, the Supreme Court has found that the Commerce Clause not only expressly authorizes Congress to regulate interstate commerce, but it also contains "an implied limitation on the power of the States to interfere with or impose burdens on interstate commerce." *W. & S. Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 652 (1981). This implicit limitation (the Dormant Commerce Clause) essentially "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988).

170.    Strict scrutiny must be applied by a federal court when the Plaintiff alleges that the relevant law discriminates against interstate commerce "either on its face or in practical effect." *Maine v. Taylor*, 477 U.S. 131, 138 (1986).

171.    Legal services constitute interstate commerce, even when the representation only has a modest connection to another state. *Goldfarb v. Virginia State Bar,* 421 U.S. 773 (1975).

172.    In this case, Del. Sup. Ct. R. 52(a)(8), Del. Sup. Ct. R. 52(a)(9), Del. Sup. Ct. R. 52(a)(2), and Del. BR. 10 interfere with the natural functioning of the interstate market more than any other state law has in the entire history of the United States Jurisprudence. This is because Delaware is the *corporate capital of the world*, and its Court of Chancery is the ultimate decisionmaker—the fate-determiner—in disputes involving 60% of the Nation's Fortune 500 companies. The Delaware Bar, and thus its admissions rules, *directly controls* the lifeblood of the American economy.

173.   Defendants have violated Plaintiff's right to engage in the free flow of interstate commerce as protected by the Dormant Commerce of the United States Constitution, Article 1, Section 8, Clause 3 and subject to 42 U.S.C. §1983.

174.   The admissions rules subject to this Complaint *facially* discriminate against interstate commerce in favor of intrastate commerce and therefore are invalid *per se* as economic protectionism not necessary to achieve a compelling government interest by the most narrowly tailored means.

175.   The admissions rules subject to this Complaint discriminate in *practical effect* because they: (i) have the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the State of Delaware by preventing the free flow of legal representation by non-resident attorneys who are otherwise qualified to practice law within Delaware's borders; (ii) frustrate the ability of a non-resident attorney to practice on a multi-state basis; and/or (iii) burdens lawyers employed by multistate corporations.

176.    Every major corporation is impacted because they have to retain local counsel to represent their interests where their own in-house counsels could represent their interests but for Defendants' unconstitutional admissions rules.

177.   The admissions Rules subject to this Complaint are not narrowly tailored because they impose a burden on interstate commerce not commensurate with the local benefits allegedly secured and are not the least-restrictive means of ensuring legal and ethical competency.

WHEREFORE, Plaintiff requests that the Court (i) declare that Del. Sup. Ct. R. 52(a)(8), Del. Sup. Ct. R. 52(a)(9), Del. Sup. Ct. R. 52(a)(2), and Del. BR. 10 violate the Dormant Commerce Clause of the United States Constitution; (ii) issue a preliminary injunction prohibiting the Five Members from enforcing the rules; (iii) issue a permanent injunction

prohibiting the Five Members from enforcing the rules; and (iv) award Plaintiff any other relief that the Court determines is appropriate.

## COUNT IV- VIOLATION OF THE EQUAL PROTECTIONS CLAUSE OF U.S. Const. Amendment XIV (All Defendants)

178.     Plaintiff re-alleges and incorporates by reference all allegations and Paragraphs of this entire Complaint, above and below, as though fully set forth herein.

179.     The Due Process Clauses and the Equal Protection Clause of the 14th Amendment guarantee the fairness of laws—substantive due process guarantees that laws will be reasonable and not arbitrary, and equal protection guarantees that similarly situated persons will be treated alike[6].

180.     Where a law treats a person or class of persons differently from others, it is an equal protection issue. *See Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (equal protection claims may be brought by a class with as few as one member). The Court uses the strict scrutiny standard when a suspect classification or fundamental right is involved. Under the strict scrutiny standard, a law will be upheld only if it is ***necessary*** to achieve a ***compelling*** or ***overriding*** government purpose. The Court will always consider whether less burdensome means for accomplishing the legislative goal are available. Most governmental action examined under this test fails.

181.     When the strict scrutiny standard is applied, the ***government*** will have the burden of proving that the law is necessary. The Court will not allow a loose-fitting law (*i.e.*, if a law reaches more people or conduct than is necessary (overinclusive) or does not reach all of the people or conduct sought to be regulated (underinclusive), it will likely be struck down).

---

[6] Please note that this is an Equal Protection Clause challenge, *not* a challenge brought pursuant to the 14th Amendment Privileges and Immunities Clause which gives newly arrived state citizens an immediate right to be treated on the same terms as long-time state residents.

182.     The right for an out-of-state lawyer to practice his or her calling in another jurisdiction free from discrimination and harassment is a fundamental right protected by the Constitution. *Barnard v. Thorstenn*, 489 U.S. 546 (1989); *Supreme Court of Virginia v. Friedman*, 487 U.S. 59 (1988); *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274 (1985). Laws that prohibit or otherwise impose unnecessary burdens on non-resident attorneys will be subject to strict scrutiny. *Id*.

183.     Similarly, admissions rules that frustrate the ability of a non-resident attorney to practice on a multi-state basis, or burdens lawyers employed by multistate corporations, triggers the strict scrutiny standard. *Stalland v. South Dakota Bd. of Bar Examiners*, 530 F. Supp. 155 (D.S.D. 1982).

184.     The mere fact that legislation or governmental action has a discriminatory effect is not sufficient to trigger strict scrutiny or intermediate scrutiny. There must be ***intent*** to discriminate on the part of the government. Intent can be shown in three ways: (i) facial discrimination; (ii) discriminatory application; or (iii) discriminatory motive.

185.     Del. Sup. Ct. R. 52(a)(8), Del. Sup. Ct. R. 52(a)(9), Del. Sup. Ct. R. 52(a)(2), and Del. BR. 10 facially discriminate against non-residents because the Rules require applicants to the Bar who pass the bar exam to complete a durational residency requirement of at least five months as a prerequisite to admission. Under the plain meaning of the Rules' text, it would be a literal impossibility for a lawyer living out-of-state to complete the durational residency requirement absent physical presence/relocation.

186.     The Rules also discriminate facially because a non-resident attorney would be made to give up his or her out-of-state law practice for at least five months to complete the durational residency requirements the Rules impose.

187.    The burdens the Rules impose are disproportionate and not shared by long-term Delaware citizens as they do not have to suffer the burden of giving up their livelihoods and relocating to a new state. Additionally, long-term residents can complete some of the durational residency requirements while still in law school.

188.    The Rules are also discriminatorily applied in ways that violate the fundamental rights of applicants. Defendants routinely execute the Rules to sabotage the admission of non-resident applicants to the Bar. Plaintiff was one of the applicants targeted by this tactic. The Rules also have a longstanding history of arbitrary application and waiver and have been waived entirely for resident applicants with cozy local ties to the Defendants.

189.    The Rules have a discriminatory motive—a motivation which existed at the time the rules were first enacted—as the Rules were designed and were adopted for the express unconstitutional purpose of excluding non-resident attorneys and ensuring economic protectionism. In addition or alternatively, the Rules were designed and adopted for the purpose of arming Defendants with arbitrary weapons they can use to identify, target, and frustrate the admission of applicants Defendants feel do not mesh with local viewpoints (*i.e.* The Delaware Way).

190.    Plaintiff was adversely impacted by the Rules because he spent close to a year completing the durational residency requirements when other resident applicants had completed them during law school or had the requirements waived entirely.

191.    Plaintiff was also adversely impacted by the Rules by way of discriminatory application when Tsantes and Robinson, at the instruction of Defendants, intentionally sabotaged Plaintiff's relationship with his Preceptor and afterwards when Defendants refused to find Plaintiff a replacement Preceptor.

192.    Plaintiff was denied the right to be treated on the same basis as other similarly-situated resident-applicants when Defendants refused to process his application despite doing so for all other applicants who were identically situated in all relevant aspects with the exception of residency.

193.    The Defendants targeted Plaintiff because of his non-resident status and/or his plans to get licensed and return to Idaho to practice law multijurisdictionally. The Defendants have violated Plaintiff's right to be treated on the same terms as similarly situated residents, as protected by U.S. Const. Amendment XIV subject to 42 U.S.C. §1983.

WHEREFORE, Plaintiff requests that the Court (i) declare that Del. Sup. Ct. R. 52(a)(8), Del. Sup. Ct. R. 52(a)(9), Del. Sup. Ct. R. 52(a)(2), and Del. BR. 10 violate the 14th Amendment Equal Protection Clause of the United States Constitution; (ii) issue a permanent injunction preventing the Defendants from enforcing the Rules; and (iii) award Plaintiff any other relief that the Court determines is appropriate.

## COUNT V- VIOLATION OF SUBSTANTIVE DUE PROCESS UNDER U.S. Const. Amendment XIV (Rational Basis Test)(The Five Members)

194.    Plaintiff re-alleges and incorporates by reference the allegations and Paragraphs of this entire Complaint, above and below, as though fully set forth herein.

195.    As a result of Defendants' acts, practices, customs, laws, and rules, Plaintiff has been deprived of his due-process rights under the Fourteenth Amendment of the United States Constitution and subject to 42 U.S.C. § 1983.

196.    Del. Sup. Ct. R. 52(a)(8), Del. Sup. Ct. R. 52(a)(9), Del. Sup. Ct. R. 52(a)(2), and Del. BR. 10 are unconstitutionally overbroad and substantially burden constitutionally protected conduct, such as applying for a job with a private employer in the Delaware, practicing ones' profession within Delaware, opening ones' own law practice in Delaware, and/or ones' ability to

practice in Delaware multijurisdictionally. The Rules' effects are chilling on Plaintiff's behavior and far broader than allowed by the Constitution.

197.    The Rules have severely injured Plaintiff's financial interests as he expended over two years of his time and over $100,000.00 of investment to become licensed in Delaware and practice his calling, only to have the Defendants intentionally sabotage Plaintiff's career utilizing the destructive potential the Rules afford Defendants by way of their strategic design.

198.    The Rules are not rationally related to a legitimate government interest and are discriminatory, arbitrary, and oppressive. The Rules serve merely as tools to identify and filter out applicants to the Bar in ways that violate the Constitution, this is not a legitimate government purpose.

WHEREFORE, Plaintiff requests that the Court (i) declare that Del. Sup. Ct. R. 52(a)(8), Del. Sup. Ct. R. 52(a)(9), Del. Sup. Ct. R. 52(a)(2), and Del. BR. 10 violate the 14th Amendment Substantive Due Process Clause of the United States Constitution; (ii) issue a permanent injunction preventing the Five Members from enforcing the Rules; and (iii) award Plaintiff any other relief that the Court determines is appropriate.

## COUNT VI- DECLARATORY AND INJUCTIVE RELIEF

199.    Plaintiff re-alleges and incorporates by reference all allegations and Paragraphs of this entire Complaint, above and below, as though fully set forth herein.

200.    Plaintiff is in doubt as to his rights, privileges, and immunities with respect to the conduct at issue herein. Plaintiff requires a judgment declaring his rights, privileges, and immunities. There is a clear, present, actual, substantial, and bona-fide justiciable controversy between the parties.

201.    Plaintiff has no adequate remedy at law. No amount of money damages could adequately compensate the Plaintiff for the irreparable harm described herein. Plaintiff in this case wishes to exercise rights that are guaranteed to him under the United States Constitution. No legal remedy would ever suffice to properly address state action that ultimately results in denying citizens' rights guaranteed by the Due Process Clause, The Privileges and Immunities Clause, The Dormant Commerce Clause, The Equal-Protection Clause, and the other constitutional provisions discussed herein.

202.    Plaintiff and the public-at-large will suffer irreparable injury if injunctive relief is not granted and Defendants are further permitted to enforce the customs, policies, practices, and impermissible laws and rules at issue herein. The loss of rights guaranteed by the Constitution is so serious that, as a matter of law, irreparable injury is presumed, and, in such an instance involving the loss of rights ensured by the Due Process Clause, the Privilege and Immunities Clause, the Dormant Commerce Clause, and the Equal Protection Clause, damages are both inadequate and unascertainable.

203.    The public interest would best be served by the granting of injunctive relief, and indeed, the public interest is disserved by permitting the enforcement of customs, policies, practices, laws, and rules that are designed to and do exhibit a callous indifference to Plaintiff's constitutional rights.

204.    All conditions precedent to the institution and maintenance of this cause of action has occurred or has been performed.

205.    The acts and practices of Defendants as set forth herein, were and are being performed under color of law and, therefore, constitute state action within the meaning of the Fourteenth Amendment to the Constitution of the United States.

WHEREFORE Plaintiff requests entry of a Temporary Restraining Order and Preliminary Injunction requiring the Defendants to cease their delaying and intentional sabotaging of Plaintiff's admissions process and issue a decision on his admission to the Delaware Bar. Plaintiff requests entry of a judgment declaring that Del. Sup. Ct. R. 52(a)(8), Del. Sup. Ct. R. 52(a)(9), Del. Sup. Ct. R. 52(a)(2), and Del. BR. 10 are unconstitutional and unenforceable, and that the Plaintiff is not required to comply with the terms of these Rules when he makes his second attempt to get into the Bar. Plaintiff requests entry of a preliminary and permanent injunctive relief necessary to implement the judgment, and an award of attorneys' fees, costs, and such other and further relief as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all issues so triable.

Respectfully Submitted,

DATE: November 22, 2021

_____/S/_____
Brooks M. Witzke
LAWMAN LLC*
211 CIRCLE INN #57
CHUBBUCK, ID 83211
302-604-4925
BrooksWitzke@Witzkelaw.com

*Please note this is a law firm accepting service

## VERIFICATION

Brooks M. Witzke, pursuant to 28 U.S.C. §1746, being first duly sworn, states that he has read the foregoing Complaint; that he is familiar with the contents thereof; and he declares under the penalty of perjury that the facts stated therein are true and correct to the best of his knowledge.

DATED: 11/22/2021

Brooks M. Witzke

