# **EXHIBIT A**

# THE CONTRIBUTIONS
# OF THE LEGAL INDUSTRY
# TO THE DELAWARE ECONOMY
## June 2019

Paul Larson,[1] William Latham,[2] and Kenneth Lewis[3]

# Table of Contents

**Page**

Executive Summary: .................................................................................................... 1

Introduction: ............................................................................................................... 3

I.   Delaware's Legal Industry: A Pillar of the State's Economy ................................. 7

II.  The Delaware Legal Industry: Key Economic Metrics ......................................... 8

   A.   Employing Thousands of Delawareans ......................................................... 9

   B.   Creating High-Quality Jobs ........................................................................ 9

   C.   Providing Charitable Donations and *Pro Bono* Legal Services ...................... 11

   D.   Generating a Flourishing Legal Support Market ........................................... 11

   E.   Sharing the Benefits of the Legal Industry Throughout the Delaware Economy ............. 15

III. The Delaware Legal Industry: Attracting Out-of-State Business .......................... 17

   A.   Surpassing Its Comparably Sized Peers ....................................................... 17

   B.   Growing AmLaw 100 and Indigenous Firms in Delaware .............................. 18

   C.   Drawing Out-of-State Lawyers Who Provide Direct and Indirect Revenue to Delaware . 20

   D.   Supporting Commercial Real Estate, Hotels, and Restaurants ........................ 20

IV.  The Delaware Legal Industry: The High Benefit-to-Cost Ratio ........................... 23

   A.   Minimally Impacting the Environment ......................................................... 23

   B.   Creating Jobs Where Delaware Wants Jobs .................................................. 24

   C.   Providing a Safe Workplace ........................................................................ 26

V.   The Foundation of the Delaware Legal Industry: The Corporate Franchise .......... 27

   A.   The Delaware Division of Corporations ....................................................... 28

   B.   Development and Maintenance of Corporate and Business Codes .................... 29

C.  Delaware's State Judiciary................................................................. 30

    1.  The Court of Chancery .................................................................... 32

    2.  The Complex Commercial Litigation Division of the Delaware Superior Court....... 33

    3.  The Delaware Supreme Court ........................................................ 33

D.  Delaware's Federal Judiciary and the Corporate Franchise ............................................. 34

    1.  Delaware's Bankruptcy Court ........................................................ 35

    2.  Federal District Court for the District of Delaware ................................. 36

E.  Delaware's Alternative Entity Practice............................................................. 38

    1.  Partnerships ................................................................................ 39

    2.  Limited Liability Companies........................................................ 40

    3.  Statutory Trusts........................................................................... 41

VI.  The Corporate Franchise: Providing Significant Revenue for Delaware ............................. 42

VII. Conclusion: A Sustained Commitment Going Forward........................................ 44

Acknowledgments.......................................................................................... 45

# THE CONTRIBUTIONS OF THE
# LEGAL INDUSTRY TO THE DELAWARE ECONOMY

**Executive Summary:**

- Drawing upon independent research and newly compiled data, this study reveals the considerable impact the legal industry has on Delaware's economy in terms of employment, tax revenue, and the secondary effects on the businesses that serve the industry.

- The legal industry contributes $2.4 billion to Delaware's economy, with legal sector jobs contributing to the state's gross domestic product at double the rate of other major sectors. While the legal industry contributed $1.74 billion directly through the industry itself, the multiplier effect of the industry provides an additional $731 million to the state's gross domestic product, as firms and employees make purchases in Delaware.

- Individuals employed in Delaware's legal sector contributed $228,000 per year to the state's gross domestic product. That number is two to three times that of other leading Delaware industries and approximately 83% higher than the average of all Delaware service industries.

- The legal industry helps generate one-third of the state's total annual revenue for fiscal year 2018, approximately $1.8 billion. Much of this revenue is generated from out-of-state sources, which helps fund Delaware schools, public safety, medical care for the poor, and other priorities.

- One of main reasons for this considerable economic impact is Delaware's ability to attract out-of-state business, which it does better than any other state except for New York. Wilmington is home to offices of 19 of the largest law firms in the country, a number unmatched by comparable or even larger cities.

- Compared to other leading Delaware industries such as manufacturing and agriculture, the legal industry has a relatively low carbon footprint and a low rate of workplace injuries. Further, almost all investments and job creation by the legal industry are located in areas of the state where there is already a high degree of existing public infrastructure, minimizing the need for additional investment to sustain the industry.

- The Delaware legal industry is part of, and prospers from, the state's "Corporate Franchise," Delaware's historic and unique role as the situs for the formation of public corporations. Over 60% of Fortune 500 companies are in Delaware, and Delaware courts serve as a center of corporate, bankruptcy, and intellectual property disputes.

- Because of the Corporate Franchise, Delaware continues to grow as a favored place for corporations and alternative entities, such as partnerships, statutory trusts, and limited liability companies. Delaware statutory trusts are the vehicle of choice for the formation of mutual funds, and there is approximately one Delaware limited liability company for every resident of Delaware.

- The legal industry's success in, and importance to, Delaware is largely anchored in the judgment of decision-makers in the national and international business community that Delaware is the first choice for their corporate home and the resolution of their legal disputes.

**Introduction:**

This study was commissioned by the Delaware State Bar Association and conducted by the authors to provide a detailed examination of the economic impact of the legal industry in the state of Delaware. This study analyzes publicly available data and conducts traditional economic modeling to measure the economic impact of the legal industry and to understand the reasons for this impact. The study also examines original data acquired and analyzed for this specific

2

project, including a detailed survey of every law firm with a substantial presence in Delaware providing data on the number of employees, average salaries, square footage occupied, and other metrics such as vendor usage and charitable contributions.   A second survey of law-related businesses also provides useful data and significant anecdotal information.   In addition, the Delaware Department of Finance provided aggregate tax data for this study, the analysis of which provides a deeper and more granular review of revenues generated by the legal industry. Comparing the legal industry in Delaware to that in other jurisdictions, the study also details the presence of Delaware offices for the world's top law firms, as well as the per capita employment created by the Delaware legal industry compared to that of other states.   To contextualize the net value of these jobs and investments, the study reviews and compares workplace injury data and the environmental externalities associated with this and other industries.   Similarly, the study also includes a zip code analysis of all the law firms in this state, mapped against the State's priorities for infrastructure investment.

Drawing upon this independent research and newly compiled data, the study reveals the considerable impact the legal industry has on Delaware's economy in terms of employment, tax revenue, and the secondary effects on the businesses that serve the industry.   Providing historical context for the evolution of this industry in Delaware, the study concludes this significant contribution is not mere happenstance.   Instead, it is the result of a deliberate and concerted effort of members of the legal industry, including attorneys and judges, together with members of the executive and legislative branches of Delaware government, to preserve and foster Delaware's status as a national legal center.

Like most studies of this nature, this study begins with an economic analysis of the industry, highlighting the large number of Delawareans employed by the legal industry—second

3

only to New York on a per capita basis.  Importantly, these jobs are high paying, with an average salary more than double that of the state average.  Further, to support the legal sector, a flourishing legal support market of related industries has emerged, including registered agents, legal service providers, office and equipment suppliers, e-discovery vendors, and trial technologists.  In terms of the total impact on the state, the legal industry contributes $2.4 billion to Delaware's economy, with legal sector jobs contributing to the state's gross domestic product ("GDP") at double the rate of other major sectors.

One of main reasons for this considerable impact is Delaware's ability to attract out-of-state business, which it does better than any other state except for New York.  Wilmington is home to offices of 19 of the largest law firms in the country, a number unmatched by comparable or even larger cities.  In 2018, approximately 4,500 out-of-state lawyers sought temporary admission to our courts, generating $1.7 million in fees.  This influx of out-of-state attorneys is far more significant than the admission fees alone, as these attorneys—along with their staff, consultants and other members of their teams—generate additional revenue for Delaware's real estate, hospitality, and restaurant industries.  To provide context, the study includes anecdotes from members of this broader community, including a large commercial relator who reveals that 85% of his company's tenants are law firms and a restaurant that reports 50% of its revenues are attributable to the patronage of the legal industry.

Policymakers should consider the net benefit of an industry, including the public infrastructure investments necessary to support it, its impact on the environment, and its potential associated increased health care costs.  To that end, this study contrasts this sizeable economic impact with the marginal impact on quality of life factors, such as the environment and workplace safety.  For example, the study compares the relatively low carbon footprint and the

4

low rate of workplace injuries of the legal industry to that of other leading Delaware industries such as manufacturing and agriculture.  Finally, almost all investments and job creation by this industry are located in areas of the state where there is already a high degree of existing public infrastructure, minimizing the need for additional investment to sustain the industry.

The study goes behind the numbers to explain why Delaware's legal industry stands out from its peers in other jurisdictions.  In particular, the study focuses on the "Corporate Franchise," Delaware's historic and unique role as the situs for the formation of public corporations.   There  are  various  components  of  this  Corporate  Franchise,  including  the responsiveness and efficiency of the Division of Corporations, the flexible yet stable Delaware General Corporation Law, and Delaware's judiciary—especially the Court of Chancery.  The study reviews the critical interplay between these symbiotically related components and how members of the legal industry, Delaware legislators, and the executive branch work together to preserve and enhance the Corporate Franchise.  The collective effects of these efforts include the incorporation in Delaware of over 60% of Fortune 500 companies, and the establishment of Delaware courts as a center of corporate, bankruptcy, and intellectual property disputes, as evidenced by an analysis of cases filed and pending.   These efforts have also resulted in Delaware's growth into a favored place for alternative entities, such as partnerships and limited liability companies, with almost 200,000 entities formed in 2017 alone.

The positive effect of the Corporate Franchise on Delawareans is perhaps most evident in the revenue it generates—approximately 1.8 billion in fiscal year 2018, one-third of the state's total annual revenue.  Much of this revenue is generated from out-of-state sources and helps fund our schools, public safety, medical care for the poor, and other priorities.  Specific carve-outs for revenue also flow directly to city and county governments to support the services they provide.

5

Simply put, the robust tax revenue associated with the legal industry is not limited to the direct taxes from law firms and those working in this industry; it includes the revenue created by the Delaware Corporate Franchise, of which this industry is an integral part.

In the end, the study makes clear the contributions of the legal industry to the state are significant by almost any measure. The study also cautions that maintaining Delaware's preeminence as a legal center and all the resultant benefits requires the consistent and thoughtful cooperation and support of several Delaware constituencies. The industry is largely anchored in the well-supported view of decision-makers in the national and international business community that Delaware is the first choice for their corporate home and the first choice for the resolution of their most important disputes. Other jurisdictions continually try to convince these same decision-makers otherwise. It is critical that industry representatives, the judiciary, elected officials, and policymakers continue to be vigilant in their efforts to keep Delaware first.

## I.    Delaware's Legal Industry: A Pillar of the State's Economy

The legal industry plays a unique role in the economy of the state of Delaware. Based upon independent research and newly compiled data, this study documents the substantial economic impact the legal industry has made, and continues to make, upon the state.

The authors of this study and their collaborators—including the Delaware State Bar Association ("DSBA"), various government agencies, members of the judiciary, and individual attorneys—compiled and analyzed data regarding the legal sector and the broader legal industry in Delaware. The data involved: (i) law firms, (ii) law-related businesses, (iii) employment and wages in the legal sector, (iv) the "multiplier effects" of the Delaware legal industry throughout Delaware, (v) tax revenues attributable to the legal sector, (vi) workplace safety, and (vii) the

environmental impact of various industries.  The picture that emerges from the data and analysis is clear: Delaware's legal industry is a pillar of the Delaware economy.

The legal industry bolsters the Delaware economy both directly and indirectly.  The direct effects on Delaware's economy include high rates of employment, higher-than-average salaries (for both lawyers and non-lawyers), and substantial tax revenue, both from the law firms practicing in the state as well as from Delaware's unique "Corporate Franchise"—i.e., the "outsized place in the formation of business entities, particularly publicly held corporations,"[4] that Delaware has retained "[f]or over two centuries."[5]  The indirect effects on Delaware's economy include employment, investment, and revenue from industries serving Delaware's legal sector, including "back-office" industries, couriers, and process servers, as well as general service providers, such as the food, beverage, hospitality, and real estate industries.  There are substantial effects on the incomes of all those employed both directly and indirectly, which result in significant additional employment and spending in the state.  Finally, as detailed further below, the contributions to the state's tax revenue constitute a major part of the legal industry's impact on the state.  These contributions occur with relatively small burdens on Delaware's resources: the legal industry's carbon footprint and other pollution impacts are low, the industry grows without the need for significant changes in infrastructure investment, and it results in few work-place injuries.

The legal industry's success and the many benefits it brings to Delaware are not the product of happenstance.  They are the product of public officials working closely with the members of the legal profession to carefully support the Corporate Franchise through (1) the passage of responsive and innovative legislation, (2) support for the judiciary both financially and through the retention and recruitment of highly qualified personnel and (3) the establishment

and support of the Division of Corporations.  The legal industry's continued success requires planning and the support of key constituencies in this state—namely, the private sector, and the executive and legislative branches of government.

## II.    The Delaware Legal Industry: Key Economic Metrics

By any conventional metric, Delaware's legal industry is an economic pillar of the state. Whether measured directly (by legal-sector employment, wages, benefits) or indirectly (by "multiplier effect"[6] of jobs and spending, and back-office industries), the economic contributions of the legal industry to the state of Delaware are considerable.

### A.    Employing Thousands of Delawareans

Many Delawareans are employed in the legal services industry.  As Chart 1 below illustrates, Delaware ranks second nationally—behind only New York—in the percentage of total state population employed by the legal industry.



Based upon surveys conducted by the study's authors and the DSBA, the 12 largest Delaware law firms (ranked by total expenditures on employees, materials, and support services) alone provided 1,498 full-time jobs in 2018.

### B.   Creating High-Quality Jobs

According to the Delaware Department of Labor's most recent comprehensive study on Delaware wages, the annual mean wage among Delawareans employed in the "legal" occupational group was $119,131—the fourth highest level in the country and more than double the statewide average of $52,203.[7]  Although attorney salaries influence this industry-wide average, a deeper breakdown of the numbers reveals that the success of the Delaware legal industry is felt by all legal industry employees.  Indeed, the mean annual wage of the employees within each individual "legal occupation" for which such data exist—including paralegals and legal assistants ($55,120), court reporters ($59,730), and miscellaneous "legal support workers" ($54,720)—exceeds the statewide average annual wage.[8]

While Delaware's salaries within the legal *occupation* rank as the fourth highest in the country, Delaware ranks first in average salaries within the legal services *industry* due to comparatively high salaries of individuals in non-legal occupations, such as IT, within the legal industry.

9



The foregoing chart shows the aggregate compensation (including wages, salaries, benefits, profit shares, etc.) of *all* employees in the Delaware legal sector. The benefits of the quality jobs provided by Delaware's legal sector are shared among associates, paralegals, IT specialists, firm librarians, and secretaries, not just partners.

The high compensation levels of the non-attorneys associated with Delaware's largest law firms are enjoyed not just in Wilmington but throughout the state, as shown in the chart below.[9]

| Job Titles | Delaware | | Kent County | | New Castle County | | Sussex County | |
|---|---|---|---|---|---|---|---|---|
| | Average Compensation per Person | Median Compensation per Person | Average Compensation per Person | Median Compensation per Person | Average Compensation per Person | Median Compensation per Person | Average Compensation per Person | Median Compensation per Person |
| Paralegals | $72,777 | $80,000 | $36,700 | $38,000 | $95,254 | $96,667 | $52,945 | $55,000 |
| IT and Tech | $120,172 | $113,000 | $68,333 | $68,333 | $122,109 | $123,566 | | |
| Secretarial | $81,447 | $80,979 | $60,527 | $50,000 | $86,374 | $82,000 | $39,532 | $42,500 |
| Other | $105,927 | $96,180 | $73,833 | $45,000 | $109,921 | $112,141 | $32,882 | $44,504 |

C.      **Providing Charitable Donations and *Pro Bono* Legal Services**

Contrary to some popular portrayals of attorneys, Delaware's legal professionals are generous, with both their money and time.  Surveys revealed that in 2018, Delaware's 35 largest law firms contributed over $1.4 million—approximately $1,000 per worker—in donations to local and national charities.  In that same spirit, those firms volunteered an average of 204 hours of *pro bono*—a Latin phrase meaning "for good"—legal assistance per attorney to indigent or otherwise underserved clients.

D.      **Generating a Flourishing Legal Support Market**[10]

The economic footprint of Delaware's legal industry does not stop at the law firm or courthouse door.  In addition to employing attorneys, paralegals, and legal assistants, Delaware's firms and courts require general services, such as office equipment and supplies, as well as specialized legal services, which has spawned a thriving back-office industry of registered agents and e-discovery vendors throughout Delaware.

Delaware law offices spend millions of dollars every year on operational expenses.  Like any office-based business, Delaware law firms incur expenses for office equipment and supplies, printing, copying, postage, mailings, banking and financing fees, food and beverage services, outside accounting and auditing, cleaning, maintenance, security, and utilities.

In addition, each Delaware corporation and most non-corporate entities (or "alternative entities") are required to have a registered or "resident" agent in the State of Delaware.  To serve as a registered agent in Delaware, an individual or a company must maintain a street address and office located in Delaware, and be open during normal business hours for the purpose of accepting service of process on behalf of the corporation or entity.[11]  Currently, there are 116

11

registered agents listed on the website of the Delaware Division of Corporations.[12]   Those

registered agents serve more than 1,000,000 Delaware business entities.

Two of the oldest registered agent companies in Delaware are CSC and the Corporation

Trust Company ("CT Corporation").

***CSC***.   For more than 120 years, CSC has provided business solutions to the world's

largest corporations, law firms, and financial institutions for every stage of the business life

cycle.   Headquartered in Wilmington, CSC works with 90% of the Fortune 500 companies, more

than half of the Best Global Brands (Interbrand), nearly 10,000 law firms, and more than 3,000

financial organizations.

CSC has approximately 1150 employees in Delaware.   As Rod Ward, CEO of CSC,

explains, CSC's success is a function of its role within and dependence upon the "broader

Delaware legal ecosystem":

> Having been a part of the broader Delaware legal ecosystem for over 100 years,
> our business is inextricably connected to Delaware's legal sector.   Delaware's
> highly respected judicial system has made Delaware a jurisdiction of choice for
> public and private companies around the world.   The importance of the continued
> health and growth of this critical sector of our state economy to CSC's overall
> success cannot be overstated.

***CT Corporation***.   CT Corporation opened its first Delaware office in 1907 and currently

has two Delaware offices (one on Orange Street in downtown Wilmington and one in suburban

Wilmington).   Alan Stachura, CT Corporation's Senior Manager for Government Relations in

Wilmington, outlines the mission of CT and its reliance on the legal industry:

> The Corporation Trust Company was created to assist lawyers and the legal
> community in 1892.   We exist to serve the broader Delaware legal industry.
> Every day, for the last 127 years, we have met the needs of that industry and
> helped it to thrive.   And that relationship has been mutual.   Were it not for the
> Delaware legal industry, we would not exist either.

Approximately 70% of CT's business in Delaware comes from the legal community (the balance is small businesses).  The downtown office has 85 full-time employees, and the suburban office has 12 full-time employees.

Just as the success of the legal industry has fueled the strong growth of long-standing businesses like CT and CSC, technological innovations over the last 25 years have created new industries in Delaware that support the ever-growing technology, communications, and records- and document-management needs of law firms, legal departments, and companies.[13]  Most courts in Delaware require electronic filings of pleadings, and the state is moving toward its goal of across-the-board e-filing.  Document review and production have been digitized.  Courtroom technologies allow for sophisticated audio-visual presentations at hearings and trials.

Numerous Delaware businesses have been formed to meet these evolving technology and service needs of the legal industry, such as e-discovery and data analytics, hosted document review, data collection, trial support, and document technology and printing.

*Parcels, Inc*.  One of the earliest companies to provide these services was Parcels, Inc., which was founded in 1980.  Parcels began as a courier delivery service.  Today, it supports 88 full-time employees.  The legal industry comprises 90% of its business.  Vito DiMaio, Executive Vice President of Parcels, explains the company's dependence upon and contribution to Delaware's legal industry:

> Without the legal industry, there would likely be no Parcels.  Although many of our services apply to other industries, such as medical or finance, our sweet spot is within the legal industry.  In addition, we've witnessed many other types of service providers that benefit tremendously from the legal industry.  Examples include: office supply companies, copier/printer dealers, hotels, restaurants/caterers, IT support businesses, commercial real-estate firms, interior design/office furniture groups, staffing agencies, court reporting firms, registered agents, insurance companies, health care providers, and the list goes on and on.  With this in mind, and taking pride in the fact that we are a family-oriented business, it's important to acknowledge the extraordinary number of families that

13

survive by supporting the legal industry. Parcels alone supports at least 88 families who contribute to society in being good citizens who pay taxes, boost the economy by purchasing goods and services, volunteer their time to help various non-profits and charities, and again, the list goes on and on.

***DLS and PTC.***   Founded in 2001, Digital Legal Services ("DLS") began its venture with 25-30 employees.  Today, DLS employs 50 full-time employees in Wilmington.  In 2013, as e-discovery launched in Delaware, DLS rebranded as "DLS Discovery."  "DLS primarily started out as a legal copy, print and courier company," observed DLS President Ed Carp.  "Through our work with local counsel, DLS has matured into a technology company now supporting e-discovery and hosting, managed attorney review, trial suite rentals and marketing, along with our core litigation support services."  In addition to its location in Wilmington, DLS manages a document review center in Greenville, with the capacity for providing up to 25 reviewers.

Prevail Trial Consultants ("PTC"), a sister company to DLS, owes its origin to the growing number of trials in the federal and state courts in Delaware.  PTC provides technical assistance to trial teams using contract attorneys to review documents.  "Our business is 100% due to the legal industry," says Andrew McClary, ESI and Discovery Manager at DLS.  Ed Carp adds, "We wouldn't be able to invest in new business if not for the continued growth of the legal industry in Delaware."

### E.   Sharing the Benefits of the Legal Industry Throughout the Delaware Economy

The large number of well-paying legal services jobs in Delaware creates a high concentration of middle- and upper-income professionals—particularly in cities where legal activity is most prominent, such as Wilmington and Dover.  This concentration of income gives rise to a broader "multiplier effect"[14] throughout the Delaware economy. Jobs create more jobs, and spending creates more spending, as initial legal industry employment and expenditures

14

ripple throughout the Delaware economy.  On a human level, Delaware's international reputation as a leading center for sophisticated business law makes it recognizable to professionals in other business sectors, and establishes Delaware as a place associated with high-level commerce and cutting-edge involvement in the global economic system.

| Total Economic Contributions of Delaware's Entire Legal Sector And Courts on the Delaware Economy | | |
|---|---|---|
| Impact Type | Employment | State GDP |
| Direct Effects | 7665.50 | $1,745,168,376 |
| Impact of Spending at All Related Firms | 1839.00 | $197,413,235 |
| Impact of Spending by All Affected Households | 5005.90 | $465,916,588 |
| Total Effect | 14510.30 | $2,408,498,202 |

The total economic impact of the legal industry upon Delaware's economy is more than $2.4 billion.  While the legal industry contributed $1.74 billion directly through the industry itself, the multiplier effect of the industry provides an additional $731 million to the state's GDP, as firms and employees make purchases in Delaware.  This total contribution of $2.4 billion amounted to 3.2% of Delaware's total GDP in 2018.

A breakdown of these totals reveals that every legal industry job translates into 1.89 Delaware jobs and contributes (both directly and indirectly) over $314,000 to the state's economy.

| Economic Contributions of Delaware's Entire Legal Sector And Courts Per Legal Sector Job | | |
|---|---|---|
| Impact Type | Employment | State GDP |
| Direct Effect of Legal Sector | 1.00 | $227,665 |
| Impact of Spending by All Firms | 0.24 | $25,753 |
| Impact of Spending by All Affected Households | 0.65 | $60,781 |
| Total Effect | 1.89 | $314,200 |

Among Delaware's largest law firms the multiplier effect is even greater; each legal sector job translates into 2.12 jobs and contributes $355,574 to the Delaware economy.

15

| Economic Contributions of Large Delaware Law Firms Per Legal Sector Job | | |
|---|---|---|
| Impact Type | Employment | State GDP |
| Direct Effect of Legal Sector | 1.00 | $251,108 |
| Impact of Spending by All Firms | 0.16 | $15,751 |
| Impact of Spending by All Affected Households | 0.96 | $86,715 |
| **Total Effect** | **2.12** | **$353,574** |

On average, individuals employed in Delaware's legal sector contribute $228,000 per year to the state's GDP. As the chart below indicates, that number is two to three times that of other leading Delaware industries and approximately 83% higher than the average of all Delaware service industries:

| Comparisons of Contributions to State GDP Per Worker | |
|---|---|
| Delaware Legal Sector | $228,000 |
| All Delaware Service Industries (Includes Legal) | $141,400 |
| Delaware Agriculture | $89,100 |
| Delaware Manufacturing | $133,600 |
| Delaware Construction Industries | $86,900 |

## III. The Delaware Legal Industry: Attracting Out-of-State Business

### A. Surpassing Its Comparably Sized Peers[15]

The role the legal industry plays in making Delaware a hub for national commerce is exemplified by the extent to which the leading national law firms both locate and appear in Delaware. As a leading venue for corporate, commercial, patent, and bankruptcy law,[16] Delaware attracts law firms and individual attorneys from across the country. Indeed, Delaware attracts more out-of-state legal business than any comparably sized state. As Chart 3 below illustrates, Delaware is only surpassed by New York as a provider of out-of-state legal services.[17]

16



To meet their clients' needs, ==national law firms establish offices in Delaware.  In addition, out-of-state attorneys regularly frequent Delaware's state and federal courts or travel to Wilmington to meet with co-counsel.  Along with Delaware's indigenous firms, these national branch offices and visiting attorneys provide jobs and revenue not only for the legal sector but also for commercial real estate, hotels, restaurants, and general service providers.==

**B.      Growing AmLaw 100 and Indigenous Firms in Delaware**[18]

Nineteen of the American Lawyer's 100 (the "AmLaw 100") law firms have offices in Wilmington.  The AmLaw 100 provides industry rankings based on the number of attorneys, profits per partner, and overall revenue of law firms.  Generally speaking, law firms on the AmLaw 100 are full-service firms with sophisticated practices.  Most have their offices in major cities, such as New York, Chicago, Washington D.C., Los Angeles, and Philadelphia.  Rarely are smaller cities, especially with populations under 100,000, home to firms of this size and caliber. Wilmington, with a population of approximately 71,000, is the exception.

==In comparison to Wilmington, neighboring cities of comparable size such as Reading, Pennsylvania (88,000), Frederick, Maryland (71,000), and Cherry Hill, New Jersey (71,000)==

17

attract few, if any, AmLaw 100 firms.  In Delaware's neighboring states, the only city with more AmLaw 100 firms is Philadelphia, with a population of 1,580,000.  Despite this disparity in size, Philadelphia has only two more AmLaw firms than Wilmington.  Baltimore has eleven of the AmLaw 100 firms, despite having a population over eight times that of Wilmington.  Newark, New Jersey has only seven AmLaw firms despite being four times the size of Wilmington.  As the following chart shows, no other comparable city approaches Wilmington's appeal among AmLaw 100 firms:

| Number of AmLaw100 Firms by Revenue with Offices in Respective Cities | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Wilmington DE (71,000) | Philadelphia PA (1,581,000) | Redding PA (88,000) | Scranton PA (77,000) | Baltimore MD (611,000) | Frederick MD (71,000) | Rockville MD (68,000) | Newark NJ (285,000) | Camden NJ (74,000) | Cherry Hill NJ (71,000) |
| 19 | 21 | 0 | 0 | 11 | 0 | 0 | 7 | 0 | 3 |

The reason for this unique concentration of top-tier law firms in Wilmington is clear: Delaware's renowned courts and body of corporate and commercial law.  A scan of some of the websites for these firms confirms this conclusion.  DLA Piper, which is ranked 5 on the AmLaw 100 and is one of the largest law firms in the world, explains on its Wilmington office website: "Delaware is the corporate capital of the world because of its sophisticated business laws and highly respected judicial system."[19]  Duane Morris, ranked 71 on the AmLaw 100, with its headquarters in Philadelphia, explains its presence in Delaware: "The state's preeminence in business law has developed primarily through the work of the Delaware Court of Chancery–nationally, the forum of choice for resolving corporate disputes."[20]  Skadden Arps, ranked 4, has 22 offices on four continents, but its Wilmington office is the only one (with the exception of Palo Alto, California) located in a city with less than a million people.  According to its website, "Skadden's Wilmington office handles corporate transactions, litigations, reorganizations and restructurings for Fortune 500 companies and corporate clients."[21]  In short, nearly every

18

AmLaw 100 firm with an office in Delaware touts Delaware's prominence in business law and/or the sophistication of Delaware's state and federal courts when describing its practice in the state.

Similarly, Delaware's home-grown law firms headquartered in Wilmington are larger than local law firms in similarly sized jurisdictions. Richards, Layton & Finger has 165 lawyers, Potter Anderson Corroon has 97, and Morris Nichols Arsht & Tunnell has 95. Comparatively, the largest headquartered firm in Reading, Stevens & Lee, has 38 lawyers. In Cherry Hill, Flaster Greenberg has 26 lawyers, and in Rockville, Maryland, the Stein Sperling firm has 50 lawyers. Wilmington's large local law firms are three to five times the size of the typical largest firm in comparable neighboring cities and resemble those located in cities with far larger populations.

### C. Drawing Out-of-State Lawyers Who Provide Direct and Indirect Revenue to Delaware

Each year, approximately 4,500 attorneys who are not active members of the Delaware Bar are admitted temporarily for the purpose of participating in particular cases. Many of the cases in which they appear are directly related to Delaware's Corporate Franchise. The vast majority of these *pro hac vice*—a Latin phrase meaning "for this occasion or particular purpose"—admittees are from out-of-state, and their combined admission assessments contribute approximately $1.7 million annually to the overall operating costs of the Supreme Court and its regulatory agencies, which are known as the Arms of Court. Even more importantly, these out-of-state attorneys—along with their staffs, consultants, and other team members—generate revenue for the Delaware real estate, hospitality, and restaurant industries.

### D.    Supporting Commercial Real Estate, Hotels, and Restaurants[22]

<mark>Delaware's success in fostering home-grown firms and attracting national firms and prominent co-counsel provides benefits that go beyond the legal sector and back-office industries.</mark>  Businesses throughout the state provide general goods and services—such as commercial office space, restaurants, hotels, transportation, and parking facilities—to this broader legal industry, which in turn provides employment and tax revenue for the citizens of Delaware.

Delaware law offices—both home-grown and national branches—occupy substantial amounts of commercial space within the state, thus supporting an important sector for economic development.

Surveys of some of Delaware's most prominent real estate and general services companies, also conducted by the study's authors and the DSBA, witness to the importance of the legal industry to the life of these businesses:

*BPG*.  The Buccini/Pollin Group, Inc. ("BPG") is a privately held, full-service real estate acquisition, development, and management company with offices in Washington D.C., Wilmington, and Philadelphia.  Formed in 1993, BPG develops and acquires hotel, office, residential, retail, and parking properties.  Since its inception, BPG has acquired or developed significant real estate assets in Delaware, including hotels, office and retail space, major residential communities, and multiple entertainment venues, including the Sixers Fieldhouse.

Through a group of affiliated companies, the principals of BPG oversee all aspects of project acquisition, finance, development, construction, leasing, operations, and disposition for its portfolio properties.  Regarding the relationship between BPG and the legal industry, BPG Co-President Chris Buccini observes:

The legal industry perhaps has the largest impact on the economy of the state of Delaware, and the city of Wilmington. Its presence is felt in everything BPG does, whether office space for the law firms and businesses that support them, the lodging industry and the large amount of meeting space that is utilized, the growing residential apartment inventory that houses the employees, as well as those that come for shorter stays for trials, and the impact on the dining and entertainment industry. It would be difficult to fully estimate the impact that the legal industry has on Delaware's economy.

*McConnell Johnson Real Estate.* Founded in 1989, McConnell Johnson Real Estate owns and leases 1313 North Market Street (formerly the Hercules Building) and 1201 North Market Street. Partner Scott Johnson estimates that approximately 85% of the company's tenants are law firms. Johnson states:

The backbone of the Central Business District in Wilmington is supported by the legal community economically. The buildings they occupy support many vendors for building support services like security, cleaning, leasing, and management, along with many other small businesses in and around Wilmington that support the legal industry.

*Sheraton Suites.* The Sheraton Suites in Wilmington ("Sheraton"), which was founded in 1979, has 60 employees. According to a company representative, the annual revenue impact of the legal industry on the Sheraton is roughly $465,000. As noted above, out-of-state counsel frequently come to Wilmington for trials, hearings, depositions, mediations, and arbitrations. On average, the legal industry accounts for between 2,500 and 3,000 room nights per year at the Sheraton. Those guests also frequent local restaurants and bars, and utilize the services of legal support companies.

*Tonic Bar and Grille.* Founded in December 2015, Tonic Bar and Grille ("Tonic") currently has 50 employees. According to Tonic's management, over 50% of Tonic's revenue is attributable to attorneys and judges. Counting law-related employees such as legal assistants, paralegals, DLS employees, Parcels employees, etc., that figure jumps to 60-65% of Tonic's business.

*Colonial Parking*.   Founded in 1956 by Richard G. Hatfield and headquartered in Wilmington, Colonial Parking provides monthly and daily parking services in Wilmington, at the Philadelphia International Airport, and in West Chester, Pennsylvania.  Many of its monthly and daily parking customers work in Delaware's legal industry.   John E. ("Jed") Hatfield, the president of Colonial Parking, estimates that approximately 34% of its total volume of parking is attributable to the legal industry.  "The legal industry is a substantial portion of the activity in Wilmington, second only to the financial services industry.  Therefore, they represent a sizeable portion of the customers Colonial Parking serves."

## IV.   The Delaware Legal Industry: The High Benefit-to-Cost Ratio

The legal industry's substantial contributions to the economy come at comparatively little cost to the state of Delaware.  Unlike many industries, which take a heavy toll on Delaware's resources, the legal industry generates revenue and creates high-quality jobs at minimal expense to the environment, infrastructure, and healthcare system.

### A.   Minimally Impacting the Environment

The Delaware legal industry is environmentally sound.   Compared to other major Delaware industries (manufacturing, chemicals, and agriculture), the legal industry has virtually no detrimental impact on the state's environment.  Three factors explain why the legal industry is green:

*First*, while many industries rely on costly, industry-specific significant physical infrastructure—water and sewer, spray irrigation, smokestacks, etc.—Delaware's legal industry is located primarily in urban centers where transportation and office space already exist.  In addition, manufacturing, agricultural, and other similar industries generate air emissions and pollutant discharges from point and non-point sources, and/or create waste and hazardous

22

substances—all of which trigger state permitting and monitoring requirements.  Investments and job creation in the legal industry are unlikely to trigger these environmental permitting and monitoring issues.   A growing legal industry utilizes existing infrastructure and has comparatively little impact on Delaware's environmental landscape.  By fostering growth in commercial real estate, tax revenue, and population, Delaware's legal industry leaves a positive mark on the communities in which it operates.  As discussed below, state policy encourages development in our existing downtown communities.  The legal services industry meets both objectives and helps the state encourage other business sectors to do so.

*Second*, the legal industry poses almost no latent environmental danger.  Housed in offices and courthouses, attorneys, judges, and their staffs pose no environmental risk unique to their profession.  By contrast, hazardous chemicals,[23] animal waste,[24] and other environmentally sensitive materials are part and parcel of some of Delaware's other leading industries.[25]

*Third*, compared to certain of Delaware's other major industries,[26] the legal industry is carbon-friendly and non-resource intensive.  To be sure, every individual working in Delaware's legal industry makes a carbon and environmental footprint.  But with its tight concentration in newer (and thus more energy-efficient) buildings, the legal industry is viewed by many as a leader in conservation and environmental sustainability.[27]  As important, the legal industry consumes less natural resources in its daily operations than more resource-intensive industries like agriculture and manufacturing.

**B.     Creating Jobs Where Delaware Wants Jobs**[28]

Future investments and growth in the legal industry are likely to occur in areas the state of Delaware has identified as high priorities for investment and growth.  As a result, expansion of the legal industry should only minimally burden the state's infrastructure.

23

More specifically, the *2015 Delaware Strategies for State Policies and Spending* document sets out the state's policy priorities for infrastructure and development investment in an effort to make the best use of limited resources. The *Policies and Spending* document is intended to facilitate collaboration between state government and local jurisdictions. In furtherance of that end, the *Policies and Spending* document defines areas of the state as Investment Levels 1, 2, 3, 4, and "Out-of-Play" (i.e., "lands that are not available for development or for redevelopment").[29]

Investment Level 1 areas are typically cities and urban areas where significant investment in transportation and other infrastructure has already occurred. Thus, developments in Level 1 areas represent the most efficient use of resources due to the existing infrastructure. Not surprisingly, Level 1 areas are the targets for state agencies to "focus [on] new and expansion projects" and/or aggressively seek development projects.[30]

To that end, the *Policies and Spending* document encourages "enhanced incentives to those projects that select locations in Level 1 or Level 2 Areas."[31] These incentives are justified because the benefits of Level 1 developments are felt by a large number of Delawareans due to the density of Level 1 areas and the minimal additional public investment typically needed for Level 1 developments. Compared to developments in Level 1 areas, projects in less developed regions of Delaware often require substantial public investment in transportation, utilities, or public services. As the *Policies and Spending* document puts it, "In general, the more spread out we are, the more costly it is for taxpayers and the more of our environmental resources will be consumed."[32] Projects outside Level 1 areas generally have greater environmental impact and create negative environmental externalities for the local community.

24

As illustrated by the juxtaposition of the maps below, most of the investments and job creation by the legal industry are in Level 1 areas, principally Wilmington, Dover, and Georgetown:



Indeed, all the AmLaw 100 firms in Delaware are located in Level 1 areas, as are all the large indigenous law firms.  Access to Delaware's courthouses, lawyers, and clients drives the legal industry to self-select its investment in these Level 1 areas.  By comparison, economic development initiatives with other industries, particularly those outside Level 1, often require expensive transportation and sewer infrastructure investments at the county and state levels.

### C.    Providing a Safe Workplace

The legal industry is a safe place to work—especially as compared to certain of Delaware's other leading industries.  By incidence of occupational injury, law offices and courts are among the safest workplaces in the national economy.  For instance, in the most recent year on record, the Federal Bureau of Labor Statistics found 0.8 total recordable cases of nonfatal occupational injuries and illnesses per 100 full-time workers in the "legal services" industry.[33]  Delaware's other major industries did not fare as well on the same metric, as the following table shows:

| Industry | Nonfatal Occupational Injuries and Illnesses Per 100 Workers, 2017[34] |
|---|---|
| Animal production and aquaculture | 6.1 |
| Poultry and egg production | 6.1 |
| Agriculture, forestry, fishing, and hunting | 5.0 |
| Crop production | 5.2 |
| Manufacturing | 3.5 |
| Animal slaughtering and processing | 4.8 |
| Chemical manufacturing | 2.0 |
| **Legal Services** | 0.8 |

The policy implications and real-world impact of this data can be far-reaching.  As these numbers demonstrate, as the legal industry grows to employ a greater share of Delaware's working population, fewer Delawareans will suffer workplace injuries—and all the attendant personal and economic consequences.[35]

In short, the legal industry provides communities with high-paying jobs, occupancy for premium office space, and significant tax revenue with minimal impact on the state's environment, infrastructure, or healthcare system.

## V.    The Foundation of the Delaware Legal Industry: The Corporate Franchise

The economic success of the legal industry is tied to the state's Corporate Franchise, i.e., Delaware's historically outsized place in the formation of business entities, particularly publicly

26

held corporations.  But that causal relationship is not one-sided.  The Corporate Franchise exists because of—and its continuation depends on—Delaware's sophisticated bench and bar.  A state with a 2018 population of approximately 967,000 people,[36] Delaware is home to more than 1.3 million legal entities. [37]  Those entities include 66.8% of all Fortune 500 companies and 80% of companies that made initial public offerings on the U.S. stock market in 2017.[38]

Scholars and legal commentators attribute Delaware's Corporate Franchise to the symbiotic relationship among the component parts of the state's legal industry.  The Division of Corporations of the Delaware Secretary of State's Office (the "Division of Corporations"), the development and maintenance of sophisticated corporate and business codes by the Delaware General Assembly and the DSBA, and the interpretation and application of those laws by Delaware's internationally renowned expert business courts are the key reasons for entities' decisions to organize in or migrate to Delaware.[39]  It is not that Delaware is the low-cost place to incorporate.  Business entities pay a market premium for the substantial advantages provided by Delaware's superior business law courts and service they receive from the Division of Corporations.

A.      The Delaware Division of Corporations[40]

The Division of Corporations receives and processes "all filings required by law to be made with the Secretary of State and maintains the official records of all Delaware corporations and alternative entities."[41]  It also collects corporate franchise taxes, registers foreign business entities to do business in Delaware, and accepts service of process of behalf of Delaware entities (in certain cases).[42]

The Division of Corporations is organized "with separate administrative sections to expertly handle basic customer inquiries, franchise tax matters and business entity filings."[43]  A

27

"second shift" allows the Division of Corporations to remain open until midnight to "accommodate requests for expedited handling,"[44] as well as to make Delaware more accessible to West Coast and international businesses.   Moreover, the Division of Corporations offers expedited services by providing "one hour, two hour, same day and 24 hour service for urgent and time-sensitive filings for an added fee."[45]

Further, the Division of Corporations is responsive to the commercial importance of avoiding bureaucratic delays.  In fact, companies sometimes structure transactions "to involve Delaware business entities simply to avoid potential ministerial bottlenecks in other jurisdictions that could delay an important closing."[46]  Whereas government involvement in business affairs is traditionally regarded as a hindrance, the operations of the Delaware Division of Corporations instead entices transacting with or through Delaware entities, thus contributing to the Corporate Franchise.

### B.    Development and Maintenance of Corporate and Business Codes[47]

Cooperation between the General Assembly and the Delaware legal community has been essential to ensuring the modernity of Delaware's corporate and business codes as commercial conditions change.[48]  For example, "in response to a 1980s' crisis in obtaining directors' and officers' liability insurance on reasonable terms,[49] Delaware amended its statute to permit stockholders to limit the personal liability of directors,"[50] thus encouraging qualified individuals to assume critical directorships.  Responsive revisions to the corporate and business laws have helped Delaware retain its dominance of the market for corporate charters.  One study published in 1985, around the time of the aforementioned 1980s amendment, observed that, in the preceding quarter century, "[m]ore than 80 percent of the companies that have reincorporated . . . have migrated to Delaware."[51]

28

The Delaware General Corporation Law ("DGCL") is the "formal apex" of Delaware corporate law.[52]  Appropriately construed, the DGCL is "an enabling statute intended to permit corporations and their shareholders the maximum flexibility in ordering their affairs."[53]  At the same time, "[o]ne of the perceived benefits of incorporation in Delaware has been the stability of its corporation statute."[54]

Keeping the DGCL contemporaneous as commercial circumstances evolve depends on the cooperation of the General Assembly and the DSBA Section on General Corporation Law.[55]  Delaware's legislature has called upon the expertise of lawyers in this DSBA section to recommend, draft, and review amendments to the DGCL.[56]  In fact, nearly every amendment to the DGCL since 1967—the last time the code was substantively modified[57]—"has had its inception in the Corporation Law Section . . . of the [DSBA], whose overriding concern has been to clarify provisions [of the DGCL] in which practical experience or judicial scrutiny have exposed unnecessary ambiguity or uncertainty."[58]  Typically, the Corporation Law Committee submits a single bill each year containing all proposed amendments and commentaries to the DGCL for action by the General Assembly.[59]

Under this arrangement, "the Delaware General Assembly has not perceived the content of the DGCL as an appropriate subject for partisan controversy."[60]  Furthermore, the process discourages amendments that are "the product of any legislative staff, or of any lobbyists engaged by individual businesses."[61]  Instead, developments in the DGCL are driven by the Corporation Law Section's determinations as to what promotes Delaware's corporate law preeminence[62] and keeps the DGCL "dynamic and flexible to corporate needs."[63]  Although other states have copied the DGCL[64]—if not verbatim, then very closely—the uniqueness of "the process and philosophy that result in statutory law" is not so easily imitated.[65]

29

## C.       Delaware's State Judiciary[66]

Delaware's desirability as a legal forum for sophisticated business dispute resolution extends beyond its possession of "more than . . . up-to-date code[s]; Delaware also offers a comprehensive body of case law, which is not easily replicated by another state."[67]    In conjunction with the flexibility and reliability of the state's corporate and business codes, the wealth of established case law written by Delaware's expert judges affords companies "greater predictability of the legal outcomes," thereby "facilitating planning and reducing the costs of doing business" in the state.[68]  In turn, the "large number of corporations domiciled in Delaware contributes to the development of its case law, for the sheer numbers make it more likely that a particular issue will have been litigated."[69]

Further, the success of Delaware's state courts is a function of their reputation for integrity and fairness.  Investors in Delaware companies, such as large mutual funds, trust the Delaware courts to enforce the rights of stockholders and to ensure that corporate managers do not use their power for improper purposes.   For Delaware to continue to attract corporations and business entities, both the investors and the directors and officers who run those entities must feel that in the event of a dispute, the case will be resolved fairly.   The Delaware courts have demonstrated that sense of balance and most importantly, a willingness to take measures, whether by stopping an unfair corporate action or awarding sizable damages, to make sure that stockholders get the legal protections Delaware law promises them.

Moreover, the corporate success of Delaware's state courts has bred further success:  they have expanded beyond the borders of corporate law to a broader field of "commercial law." Toward the end of the twentieth century and into the twenty-first, Delaware became a preferred venue for major Delaware corporations to litigate disputes involving contracts and alternative

entities.  The Court of Chancery's reputation for speed and business expertise fueled substantial growth in these areas of practice.   Now, the Court of Chancery is regularly asked to adjudicate contract cases involving the world's largest businesses, both corporate and non-corporate.   In fact, the Court of Chancery is so popular that non-Delaware companies seek it out.[70]

### 1.      The Court of Chancery

Delaware's Court of Chancery is well known for its expertise in resolving corporate and complex business disputes.  As a court of equity, the Court of Chancery does not have jury trials, but instead has trials before individual judges.[71]   Accordingly, when redress is granted by the Court of Chancery, "the chancellor [or vice chancellor] bears the personal, nondelegable duty to shape an equitable remedy in the fairest and most just manner possible."[72]   The equitable nature of much of the relief sought in corporate litigation has contributed to the court's accession to its "dominant position over intracorporate matters."[73]   Because of Chancery's limited jurisdiction, the court is able to focus its resources on particular areas of law and "handle corporation law cases quickly and effectively."[74]

Over the years, cases involving corporate law issues came to be concentrated in the Court of Chancery, "where there were no juries and where judges were called upon, on a regular basis, to explain the reasons for their decisions in written opinions."[75]   "The economies of scale created by the high volume of corporate litigation in Delaware," particularly in the Court of Chancery, "contribute to an efficient and expert court system and bar."[76]   The exceptional volume of corporate cases has also contributed to the "highly developed body of case law," which, "more than the statute . . . is 'the Delaware corporation law.'"[77]   The development of Chancery's case law "and the reputation for expertise in corporate matters which followed"[78] have led to the

court's international renown for its specialization in resolving corporate and sophisticated business and commercial disputes.[79]

The decisions of jurists on Delaware's Court of Chancery have garnered the respect of legal communities across the globe.[80]   Delaware judges are often invited to "participate in conferences throughout the world on the subject of corporate law" to share their expertise.[81]   The reputation of the Court of Chancery has allowed the court "to attract some of the best lawyers in Delaware to serve as chancellors and vice chancellors."[82]   Throughout its history, the Court of Chancery has been expanded to accommodate increased demand as the number of entities in Delaware grew.[83]   Most recently, in 2018, two new vice chancellors were added to the bench.[84]

### 2.   The Complex Commercial Litigation Division of the Delaware Superior Court

A natural complement to the Court of Chancery, the Complex Commercial Litigation Division of the Delaware Superior Court (the "CCLD") provides businesses with a Delaware forum to resolve their non-equity legal disputes that cannot be heard in the Court of Chancery.[85] Created by administrative directive of then-President Judge James T. Vaughn Jr. on May 1, 2010,[86] the CCLD was formed, in part, to hear complex commercial cases that require the same level of sophistication, business acumen, expediency, and attention as those in the Court of Chancery.[87]   The creation and success of a second specialized commercial court only furthers Delaware's reputation as the first choice for business litigation.[88]   Aside from Wyoming, no other state of comparable population has a court—let alone two—that specializes in corporate or commercial law.[89]

32

### 3.    The Delaware Supreme Court

Appeals from the Court of Chancery and the Superior Court proceed directly to the Delaware Supreme Court.[90]   Although most corporate law cases decided by the Court of Chancery are not appealed, "some of the best known decisions on Delaware corporation law" come from appeals to the Supreme Court.[91]   The Delaware Supreme Court, like the Court of Chancery, has demonstrated "a very practical bent," generating "predictable, efficient results that balance[ ] the needs of managers for flexibility and consistency with those of stockholders in policing self-dealing and managerial sloth."[92]   The Supreme Court has also shown that it is well equipped "to act quickly in important corporate cases."[93]   In fact, it is not uncommon for the Supreme Court to resolve important corporate law cases overnight[94] or even to "announce its decision shortly after hearing arguments with a more detailed opinion to follow."[95]

### D.    Delaware's Federal Judiciary and the Corporate Franchise[96]

For most of the twentieth century, Delaware's advantage in corporate law was just that, an advantage in corporate law.  This provided substantial benefits to the state, but they were far more limited than today.  In the late twentieth century and continuing into the twenty-first century, Delaware's reputation for sophistication, speed, and efficiency in business law fueled an expansion of the legal industry.  Businesses and their constituents recognized that choosing Delaware as the state of incorporation allowed them to have other types of cases adjudicated in the courts of Delaware.  In the 1980s and 1990s, corporations and their constituents began to make the United States Bankruptcy Court for the District of Delaware ("Delaware Bankruptcy Court") a leading place for the largest corporate reorganizations.  With that choice came a sizable increase in the presence of bankruptcy lawyers and professionals working in Delaware, which led to a growth in the Delaware Bankruptcy Court.

Likewise, as we have become a more technologically- and scientifically-intensive world, Delaware corporations have used the United States District Court for the District of Delaware ("District of Delaware") as their preferred place to address key issues of intellectual property law. These changes led to an increase in legal employment as Delaware firms hired more IP lawyers to meet the demand, and as with bankruptcy, national law firms opened Delaware offices to support their regular practice in our federal court.

We now briefly discuss Delaware's two federal courts.

### 1.    Delaware's Bankruptcy Court

Delaware is one of the nation's most prominent bankruptcy venues. As Table 1 below indicates, Delaware's Bankruptcy Court is first among its comparably sized peers, as measured by number of filings:

**Table 1: 2018 U.S. Federal Bankruptcy Court Filings[97]**

| State | Cases Filed | Cases Terminated | Cases Pending |
|---|---|---|---|
| **Delaware** | **2,979** | **3,240** | **5,412** |
| Alaska | 450 | 479 | 354 |
| Montana | 1,302 | 1,383 | 1,457 |
| Rhode Island | 2,165 | 2,267 | 1,585 |
| South Dakota | 1,084 | 1,110 | 1,113 |
| Vermont | 555 | 642 | 669 |
| Wyoming | 1,026 | 1,185 | 929 |

Delaware's success in bankruptcy is attributable to at least two factors. First, over the course of a rich history of successfully reorganizing many of the world's largest and most

complex companies, the Delaware Bankruptcy Court has earned a reputation for expertise, sophistication, predictability, and efficiency.[98]  Second, Delaware is the preeminent state for incorporation.[99]

Delaware's reputation as a top bankruptcy venue emerged in the late twentieth century and traces back to the famed 1990 bankruptcy of Continental Airlines.[100]  In the years that followed, Delaware cemented itself as the nation's leader in corporate reorganizations,[101] and a number of prominent national law firms opened Delaware offices with bankruptcy practices— including, among others, Fox Rothschild, Drinker Biddle, Greenberg Traurig, Blank Rome, Pachulski Stang, and Womble Bond Dickinson.[102]

## 2.    Federal District Court for the District of Delaware

As Table 2 below shows, the District of Delaware is first among its comparably sized peers, as measured by number of filings.

**Table 2: 2017 U.S. Federal District Court Filings**[103]

| State | Cases Filed | Cases Terminated | Cases Pending |
|---|---|---|---|
| **Delaware** | **2,225** | **2,125** | **2,161** |
| Alaska | 630 | 542 | 736 |
| Montana | 1,337 | 1,235 | 1,074 |
| Rhode Island | 854 | 814 | 871 |
| South Dakota | 1,288 | 1,335 | 934 |
| Vermont | 504 | 532 | 571 |
| Wyoming | 634 | 665 | 729 |

The success of the District of Delaware is a result of its long history and reputation as a leader and innovator in patent litigation.   As one article notes:

> Delaware's experience in patent litigation reaches back to the beginning of the last century.   In the 1920s, Judge Hugh Morris—then the sole federal judge in Delaware—decided many of the country's most important patent cases.   In the 1960s and 1970s, Chief Judge Caleb Wright presided over numerous patent cases (involving technologies such as the manufacture of synthetic rubber and polyurethane foam insulation, the zeolite cracking of petroleum to produce gasoline, and the manufacture of transistors), thereby helping "to establish on a national scale the reputation of the District of Delaware as a forum for the expeditious and knowledgeable resolution of patent disputes."[104]

When combined with the court's role in modern patent litigation, this judicial lineage has translated into "a bench with extensive practical experience and a rich collection of rulings that enhance the predictability of patent law as applied in Delaware."[105]   On a per-judge basis, no district court in America matches the level of practical patent-litigation experience shared by the District of Delaware bench.[106]   As in the corporate-litigation context, this collective expertise fosters predictability that is attractive to patent litigants, many of whom are "repeat players."[107]

36

Delaware's intellectual property bar is active and well regarded, particularly in the area of patent litigation.  With its skilled judges, extensive history, and location in America's corporate heartland,[108] Delaware's federal district court has become the busiest patent venue in the country.  The District of Delaware received a remarkable 24.01% of all patent cases filed in 2018, outpacing the second-busiest patent venue (the Eastern District of Texas) by 10.20% over the same period.[109]  In the same year, the District of Delaware received half of all new Abbreviated New Drug Application (ANDA) cases—as many as its 93 sister courts combined.[110]

In an increasingly tech-centric society, the degree of predictability in patent lawsuits is an increasingly important factor in the incorporation decisions of many companies.  "[C]ompanies like Amazon and Facebook, which are located in California but incorporated in Delaware, face dozens of patent-infringement lawsuits every year."[111]  The growth and reputation of Delaware's patent-litigation bar contributes to the state's efforts to maintain its status as the preferred incorporation destination.  Indeed, Delaware firms and/or offices crowd the rankings of the most active plaintiffs' and defendants' firms in 2018 patent-case filings.[112]  Given the District of Delaware's reputation as a patent-litigation center, renewed competition among state bars and courts to attract companies to facilitate patent litigation "will likely end in a familiar way: with Delaware maintaining or even furthering its appeal as the dominant state of incorporation."[113]

### E.    Delaware's Alternative Entity Practice[114]

Counting both corporate and non-corporate business entities, Delaware is the leading state for the formation of business entities.  In 2017 alone, 198,457 entities were formed as Delaware corporate or alternative entities, with 143,996 LLCs, 11,517 LPs/LLPs, 41,553 corporations, and 1,391 statutory trusts being formed.   Overall, more than 1.3 million legal entities have been formed in Delaware.

37

The success of Delaware's corporate and alternative entity practice becomes clear when compared to business entity formation in comparably sized states.  In Montana, there were over 223,000 total businesses registered in 2018.   The total number of registered entities includes 105,595 LLCs, 49,470 corporations, 13,849 non-profits, 50,929 assumed business names, and 4,070 partnerships.   Of those entities, 31,400 were new entities registered in 2018.   The total number of businesses registered in Montana is comparable to the number of entities formed in Delaware in just one year, and Montana's total of 233,000 entities pales in comparison to Delaware's total of 1.3 million.  In South Dakota, at the end of the fourth quarter of 2017, there were 75,802 entities in good standing, a mere 38% of those formed in Delaware in 2017 alone. Similarly, in Wyoming there were 42,425 domestic entities and 1,888 foreign entities registered in the state as of 2018, less than a quarter of the number of entities registered in Delaware in a single year.  As of 2018, Alaska had 73,053 registered entities, 67,250 of which were in good standing and 5,803 of which were noncompliant.   Rhode Island currently has approximately 65,000 registered entities.   As of March 26, 2019, Vermont had 98,479 active businesses.   In other words, in 2017, more entities were formed in Delaware than the total number of existing entities in South Dakota, Alaska, Rhode Island, and Vermont.   In fact, Delaware is home to approximately 1 million more businesses than exist in those four states combined.

As these numbers indicate, Delaware is a national leader and innovator in the creation and growth of alternative entities: partnerships, limited liability companies, and statutory trusts.

### 1.      Partnerships

In 1999, Delaware enacted the Delaware Revised Uniform Partnership Act, which governs general and limited liability partnerships, and in 1983, the Delaware Revised Limited Partnership Act, which governs limited partnerships.  Delaware general partnerships ("DGP"),

limited liability partnerships ("DLLPs"), and limited partnerships ("DLP") are forms of "pass through" entities, which enable a business owner or investor to avoid double taxation of income. Unlike a corporation, a partnership itself is not taxed; rather, the partners are taxed on their share of the partnership income. Partnerships also give the partners broad contractual discretion to structure their business to meet their particular needs. With the exception of certain banking activities, any type of lawful business—from a professional sports franchise or apartment complex to a manufacturing company or investment advisory service—can be formed as a partnership. As of 2018, there were 101,652 active Delaware partnerships. [115]

Delaware limited partnerships (and limited liability companies, discussed below) are the entity of choice for domestic private equity funds, and play an important role when fund sponsors desire to have a U.S.-domiciled fund. [116] Delaware is the leading U.S. jurisdiction for the formation of domestic private equity funds.

## 2.    Limited Liability Companies

Following a 1988 IRS ruling that limited liability companies could qualify as pass-through entities for federal tax purposes, Delaware enacted the Delaware Limited Liability Company Act ("DLLCA") in 1992. Delaware limited liability companies ("DLLCs") are a flexible form of business entity that combines the limited liability of corporations and the pass-through benefit of partnerships with the flexibility and certainty of a contractual arrangement. As with partnerships, DLLCs can be used for any type of lawful business, with the exception of certain banking activities.

Since the enactment of the DLLCA, the DLLC has become an increasingly popular form of business organization.  As illustrated in the chart below, in 2004 there were 273,252 active DLLCs, and 68,641 new DLLCs were formed in that year.[117]  By 2010, there were 550,238 active DLLCs, with 82,027 new DLLCs being formed in that year.[118]  By 2018, the total number of active DLLCs was 930,290[119]—i.e., approximately one DLLC for every resident in Delaware—and 157,142 new DLLCs were formed in that year.



### 3.    Statutory Trusts

In 1988, Delaware enacted the Delaware Statutory Trust Act ("DSTA"), becoming the first state to provide for the creation of legally separate "business trusts."  In 2000, the total number of Delaware statutory trusts ("DSTs") was 6,692.  By 2018, that number had climbed to 21,605.[120]

DSTs are the preferred entity for use in structured finance transactions, including asset-backed securitizations or secured transactions.[121]  DSTs are also "the most favored form of mutual fund organization" in the United States.[122]  According to data provided by Investment

Company Institute,[123] in 2017 DSTs accounted for approximately 40% of the total number of mutual funds.  In addition, DSTs have grown in popularity among real estate investors as vehicles for facilitating "like-kind" exchanges under Section 1031 of the Internal Revenue Code, i.e., exchanges of one business or investment property for another that does not trigger immediate tax liability.[124]

Further, each DST that is not an investment company under certain federal law is required to engage a trustee who, if a natural person, is a resident of Delaware or, if a business entity, has its principal place of business in Delaware.  Local banks, such as Wilmington Trust and Wilmington Savings Society Fund, and national banks with Delaware offices, such as U.S. Bank and Citibank, provide these trustee services to DSTs.  Moreover, DSTs that are investment companies under certain federal law, DLPs, DLLPs, DGPs, and DLLCs must have and maintain a registered office and a registered agent in Delaware.

In brief, from its Division of Corporations and corporate code to its judiciary and alternative entity practice, the Corporate Franchise fuels the Delaware economy by providing employment and income to thousands of Delawareans—both directly through the legal sector, and secondarily through the legal support and general services industries.

## VI.    The Corporate Franchise: Providing Significant Revenue for Delaware[125]

The Corporate Franchise, of which the legal industry is an integral and dependent part, not only fuels the private economy; it funds state and local government, as well.  The Corporate Franchise generates considerable tax revenue for the state, both directly and indirectly.  Directly, the Franchise Tax and associated taxes and fees accounted for approximately one-third of all state revenue in 2018.  The following chart illustrates the breadth of the Delaware Corporate

Franchise's contributions to the state budget and reflects the importance of attracting corporations and other entities to the state.

**Revenues Associated with Delaware's Corporate/Business Environment**

($ in millions)

*Preliminary*

| | FY 16 | FY 17 | FY 18 | FY 19 (Est) |
|---|---|---|---|---|
| Corporate Franchise Tax (net) | 694.2 | 702.5 | 846.8 | 886.5 |
| Escheat (net GF) | 450.3 | 449.2 | 506.2 | 444.0 |
| LLC | 268.8 | 284.3 | 305.1 | 324.5 |
| Entity Fees | 104.8 | 110.8 | 119.0 | 123.6 |
| Escheat ASF | 44.6 | 44.6 | 44.6 | 45.1 |
| Expedited Services | 33.2 | 33.6 | 39.0 | 30.6* |
| UCC | 19.3 | 19.5 | 23.4 | 25.8 |
| Tech Infrastructure Fund (SOS) | 7.5 | 8.1 | 8.1 | 8.1 |
| SOS Sec Office Admin | 3.5 | 4.0 | 4.0 | 3.2 |
| Chancery ASF | 1.7 | 1.7 | 1.7 | 1.8 |
| Gov't Information Center (SOS) | 0.6 | 0.6 | 0.6 | 0.6 |
| Supreme Court ASF | 0.1 | 0.2 | 0.2 | 0.2 |
| **TOTAL** | **1,628.8** | **1,659.2** | **1,898.8** | **1,894.1** |

\* Year-to-date through March 2019
Department of Finance, , May 3, 2019

Over and above these revenues, in 2018, the Division of Corporations collected approximately $17.6 million in Corporate Franchise-related revenues, which provided funds for local governments. In particular, the Division of Corporations collected $4.2 million in county recording fees (shared among Delaware's three counties), $6.3 million in courthouse municipality fees (shared among Delaware's three county seats—Wilmington, Dover, and Georgetown), $6.1 million in UCC filing fees (Wilmington), and $1.0 million in statutory trust/captive insurance fees (Wilmington).

Further, Delaware law firms and the industries that support them pay a substantial amount of taxes in their own right. Based upon a Delaware Department of Finance (Revenue Division) review of tax filings, employees (W-2s: $420.2 million), partners (Schedule Ks: $319.7 million), and independent contractors (1099s: $48.3 million) in 99 Delaware law firms and registered agents involved in corporate law claimed taxable income of approximately $788.4 million. Delaware collected approximately $44.7 million in taxes from these wage earners and partners.[126]

Much of the taxable income from law firms and industries occurred in Wilmington and therefore also is subject to the city wage tax, currently a flat rate of 1.25%.

Yet, the full impact of the Corporate Franchise on the state budget is even broader. Taking into account the multiplier effects due to the spending of income from both the legal sector and supporting sectors, Delaware collects approximately $300 million in additional taxes each fiscal year. Delaware's Corporate Franchise fuels the state's economy by further supporting Delaware's important role in American litigation[127]—which provides all the attendant economic benefits referenced throughout this report. These economic benefits contribute to a growing state economy in the form of increased wages, consumer spending, tax revenue from the legal sector (as shown above), additional business taxes, and critically, property taxes. This economic activity, in turn, produces further indirect revenue growth.[128] Like the mutually reinforcing cycles examined previously in this report,[129] this revenue growth produces fruits of its own, enabling Delaware to fund schools, infrastructure, programs, and services. This funding, then, further fuels the state economy and generates additional revenue. Delaware's legal industry is a vital factor in this cycle.

By cultivating Delaware's reputation as a premier forum for corporate, bankruptcy, patent, and other types of complex legal practice, Delaware's legal industry can continue to play a substantial role in furthering the state's efforts to attract both national and international companies—and the revenue that comes with them.  This revenue results in a number of positive effects[130] and contributes to the general welfare of Delaware.

## VII.    Conclusion: A Sustained Commitment Going Forward

The economic success of Delaware's unique legal industry is demonstrated by the foregoing data and is recognized nationally and internationally.   This data bring to light the "Delaware Difference," the unique attributes of the legal industry that make a small state with fewer than one million people the name brand in business law for the world economy and provide our state with positive name recognition among the globe's business leaders.

This study, with its review of the history of the Corporate Franchise, demonstrates that a continued commitment by the private legal sector, judiciary, and executive and legislative branches is required for Delaware to maintain its current prominence and continue to deliver the substantial benefits Delaware enjoys as a result.

The need for this commitment is not always evident and may be easily forgotten.   Many industries have geographic-specific anchors that tether them to a particular location.  Investments in brick and mortar, and integration of company leadership and workforce in the community keep some industries anchored to a certain state.  In other industries, the particular location provides important access to markets and infrastructure like ports, railways, and major highways, mooring those industries to a given location.

In contrast, the economic drivers of the unique Delaware legal industry are the decisions made by thousands of executives on a daily basis as to where they want their businesses to

reside.  Such decisions are not haphazard; they are based on a cost-benefit analysis affected by the collective efforts of Delaware's public officials, the judiciary, and legal community.  These efforts have resulted in the balance tilting toward Delaware for many years, but that balance can shift quickly.  Business executives have choices, and there are always states urging them to choose differently.

**********

**Acknowledgments**

This report grew from a perceived need by the Delaware legal community, including the DSBA, the judiciary, and government and private practice attorneys, to document the critical role the legal industry plays in the economic development of the state.

In producing this report, we received a high level of cooperation and support from many individuals and agencies within the state. We are grateful to Chief Justice Leo Strine for his guidance in structuring this project and providing valuable comments to previous drafts of this report.  We are also indebted to the personnel in the administrative office of the courts, in particular Bill Montgomery and Tanya Whittle, who devoted many hours to make this project a success. Similarly, we received excellent support from the DSBA and its executive director, Mark Vavala, as well as the current President, David Ferry.  The project would not have been possible without the leadership and guidance of the past president of the DSBA, Mike Houghton of Morris, Nichols, Arsht & Tunnell LLP and Tom McGonigle of Drinker Biddle & Reath LLP, who co-chaired this effort on behalf of the DSBA.  Mike and Tom worked closely with Arthur (Chip) Connolly from Connolly Gallagher, LLP; Lauren Neal Bennett and Barnaby Grzaslewicz from Morris, Nichols, Arsht & Tunnell LLP; and Greg Williams and Andrew Peach from Richards, Layton, & Finger, P.A., whose expertise regarding the legal industry and its

45

development in Delaware were essential.  The sections of the report dealing with these issues are mostly, if not completely, their work, and we are most appreciative for their contributions to the project.  Similarly, we are indebted to personnel from the state Department of Finance for their analysis of the tax contributions of members of the legal industry.

[1] Dr. Larson is a recent University of Delaware Ph.D. who has taught economics at the United States Naval Academy and Anne Arundel Community College.

[2] Dr. Latham retired from the Economics Department of the University of Delaware in 2018.

[3] Dr. Lewis is a Professor of Economics at the University of Delaware.

[4] Lawrence A. Hamermesh, *The Policy Foundations of Delaware Corporate Law*, 106 Colum. L. Rev. 1749, 1749 (2006).

[5] David Mace Roberts; Rob Pivnick, *Tale of the Corporate Tape: Delaware, Nevada and Texas*, 52 Baylor L. Rev. 45, 46 (2000).

[6] A "multiplier effect" refers to the numerical relationship between an original change in economic activity and the ultimate change in activity that results as the money is spent and re-spent through various sectors of the economy. Here, the multiplier effect is the ratio between the total impact of a legal industry activity and its initial direct impact.

[7] DEL. DEP'T OF LABOR, OFFICE OF OCCUPATIONAL & LABOR MKT. INFO., DELAWARE WAGES 2017: OCCUPATIONAL EMPLOYMENT STATISTICS 3, https://lmi.delawareworks.com/Content/Publications/Documents/Delaware%20Wages%202017.pdf.

[8] *Id.* at 8; *see also* BUREAU OF LABOR STATISTICS, OCCUPATIONAL EMPLOYMENT STATISTICS: MAY 2017 STATE OCCUPATIONAL EMPLOYMENT AND WAGE ESTIMATES, DELAWARE, https://www.bls.gov/oes/2017/may/oes_de.htm#23-0000.

[9] Information regarding "IT and Tech" compensation for Sussex County was not available.

[10] We are grateful to the entities and individuals named in the Acknowledgments section of this report for their collaboration with us in developing the material in this section.

[11] *See* 6 *Del. C.* § 17-104; 6 *Del. C.* § 18-104; 8 *Del. C.* § 132; and 12 *Del. C.* § 3807.

[12] https://corp.delaware.gov/agents/.

[13] An example of this technological expansion: In 1991, before smartphones became available and during the infancy of email use by businesses, there were 1,626 active attorneys registered in Delaware. Today, there are 3,746 registered attorneys in Delaware, most of whom are electronically connected to their offices.

[14] This report utilizes output multipliers, employment multipliers, and income multipliers to evaluate the extent of the legal industry's impact on Delaware's economy. The multiplier effect measured in this report reflects both the indirect and induced impacts of the legal industry. Indirect impacts are those that result from the additional jobs, payrolls, and output created when a legal industry entity purchases goods and services from the diverse businesses that support it. These businesses include equipment suppliers, construction services, transportation services, management services, food services, and many other types of support businesses. Induced impacts are those that result when the employees of a direct or indirect employer spend their personal incomes (wages and salaries, profit shares, etc.) on consumer goods, property, services, and taxes. Local firms purchase input supplies that they need for their businesses from other local firms. They pay their employees, who then also make local purchases. Thus, a dollar increase in local direct activity at a law firm, for example, results in expansion of total economic activity of more than one dollar throughout the rest of the state.

[15] Throughout this study, states described as "comparable" to Delaware are those with similar populations. Those states are Alaska, Montana, Rhode Island, South Dakota, Vermont, and Wyoming.

[16] *See* Section V below.

[17] This percentage is calculated by adding the legal services required by all businesses (industry by industry), households, and agencies in Delaware, and subtracting those services from the total

amount of legal services provided.  Within the economics profession, this difference is considered the best available estimate of the services provided to out-of-state clients.

[18] We are grateful to the entities and individuals named in the Acknowledgments section of this report for contributing the material in this section.

[19] https://www.dlapiper.com/en/us/locations/wilmington/.

[20] https://www.duanemorris.com/offices/wilmington.html.

[21] https://www.skadden.com/locations/americas/wilmington

[22] We are grateful to the entities and individuals named in the Acknowledgments section of this report for their collaboration with us in developing the material in this section.

[23] *See, e.g.*, Vince Lattanzio, *Potentially "Catastrophic" Chemical Leak Shuts Down Delaware Memorial Bridge Amid Thanksgiving Travel Rush*, NBC PHILA. (Nov. 25, 2018) ("The leak of a highly flammable chemical from a plant next to the Delaware Memorial Bridge forced an emergency shutdown of the dual-span suspension bridge.").

[24] *See, e.g.*, SIERRA CLUB, WHY ARE CAFOS BAD? (observing that the waste produced by a typical concentrated animal feeding operation can include "antibiotic-resistant bacteria, hormones, chemicals used in livestock care, milkhouse wastes, cleaning agents, ammonia and heavy metals, silage leachate, and millions of gallons of water contaminated by all of the above," in addition, of course, to large amounts of animal urine and feces). https://www1.eere.energy.gov/manufacturing/states/pdfs/delawareindustrialresourcefactsheet.pdf

[25] Many other industries pose significant environmental challenges to the state.  *See, e.g.*, Maddy Lauria, *Report: Mountaire Has Contaminated Water Near Its Millsboro-Area Plant for Years*, DEL. NEWS J. (Apr. 9, 2018) ("Data show that Mountaire, which is permitted to spray 2.6 million gallons of treated wastewater on hundreds of acres of farm fields north of the Indian River each day, has contributed large amounts of nutrients that . . . could potentially threaten the Inland Bays' contribution to the state's $7 billion coastal tourism economy."); Molly Murray, *Pollution Gains Prove Elusive in Delaware*, DEL. NEWS J. (Apr. 21, 2016) (detailing environmental harms caused primarily by industrial polluters and noting, for example, that "[i]n some places in Delaware, such as the nontidal Brandywine and Shellpot Creek, it's unsafe to eat any fish [because these] areas have problems with PCBs . . . pesticides, mercury, [and/or] dioxins").

[26] The Delaware legal industry consumes less resources than several peer industries, such as the industrial and manufacturing sectors.  *See* U.S. DEP'T OF ENERGY, INDUSTRIAL TECHNOLOGIES PROGRAM ("[Delaware's] largest consumer of energy is the industrial sector, in part because Delaware contains several energy-intensive industries, including petroleum refining, chemical production, and other manufacturing.").

[27] Indeed, many of the nation's top law firms have made conservation a point of emphasis, particularly as they cater to corporate clients who increasingly deem conservation a key element of corporate social responsibility.  *See* Marialuisa Taddia, *Environmental Considerations Are Rising up the Law Firm Management Agenda*, LAW SOC'Y GAZETTE (Sept. 15, 2011).

[28] We are grateful to the entities and individuals named in the Acknowledgments section of this report for contributing the material in this section.

[29] 2015 Delaware Strategies for State Policies and Spending, Delaware Office of State Planning Coordination, (April 14, 2015) *available at*, https://stateplanning.delaware.gov/strategies/documents/2015-state-strategies.pdf at 19.

[30] *Id.* at 20.

[31] *Id.*

[32] *Id.* at 3.

[33] BUREAU OF LABOR STATISTICS, INJURIES, ILLNESSES, AND FATALITIES, TABLE 1: INCIDENCE RATES OF NONFATAL OCCUPATIONAL INJURIES AND ILLNESSES BY INDUSTRY AND CASE TYPES, 2017, https://www.bls.gov/iif/oshwc/osh/os/summ1_00_2017.htm.  The Delaware-specific numbers for the industries for which such data exist track these numbers closely.   For example, nonfatal manufacturing injuries occurred at a rate of 3.5 times per 100 workers nationally and 2.6 times per 100 workers in Delaware.   *See* BUREAU OF LABOR STATISTICS, INJURIES, ILLNESSES, AND FATALITIES, STATE OCCUPATIONAL INJURIES, ILLNESSES, AND FATALITIES, https://www.bls.gov/iif/oshstate.htm.

[34] *Id.*  The nature of the modern legal industry is likely the primary driver of this positive outcome.  For better or worse, the vast majority of today's attorneys and judges—and the staffs who serve them—spend most of their working hours behind computers in climate-controlled office buildings.

[35] Including, among other things, missed work days, lost wages, diminished skills, and weakened career prospects.

[36] *National Population Totals and Components of Change: 2010-2018*, United States Census Bureau, available at https://www.census.gov/data/tables/time-series/demo/popest/2010s-national-total.html (last visited Apr. 25, 2019) (data provided in linked Excel file entitled: *Annual Estimates of the Resident Population for the United States, Regions, States, and Puerto Rico: April 1, 2010 to July 1, 2018 (NST-EST2018-01)*).

[37] *Annual Report Statistics*, Delaware Division of Corporations, available at https://corp.delaware.gov/stats/ (last visited Mar. 30, 2019).

[38] *Id.*

[39] *See generally* Lewis S. Black, Jr., *Why Corporations Choose Delaware*, Delaware Department of State, Division of Corporations (2007); Hamermesh*, at 1749; Roberta Romano, *Law as a Product: Some Pieces of the Incorporation Puzzle*, Vol 1 Issue 2 Yale J.L., Econ. & Org., at 225 (1985).

[40] We are grateful to the entities and individuals named in the Acknowledgments section of this report for contributing the material in this section.

[41] Black, Jr., at 8.

[42] *Id.*, at 8-9.

[43] *Id.*, at 9.

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] We are grateful to the entities and individuals named in the Acknowledgments section of this report for contributing the material in this section.

[48] 1 R. Franklin Balotti & Jesse A. Finkelstein, Del. Law of Corps. & Bus. Orgs., History, at H-13 (3d ed. Supp. 1999).

[49] This "crisis" resulted largely from the controversial Delaware Supreme Court decision in *Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985), which "greatly increased the risk that directors would be held liable for breaches of their duty of care."  Marcel Kahan, Edward Rock, *Symbiotic Federalism and the Structure of Corporate Law*, 58 Vand. L. Rev. 1596, 1600 (2005).

[50] Balotti & Finkelstein, Foreword, at F-6 (3d ed. Supp. 2001) (citing 8 *Del. C.* § 102(b)(7)).

[51] Balotti & Finkelstein, Foreword, at F-1 (3d ed. Supp. 2008) (citing Roberta Romano, at 265-73).

[52] Hamermesh, at 1752.

[53] Black, Jr., at 2.

[54] 1 David A. Drexler et al., Delware Corporate Law and Practice § 1.02 at 1-4 (Matthew Bender).

[55] Balotti & Finkelstein, History, at H-13.

[56] Black, Jr., at 2.

[57] Drexler et al., at 1-4.

[58] *Id.*

[59] Balotti & Finkelstein, History, at H-14.

[60] Hamermesh, at 1753.

[61] *Id.*, at 1754.

[62] Kahan, at 1600.

[63] Roberts, at 46.

[64] William L. Cary, *Federalism and Corporate Law: Reflections upon Delaware*, 83 Yale L.J. 663, 665 (1974) (noting that "Nevada has attempted to become the western Delaware but not with comparable success"); *see also* Balotti & Finkelstein, Foreword, at F-15 (3d ed. Supp. 2008) ("Nevada, for example, has adopted a liberal corporate statute very similar to the Delaware General Corporation Law.").

[65] Black, Jr., at 2.

[66] We are grateful to the entities and individuals named in the Acknowledgments section of this report for contributing the material in this section.

[67] Romano, at 280.

[68] *Id.*, at 280.

[69] *Id.*

[70] By way of example, two of the highest profile commercial cases in the last decade involved non-Delaware corporations that chose Delaware as the forum to resolve their high-stakes contractual disputes. *See Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *4-5 (Del. Ch. Oct. 1, 2018), *aff'd* 2018 WL 6427137, 198 A.3d 724 (Del. 2018) (TABLE) (resolving a dispute between a Louisiana company headquartered in Illinois and a German company); *Martin Marietta Materials, Inc. v. Vulcan Materials Co*., 56 A.3d 1072, 1076 (Del. Ch. 2012), *aff'd* 68 A.3d 1208 (Del. 2012) (resolving a dispute between a North Carolina company headquartered in Raleigh, North Carolina and a New Jersey company headquartered in Birmingham, Alabama).

[71] Drexler et al., § 2.01 at 2-2.

[72] William H. Rehnquist, *The Prominence of the Delaware Court of Chancery in the State-Federal Joint Venture of Providing Justice*, The Business Lawyer; Vol. 48, at 353 (Nov. 1992)

[73] Drexler et al., at 2-2.

[74] Balotti & Finkelstein, Foreword, at F-6 (3d ed. Supp. 2001); *see also* Rehnquist, at 354.

[75] Black, Jr., at 5.

[76] Balotti & Finkelstein, Foreword, at F-6 (3d ed. Supp. 2001); *see generally id.* at F-16 (3d ed. Supp. 2008) ("Delaware now clearly has the economies of scale to sustain an effective system. However, large states such as California, Illinois, New York, Pennsylvania and Texas should be able to achieve similar economies of scale. . . . Surprisingly, because of the nature of their legislature, much of the difficulty in these large states appears to be with their statutes. . . . [T]hese states' legislatures frequently turn corporation law matters into complex moral and political problems. If a state's corporation statute is inferior, its court system and lawyers never even have a chance.").

[77] Black, Jr., at 7.

[78] *Id.*, at 5 (2007).

[79] Although best known for its contribution to Delaware's national preeminence in the field of corporation law, the Court of Chancery has also demonstrated sound judgment in adjudicating other areas of law. Among the Court of Chancery's recognized achievements is the 1952 decision in *Belton v. Gebhart*, 87 A.2d 862 (Del. Ch. 1952)—one of the four cases consolidated in the United States Supreme Court in *Brown v. Board of Education*, 349 U.S. 2294 (1955), and the only one of the four lower court decisions to be affirmed. In *Belton*, Chancellor Collins Seitz used the broad

equitable powers of the Court of Chancery to order immediate relief to black schoolchildren who suffered from state-imposed segregation.

[80] Black, Jr., at 5, 7 ("Delaware corporations have the benefit of having their actions governed by a law that is recognized and respected everywhere.").

[81] Hamermesh, at 1759.

[82] Black, Jr., at 5.

[83] Drexler et al., § 1.02 at 1-7 (noting that the Court of Chancery added additional members in 1960, 1984, and 1989).

[84] 2018 Annual Report for the Delaware Judiciary, at 19 (2018) ("In September 2018, Governor Carney nominated Morgan T. Zurn and Kathaleen St. J. McCormick to serve as our two newest Vice Chancellors. They both were confirmed by the Delaware State Senate in October 2018, and have since taken the oath of office.").

[85] *See* Joseph R. Slights III & Elizabeth A. Powers, DELAWARE COURTS CONTINUE TO EXCEL IN BUSINESS LITIGATION WITH THE SUCCESS OF THE COMPLEX COMMERCIAL LITIGATION DIVISION OF THE SUPERIOR COURT, THE BUSINESS LAWYER, Vol. 70 at 1047 (Fall 2015).

[86] *See* Administrative Directive of the President Judge of the Superior Court of the State of Delaware, No. 2010-3: Complex Commercial Litigation Division (May 1, 2010) ("Administrative Directive No. 2010-3"), *available at* https://courts.delaware.gov/superior/pdf/Administrative_Directive_2010-3.pdf.

[87] *See* DELAWARE'S COMPLEX CIVIL LITIGATION COURT: ONE YEAR LATER, Morris James LLP (May 18, 2012), *available at* https://www.morrisjames.com/newsroom-articles-72.html.

[88] *See* Slights & Powers, at 1047.

[89] Earlier this year the Wyoming state legislature introduced a bill to establish a chancery court, and on March 15, 2019, the governor of Wyoming signed the bill into law. The effectiveness of this court is yet to be determined, but it is expressly modeled upon the Delaware Court of Chancery—as Nevada's corporate statutes largely replicate the DGCL.

[90] Drexler et al., § 2.06, at 2-12.

[91] Black, Jr., at 7.

[92] Leo E. Strine, Jr., *The Delaware Way: How We Do Corporate Law and Some of the New Challenges We (and Europe) Face*, 30 Del. J. Corp. L. 673, 682 (2005).

[93] Rehnquist, at 354; Black, Jr., at 7 ("The Delaware Supreme Court has become known, in particular, for the speed with which it can review significant decisions on appeal when time is of the essence.").

[94] Balotti & Finkelstein, Foreword, at F-6 (3d ed. Supp. 2001).

[95] Black, Jr., at 7.

[96] We are grateful to the entities and individuals named in the Acknowledgments section of this report for contributing the material in this section.

[97] U.S. BANKRUPTCY COURTS, *Business and Nonbusiness Cases Commenced, by Chapter of Bankruptcy Code, During the 12-Month Period Ending December 31, 2018, Table F-2*, https://www.uscourts.gov/sites/default/files/data_tables/bf_f2_1231.2018.pdf.

[98] *See* Ofer Eldar & Neel U. Sukhatme, *Will Delaware Be Different? An Empirical Study of* TC Heartland *and the Shift to Defendant Choice of Venue*, 104 Cornell L. Rev. 101, 131 (2018).

[99] Federal bankruptcy law provides a menu of venue options, including not only the state of incorporation but also the state(s) where a company has its principal place of business, principal assets, or legal domicile. *See* Eldar & Sukhatme, at 130.

[100] *See id.* at 130–31.

[101] Eldar & Sukhatme, at 131; *see also* Marcus Cole, *"Delaware Is Not a State": Are We Witnessing Jurisdictional Competition in Bankruptcy?*, 55 VAND. L. REV. 1845, 1852 (2002).

[102] *See, e.g.*, GREENBERG TRAURIG, DELAWARE ("Greenberg Traurig opened its Delaware office in 1999 in response to the unique and increasing role Delaware plays in the needs of our national and international clients."). https://www.gtlaw.com/en/locations/delaware.

[103] U.S. DISTRICT COURT JUDICIAL CASELOAD PROFILE (2018), https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0331.2018.pdf. These filings are from the period April 1, 2017 to March 31, 2018.

[104] Donald F. Parsons, Jr. et al., *Solving the Mystery of Patentees' "Collective Enthusiasm" for Delaware*, 7 DEL. L. REV. 145, 145–46 (2004) (quoting Arthur G. Connolly, Sr. & Donald F. Parsons, Jr., *Senior Judge Caleb M. Wright's Contributions to the Trial of Complex Patent Cases*, 7 DEL. LAW. 6 (Mar. 1989)).

[105] *Id.* at 146.

[106] For example, the most recent additions to the bench bring with them years of patent-litigation experience: Judge Maryellen Noreika as a long-time IP litigation partner at a prominent Delaware firm, and Magistrate Judge Jennifer Hall as a law clerk to Judge Sharon Prost of the patent-focused Federal Circuit and an associate at a nationally recognized patent litigation boutique. *See* Press Release, The White House, President Donald J. Trump Announces Ninth Wave of Judicial Nominees and Tenth Wave of United States Attorney Nominees (Dec. 20, 2017).

[107] *See, e.g.*, GENEVA CLARK, LEX MACHINA, PATENT LITIGATION REPORT 7 (Rachel Bailey & Jason Maples eds., 2019), at 9–14 (confirming the prevalence of "high-volume" plaintiffs and defendants in modern patent litigation).

[108] *See* R. Eric Hutz, *7 Reasons Delaware Is a Hot Spot for IP Litigation*, LAW360 (Aug. 20, 2014) (noting the District of Delaware's "long history of handling complex patent cases" and "long tradition of judges who are not intimidated by patent cases [and] the related technical subject matter").

[109] *See* CLARK, at 7.

[110] *Id.* With just four congressionally authorized judgeships and three magistrates, the District of Delaware ranks among the nation's smallest and "most overworked district courts." Cara Bayles, *These Are the Nation's 27 Most Overworked District Courts*, LAW360 (Mar. 18, 2019). The massive caseload handled by this relatively small group of judges recently prompted the Judicial Conference of the United States to authorize a fourth magistrate judgeship in the district. *See* Press Release, U.S. Dist. Court for the Dist. of Del., Selection of Jennifer L. Hall as U.S. Magistrate Judge (Feb. 28, 2019).

[111] Eldar & Sukhatme, at 149.

[112] *See* CLARK, at 16–17.

[113] *Id.* at 146–47.

[114] We are grateful to the entities and individuals named in the Acknowledgments section of this report for contributing the material in this section.

[115] *Annual Report Statistics*, Delaware Division of Corporations, available at https://corp.delaware.gov/stats/ (last visited Mar. 30, 2019).

[116] Scott W. Naidech, *Private Equity Fund Formation*, Practical Law Practice Note 3-509-1324 (2018).

[117] *Annual Report Statistics*, Delaware Division of Corporations, available at https://corp.delaware.gov/stats/ (last visited Mar. 30, 2019).

[118] *Id.*

[119] *Id.*

[120]   *Annual Report Statistics*, Delaware Division of Corporations, available at https://corp.delaware.gov/stats/ (last visited Mar. 30, 2019).

[121]   "[S]ecuritization—both private and government-sponsored—represents $8.6 trillion, or about 50% of the nation's roughly $17.3 trillion of loans outstanding as of Q2 2015."  Structure Finance Industry Group, *A Comprehensive Guide to U.S. Securitizations*, 3 (April 7, 2016).

[122]   Investment Company Institute, *2018 Investment Company Fact Book: A Review of Trends and Activities in the Investment Company Industry*, 58th edition, pp 281-82.

[123]   Correspondence with Judy Steenstra, Senior Director, Statistical Research, Investment Company Institute, March 21, 2019.

[124]   Joseph J. Whitney *et al.*, *Why Delaware Statutory Trusts Are Becoming Popular*, New Jersey Law Journal, 50 (Oct. 23, 2017).

[125]   We are grateful to the entities and individuals named in the Acknowledgments section of this report for their collaboration with us in developing the material in this section.

[126]   Information regarding tax revenues from independent contractors (1099 filings) was not available.

[127]   And, as demonstrated above, the success of Delaware's legal industry is perhaps the primary driver of the Delaware Corporate Franchise.

[128]   *See, e.g.*, Andrew Lundeen, *Economic Growth Drives the Level of Tax Revenue*, Tax Found. (Oct. 15, 2014) ("[E]conomic growth is a major driver of the level of tax revenues."), https://taxfoundation.org/economic-growth-drives-level-tax-revenue/.

[129]   *See, e.g., supra* at V.D.1

[130]   Among these are lower taxes on Delaware residents and businesses, increased state investment in schools and other government services, and a multitude of positive downstream effects.  For example, Delaware is one of just five states without a sales tax.  Sandra Block, *5 States with No Sales Tax*, Kiplinger (Feb. 28, 2019), https://www.kiplinger.com/slideshow/taxes/T054-S001-states-without-state-sales-tax/index.html.  Tax-free shopping is helpful to Delaware's businesses and citizens, and would be less feasible fiscally and less palatable politically without the revenue produced by Delaware's robust Corporate Franchise.

# **<u>EXHIBIT B</u>**



# SUPREME COURT OF DELAWARE

COLLINS J. SEITZ, JR.
   *CHIEF JUSTICE*

THE RENAISSANCE CENTRE
405 N. KING STREET, SUITE 505
WILMINGTON, DELAWARE  19801

(302) 651-3901

January 8, 2021

**By Email Only**

Delaware Compensation Commission
c/o Michael A. Barlow, Esquire, Chair
Abrams & Bayliss, LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807

Re:    *Information about Compensation of the Delaware Judiciary*

Dear Chairman Barlow and other Members of the Delaware Compensation Commission:

Thank you for your service on the Delaware Compensation Commission.  Your work is critical as the State of Delaware strives to attract and maintain the best talent for our State. While compensation is only one factor people consider before entering public service, salaries must be high enough to encourage people to enter service and make it a career.

The Judicial Branch understands that these are times of great sacrifice for all.  In the spirit of shared sacrifice, the Judicial Branch makes no specific salary requests and offers no salary recommendations for its judges.  Although we make no specific request, we wanted to be helpful by providing some salary comparison information to help you make informed and fair decisions about proper compensation of judicial officers.

January 8, 2021
Page **2** of **5**

## INFLATION AND DELAWARE JUDICIAL SALARIES

It is our understanding that the last implemented Compensation Commission report was in 2005. Since that time, the salaries of Delaware's judicial officers have increased by approximately 10% while inflation has increased by over 29%, and the national average percent change across other states has exceeded 30%.

While our national salary ranking may look reasonable, it is important to note the losses in national ranking over the years. Delaware's salaries rank as #11 and #16 for Supreme Court Justices (Highest Court) and Superior Court Judges (General Trial Court) respectively in 2020. By contrast, in 2006, Delaware ranked #2 in salaries for both Justices and Superior Court Judges. In other words, Delaware is rather quickly losing ground when compared to other states.

| Judicial Salaries | FY 2006 | FY 2020 | Percent Increase 2006-2020 | National Average Percent Change | National Ranking For Salary |
|---|---|---|---|---|---|
| Chief Justice | $189,300 | $206,148 | 8.9% | | |
| Justices | $179,700 | $197,245 | 9.8% | 30.9% | 16 out of 51 |
| Chancellor | $180,400 | $196,738 | 9.1% | | |
| Vice-Chancellors | $169,900 | $185,444 | 9.1% | | |
| President Judge | $178,400 | $196,738 | 10.3% | | |
| Superior Court Judges | $163,900 | $185,444 | 13.1% | 32.7% | 11 out of 51 |
| Superior Court Commissioners | $100,500 | $115,452 | 14.9% | | |
| Family Court Chief Judge | $178,400 | $196,738 | 10.3% | | |
| Family Court Judges | $163,900 | $185,444 | 13.1% | | |
| Family Court Commissioners | $100,500 | $115,452 | 14.9% | | |
| CCP Chief Judge | $178,400 | $194,541 | 9.0% | | |
| CCP Judges | $163,900 | $179,066 | 9.3% | | |
| CCP Commissioners | $100,500 | $111,516 | 11.0% | | |
| Chief Magistrate | $117,700 | $129,816 | 10.3% | | |
| Magistrates – 3rd term | $72,400 | $81,507 | 12.6% | | |
| Magistrates – 2nd term | $70,100 | $79,101 | 12.8% | | |
| Magistrates – 1st term | $67,700 | $76,488 | 13.0% | | |
| **Inflation Rate Increases** | | | **29.10%** | | |

January 8, 2021
Page **3** of **5**

## COMMERCIAL LITIGATION STATES

We looked at a comparison of judicial salaries from those states that try to compete with Delaware Courts as national and international business centers ("commercial litigation jurisdictions") – California, Illinois, New York, and Pennsylvania, noting that California and Illinois have the greatest similarity to Delaware.  Comparing Delaware salaries with other commercial litigation jurisdictions has been used in the Delaware Compensation Commission process since 2001.  Delaware should not be compared to most other state court systems because of its unique role – the Delaware Courts serve as a "model judiciary" across the nation.

While the other Commercial Litigation state salaries have increased an average of 33% since 2006, the State of Delaware judicial salaries (in the tables below) have only increase 9% and 13%.

| JUDICIAL SALARIES IN COMMERCIAL LITIGATION STATES HIGHEST COURT JUDGES' SALARIES | | | |
|---|---|---|---|
| **State** | **2006** | **2020** | **% Increase** |
| California | $182,000 | $262,000 | 44% |
| Delaware | $180,000 | $197,000 | 9% |
| Florida | $160,000 | $221,000 | 38% |
| Georgia | $158,000 | $179,000 | 13% |
| Illinois | $177,000 | $246,000 | 39% |
| New Jersey | $159,000 | $209,000 | 31% |
| New York | $151,000 | $233,000 | 54% |
| **AVERAGE** | **$167,000** | **$221,000** | **33%** |

*Please note that salaries are rounded.*

January 8, 2021
Page **4** of **5**

| JUDICIAL SALARIES IN COMMERCIAL LITIGATION STATES GENERAL JURISDICTION COURT JUDGES' SALARIES | | | |
|---|---|---|---|
| **State** | **2006** | **2020** | **% Increase** |
| California | $149,000 | $215,000 | 44% |
| Delaware | $164,000 | $185,000 | 13% |
| Florida | $139,000 | $161,000 | 16% |
| Georgia | $133,000 | $174,000 | 31% |
| Illinois | $143,000 | $213,000 | 49% |
| New Jersey | $141,000 | $189,000 | 34% |
| New York | $137,000 | $211,000 | 54% |
| **AVERAGE** | **$144,000** | **$172,000** | **34%** |

*Please note that salaries are rounded.*

## **FEDERAL JUDGES' SALARY COMPARISON**

The salaries of federal judges have increased in line with the rate of inflation, while State of Delaware judicial officer positions have increased by less than 15%.

| FEDERAL JUDGES SALARIES | | | |
|---|---|---|---|
| | **2006** | **2020** | **% Increase** |
| Chief Justice | $212,100 | $277,700 | 31% |
| Associate Justice | $203,000 | $265,600 | 31% |
| Circuit Judge | $175,100 | $229,500 | 31% |
| District Judge | $165,200 | $216,400 | 31% |
| Bankruptcy Judge** | $151,984 | $199,088 | 31% |
| Magistrate Judge*** | $151,984 | $199,088 | 31% |
| | | | |
| ** Bankruptcy judges' salary is 92% of a district judges' salary. | | | |
| ***Since 1988, the salary of magistrate judges is determined by the Judicial Conference, of up to 92 percent of the salary of district judges. | | | |

The federal Delaware courts have dramatically smaller caseloads than in Delaware state courts,1 but the caseloads for both sets of courts have varying degrees of complexity (contracts,

---

1 For example, in 2015, the caseload per district court judge was approximately 270 per judge, while the caseload per Superior Court judge was three to four times that (712 per judicial officer if commissioners are included and 882 per judge if only judges are included.

January 8, 2021
Page **5** of **5**

prisoner petitions vs. patent (federal district court) or complex commercial litigation (Superior Court).

## **CONCLUSION**

Once again, we thank the Compensation Commission for its work under difficult circumstances.  The Delaware legal industry contributes annually about $2.6 billion to the Delaware economy.  Investing in the people that make this financial contribution happen is an investment in the State's financial future.  It also ensures that the State attracts the best talent to allow the Delaware Judiciary can accomplish its essential mission – equal justice for all.

Sincerest regards,

/s/ *Collins J. Seitz, Jr.*
Chief Justice

# DELAWARE COMPENSATION COMMISSION

## 2021

## Final Report

## January 12, 2021

Michael A. Barlow, Chair

Drew Fennell

Doncene A. Keemer-Damon

Guy Marcozzi

Rod Ward, III

Saundra Ross Johnson
Secretary, Department of Human Resources
Ex-Officio

*By using this form, the parties acknowledge their agreement to conduct transactions by electronic means. A party's electronic signature for purposes of the Uniform Electronic Transactions Act, 6 Del. C. Ch. 12A, may be provided by checking the box as indicated, electronic initials or name, or e-mail confirmation.*

# TABLE OF CONTENTS

## INTRODUCTION

- **Creation of Commission**
- **Members**
- **Authorization**
- **Meetings and Hearings**
- **Attracting and Retaining Talent**
- **Past Commissions' Recommendations**
- **Compensation Comparisons with Other States**
- **Unique Circumstances Affecting the Work of the 2021 Commission**
- **Conceptual Framework for Analysis**

## RECOMMENDATIONS

## EXECUTIVE BRANCH:

- **Governor**
- **Cabinet**
- **Other Elected Officials**

## JUDICIAL BRANCH:

- **Impact of the Judiciary on Delaware**
- **Judicial Salaries**

## LEGISLATIVE BRANCH:

- **Legislative Pay, Supplements and Expense Allowances**

## TABLE A:  Executive

## TABLE B:  Other Elected Officials

## TABLE C:  Judiciary

## TABLE D:  Legislative Pay, Supplements and Expense Allowances

## SUMMARY

## ACKNOWLEDGMENTS

## APPENDICES

### Office of Management and Budget Memo on DEFAC

### Salary Survey Data (provided by Willis Towers Watson)
- **Executive and Elected Officials**
  - o **Book of States, 2019 (aged)**
  - o **Additional State and Local Data, 2019 (aged)**
- **Judicial Branch**
  - o **National Center for State Courts, 2019 (aged)**
  - o **Federal Judicial Salaries, 2020**
- **Legislative Branch**
  - o **Book of States, 2019 (aged)**
  - o **Wilmington City Council, 2019 (aged)**

### Delaware Compensation Commission – Letter to M. Barlow 01.08.21

# INTRODUCTION

## Creation of Commission

In July 1984, Governor DuPont approved a law (29 <u>Del. C.</u> Sections 3301- 3304) creating the Delaware Compensation Commission.  Emerging from the difficult financial times of the '70s, the establishment of the Commission was one of many reforms implemented to set Delaware on a future non-partisan course of setting policies and salaries for the Cabinet, Legislature, and Judiciary in such a way as to remove political considerations while attracting top talent to State government.

In January 1985, the first Commission submitted its recommendations as required under the statute, which were passed by the General Assembly and the recommendations became effective on February 1, 1985.  In December 1988, in accordance with the statute, the 1989 Commission submitted its report and recommendations, which were passed and became effective on February 1, 1989.

In January 1993, the 1993 Commission submitted its report and recommendations.  By joint resolution, the General Assembly rejected the report of the 1993 Commission.  In April 1993, the General Assembly passed legislation adjusting salaries for members of the Judiciary, General Assembly, other Elected Officials, and the Cabinet.

In January 1997, the 1997 Commission submitted its report and recommendations, which were passed and became effective February 1, 1997.  Likewise, in January 2001, the 2001 Commission submitted its report and recommendations, which were passed and adopted by the Legislature and became effective February 1, 2001.  In January 2005, the 2005 Commission submitted its report and recommendations, which were passed and became effective February 1, 2005.  In January 2009, the 2009 Commission submitted its report and recommendations; however, based on the economic condition of the State's budget and the national economic climate, the 2009 Commission recommended no salary increases for any of the positions covered by this Report.  The effective date of the Commissions' reports was changed from February 1 to July 1 in the Fiscal Year 2009 Budget Act Epilogue, Section 35. The 2013 Commission submitted its report and recommendations in January 2013; however, per House Joint Resolution No. 2, the General Assembly voted to reject the report.  The

2017 Commission submitted its report and recommendations in January 2017; however, per House Joint Resolution No. 2, the General Assembly voted to reject the report.

The Report of this Commission, referred to as the 2021 Commission, has the force and effect of law as of the first day of July following submission unless the General Assembly, by joint resolution, rejects the report in its entirety within 30 days following commencement of its 2021 session.

## Members

The 2021 Commission consisted of six members and was chaired by Michael A. Barlow, appointed by the Governor, John C. Carney.  Other members include Guy Marcozzi, appointed by the President Pro Tempore of the Senate; Rod Ward III, Chair of the Delaware Business Roundtable; Doneene A. Keemer-Damon, appointed by the Governor; and Drew Fennell, appointed by Rep. Schwartzkopf, Speaker of the House.  Saundra Ross Johnson, Secretary, Department of Human Resources, serves as an Ex-Officio and non-voting member.

## Authorization

Under its enabling statute, the Commission was authorized to study the "remuneration" of key office holders within the Executive, Judicial, and Legislative branches of State government.  It was also authorized to issue a report no later than January 12, 2021, establishing "remuneration" for these public officials.

## Meetings and Hearings

The 2021 Commission met on November 17, 2020, December 7, 2020, December 23, 2020, January 7, 2021 and January 11, 2021.  In addition, the 2021 Commission held a public WebEx hearing on December 23, 2020.  There were neither speakers nor public comment at the hearings.

The 2021 Commission members were provided with information showing a historical view of salaries, budgets, positions, and general salary increases (GSI) from Fiscal Year 2017 through the present (2020).

Willis Towers Watson was engaged as a consultant to the 2021 Commission, providing and interpreting salary survey data requested by the 2021 Commission. Theresa Lynch, Consulting Director, was the team lead for the consultant.

Based on the information received from the consultants and the 2021 Commission members' own deliberations and experience, the 2021 Commission submits unanimously the following findings and determinations.

## **Attracting and Retaining Talent**

The 2021 Commission, as was the case with the previous Commissions, believes strongly that the quality of State government depends largely upon its ability to attract and retain highly talented individuals to lead its various programs and activities. The 2021 Commission agrees with and concluded that reasonable compensation, set by an impartial body such as the Commission, plays an important role in attracting and retaining top talent.

This is particularly the case for Delaware government leadership positions since many services that are offered statewide in Delaware are either not offered by other government entities or are offered in other states at a local level. The State of Delaware has a nationally respected, fair, high quality, and efficient court system; a responsive State Legislature; and a dedicated and effective Executive Branch of State government. The individuals who agree to represent the people in those positions are entitled to earn competitive and appropriate wages.

## **Past Commissions' Recommendations**

The Compensation Commission was created in 1984 and was in large part able to remove deliberations on executive level salaries from the political arena. The recommendations of the 1985, 1989, 1997, 2001, and 2005 Commissions, which were accepted by the State Legislature, improved considerably the compensation for most of the positions that this report evaluates. From that, Delaware was able to continue to attract highly qualified individuals to the three branches of government.

After rejecting the 1993 Commission report, the General Assembly passed legislation providing 4% increases for members of the Judiciary, 3% for members of the General Assembly and other Elected Officials, and an average of 4.1% increases for members of the Cabinet. The legislation also increased legislative supplements for members of the General Assembly by 3%.

Due to the economic condition of the State's budget and the national economic climate, the 2009 Commission recommended no salary increase for any of the positions covered by the Commission.

With the 2009 Commission recommending no salary increases and the rejection of the 2013 and 2017 Commission recommendations/reports, the positions covered by the Delaware Compensation Commission have not received salary adjustments through the Commission since 2005. These positions have been provided the same general salary increases given to other State employees. The exception to this rule is the Governor, whose position is restricted, by law, from receiving these increases.

Through the work of prior Commissions, much progress has been made in providing more appropriate compensation to those within the Commission's jurisdiction. However, the Commission is of the view that the decisions not to implement Commission recommendations since 2005 risks the future ability of State government to attract and retain talented leaders. This Commission is of the firm view that the proposal is not thought of as salary increases but reflects appropriate salary adjustment for positions covered in this report.

## Compensation Comparisons with Other States

The 1989, 1993, and 1997 Commissions compared Delaware salaries for the offices under review with the states of New Jersey, Pennsylvania, Maryland, Virginia, New York, North Carolina, and Massachusetts. Although there is no requirement to do so, the 2021 Commission also reviewed and evaluated these seven states as one of their references. Because of its concern as to the significant demographic differences between some of the states in this comparative group, the 2021 Commission felt it appropriate to examine other

states of comparable size.  Consequently, the 2021 Commission identified and considered salary data from three states with similar budgets (Rhode Island, New Hampshire, and Vermont), as additional references.  We want to emphasize, however, that throughout our deliberations and in this Report, we were not constrained by rigid comparisons, as statewide comparisons can be difficult because of the numerous differences among the states.  The 2021 Commission also considered salary survey data from local entities in Delaware, Maryland, and Pennsylvania.  The 2021 Commission considered salary survey data from all the entities referenced above as well as (for the judiciary) the states of Georgia, California, Florida, and Illinois due to the similarity of their judicial structure for adjudicating corporate law.  When considering the salary survey data from other states, as provided by Willis Towers Watson in their recommendations, this Commission considered similarities in the State's job responsibilities compared to the survey states as well as the impact of the job on the State's revenues.  The salary recommendations of the 2021 Commission reflect these factors.

## Unique Circumstances Affecting the Work of the 2021 Commission

As the 2021 Commission began its deliberations, the Commission acknowledged the emergency situation created by the COVID-19 pandemic and its effects on the national, state, and local economic climate.  At the same time, the Commission recognized while the immediate concerns created by the pandemic were considerable, the responsibility of the Commission was to focus on the long-term competitiveness of the compensation of State leadership to continue to attract and retain talented leaders into State government.  The 2021 Commission acknowledged that while the economic climate had improved somewhat, recovery has been slow, and revenues forecasted less than anticipated.  The DEFAC FY '22 revenue estimates are forecast to be 3% less than FY '21.  Specifically, DEFAC estimates are expected to grow 8.3% in FY '21 ($4.90 billion), but then decline 2.7% ($4.76 billion) in FY '22, per the OMB report attached.  To address current events, the Commission proposes that its proposals be implemented only when the General Assembly determines that the economic health of the State is such that a general salary increase (GSI) for non-union State employees is appropriate.

The 2021 Commission considered a variety of courses of action in an effort to balance their strong commitment to maintain competitive and fair salaries to attract and retain the highest

caliber of top state management officials. The salaries under consideration by the 2021 Commission have not been increased since 2005 other than the general salary increases provided to most State employees. The recommendations of this Commission for salary adjustments reflect the effect of the 16-year gap since any market adjustments have been implemented for these positions. To address the effects of that 16-year gap, most salary changes are recommended in a phased-in four (4)-year approach with consideration of budget projections. In many cases, the phased-in four (4)-year approach will result in salaries at the end of the period more commensurate with present median salaries for comparable positions.

Per 29 Del. Code § 3304, the salary increases in the Delaware Compensation Commission report are to be effective in July of the Fiscal Year in which State employees, who are not covered by a finalized compensation collective bargaining agreement, are provided a general salary increase. However, Budget Act Epilogue provides for implementation on the first day of the first pay period of the fiscal year. These two laws need to be reconciled. Salary increases are recommended on Tables A, B, C, and D.

## Conceptual Framework for Analysis

Before beginning its deliberations on specific salary recommendations, the 2021 Commission discussed compensation for State executives and agreed upon the following principles:

1. In determining salary increases, market data, median and average salaries, as well as similarities in job responsibilities comparable to other State of Delaware agency leaders and among the survey states, and the impact of a job on the State's revenues should be considered.

2. Executive Branch tiers should be collapsed into two (2) tiers.

3. Executive Branch compensation should consider full-time equivalents (FTEs), budgets, responsibility, risk, re-organizations, impact on State revenues, and any circumstances unique to this Commission.

4. Some phasing-in of salary increases should be considered over a four (4)-year period, due to economic realities but as a rule should not exceed five percent (5%) in one year.

5. Although the State's financial climate is a factor, the primary emphasis is the need for salaries to maintain competitiveness in recruiting and retaining top talent.

6. The Governor should continue to have some flexibility in making salary offers to Cabinet secretaries.

7. Judicial salaries need to be reviewed with an emphasis on attracting top talent for these positions.

8. The concept of a supplement for administrative duties continues to be valid for leadership positions within the Legislature.

9. Consideration should be given to all public comments.

10. Since the 2009 Commission recommended no salary increases due to the national financial crisis, and the reports issued by the 2013 and 2017 Commissions were rejected by the General Assembly, other than general salary increases provided to most State employees, the salaries under consideration by the 2021 Commission have not been adjusted since 2005.

11. Consideration should be given to how GSI provided to other non-union State employees may affect any recommendations.

12. Consideration should be given to how any recommendations would be implemented with attention to the State's economic status and revenue projections.

## RECOMMENDATIONS

The 2021 Commission considered a variety of courses of action in an effort to balance its strong commitment to maintain competitive and fair salaries to attract and retain the highest caliber of top state management officials and recent events affecting the State economy. The positions' salaries under consideration by the 2021 Commission have not been adjusted since 2005, other than the general salary increases provided to most State employees. The current status of Delaware salaries in these covered positions reflect the effect of that 16-year gap. The market adjustment recommendations of this Commission aim to close that gap, avoid any negative effects resulting from the current salary situation, and preserve the State's ability to attract and retain top talent in these positions.

In deliberating on the implementation of market adjustment recommendations, the 2021 Commission considered the State's current economic status still in a public health crisis and

the organization's revenue projections.  It was decided that implementation recommendations would include a phased-in four (4)-year approach for most salary adjustments.

Salary increases in this report are to be effective July of the appropriate Fiscal Year.  These recommendations include an implementation date, or trigger, that begins the rollout of these market adjustments coinciding with the first fiscal year in which State non-union employees are provided a general salary increase through the Budget Act.  (Non-union employees are defined for this document as those who are not covered by a finalized compensation collective bargaining agreement.)  This trigger recommendation is an integral part of the Commission's approach and the phase-in is meant to move forward only when the State is in a position to increase salaries for State employees.

Positions covered in this report will receive either the designated fiscal year amount recommended in this Report or the general salary increases approved by the Legislature for other State non-union employees, whichever is higher.  Although the GSI in a given year may bring the incumbent's salary to a higher amount than designated for that fiscal year in the Tables A, B, C, or D, it will not compound or increase the next fiscal year's amount.  That is, the fiscal year amount listed in the tables is the amount the incumbent will receive even if, in an earlier year, the amount may have been higher due to the GSI.

## EXECUTIVE BRANCH

The 2021 Commission concludes that the salaries for the Executive Branch should be as established in Table A: <u>Executive</u>.  The recommended tiers for the various offices within the Executive Branch are a reflection of each office's level of responsibility and authority.  The 2021 Commission used the salary market data provided by Willis Towers Watson in its evaluation of salary recommendations.

## Governor

Delaware's Constitution prohibits the Governor from receiving any salary increases or decreases during the period for which he or she shall have been elected (Article III, § 7).

Therefore, under the State's Constitution, the 2021 Commission's recommendations will have no impact on the salary of the 2021 Governor-Elect. However, a recommendation for the next/2025 Governor's salary is included in this Report.

The 2005 Commission, in its report of January 2005, proposed a salary that was 10% above the highest base salary ($155,450) paid to an Executive Branch official, the agency heads of the Department of Technology & Information and the Department of Education at the time, effective when the Governor took office in 2009 which resulted in a salary of $171,000. That Commission also recommended that prior to January 18, 2005, the General Assembly entertain legislation to increase the salary of the incoming Governor to 10% above the highest paid Executive Branch official. The salary of the Governor has not changed since 2009 and remains $171,000.

To continue to keep the salary of the Governor above those of other Executive Branch officials, albeit not 10% above, the 2021 Commission supports a salary policy that adds 2.0% market adjustment each year for four (4) years that would be implemented in FY 2025. This recommendation will require its inclusion into the FY 2025 Budget Act Epilogue.

## Cabinet

Cabinet members currently receive salaries that fall into four tiers. The salaries were clustered into those four tiers by prior Commissions based upon a combination of factors including the size of the agency as measured by budget and personnel employed, and the impact of the agency on the citizens and economy of the State. The 2021 Commission recognizes the advantages of such a tiered pay scale and believes that, in general, all Cabinet members should be placed in an appropriate tier; however, the Commission believes the number of tiers should be decreased. The 2021 Commission also gave consideration to other factors, such as risk, 24/7 operations, and major organizational changes. The 2021 Commission recommends moving to a two-tier system for Cabinet members.

After reviewing the impact of the agencies on the citizens (safety, security, social services, families, juvenile justice, and transportation) and economy of the State (revenues generated, jobs created, and businesses attracted to the State), as well as recent events including the ongoing public health threat, the size of the agencies as measured by budget and personnel

employed, salaries paid to comparable positions in the surrounding states, and the direct service provided to constituents by the departments, the 2021 Commission recommends the following:

1. Reduce the number of tiers from the current four (4) to two (2). The Commission recommends the following tier structure:

    Tier 1:

    Chief Information Officer
    Secretary of Education
    Secretary of Health & Social Services
    Director, Office of Management & Budget
    Secretary of Finance
    Secretary of State
    Commissioner of Correction
    Secretary of Safety & Homeland Security
    Secretary of Services for Children, Youth & Their Families
    Secretary of Transportation

    Tier 2:

    Secretary of Human Resources
    Secretary of Natural Resources & Environmental Control
    Adjutant General
    Secretary of Agriculture
    Secretary of Labor
    Director, Delaware State Housing Authority

    The rationale for the above Tier 1 groupings and salary adjustments are based upon the following:

    o   The Secretary of the **Department of Health and Social Services** (DHSS) administers the State's largest department of approximately 4,000 employees in 11 divisions, including the Delaware Psychiatric Center, a long-term care facility, and the Stockley Center for developmentally-disabled persons, with a total budget of almost $2 billion, and its leadership in the continued management of the COVID-19 public health threat is recognized by recommending a market adjustment that brings this position's salary in line with the Secretary of Education and the Chief Information Officer.

    o   The Director of the **Office of Management & Budget** (OMB) who leads this office with the central role in designing and implementing the State budget, allocating State resources, and supporting government services, and the Secretary of the **Department of Finance** (DOF), where forecasting, generating, collecting and accounting for funds is conducted, were both moved into Tier 1 from their

current Tier 2 placement with similar salaries. This is due to these positions having significant fiscal responsibilities for the State.

o   At the **Department of State** (DOS), the Division of Corporations generates millions of dollars through its diverse businesses and is the legal home of more than half of all U.S. publicly traded companies and 64% of the Fortune 500 in the State. These significant revenues are in addition to State and local taxes. DOS administers the Delaware Veterans Home, Professional Regulation, the Public Service Commission, the Public Advocate, the Merit Employee Relations Board, the Public Employment Relations Board, and the Public Integrity Commission. Although the Secretary of DOS has diverse responsibilities, those that involve revenue matters align with work conducted by the OMB Director and DOF Secretary. This position was placed on the same tier with a similar market adjustment. The Commission recommended increases slightly over 5% for this position and unanimously supports the recommendation based on the responsibilities of this position.

o   The Commissioner of the **Department of Correction** (DOC), as the largest law enforcement agency in the State supervising up to 5,000 inmates and approximately 13,000 probationers under a unified correctional system, where all correctional facilities and institutions fall under the State's jurisdiction, was brought into Tier 1 due to these significant adult incarceration responsibilities.

o   The Secretary of the **Department of Services for Children, Youth and Their Families** (DSCYF) has responsibilities of serving at-risk children and families; administering 24/7 crisis operations, suicide prevention programs, child abuse intervention, and five secure-care youth facilities; adjudicated youth; is the fourth largest department by positions; and overseeing the development and implementation of an integrated, department-wide, client-based information system. Functions supervised by this Secretary for the State's youth correlate with work at the DOC; therefore, this agency head was placed at a similar market adjustment amount.

o   The Commission views the **Department of Safety and Homeland Security,** that oversees State Police, Emergency Management, Forensics, Alcohol and Tobacco Enforcement, and Capitol Police forces, as providing comparable public safety services to the DOC and DSCYF and placed this position in this grouping in Tier 1 with comparable market adjustments. The Commission noted the addition of the Division of Forensic Science to the work of the Department in 2014.

o   The Secretary of the **Department of Transportation** is recommended for Tier 1 due to responsibilities for overall transit redesign; its focus on customer service and innovation; project prioritization; focus on performance management; greenways planning and development; right of way section restructuring; internal restructuring of tolls administration and Transportation Solutions; expanded DMV customer service enhancements; implemented electronic plan submittals; and continued emphasis on multi-modal forms of transportation.

Tier 2 includes:

- o  Secretary of Human Resources moved from current Tier 3.
- o  Secretary of Natural Resources & Environmental Control moved from current Tier 3.
- o  Adjutant General moved from current Tier 3.
- o  Secretary of Agriculture moved from current Tier 4.
- o  Secretary of Labor moved from current Tier 4.
- o  Director, Delaware State Housing Authority moved from current Tier 4.

2.  To achieve the recommended structure, salary increases are phased in over four (4) years.

3.  The trigger to move into the target amounts in each year is the first year after the 2021 Commission when the State Budget Act provides a general salary increase (GSI) for non-union State employees. This trigger recommendation is an integral part of the Commission's approach and is meant to move forward only when the State is in a position to increase salaries for State employees.

4.  As did recent Commissions, the 2021 Commission believes that Governors should have some flexibility to set the salaries of Cabinet officials to ensure the recruitment and retention of talented people. The 2005 Commission report provided the Governor the flexibility to pay Cabinet officials a salary that is within a range of 5% below to 5% above the recommended salary of the position. To provide the Governor increased flexibility, effective July of 2020, for new hires or appointments only, this Commission believes that the Governor should be able to pay Cabinet officials a salary that is within a range of 5% below to 5% above the recommended salary for the position, provided that the maximum of the range does not exceed the 20% cap required by law.[1]

5.  Positions covered in this Report will receive either the designated fiscal year amount recommended in this Report or the general salary increases approved by the Legislature for other State non-union employees, whichever is greater.

6.  Although the GSI in a given year may bring the incumbent's salary to a higher amount than designated for that fiscal year in the Tables A, B, C, or D, it will not compound or increase the next fiscal year's amount. That is, the fiscal year amount listed in the tables

---

[1] 29 Del. Code § 3303(b) Remuneration study; report: "....The rate of remuneration established in the report for offices which salaries are more than $25,000, except for the Governor shall not exceed 120% of the remuneration received in the fiscal year in which the report is submitted."

is the amount the incumbent will receive even if, in an earlier year, the amount may have been higher due to the GSI.

7. Please see recommendations in Table A: <u>Executive</u> for the salary recommendations of the 2021 Commission.

8. The 2021 Commission recommends no revisions to the pension plans of Cabinet officials.

## Other Elected Officials

1. The 2021 Commission recognizes the individual considerable responsibilities of the Insurance Commissioner, the State Treasurer, and the State Auditor in their respective offices and the varied boards and commissions upon which these elected officials serve. In turn, the Attorney General, the State's chief law enforcement officer, with broad responsibility to combat crime, safeguard families, fight fraud, and protect consumers in the State, and head of the Office of Defense Services, which provides legal services to indigent and incarcerated clients statewide, are recommended for market adjustments that recognize these responsibilities. The 2021 Commission recommends salary adjustments for the State Auditor, the State Treasurer, and the Insurance Commissioner to bring them in line with market and each other. Please see recommendations on Table B: <u>Other Elected Officials</u>.

2. The 2021 Commission reviewed the market and significant responsibilities of the Attorney General and the head of the Office of Defense Services and recommends salary adjustments in Table B: <u>Other Elected Officials</u>.

3. The Lieutenant Governor's responsibilities and pay is divided by specific work. This work was reviewed, and the 2021 Commission recommends increasing each portion of the work by 2%. Recommendations can be found in Table B: <u>Other Elected Officials</u>.

4. The trigger to move into the target amounts in each year is the first year after the 2021 Commission when the State Budget Act provides a general salary increase (GSI) for non-union State employees. This trigger recommendation is an integral part of the Commission's approach and the phase-in is meant to move forward only when the State is in a position to increase salaries for State employees.

5. Positions covered in this Report will receive either the general salary increases approved by the Legislature for other State non-union employees or the designated fiscal year amount recommended in this Report, whichever is higher.

6. Although the GSI in a given year may bring the incumbent's salary to a higher amount than designated for that fiscal year in the Tables A, B, C, or D, it will not compound or increase the next fiscal year's amount. That is, the fiscal year amount listed in the tables is the amount the incumbent will receive even if, in an earlier year, the amount may have been higher due to the GSI.

# JUDICIAL BRANCH

The 2021 Commission concludes that the salaries of the Judicial Branch should be as listed in recommendations on Table C: Judiciary.

## Impact of the Judiciary on Delaware

The 2021 Commission recognizes that Delaware has gained a national and increasingly international reputation for its outstanding courts and highly qualified Judiciary. The Delaware Judiciary adjudicates sensitive issues faced by Delaware citizens in their daily lives and renders decisions of major importance that affect corporate governance, stockholders' rights, and the business marketplace in the United States and around the world. Therefore, recruiting and retaining outstanding, diverse, and high caliber judges is essential to the quality of life and economic well-being of the people of Delaware. Further, significant revenues can be attributed to Delaware's renowned legal system and Judiciary.

## Judicial Salaries

In addition to the stature and reputation of Delaware's Judiciary, the 2021 Commission considered the fact that no Commission recommendations have been implemented since 2005, inflation increases in the past 16 years, maintaining the Judiciary's national ranking, the salaries of Federal judges as benchmarks, along with the states' commercial litigation jurisdictions for which Delaware competes for candidates, namely New York, Illinois, California, and Pennsylvania.

The 2021 Commission spent a considerable amount of time reviewing and discussing the appropriate benchmarks to use for setting judicial salaries: the salaries of Federal court judges, the salaries of judges in states which also have renowned commercial litigation courts, State median salary survey data for the Judiciary, as well as the relationship of Delaware's courts to each other. It is the recommendation of this Commission that the salaries of Federal judges be used as an initial benchmark for setting the salaries of Delaware's judges due to the prestige of Delaware's courts not only nationally but internationally and the role our courts play in the economy of the state. Delaware's court

system is well-known for being expeditious and equitable and having the highest level of integrity and well-thought out defensible decisions.

1. To achieve salaries in the future closer to parity with Federal benchmarks, this Commission recommends the phasing in of market adjustments for the State's Judiciary over several years.
2. The trigger to move into the target amounts in each year is the first year after the 2021 Commission when the State Budget Act provides a general salary increase (GSI) for non-union State employees. This trigger recommendation is an integral part of the Commission's approach, and the phase-in is meant to move forward only when the State is in a position to increase salaries for State employees.
3. Positions covered in this Report will receive either the general salary increases approved by the Legislature for other State non-union employees or the designated fiscal year amount recommended in this Report, whichever is higher. Please see Table C: Judiciary for our recommendations.
4. Although the GSI in a given year may bring the incumbent's salary to a higher amount than designated for that fiscal year in the Tables A, B, C, or D, it will not compound or increase the next fiscal year's amount. That is, the fiscal year amount listed in the tables is the amount the incumbent will receive even if, in an earlier year, the amount may have been higher due to the GSI.

The 2021 Commission believes its recommendations are fair and reasonable based on the information and the data it examined and the significance of recognizing the hierarchy within Delaware's Judiciary.

# LEGISLATIVE BRANCH

The 2021 Commission recommends market adjustments in recognition of the enormous amount of time spent working with constituents, serving on committees which have significant impact upon the citizens of the State, as well as holding key leadership positions within the caucuses of their respective parties within the Legislative Branch. The Commission did not endorse multi-year increases because of the absence of strong comparables that would suggest an increase is warranted. That said, the Commission believed a modest increase was warranted to reflect the absence of changes since 2005 (other than GSI).

1. The 2021 Commission recommends the salaries, supplements, and expense allowances of the Legislative Branch as established in Table D: Legislative.
2. The trigger to move into the target amounts in each year is the first year after the 2021 Commission when the State Budget Act provides a general salary increase (GSI) for non-union State employees. This trigger recommendation is an integral part of the Commission's approach and the phase-in is meant to move forward only when the State is in a position to increase salaries for State employees.
3. Positions covered in this Report will receive either the general salary increases approved by the Legislature for other State non-union employees or the designated fiscal year amount recommended in this Report, whichever is higher.
4. Although the GSI in a given year may bring the incumbent's salary to a higher amount than designated for that fiscal year in Tables A, B, C, or D, it will not compound or increase the next fiscal year's amount. That is, the fiscal year amount listed in the tables is the amount the incumbent will receive even if, in an earlier year, the amount may have been higher due to the GSI.

TABLE A:  Executive

| | Executive* | | | | | | |
|---|---|---|---|---|---|---|---|
| | FY 2021 | FY 2021 | FY 2021 | FY 2022** | FY 2023 | FY 2024 | FY 2025 |
| | FTE*** | Budget**** | CURRENT | | | | |
| Governor***** | | | $ 171,000 | $ 171,000 | $ 171,000 | $ 171,000 | $ 185,096 |
| **Tier 1** | | | | | | | |
| Secretary of Education (Does not include school districts) | 218 | $ 34,449.1 | $ 165,055 | $ 170,007 | $ 173,407 | $ 176,875 | $ 178,644 |
| Department of Technology and Information | 310 | $ 85,888.4 | $ 165,055 | $ 170,007 | $ 173,407 | $ 176,875 | $ 178,644 |
| Department of Health and Social Services | 3,925.1 | $ 1,386,044.4 | $ 152,088 | $ 159,692 | $ 166,080 | $ 172,391 | $ 178,644 |
| Department of Finance | 304 | $ 141,244.0 | $ 152,088 | $ 155,890 | $ 159,008 | $ 161,397 | $ 163,011 |
| Secretary of State | 626 | $ 96,772.1 | $ 132,011 | $ 139,008 | $ 146,375 | $ 154,133 | $ 163,011 |
| Office of Management & Budget | 319 | $ 180,346.6 | $ 152,088 | $ 155,890 | $ 159,008 | $ 161,397 | $ 163,011 |
| Department of Correction | 2645 | $ 354,011.7 | $ 152,088 | $ 155,130 | $ 157,467 | $ 159,031 | $ 160,625 |
| Department of Services for Children, Youth, and Families | 1288 | $ 211,082.9 | $ 137,240 | $ 143,416 | $ 149,152 | $ 155,119 | $ 160,625 |
| Department of Safety & Homeland Security | 1259 | $ 177,721.1 | $ 137,240 | $ 143,416 | $ 149,152 | $ 155,119 | $ 160,625 |
| Department of Transportation | 1820 | $ 336,290.8 | $ 142,572 | $ 146,136 | $ 149,059 | $ 152,040 | $ 155,081 |
| **Tier 2** | | | | | | | |
| Department of Human Resources (New Cabinet FY19) | 252 | $ 28,553.6 | $ 132,011 | $ 135,971 | $ 139,371 | $ 142,158 | $ 145,001 |
| Department of Natural Resources | 735 | $ 141,987.0 | $ 132,011 | $ 135,971 | $ 139,371 | $ 142,158 | $ 145,001 |
| Adjutant General | 120 | $ 4,959.9 | $ 126,156 | $ 131,202 | $ 136,450 | $ 141,908 | $ 145,001 |
| Delaware State Housing Authority | 5 | $ 21,388.7 | $ 123,333 | $ 129,500 | $ 135,327 | $ 140,097 | $ 145,001 |
| Department of Labor | 472 | $ 26,987.8 | $ 123,333 | $ 129,500 | $ 135,327 | $ 140,097 | $ 145,001 |
| Department of Agriculture | 141 | $ 16,066.3 | $ 123,333 | $ 129,500 | $ 135,327 | $ 140,097 | $ 145,001 |

KEY:

* Recommendations are based on fiscal year amounts or positions will be eligible for general salaries increase (GSI) provided by the Budget Act, whichever provides the greater amount.

** Trigger proposed:  The FY Increases would begin with first year GSI is implemented for non-union employees (no compensation bargaining CBA) in the Budget Act.

*** Full time equivalency

**** Budget expressed in thousands

***** Per Delaware's Constitution, Article III, §7, Term Of Office which states "The Governor shall, at stated times, receive for his or her services an adequate salary to be fixed by law, which shall be neither increased nor diminished during the period for which he or she shall have been elected."

ORGANIZATIONAL CHANGES

DHR= Department of Human Resources (moved from OMB (except for Pensions) into separate Cabinet dept in FY19 budget)

DEDO= Delaware Economic & Development Office (abolished FY2019 budget; most functions privatized; Small Business and Tourism moved into the Department of State)

Delaware Compensation Commission 2021 Report (FINAL 1/12/21)

20

TABLE B: Other Elected Officials

| | ELECTED* | | | | |
|---|---|---|---|---|---|
| | Current | FY 2022** | FY 2023 | FY 2024 | FY 2025 |
| Lt. Governor** | $ 82,239 | $ 83,884 | | | |
| | | | | | |
| Attorney General | $ 149,893 | $ 152,891 | $ 155,949 | $ 159,068 | $ 162,249 |
| Defense Services (Appointed) | $ 144,769 | $ 147,664 | $ 150,618 | $ 153,630 | $ 156,703 |
| State Treasurer | $ 117,582 | $ 122,285 | $ 127,177 | $ 132,264 | $ 136,947 |
| Auditor | $ 112,667 | $ 118,300 | $ 124,215 | $ 130,426 | $ 136,947 |
| Insurance Commissioner | $ 112,667 | $ 118,300 | $ 124,215 | $ 130,426 | $ 136,947 |
| KEY: | | | | | |

* Recommendations are based on fiscal year amounts or positions will be eligible for general salary increases (GSI) provided by the Budget Act, whichever provides the greater amount.

** Per Del. Constitution, Article III, Executive, subsection 19: Lieutenant Governor: election, term and qualifications; President of the Senate; compensation. "The Lieutenant Governor, for his or her services as President of the Senate, shall receive the same compensation as the Speaker of the House of Representatives; the Lieutenant Governor, for his or her services as a member of the Board of Pardons and for all other duties of the said office which may be provided by law, shall receive such compensation as shall be fixed by the General Assembly." 47,291 * 2% ($48,237 - Legislator) + 19,893 * 2% ($20,291 - Supplement for Speaker of House) = $68,528 (this matches the Speaker's salary) and remainder is $15,356 ($15,055 * 2%) for remainder of duties.

TABLE C: Judiciary

| Judiciary* | | | | | | |
|---|---|---|---|---|---|---|
| | FY 2021 | FY 2022** | FY 2023 | FY 2024 | FY 2025 |
| | Current | | | | |
| Chief Justice | $206,148 | $214,394 | $221,898 | $228,999 | $236,327 |
| Supreme Court Justice | $197,245 | $205,135 | $212,315 | $217,623 | $223,064 |
| Chancellor | $196,738 | $204,608 | $211,769 | $217,063 | $222,490 |
| President Judge Superior | $196,738 | $204,608 | $211,769 | $217,063 | $222,490 |
| Vice Chancellor - Chancery | $185,444 | $192,862 | $199,612 | $205,401 | $211,358 |
| Associate Judge - Superior | $185,444 | $192,862 | $199,612 | $205,401 | $211,358 |
| Chief Judge - Family | $196,738 | $204,608 | $211,769 | $217,063 | $222,490 |
| Associate Judge - Family | $185,444 | $192,862 | $199,612 | $205,401 | $211,358 |
| Chief Judge - Court of Common Pleas | $194,541 | $200,377 | $205,587 | $210,932 | $210,932 |
| Associate Judge - Court of Common Pleas | $179,066 | $184,438 | $189,049 | $193,775 | $193,775 |
| Justice of the Peace - 3rd term | $81,507 | $83,952 | $86,051 | $88,202 | $88,202 |
| Justice of the Peace - 2nd term | $79,101 | $81,474 | $83,429 | $85,431 | $85,431 |
| Justice of the Peace - 1st term | $76,488 | $ 78,783 | $80,595 | $82,449 | $82,449 |
| Chief Magistrate | $129,816 | $135,917 | $142,305 | $148,993 | $155,847 |
| Commissioners - Superior | $115,452 | $121,109 | $127,043 | $133,141 | $139,532 |
| Commissioners - Family | $115,452 | $121,109 | $127,043 | $133,141 | $139,532 |
| Commissioners - CCP | $111,516 | $116,646 | $122,012 | $127,625 | $133,496 |

* Recommendations are based on fiscal year amounts or positions will be eligible for general salary increases (GSI) provided by the Budget Act, whichever provides the greater amount.
**Trigger Proposed:  The FY increases begin with first year GSI is implemented for non-union employees (compensation bargaining CBA) in the Budget Act.

## TABLE D: Legislative

| Legislative* | FY 2021 | FY 2022** |
|---|---|---|
| | CURRENT | |
| State Senator/Representative Base Salary | $47,291 | $48,237 |
| | | |
| *Supplements*** | | |
| Speaker of the House | $19,893 | $20,291 |
| Pres Pro Temp of Senate | $19,893 | $20,291 |
| House/Senate Majority Leader | $12,376 | $12,624 |
| House/Senate Minority Leader | $12,376 | $12,624 |
| House/Senate Majority Whip | $7,794 | $7,950 |
| House/Senate Minority Whip | $7,794 | $7,950 |
| Chair and Vice-Chair Joint Finance Committee | $11,459 | $11,688 |
| Members of Joint Finance Committee | $9,626 | $9,819 |
| Chair and Vice-Chair of Capital Improvement Program Committee | $4,578 | $4,670 |
| Members of Capital Improvement Committee | $3,852 | $3,929 |
| Chair and Vice Chair of Joint Sunset Committee | $4,578 | $4,670 |
| Members of Joint Sunset Committee | $3,852 | $3,929 |
| Senate/House - Expense Allowance | $7,334 | $ 7,481 |

*Recommendations are based on fiscal year amounts or positions will be eligible for general salary increases (GSI) provided by the Budget Act, whichever provides the greater amount.

**Trigger Proposed: The FY increases begin with first year GSI is implemented for non-union employees (compensation bargaining CBA) in the Budget Act.

***A member of the General Assembly shall be entitled to receive the higher of any one of the above supplements and receive one-half of the amount of a second stipend of an equal or lessor amount. Eligible recipients of a second stipend may choose not to accept such additional stipend. Supplements have not changed since 2005.

## SUMMARY

As stated by the 1985 Commission, "[I]t is important, however, that compensation be provided to avoid unreasonable sacrifice by these public servants." The 2021 Commission feels strongly that the recommendations presented in this Report reflect this tenet tempered by caution regarding revenue projections. The 2021 Commission sincerely hopes that the recommendations for market adjustments to the salaries of the positions covered by this Report are accepted with the objective of attracting top talent to the State of Delaware.

While the Compensation Commission is charged by statute to examine and make salary recommendations on a quadrennial basis, the 2021 Commission also recognizes that market forces affect certain positions, and the Governor and General Assembly should remain aware of the need to address these forces as appropriate.

Quality performance requires quality people with reasonable compensation. As a result of our fact-finding, analysis, deliberations, and judgment, the 2021 Commission is of the unanimous opinion that the remuneration and levels found in Table A, Table B, Table C, and Table D of this Report, and incorporated in this Report by this reference, should take effect in July of the Fiscal Year indicated.

If any provision of this Report or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect other provisions or applications of this Report which can be given effect without the invalid provision or application, and to that end the provisions of this Act are declared to be severable.

## *ACKNOWLEDGMENTS*

The Commission wishes to thank Saundra Ross Johnson and her staff, Monica Gonzalez-Gillespie, Lisa Allison, Toni Gillis, Joy Olshefsky, Abbey Feierstein, Jennifer Rush, and Mary Darby for their assistance in preparing background information, briefing materials, drafting reports, and staff support for the Commission's meetings, and to thank Theresa Lynch and her team at Willis Towers Watson for their assistance in providing and interpreting salary survey data.

# THE DELAWARE JUDICIARY'S PRESENTATION TO THE

## DELAWARE COMPENSATION COMMISSION

## DECEMBER 12, 2016



# Introduction

➤Delaware Judiciary serves as a foundation to Delaware's leading industry – the formation of business entities and the provision of legal services.

➤Delaware Judiciary plays a key role in attracting business entities and related economic activities and revenue to Delaware.

➤Delaware judges are renowned and well-respected nationally and internationally.

*"Delaware's courts are a key feature contributing to Delaware's reputation and brand. It has one of the most important judiciaries in the country, functioning as a de facto national regulator of publicly traded corporations…."*

Omari Scott Simmons, *Delaware's Global Threat,* 41 J. Corp. L. 246, 263 (2015)

## Economic role of the Delaware judges makes them uniquely important to Delaware and distinct from judiciaries in other states

➢Delaware Judiciary plays vital role in attracting businesses to Delaware.

➢State General Fund revenues generally attributable to Delaware corporations and other business entities exceeded $1.9 billion for FY 2015.

➢This represented 43% of the State's revenue in FY 2015.

➢This does NOT INCLUDE the SUBSTANTIAL INCOME TAXES paid by legal services employees and the revenues generated by providing customers for other businesses like hotels, restaurants, etc.

# Commentators' views on the important role of the Delaware Judiciary

➢ "The Delaware courts, termed "the Mother Court[s] of corporate law," have decided most major corporate law cases in the United States, and courts in other states have often applied Delaware precedents to non-Delaware corporations."

John Armour, Bernard Black, & Brian Cheffins, *Delaware's Balancing Act*, 87 IND. L. J. 1345, 1345-46 (2012)

➢ "Apart from the Justices on the United States Supreme Court, it is hard to imagine that any judges in our country receive closer scrutiny than those serving on Delaware's courts. This is due to their central role, historically, in expounding on corporate law and, more recently, in fleshing out the law of non-corporate business entities."

Lyman Johnson, *Unsettledness in Delaware Corporate Law: Business Judgment Rule, Corporate Purpose*, 38 DEL. J. CORP. L. 405, 406-07 (2013)

# Important role of the Delaware Judiciary in the Corporate World

➢ "The institutional prestige of the Delaware Court of Chancery has never been higher. . . . Academics and practitioners alike have been impressed by both the depth and thoughtfulness of the Court of Chancery's decisions and the hardworking style of its vice chancellors (who regularly seem able to turn out lengthy decisions in days that would take many federal circuit courts months and even years to complete)."

John C. Coffee, Jr., *Foreword: The Delaware Court of Chancery: Change, Continuity – and Competition*, 2012 COLUM. BUS. L. REV. 387 (2012)

➢ "Delaware's leadership in corporate law is not just the result of its well-established body of precedent, its highly regarded judiciary, or its supposed tilt (or lack thereof, depending on one's viewpoint) toward management or investors. Delaware's bench also has the advantages of having so many opportunities to address critical corporate law issues, the certainty of immediate and sustained scrutiny and feedback from lawyers and scholars, and the deft lever of equity that permits judges, as a lawmaking mechanism, to stand between the categorical edicts of a legislative/regulatory state and pure, unconstrained private ordering."

Lyman Johnson, *Unsettledness in Delaware Corporate Law: Business Judgment Rule, Corporate Purpose*, 38 DEL. J. CORP. L. 405, 408-09 (2013)



FY 2015 STATE OF DELAWARE
REVENUE SOURCES
*(JUDICIARY-RELATED IN GREEN)*

Abandoned Property, 12.0%

Personal Income Tax, 33.8%

Incorporation Revenue*, 24.0%

Cigarette Tax, 2.5%

Lottery, 4.8%

Corp. Inc. Tax, 7.2%

Other Tax Rev., 4.3%

Business Gross Receipts Taxes, 5.3%

Bank Franchise Taxes, 2.2%

Other Non-Tax, 3.9%

*Includes  Corporate Franchise Taxes, Business Entity Fees, Limited Partnerships and Limited Liability Corporations, and UCC filings.

## Courts and legal services industry support the vitality of Delaware and its communities

➢The Courts and the legal industry have a multiplier effect on the Delaware economy.

➢The Courts and law firms serve as the "hub" of downtown communities.

➢Law firms fill downtowns – including Wilmington – office buildings and stabilize those communities and provide good jobs, paying income and other taxes.

➢Law firms use accountants, copy services, delivery services, restaurants and caterers in Delaware.

➢Out-of-town lawyers coming to litigate in Delaware Courts fill hotel rooms, rent temporary office space and support downtown restaurants.



## Benefit of Delaware Judiciary to State Revenue Far Outweighs Cost – FY 2015

**Delaware Courts represent 2.36% of the total FY 2017 state general fund appropriations and contribute towards over 40% of state revenue.**

# Delaware Judges' Salaries Have Fallen Behind Inflation



**Decreasing Judicial Compensation with Inflation**



# Delaware Judiciary Salaries – Losing Ground Compared to other Judges

### Comparison of  Judicial Salaries* for Commercial Litigation Jurisdictions  (as of July 1, 2006)



|  | California | Delaware | Pennsylvania | Illinois | New York |
|---|---|---|---|---|---|
| State | $151,000 | $168,000 | $135,000 | $158,000 | $137,000 |
| Average | $149,800 | $149,800 | $149,800 | $149,800 | $149,800 |

*General jurisdiction judges' salaries.

**Delaware judges were compensated similarly to judges in other commercial litigation jurisdictions in 2006.**

# Delaware Judiciary Salaries – Losing Ground Compared to other Judges

### Comparison of Judicial Salaries* for Commercial Litigation Jurisdictions (as of July 1, 2016)



| | California | Delaware | Pennsylvania | Illinois | New York |
|---|---|---|---|---|---|
| **State** | $192,000 | $181,000 | $177,000 | $194,000 | $193,000 |
| **Average** | $187,400 | $187,400 | $187,400 | $187,400 | $187,400 |

*General jurisdiction judges' salaries.

**By 2016, Delaware judges' salaries have dropped materially as compared to other commercial litigation jurisdictions.**

# Delaware Judiciary Salaries – Losing Ground Compared to other Judges



**COMPARISON OF JUDICIAL SALARY INCREASES\* FOR COMMERCIAL LITIGATION JURISDICTIONS**

| | California | New York | Pennsylvania | Illinois | Delaware |
|---|---|---|---|---|---|
| Percentage | 27.0% | 41.0% | 31.0% | 23.0% | 8.0% |

\*Compensation comparisons are for general jurisdiction court judges reflecting salary changes between July 1, 2006 and July 1, 2016.

**Between 2006 and 2016, Delaware judges' salaries have fallen far behind those of judges in comparable jurisdictions.**

# Delaware Judiciary Salaries – Losing Ground Compared to other Judges



### LOSING GROUND RELATIVE TO THE FEDERAL BENCH

| | Circuit Judge 2006 | Justice 2006 | District Judge 2006 | Vice Chancellor 2006 | Circuit Judge 2016 | Justice 2016 | District Judge 2016 | Vice Chancellor 2016 |
|---|---|---|---|---|---|---|---|---|
| Salaries | $175,100 | $179,700 | $165,200 | $169,900 | $215,400 | $192,360 | $203,100 | $180,733 |

In 2006, a member of the Delaware Supreme Court earned roughly the same compensation as a federal court of appeals judge. The trial judges' compensation was also comparable. That is no longer true.



# Comparable Compensation with Major Delaware Law Firms

*Salaries and bonuses for law firm compensation; averages are used.

**Delaware judges often make less than their former law clerks do – even when their former law clerks are first year associates.**

## WHY DELAWARE JUDGES' SALARIES SHOULD BE INCREASED

➤ The Delaware Judiciary plays a fundamental role in the lives of Delaware citizens and serves as the gateway for access to justice for all Delawareans.

➤ The Judiciary plays a key role in attracting business entities to Delaware which strengthens communities and is a substantial revenue generator for the State.

➤ Judicial salaries have lagged far behind inflation and comparative salaries – particularly federal judges and judges in other commercial litigation states.

# PROPOSED JUDICIAL SALARY PLAN

Considering comparable judges' salaries – specifically federal judges and those in major commercial litigation jurisdictions – the following salary changes are recommended:

➢ Increase the salaries of the Justices to that of federal circuit court judges (as of 2016) in two steps over two years (representing a 5.15% increase on July 1, 2017 and a similar increase on July 1, 2018), with the Chief Justice's salary being set proportionally (5%) higher, given his administrative responsibilities.

➢ Keep the $500 differential in place between the Chief Judges of the Court of Chancery, Superior Court, and Family Court and the Supreme Court Justices, paying those Chief Judges $500 less than the Justices.

➢ Match the salaries of the judges in the Court of Chancery, Superior Court, and Family Court to those of federal district court judges (as of 2016) in two steps over two years (representing a 5.35% increase on July 1, 2017 and a similar increase on July 1, 2018).

# PROPOSED JUDICIAL SALARY PLAN
## (CONTINUED)

➢ Increase Court of Common Pleas' judges' salaries to make them equal to a federal magistrate's salary (as of 2016) in one step (representing a 5.5% increase on July 1, 2017), and bring the Chief Judge of the Court of Common Pleas' salary to the same percentage above CCP judges' salaries as the other chief judges are higher than their courts (representing a 5.6% increase on July 1, 2017).

➢ Set as a goal to increase the salary of the Chief Magistrate to reach the amount of a federal magistrate's salary, bring his salary up to the maximum amount allowable (120%) through the Compensation Commission process in two steps over two years (10% each year).

➢ Increase the salaries of Superior Court and Family Court Commissioners to equal the salary of the lowest pay level of federal administrative law judges located in Delaware (as of 2016) in two steps over two years (representing a 7.65% increase on July 1, 2017 and a similar increase on July 1, 2018), and increasing the CCP Commissioners' salaries comparably (to bring them to 95.8% of other Commissioners' salaries – representing a 7.2% increase on July 1, 2017 and a similar increase on July 1, 2018).

# PROPOSED JUDICIAL SALARY PLAN
(CONTINUED)

➢ Level up the third term Justice of the Peace Court Magistrates' salaries commensurate with deputy attorney general IV or public defender IV positions (75% of midpoint), and increase the salaries for first and second term magistrates to maintain the current percentage differential with the third term magistrates.

*These increases are based conceptually upon federal judges' salaries as of 2016, but they would lag behind federal judges' salaries at the time of implementation because federal judges receive cost-of-living adjustments each year.*

*Any increase provided to state employees through the statewide general salary policy would supplement the proposed increases.*

# PROPOSED JUDICIAL SALARIES

| | FY 2017* Salary | Salary w/ 1st Increase | Salary w/ 2nd Increase | %Increase/yr | Description |
|---|---|---|---|---|---|
| Chief Justice | $204,148 | $215,589 | $226,708 | 5.5% | Federal Circuit Court judge salary (as of 2016), plus 5% |
| Justices | $195,245 | $205,323 | $215,400 | 5.15% | Federal Circuit Court judge salary (as of 2016) |
| Chancellor | $194,738 | $204,819 | $214,900 | 5.15% | Federal Circuit Court judge salary (as of 2016) - $500 |
| Vice-Chancellors | $183,444 | $193,272 | $203,100 | 5.35% | District Court judge salary (as of 2016) |
| President Judge | $194,738 | $204,819 | $214,900 | 5.15% | Federal Circuit Court judge salary (as of 2016) - $500 |
| Superior Court Judges | $183,444 | $193,272 | $203,100 | 5.35% | District Court judge salary (as of 2016) |
| Family Court Chief Judge | $194,738 | $204,819 | $214,900 | 5.15% | Federal Circuit Court judge salary (as of 2016) - $500 |
| Family Court Judges | $183,444 | $193,272 | $203,100 | 5.35% | District Court judge salary (as of 2016) |
| CCP Chief Judge | $192,541 | $203,378 | $203,378 | 5.6% total | Salary should be same percentage higher than CCP Judges as other chief judges are higher than their courts (5.8% higher); increase implemented fully in 2018 |
| CCP Judges | $177,066 | $186,852 | $186,852 | 5.5% total | Salary should be equal to federal magistrate salary (as of 2016); increase implemented fully in 2018 |
| Chief Magistrate | $127,816 | $140,598 | $153,379 | 10% | Salary should be equal to federal magistrate salary (as of 2016); bring up to 120% increase maximum with this Compensation Commission |

# PROPOSED JUDICIAL SALARIES

| | FY 2017* Salary | Salary w/ 1st Increase | Salary w/ 2nd Increase | %Increase/yr | Description |
|---|---|---|---|---|---|
| **Superior Court Commissioners** | $113,452 | $122,114 | $130,775 | 7.65% | Salary equal to lowest pay level of federal ALJ judges located in DE |
| **Family Court Commissioners** | $113,452 | $122,114 | $130,775 | 7.65% | Salary equal to lowest pay level of federal ALJ judges located in DE |
| **CCP Commissioners** | $109,516 | $117,399 | $125,282 | 7.2% | 95.8% of other Commissioners' salary |
| **Magistrates – 3rd term** | $79,507 | $81,731 | $83,955 | 2.8% | Salary set at 75% of midpoint of A18 (deputy attorney general IV or public defender IV) position |
| **Magistrates – 2nd term** | $77,101 | $79,226 | $81,353 | 2.75% | 3rd term magistrate salary  minus 3.1% (current difference between 2nd and 3rd term magistrate) |
| **Magistrates – 1st term** | $74,488 | $76,497 | $78,506 | 2.7% | 2nd term magistrate salary minus 3.5% (current difference between 1st and 2nd term magistrate) |

*Salaries effective on 10/1/16.

# THE DELAWARE JUDICIARY'S PRESENTATION TO THE

# DELAWARE COMPENSATION COMMISSION

# DECEMBER 12, 2016



# IMPACT OF THE DELAWARE TRIAL COURTS

## COURT OF CHANCERY

➢ The Court of Chancery is a trial court of equitable jurisdiction.  It serves two major constituencies: individual residents and entities incorporated in Delaware.

➢ For individuals and local businesses, the Court's jurisdiction includes guardianships, estate matters, and a variety of commercial and real property disputes.
  o In FY 2016, the Court's docket included 1,968 open adult guardianship cases, and 1,221 open minor guardianship cases involving property.
  o The Court handles matters arising out of probate proceedings filed in each county's Register of Wills.  In FY 2016, 2,649 probate cases were opened.

➢ Entity formation is vital to Delaware's economy:
  o Over 1 million entities are incorporated in Delaware, including more than half of U.S. publicly traded companies and approximately 64% of the Fortune 500.
  o In FY 2015, incorporation revenue and abandoned property revenue accounted for approximately 24% and 12%, respectively, of the State's revenues.
  o Delaware entity status fuels a vibrant legal industry centered in Wilmington that consists of scores of law firms and thousands of highly-compensated legal professionals who handle cases in the Court of Chancery as well as bankruptcy and intellectual property cases in the federal courts, and who provide transactional services to Delaware entities throughout the country.

# IMPACT OF THE DELAWARE TRIAL COURTS

## COURT OF CHANCERY *(continued)*

➢ The judges serving on the Court of Chancery are critical to preserving and expanding Delaware's corporate franchise.
  o The Court is widely recognized as the nation's preeminent forum for resolving corporate and complex commercial disputes, including M&A transactions and other high-stakes matters.
  o The body of law the Court produces is the gold standard that shapes corporate practice throughout the United States and in many other countries.

➢ The five members of the Court have a reputation for excellence in resolving sophisticated matters conscientiously, predictably, and efficiently.  Their services are in high demand and the demands on their time are extensive:
  o The Court's civil action docket, which consumes the vast majority of the judges' time and attention, increased approximately 64% over the past ten years, from 828 filings in FY 2007 to 1,356 filings in FY 2016.
  o A high percentage of each judge's docket consists of expedited proceedings that impose significant time pressures, such as challenges to corporate office, advancement proceedings, TRO's, and preliminary injunctions.
  o Integral to promoting the Delaware corporate franchise, the Court's members frequently speak at corporate law programs sponsored by professional organizations and academic institutions throughout the country, and periodically serve as mediators for each other's cases.

# IMPACT OF THE DELAWARE TRIAL COURTS

## SUPERIOR COURT

➤ The Superior Court is the trial court of general jurisdiction, including all criminal cases and a broad array of civil cases, such as breach of contract, complex commercial litigation, medical malpractice, mortgage foreclosure, and personal injury.  It hears appeals from the Court of Common Pleas and various state agencies, boards and commissions.

➤ The Superior Court is currently adjudicating over 7,500 civil cases and over 700 criminal cases, including 96 first degree murder cases.  In FY 2016, over 11,000 civil cases and 6,000 criminal cases were filed, with 83 representing Class A felony cases and 499 representing Class B felony cases.

➤ The Court generates significant revenue for the State.  In FY 2016, the Court collected close to $4 million in costs, fees, fines and assessments.

➤ The Court orders the forfeiture of money and guns used by defendants in criminal cases thereby providing much needed resources to law enforcement and preventing their use in further criminal activity.

# IMPACT OF THE DELAWARE TRIAL COURTS

## SUPERIOR COURT *(continued)*

➢ The Complex Commercial Litigation Division of the Superior Court is currently adjudicating over 100 complex commercial cases involving amounts in controversy of over $1M.  This Division complements Court of Chancery jurisdiction by affording businesses an attractive forum in which to prosecute claims for money damages.  Many of the businesses filing such cases are Fortune 500 companies.  These cases also generate revenue for Delaware hotels, restaurants, copy centers, transportation companies and courier services.

➢ The Court has instituted statewide "problem-solving" courts such as Veterans Treatment Court and Mental Health Court in an effort to reduce recidivism and improve outcomes for individuals struggling with severe and persistent mental illness and/or addiction.  The Court has and will continue to collaborate with the Court of Common Pleas on Adult Drug Court, a program designed to divert individuals with addiction into treatment and away from the criminal justice system.

# IMPACT OF THE DELAWARE TRIAL COURTS

## SUPERIOR COURT *(continued)*

➢ The Superior Court will be introducing in the next few months new technology which will ease the burden placed on the hundreds of Delaware citizens summoned each year for jury service. This technology will enable prospective jurors to reschedule jury service quickly and efficiently online.

➢ The Court is collaborating with other State agencies on multiple projects in an effort to improve Court processes, increase our efficiency, utilize our resources smartly, and improve access to, and delivery of, justice for all.

➢ The 21 judges of the Superior Court preside over hundreds of criminal and civil proceedings each year, including trials, motions, sentencings, suppression hearings, violation of probation hearings, and competency hearings, and issue thousands of written opinions and orders.

# IMPACT OF THE DELAWARE TRIAL COURTS

## FAMILY COURT

➢ Family Court's criminal, delinquency and civil jurisdiction is comprehensive and touches almost all legal issues related to families, parents and children. The Family Court received 49,000 filings and issued 48,000 dispositions in FY 2016.

➢ The highest volume of cases in Family Court is for child support. The Court works closely with the Division of Child Support Services (DCSS) to accurately and efficiently collect money that provides support for children in Delaware, including the handling of arrears cases to enforce child support orders. The Court works with DCSS and the Department of Correction to assist child support obligors in finding employment so they can meet the legal obligation to their children.

➢ A high percentage of litigants access Family Court without legal representation. Family Court provides *pro se* litigants resources in self-help centers in each courthouse and on the Court's website.

# IMPACT OF THE DELAWARE TRIAL COURTS

## FAMILY COURT *(continued)*

➢ For those indigent litigants requiring legal representation in matters that could lead to incarceration or loss of parental rights, the Court appoints representation through contract attorneys, court-appointed attorneys, and collaborates with the Office of the Child Advocate (OCA) on various initiatives to encourage *pro bono* legal representation.

➢ Through the Court Improvement Project (CIP), Family Court has implemented best practices for handling dependency and neglect cases to allow children to return home to their parents when appropriate or to achieve permanency for children who are unable to return to their parents' home.

➢ Family Court judicial officers have traditionally taken a leadership role to collaborate with the Court's partner agencies such as the Department of Services for Children, Youth and their Families, the Department of Justice, and the Office of Defense Services to reduce the juvenile population in detention centers, provide programming for juveniles in facilities, and address the issue of disproportionate minority confinement.

# IMPACT OF THE DELAWARE TRIAL COURTS

## COURT OF COMMON PLEAS

➤ The Court of Common Pleas is a misdemeanor trial court with limited appellate jurisdiction.  Its jurisdiction includes civil actions that do not exceed $50,000 and  criminal misdemeanors (except certain drug-related offenses) and motor vehicle offenses (except felonies).  The Court is responsible for preliminary hearings in felony offenses and hears appeals from the Justice of the Peace Court, Alderman's Courts, and the Division of Motor Vehicles.

➤ For FY 2015, filings in the Court of Common Pleas included 103,176 criminal filings, 6,507 civil complaints and 3,788 civil judgements, name changes and appeals, along with 8,621 preliminary hearings.

➤ The Court has made significant changes over the last several years to achieve the Court's goal of efficient case management to ensure timely and quality delivery of services to its customers.  For example, all notices from the Court appear in both English and Spanish, and court documents often are in both English and Spanish.

# IMPACT OF THE DELAWARE COURTS

## COURT OF COMMON PLEAS *(continued)*

➢ Other recent case management improvements include a case calendaring method designed to address cases quickly (within eight months of the filing of the responsive pleading in civil cases) and to minimize the number of times a party has to appear in court.

  o The Court has developed sample pleading forms for *pro se* litigants, which are available on the Court's website, and notices in consumer debt actions that explain the procedures for those cases.  It has implemented a fast track process for personal injury claims (piloted in Kent County).

  o For criminal cases, the Court coordinates with police officers' schedules when calendaring DUI cases and motions, instituted a procedure allowing for court payments by phone or at kiosks, developed treatment courts to address substance abuse issues, and is working on an automated system providing basic case information by phone.

# IMPACT OF THE DELAWARE TRIAL COURTS

## JUSTICE OF THE PEACE COURT

➢ The Justice of the Peace Court has jurisdiction over civil cases that do not exceed $15,000, and over certain misdemeanors.  It has exclusive jurisdiction for red light camera offenses, ordinance violations, civil marijuana offenses, most traffic charges and landlord-tenant cases.  Nearly every criminal case – from dog licensing to murder – begins in the Justice of the Peace Court, with its judges reviewing search and arrest warrant applications and making initial bail determinations in almost all of the criminal cases in Delaware.

➢ The Justice of the Peace Court processed more cases than all other Delaware Courts combined in FY 2015 – its 283,003 cases constituted 61% of the entire Judiciary's cases.
  - At 4,177 cases per judge, only CCP had a higher caseload.
  - With 32,381 civil cases, it far surpassed all but Family Court in civil filings.

➢ The Court is innovating its way to a more effective and efficient handling of its caseload and promoting a culture of embracing change and seeking improvements.

# IMPACT OF THE DELAWARE TRIAL COURTS

## JUSTICE OF THE PEACE COURT (*continued*)

➢ Some of the significant projects and processes over the years that have reduced the need for additional resources:
- o Delaware's first automated criminal case management system.
- o Voluntary Assessment Center for public convenience.
- o Statewide Videophone Court – yearly cost avoidance >$10M.
- o Electronic traffic ticket issuance and online payment options.
- o Police Prosecution Process – avoiding need for transfers to CCP.
- o JP Court Information Center – resolves 89% of all calls to court locations.
- o Adopted procedural fairness tenets; incorporated into all aspects of training.

➢ JP Court Judges are well-educated, professional standard-bearers of the Judiciary.
- o 13% of current judges have law degree or are members of a Bar; other previous professions of JP Court judges include bankers, entrepreneurs, a former Navy Captain, a former Federal Inspector General, educators and broad representation in the overall criminal justice community.
- o Multi-dimensional Basic Legal Education training is required before judges take bench, and Continuing Legal Education requirements for sitting JP Court judges surpass those of Delaware attorneys.

# REPORT TO THE DELAWARE COMPENSATION COMMISSION

**Delaware State Bar Association**
**Committee on Judicial Compensation**

Michael Houghton, Esquire
Michael W. Arrington, Esquire
*Co-chairmen*
Craig A. Karsnitz, Esquire
Thomas P. McGonigle, Esquire
John W. Paradee, Esquire
Yvonne Takvorian Saville, Esquire
Gregory B. Williams Esquire

December 5, 2016

# TABLE OF CONTENTS

A.   Executive Summary ................................................................2

B.   Background ...........................................................................11

C.   Preeminence of Delaware Judiciary .....................................14

D.   Comparisons with Federal Courts and Other States ............21

E.   Recommendations.................................................................24

F.   Conclusion ...........................................................................27

## A.    Executive Summary

The Delaware Compensation Commission ("Commission") is charged by statute with the responsibility for recommending the level of compensation for various public officials in all three branches of State government on a quadrennial basis.  The Report of the Compensation Commission becomes the basis for compensation unless rejected by the Legislature within thirty days following the commencement of the legislative session. Paraphrasing prior Commission Reports, the function of the Commission is to assure that compensation levels are adequate in Delaware from a national, regional, local, and marketplace perspective.  One of the driving forces supporting the importance of the Commission's Report is the need to attract and retain highly qualified public officials.

The Delaware Judiciary comprises approximately two-thirds of all persons affected by the Commission's work. The 2013 Compensation Commission recognized "that Delaware has gained a national and increasingly international reputation for its outstanding courts and highly qualified Judiciary." (Delaware Compensation Commission 2013 Final Report at *14).  The Commission further noted that "recruiting and retaining outstanding, diverse, and high caliber judges is essential to the quality of life and economic well being of the people of Delaware." (*Id.*). Unfortunately, the current compensation levels that have fallen far behind Delaware's comparable counterparts are inconsistent with the reputation of our courts and seriously hampers our state's ability to meet the goals identified by the last Commission.

The Judiciary in Delaware continues to play a unique and expanding role of a national and international importance.  In the commercial world, major corporations rely on the quality, consistency and speed with which the Delaware Supreme Court, Court of Chancery and Superior Court render decisions that affect corporate governance,

stockholders' rights and the business marketplace in the United States and the world.  In this capacity of domestic and international leadership, the Delaware Judiciary has been the keystone of corporate law in the last century and is widely recognized as the nation's preeminent forum for the determination of disputes involving the internal affairs of more than 1,181,000 legal entities are incorporated in Delaware through which a vast amount of the world's commercial affairs are conducted.   The number of active business entities domiciled in Delaware has increased 34% in the last seven years.   The confidence of 66% of the Fortune 500 companies is firmly rooted in the quality of the Delaware Judiciary.   Delaware is home to half of all U.S. firms trading on the NYSE and NASDAQ.  The growing strength of Delaware's national reputation is evidenced by the fact that 86% of U.S. based Initial Public Offerings in 2015 chose Delaware as their corporate home, including Box, Etsy, Go Daddy, Shake Shack, and Square. The reward for the State of Delaware from the Court system is the annual taxes, fees and abandoned property from business entities registered in Delaware paid to the State, as well as the substantial economic activity generated by those in the private sector who represent Delaware business entities.  The annual taxes and fees in FY2015 from corporate, LLC, and business entities and UCC filings totaled $1.032 billion and have increased more than 11% since the last Commission. Together with the revenue from abandoned property, these amounts represent 43.2% of the State Operating Budget.   Additionally, the Delaware Court System makes significant annual contributions in excess of $12.5 million, on average, through filing fees, cost payments and assessments paid by litigants.

Of equal importance are the "people's courts" of Delaware which render justice to the great majority of the citizens of the State. Currently the Family Court, Court of Common Pleas and Justice of the Peace Courts collectively handled 476,000 matters in

FY2016.  The quality of the judges, commissioners and magistrates in these courts is of no less importance to the citizens of the State than those who serve the justice needs of the nation and the world. The personal health and welfare of Delaware's citizens depend upon and deserve the high quality of justice administered by these critical courts and their judicial officers.

The last four Compensation Commissions in setting judicial compensation levels favorably received the Delaware State Bar Association's recommended approach for evaluating the status of compensation of the Delaware judiciary.  As in past years, given the commercial importance of the Delaware Court system, it is appropriate to compare Delaware to those states that attempt to compete with Delaware as national and international business centers ("Commercial Jurisdictions").  This comparative approach served the 2001-2009 Commissions and Delaware well as Delaware not only maintained, but also further enhanced its recognition across the nation as a model judiciary.  The Delaware State Bar Association suggests that the states most comparable to Delaware, considering both current legal jurisdiction and business competition, are California, Illinois, New York, and Pennsylvania, with California and Illinois having the greatest degree of similarity.

The 2013 Compensation Commission specifically referenced the Delaware State Bar Association's report and relied upon it in some significant ways, most notably in recommending a six percent (6%) increase in judicial compensation in recognition of "the significant contributions of Delaware's Judiciary and its outstanding national reputation." (Delaware Compensation Commission 2013 Final Report at *14). The increase was recommended over a two year period but was not approved for implementation.  The

failure to adjust salaries in 2013 adds significance and immediacy to the current review cycle to ensure that the judges are adequately compensated.

Delaware's status as a national leader in all areas of the justice system should be reflected in the compensation awarded to its judges.   Judicial compensation in Delaware needs to be adjusted to appropriately reflect the status and stature of the Delaware judicial system and to take into account the fact that the members of the Delaware Judiciary have sacrificed and continue to sacrifice the opportunity to pursue economically lucrative careers in the private sector. The Delaware State Bar Association recommends that the 2017 Commission Report once again employ the average of the top two Commercial Jurisdictions as the benchmark for the Delaware Supreme Court and, in 2017, employ a percentage approach to recommend compensation for each of the trial court judges, chief judges, commissioners, and magistrates to ensure that our justice system remains a leader across the nation.   As a matter of a collateral verification, the Delaware State Bar Association recommends that the 2017 Commission Report review the level of compensation Delaware state court judges with their federal counterparts.   Both the primary methodology examining the top two commercial jurisdictions and the collateral verification examining the federal counterparts strongly argue for significant adjustment in Fiscal Year 2018.

The inherent difficulty in a quadrennial review is to find a common point for comparison as the States adjust salaries on different cycles.  The most recent study of all States' judicial salaries with a common base is July 2016 report from the National Center for State Courts. Using this report as a baseline to derive the average compensation of the top two Commercial Jurisdictions for their highest courts and separately for their trial

courts of general jurisdiction, Delaware can establish a reliable basis for equitable salary levels for all of its courts over the next four years.  The salary levels recommended for Supreme Court Justices based upon the average salaries of judges on the highest courts of each of the top two Commercial Jurisdictions and applying a recommended 5% supplement for the Chief Justice are:

DELAWARE SUPREME COURT

| Position | FY2018 |
|---|---|
| Chief Justice | $ 240,721 |
| Supreme Court Justices | $ 229,258 |

TRIAL COURTS:

The trial courts in Delaware with direct appeal to the Delaware Supreme Court currently receive 94% of the compensation of Supreme Court Justices. The presiding administrative judge should receive the 5% supplement above the level of the courts they serve.    Applying the current percentage of Supreme Court compensation to the trial court, the recommended salary levels are:

COURT OF CHANCERY / SUPERIOR COURT / FAMILY COURT

| Position | FY2018 |
|---|---|
| Chancellor/President Judge/Chief Judge | $ 226,278 |
| Vice Chancellors/Judges | $ 215,503 |

COURT OF COMMON PLEAS

The Court of Common Pleas has extensive jurisdiction over both criminal and civil matters and resolves large numbers of cases annually.  Appeals from the Court of Common Pleas are taken to the Superior Court.  The Delaware State Bar Association recommends that the Court of Common Pleas judges receive compensation at 94% of the level of the Superior Court judges to whom appeals are taken.  The Chief Judge of the Court of Common Pleas currently receives 98% of the level of a Superior Court Judge. Maintaining these percentages, the recommended salary levels for the Court of Common Pleas are:

COURT OF COMMON PLEAS

| Position | FY2018 |
|---|---|
| Chief Judge | $ 221,752 |
| Judges | $ 202,572 |

COMMISSIONERS

The burden of voluminous filings in each of our courts is manageable only in concert with the expert work of Commissioners and Masters in Chancery. Statistics on salary levels and responsibilities for Commissioners in the Commercial Jurisdictions are inconsistent and, in most cases, not comparable.   The recommendation with respect to the Commissioners and Masters in Chancery is that salaries be set at 60% of the level of the judges the courts they serve, resulting in the following salary levels:

COMMISSIONERS
(Superior Court, Family Court, Court of Common Pleas, and Masters in Chancery)

| Position | FY2018 |
|---|---|
| Master in Chancery | $ 129,302 |
| Superior Court Commissioner | $ 129,302 |
| Family Court Commissioner | $ 129,302 |
| CCP Commissioner | $ 121,543 |

JUSTICE OF THE PEACE COURTS

The Justice of the Peace Court handles an immense volume of criminal and civil matters and, at the same time, provide swift access to justice to the citizens of Delaware. As with the Court of Common Pleas, there are few truly comparable courts in the other states.  Appeals from the Justice of the Peace courts (other than Summary Possession cases) are taken to the Court of Common Pleas.  The third term magistrates should receive a salary equal to 45% of Court of Common Pleas judge to whom appeals are taken.  There currently is a $2,000 differential between the second and third term magistrates, and a $3,000 differential between the second and first term magistrates.

The Chief Magistrate has been the least adequately compensated judicial officer in the Delaware Judiciary in the last twenty years.  The 20% increase cap on Compensation Commission recommendations has hampered the state's ability to provide just compensation to this judicial officer who is responsible for more judges than any other presiding judge than the Chief Justice.  While the Delaware State Bar Association believes that the Chief Magistrate should be compensated at 75% of a Court of Common Pleas judge, the Compensation Commission will be limited in this cycle to recommending a 20% increase.  Future Commissions, or Legislative initiatives, should

attempt to rectify the below-standard compensation for the Chief Magistrate.   The recommended salary levels for the Justice of the Peace Court are:

JUSTICES OF THE PEACE

| Position | FY2018 |
|---|---|
| Chief Magistrate | $ 153,379 |
| Magistrates – 3rd term | $   91,158 |
| Magistrates – 2nd term | $   89,158 |
| Magistrates – 1st term | $   86,158 |

Since the 1996 Commission Report, judges have received annual increases when afforded to all State employees.  Such incremental increases have allowed Delaware to reduce the loss in salaries compared to other state jurisdictions over the four-year period.  However, in the four-year period preceding this Commission's study, there was an increase of $500 in FY 2015, and increase of 1.5% for the judges and commissioners in FY2017, resulting in an increase *per annum* in the aggregate of a fraction of 1%, and requiring a larger recommended quadrennial increase than might otherwise apply.

 Ideally, the Compensation Commission should have to make minor adjustments at the end of each quadrennial cycle to realign Delaware with the other comparable jurisdictions.  In order to make this possible, it is desirable to maintain the annual incremental increases afforded to all State employees on an annual basis into the future so that the Delaware Judiciary does not experience slippage during the ensuing four years.

The standing of the Delaware Courts in the legal community, the large percentage of State revenues generated based on the Judiciary's stability, and the significance of the courts to the citizens of Delaware argue strongly for the recommended increases in the

compensation levels for the judges in all of the Courts.   The Delaware State Bar Association Committee on Judicial Compensation recommends that the Compensation Commission ensure that the Delaware Courts maintain their proper status and proposes salary levels commensurate with the national and international status of the Courts that ensure that the personal, corporate, and financial health of Delawareans will be maintained.

## B.     BACKGROUND

The Delaware Compensation Commission ("Commission") is authorized by Chapter 33, Title 29 of the Delaware Code, and is charged with the duty to

> "…make a study of the salaries, emoluments, mileage, per diem, travel and other expense allowances and reimbursements … of the members of the General Assembly, the Governor, members of the Governor's cabinet, the Lieutenant Governor, the State Auditor, the State Treasurer, the Attorney General, the Insurance Commissioner, the Justice of the Supreme Court, the Chancellor and Vice Chancellors of the Court of Chancery and all judges, associate judges and court commissioners of the Superior Court, the Court of Common Pleas and the Family Court, the Chief Magistrate, and justices of the peace and the Public Defender."

29 <u>Del. C.</u> § 3303(a).

The historical function of the Commission is to assure that compensation levels are not inadequate in Delaware from a national, regional, local, and marketplace perspective. One of the driving forces supporting the importance of the Commission's Report is the need to attract and retain highly qualified public officials. Although the Commission's recommendations focus on public officials from all three branches of government, the majority of the Commission's charge centers on the justices, judges, commissioners and magistrates of the Delaware Judiciary.

The Report of the Compensation Commission becomes the basis for compensation unless rejected by the Legislature within thirty days following the commencement of the legislative session.  29 <u>Del. C.</u> § 3304.  With the exception of the most recent cycle, past Commission reports have been enacted with the notable exception of the 1993 that nevertheless resulted in appropriate increases in compensation for the Judiciary outside the Commission process.

Over the thirty-one years of the Commission's existence, compensation for public officials has been subject to an objective review on a quadrennial basis.  This review has been moderately successful in re-establishing compensation levels consistent with the marketplace, comparable states, and Delaware's financial health.  The recommendations of the Commission are essential to ensuring that the compensation level for public officials (and most notably for judges) remains appropriate with respect to comparable states in the interim between Commission reviews.  The annual incremental increase when afforded to all state employees has been applied traditionally to public officials, thereby reducing the comparative decline in compensation for these critical positions.  These annual incremental increases have enabled the Commission to "fine tune" compensation levels every four years rather than having to recommend increases that would dramatically affect Delaware's fiscal year budgets.  The flagging economic environment in recent years has resulted in erosion of the compensation level of the Delaware judicial branch in comparison to the other States. In the four-year period preceding this Commission's study, there was an increase of $500 in FY 2015, and increase of 1.5% for judges and commissioners in FY2017, resulting in an increase *per annum* in the aggregate of a fraction of 1%, and requiring a larger recommended quadrennial increase than might otherwise apply.  Consequently, adjustment at the present time is essential simply to return Delaware to its position at the time of the 2013 report.

*COMPARATIVE METHODOLOGY*

Since 2001, The Delaware State Bar Association Committee on Judicial Compensation's recommendations has employed a methodology based on comparisons to

states with comparable judicial jurisdictions and marketplace dynamics -- both of which have direct bearing on recruitment and retention of the highest quality judges for each court in Delaware.  The 2001 Delaware Compensation Commission favorably received the Commercial Jurisdiction methodology and modified the comparison states of prior Commissions to more accurately evaluate the similarities of Delaware with its true counterparts. The 2005 Delaware Compensation Commission continued to endorse the Commercial Jurisdiction approach as the appropriate group by which to measure the adequacy of judicial compensation.  The 2005 and 2009 Compensation Commissions recommended salary levels placing Delaware approximately at the average of the top two Commercial Jurisdictions.  Although the 2013 Compensation Commission recommended a 6% across-the-board increase, which recommendation was not implemented, the most recent Commission Final Report acknowledged the usefulness of the comparison to top Commercial Jurisdictions.

The 2016 Delaware State Bar Association Committee on Judicial Compensation report builds upon the work and precedent of the last four Compensation Commissions to recommend levels of compensation that maintain the status quo for Delaware courts in relation to the comparable courts in comparable states.

## C.     Preeminence of Delaware Judiciary

The Delaware Courts were ranked first in the nation by the United States Chamber of Commerce and the Institute for Legal Reform for each of the eleven years of that organization's surveys.  Delaware has continued to top the list as the best system for overall treatment of tort and contract litigation; having and enforcing meaningful venue requirements; treatment of class action suits and mass consolidation suits; punitive damages; timeliness of summary judgment or dismissals; and discovery matters. Most importantly, Delaware is the most respected state in the nation in the key areas of Judges' Impartiality and Judges' Competence.   This recurring recognition continues the longstanding status of Delaware as having the predominant business courts in the nation for the last two centuries.  In addition to the ranking of the Delaware Judicial Branch as a whole, individual judges have garnered national recognition.

The Court of Chancery as the court of equity, the Superior Court as the court of law, and the Supreme Court as the court of last resort, have placed the Delaware Courts in a unique role as a national and international entity.  In this capacity of domestic and international leadership, the Delaware Judiciary has been the keystone of corporate law for more than a century.

The Court of Chancery over the last two centuries has been the forum for the major corporate decisions affecting the economic health of business entities.   The 1,181,000 corporations and other business entities domiciled in Delaware include 66% of the Fortune 500 companies and 50% of the corporations listed on the New York Stock Exchange and NASDAQ. The growing strength of Delaware's national reputation is evidenced by the fact that 86 percent of U.S. based Initial Public Offerings in 2015 chose

Delaware as their corporate home, including Box, Etsy, Go Daddy, Shake Shack, and Square. The reward for the State of Delaware from the Court system is the annual taxes, fees and abandoned property from business entities registered in Delaware paid to the State, as well as the substantial economic activity generated by those in the private sector who represent Delaware business entities.  The annual taxes and fees in FY2015 from corporate, LLC, and business entities and UCC filings totaled $1.032 billion and has increased more than 11% since the last Commission. Together with the revenue from abandoned property, these amounts represent 43.2% of the State Operating Budget. Additionally, the Delaware Court System makes significant annual contributions in excess of $12.5 million, on average, through filing fees, cost payments and assessments paid by litigants.

The Delaware Supreme Court leads the Delaware judiciary, strengthening and enhancing the reputation of excellence of the Court of Chancery, Superior Court, and Family Court through its swift review and consistent interpretation of Delaware law and rulings in direct appeals from these courts.  Strict internal guidelines for hearing and deciding appeals from all of the Courts provide the corporate and personal worlds with confidence that disputes will be resolved quickly with the minimum impact on corporate operations and its citizens' lives.

The Court of Chancery is a state treasure and a national ideal.  Its members have the responsibility to issue more formal opinions each year than state and federal appellate courts.  That duty is made all the more challenging due to the complexity of the court's case load and the regular burden to turn out opinions within days in high-profiled, expedited corporate matters.  As important, trends in commercial litigation have

increased the mix of the Court's caseload that consists of trials, increasing the difficulty for the judges of balancing their opinion-writing and trial responsibilities.

Although elite in corporate stature, the Court of Chancery serves the ordinary citizen with equal diligence and care, yearly handling thousands of important equity matters - such as guardianships, will contests, property disputes, and expedited requests for injunctions - on top of its corporate and commercial caseload.  In sum, Chancery judges must produce opinions of the quality and quantity of a federal appeals court while handling a demanding case load comprised of complex cases and a high-volume of smaller matters, and continues to do so with a dispatch and with a commitment to quality that is unparalleled by any comparison court, state or federal.

The Superior Court of Delaware plays an equally important role in the external operations of corporations and has earned its national reputation for the efficient handling of complex litigation.  The handling of complex litigation on a special docket was a model for the nation and inspired similar processing across the country.

Each of these business courts has a reputation of individual as well as collective excellence.  Competing states are modeling their business courts after the Court of Chancery.  The Chancellor is routinely requested to provide technical assistance to other states interested in mimicking the Court of Chancery. The Superior Court of Delaware has received national acclaim for its handling of complex litigation.   Notably, the Superior Court and the Supreme Court must combine their responsibilities as business courts with their critical role as the courts that handle felony criminal cases - a

responsibility of the utmost importance in maintaining our citizen's sense of security and in protecting the legitimate rights of criminal defendants.

Of equal importance as courts of corporate and fiscal significance are the "people's courts" of Delaware which render justice to the great majority of the citizens of the State.  Currently the Family Court, Court of Common Pleas and Justice of the Peace Courts collectively handled 476,000 matters in FY2016.  The quality of the judges, commissioners and magistrates in these courts is of equal importance to the citizens of the State as the "corporate courts" are to the corporate citizens in serving the justice needs of the nation and the world.

These personal matters comprise the heart and soul of Delaware families at the most difficult times of their lives and are the matters most critical to the personal health of our State.  The cases cover the life and death of Delaware citizens from the newborn to the aged.  The dissolution of marriage, domestic violence, child abuse and neglect, termination of parental rights, drug and alcohol abuse, tragic personal injury, housing, welfare, and child support are but a sampling of the matters that the judges, commissioners, and magistrates decide on a daily basis.  To the average Delaware citizen, the ability to provide for their daily needs is significantly more important than the extent of disclosure in a proxy statement.  Our government exists to serve our citizens, and they deserve the same quality of justice as the corporations that enable Delaware to thrive.

The collective and individual excellence of these courts is equal in prominence to that of the business courts.  The Family Court of the State of Delaware is the leading family court in the nation.  Only one of three unified family court systems, Delaware has been touted as a model by the American Bar Association, National Council of Juvenile

and Family Court Judges, National Center for State Courts, State Justice Institute and the Association of Family and Conciliation Courts.  The Family Court regularly serves as a study site and pilot for programs of national importance including the frequently cited Family Court Performance Standards and Measures, programs for the self-represented litigant, full faith and credit for domestic violence protection orders, and alternative dispute resolution programs.  Individual judges have received national recognition, and have served as trustees of national organizations including the National Council of Juvenile and Family Court Judges.  Delaware Family Court's initiatives have been cited in the annual reports of the Federal Advisory Committee on Juvenile Justice over the last decade.

The Court of Common Pleas' attention to efficiency has maintained the court's reputation for excellence in conducting its affairs, most notably in its success in using the problem-solving courts approach and in its collection of fines, costs and restitution. Along with the Justice of the Peace Courts, the Court of Common Pleas has made great progress in improving its services for self-represented litigants, and has an electronic filing and docketing system providing Delaware litigants with increased service.

The Justice of the Peace Court, through its 60 magistrates in 15 courts, serves as the gateway to justice for the majority of citizens, with a broad jurisdiction affecting the daily lives of Delawareans.  The Justice of the Peace Court has led the way in the areas of court process improvement and truancy.

The Delaware Judiciary's efficiency is most notable in comparison with other states.  Employing a two-tiered system of appellate and trial courts, Delaware has avoided the need for intermediate appellate courts that increase costs to the State and

decrease the speed at which cases can be resolved.  In contrast to many other states, Delaware assigns appellate responsibility to each court in varying degrees.  The Superior Court, Court of Chancery and the Family Court all have appellate functions under the Administrative Procedures Act.

The Court of Common Pleas has appellate jurisdiction through *de novo* trial appeals from cases originating in the Justice of the Peace Courts.  Three-judge panels in the Justice of the Peace Courts handle appeals in landlord-tenant actions.  Sharing of these appellate responsibilities permits the Supreme Court to review decisions with finality in a swift manner.

The use of Commissioners has increased the efficiency of all of the Delaware trial courts immeasurably.  Court Commissioners are assigned high volume and expedited cases providing access to the courts in unprecedented time.  This highly trained group of judicial officers serves the trial courts in disposing of routine matters, thereby freeing the judges of their respective courts to grapple with more difficult and complex legal matters. Appeals from Commissioners are taken to the judges of the court providing quick resolution of disputed results.  Fewer than 3% of Commissioners' orders are appealed to judges with an insignificant number of the cases being reversed upon review.  Delaware Commissioners differ significantly from counterparts in other states not only in the importance of cases assigned, but also in the appointment process that requires nomination by the Governor and approval by the Senate.  The burden of volumes of filings in each court is manageable only in concert with the expert work of Commissioners.

The expansive use of alternative dispute resolution techniques in the Delaware trial courts has enabled the courts to deal with the high volume of cases in an expeditious manner.  Mediation and arbitration are employed in these courts with great success.  By way of example, mediation has been used in the Family Court for a quarter-century and resolves nearly three-quarters of the cases referred to court-employed mediators.  Mandatory alternative dispute resolution in the Superior Court has allowed litigants to settle their claims in short order with reduced legal fees.  Mediation in the Court of Chancery and Court of Common Pleas is used regularly to narrow, focus and resolve issues short of trial with remarkable results.

The financial and personal health of the State are highly dependent upon the individual and collective Delaware Courts, each of which has earned its position of prominence to form an efficient and effective system recognized as the finest in the country.

### D.     Comparisons with Federal Courts and Other States

In setting judicial compensation levels, the early Commissions focused on salaries in a study group of states in geographic proximity to Delaware.  The 2001 Commission expanded its perspective by adding states of similar size and similar budgets.   Although these states may have some significance in comparing salaries for the Executive and Legislative branches of government, the comparison is inappropriate for the Delaware judiciary.   The last four Compensation Commissions in setting judicial compensation levels favorably received the Delaware State Bar Association's recommended approach for evaluating the status of compensation of the Delaware judiciary.  As in past years, given the commercial importance of the Delaware Court system, it is appropriate to compare Delaware to those states that attempt to compete with Delaware as national and international business centers ("Commercial Jurisdictions").  This comparative approach served the 2001-2009 Commissions and Delaware well as Delaware not only maintained, but also further enhanced its recognition across the nation as a model judiciary.  The Delaware State Bar Association suggests that the states most comparable to Delaware, considering both current legal jurisdiction and business competition, are California, Illinois, New York, and Pennsylvania, with California and Illinois having the greatest degree of similarity. The ranking as first in quality in comparison with all fifty states supports the approach for national comparison for compensation purposes.

While comparison with the Commercial Jurisdictions provide a national perspective, a collateral comparison with the federal courts validates the need for significant increases for Delaware Court judges, as recommended by the Delaware State Bar Association.  The Third Circuit Court of Appeal, based in Philadelphia but serving

Delaware, is the court of review from the federal trial court.  The Circuit Court judges' salaries increased 17% in the last four years to the present level of $215,400. Additionally, the federal judges have lifetime appointments and receive cost of living adjustments not available to our state court judges. In contrast to federal Circuit Court judges, the Delaware Supreme Court justices (and the highest courts of the Commercial Jurisdictions) decide all state matters with finality.  It is understandable, therefore, that the comparative Commercial Jurisdictions have set salaries between the federal Supreme Court justices and the Circuit Court judges.  It is equally reasonable that the proposed salary for the Delaware Supreme Court mirrors the Commercial Courts approach, and that the other Delaware Court judges receive comparable increases.

The general trial court in the federal system is the District Court for the District of Delaware.  District Court judges currently receive a salary of $203,100.  It is significant to note that the Delaware trial courts handle more cases, more quickly, than their federal counterpart.

The closest federal comparison to the Court of Common Pleas judge is the District Court Magistrate Judge.  Appeals, or exceptions, from decisions of the federal Magistrate Judges are reviewed by the District Court judge just as Court of Common Pleas decisions are reviewed by a Superior Court judge.  The current salary of a federal Magistrate Judge in Delaware is $186,852, and the variety of responsibilities for Court of Common Pleas judges support a higher salary within the overall salary structure for the Delaware courts.

Administrative law judges review specific challenges to regulations and appeals from the decisions of these judges of the District Court, similar to the procedure for review of commissioners' orders in Delaware.   The lowest salary for an administrative

law judge in Delaware is $130,775 which is comparable to the recommendation for a Commissioner in the Delaware courts.

Compensation for Delaware judges should be set at the average of the top two Commercial Jurisdiction for the highest courts in those states.  Delaware's judges and the courts they serve are ranked above both of the comparison courts and the revenue generated as a result of the quality of the Delaware judges far exceeds the percentage generated by the comparison courts for their respective states.  Collateral review of federal salaries indicates that the recommendations are sound and reasonable. The differential for the federal courts is understandable given that Delaware is affected significantly more by its state court judges than their federal counterparts.

### E.    Recommendations

In light of the status of the Delaware Courts, comparisons with the Competitive Commercial Litigation Jurisdictions, and the precedent of prior Compensation Commissions, The Delaware State Bar Association Committee on Judicial Compensation recommends the following:

1. **Compensate the Delaware Supreme Court at the 2016 average of the highest court in the top two Commercial Jurisdictions, plus a 5% supplement for the Chief Justice.**

### DELAWARE SUPREME COURT

| Position | FY2018 |
|---|---|
| Chief Justice | $ 240,721 |
| Supreme Court Justices | $ 229,258 |

2. **Compensate the Court of Chancery, Superior Court, and Family Court at the current 94% differential of a Delaware Supreme Court Justice, plus a 5% supplement for the Chancellor, President Judge of the Superior Court and the Chief Judge of the Family Court.**

### COURT OF CHANCERY / SUPERIOR COURT / FAMILY COURT

| Position | FY2018 |
|---|---|
| Chancellor/President Judge/Chief Judge | $ 226,278 |
| Vice Chancellors/Judges | $ 215,503 |

3. **Compensate the Court of Common Pleas at 94% of the level of a Superior Court judge, plus the current percentage supplement for the Chief Judge in comparison to President Judge of the Superior Court.**

| Position | FY2018 |
|---|---|
| Court of Common Pleas Chief Judge | $ 221,752 |
| Court of Common Pleas Judges | $ 202,572 |

4. **Compensate Commissioners and Masters in Chancery at 60% of the level of the judges of the court in which they serve**

### COMMISSIONERS AND MASTERS IN CHANCERY

| Position | FY2018 |
|---|---|
| Master in Chancery | $ 129,302 |
| Superior Court Commissioner | $ 129,302 |
| Family Court Commissioner | $ 129,302 |
| CCP Commissioner | $ 121,543 |

5. **Increase compensation for the Chief Magistrate to 120% of current salary with future goal of achieving 75% of a Court of Common Pleas judge. Increase compensation for the third term magistrates to 45% of a Court of Common Pleas judges and maintain the current differential for first and second term magistrates as shown below.**

## JUSTICE OF THE PEACE COURT

| Position | FY2018 |
|----------|--------|
| Chief Magistrate | $ 153,379 |
| Magistrates – 3rd Term | $ 91,158 |
| Magistrates – 2nd Term | $ 89,158 |
| Magistrates – 1st Term | $ 86,158 |

**6. Continue to give the judiciary the annual incremental increases awarded to State employees.**

Ideally, the Compensation Commission should have to make minor adjustments at the end of each quadrennial cycle to realign Delaware with the other comparable jurisdictions. In order to make this possible, it is essential to maintain the annual incremental increases as afforded to all State employees on an annual basis into the future so that the Delaware Judiciary does not experience the decline which has occurred during the past four years. Continuation of the annual incremental increases is desirable to maintain the effectiveness of the present Commission's recommendations and future Commissions' reviews.

## F.       Conclusion

The first-place ranking of the Delaware Courts in the national legal community, the percentage of revenues generated based on the Judiciary's stability, and the significance of the courts to the citizens of Delaware argue strongly for significant increases in the compensation levels for all of the Courts. Recognizing the precedent of the prior Compensation Commission and the current economic climate, the Delaware State Bar Association Committee on Judicial Compensation recommends that the Compensation Commission adopt the proposed salary levels commensurate with the national and international status of the Courts that ensure the personal, corporate, and financial well-being of all Delawareans and the financial well-being of the State of Delaware will be maintained.

# **EXHIBIT C**

## IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| In re: MODIFICATION OF THE | § |
| REQUIREMENTS UNDER SUPREME | § |
| COURT RULE 52(a)(8) | § |

### ORDER

This 19th day of March, 2021, it appears to the Supreme Court of Delaware that:

WHEREAS, Rule 52(a)(8) of the Rules of this Court requires, among other things, applicants for admission to the Bar of this State ("Applicant") to be physically located in the State of Delaware for the purpose of serving a clerkship under the direct and constant supervision of a qualifying member of the Bar of this State for a period of 21 forty-hour work weeks (the "Clerkship");

WHEREAS, Governor John C. Carney declared a State of Emergency for the State of Delaware that took effect on March 13, 2020 due to the public health threat caused by COVID 19 (the "State of Emergency");

WHEREAS, as a result of the State of Emergency and the ongoing COVID 19 public health crisis, many employers located in the State of Delaware are requiring their employees to work remotely;

WHEREAS, some Applicants reside outside of the State of Delaware and are now required to work remotely from their out-of-state residences because of the State of Emergency;

WHEREAS, but for the State of Emergency, such out-of-state work would have been performed in the State of Delaware, including service of the Clerkship; and

WHEREAS, due to the ongoing uncertainty as to the duration of the State of Emergency and continued disruption to regular working conditions, the Court considers it advisable to modify the requirement that the Clerkship be served in the State of Delaware in certain respects;

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1.      This Order applies to: (a) Applicants who applied to take the Delaware bar examination in 2020 and whose applications have remained open for the 2021 examination; and (b) Applicants who successfully file an application for the 2021 Delaware bar examination by the final filing deadline of May 3, 2021.

2.      The 21-week Clerkship requirement set forth in Rule 52(a)(8) is temporarily reduced to 14 weeks.

3.      Subject to paragraph 4 below, Clerkship service performed outside of the State of Delaware will count toward an Applicant's Clerkship requirement, provided that: (a) the service is performed during the State of Emergency; (b) but for the State of Emergency, the Applicant would have been serving the Clerkship in the State of Delaware; and (c) the service outside of the State of Delaware satisfies each of the other requirements of Rule 52(a)(8).

4.      Clerkship service outside of the State of Delaware in accordance with paragraph 2 of this Order may count for no more than eight of the 14 forty-hour work weeks required to satisfy Rule 52(a)(8).

5.      For any service outside of the State of Delaware that the Applicant submits to be counted toward the Applicant's Clerkship requirement, the Applicant and the Applicant's Preceptor shall specifically certify: (a) the dates on which the service was performed; (b) that the service meets the requirements of paragraph 2 of this Order; and (c) the identity of the Delaware lawyer(s) who directly and constantly supervised the service performed.

BY THE COURT:

*/s/ Collins J. Seitz, Jr.*
Chief Justice

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| In re: MODIFICATION OF THE | § |
| REQUIREMENTS UNDER SUPREME | § |
| COURT RULE 52(a)(8) | § |

## ORDER

This 5th day of June, 2020, it appears to the Supreme Court of Delaware that:

WHEREAS, Rule 52(a)(8) of the Rules of this Court requires, among other things, applicants for admission to the Bar of this State ("Applicant") to be physically located in the State of Delaware for the purpose of serving a clerkship under the direct and constant supervision of a qualifying member of the Bar of this State for a period of 21 forty-hour work weeks (the "Clerkship");

WHEREAS, Governor John C. Carney declared a State of Emergency for the State of Delaware that took effect on March 13, 2020 due to the public health threat caused by COVID 19 (the "State of Emergency");

WHEREAS, as a result of the State of Emergency and the ongoing COVID 19 public health crisis, many employers located in the State of Delaware are requiring their employees to work remotely;

WHEREAS, employers may require remote work to continue through the summer, as they implement gradual or phased re-opening plans designed to promote the safe return of employees to an office setting ("Re-Opening Plans");

WHEREAS, certain Applicants reside outside of the State of Delaware and are now required to work remotely from their out-of-state residences because of the State of Emergency and Re-Opening Plans;

WHEREAS, but for the State of Emergency and Re-Opening Plans, such out-of-state work would have been performed in the State of Delaware, including service of the Clerkship; and

WHEREAS, due to the duration of the State of Emergency, the gradual and phased nature of the Re-Opening Plans, and the disruption to regular working conditions, the Court considers it advisable to modify the requirement that the Clerkship be served in the State of Delaware in certain respects;

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1.      Clerkship service performed outside of the State of Delaware will count toward an Applicant's Clerkship requirement, provided that: (a) the service is performed during the period of March 13, 2020 to August 31, 2020; (b) but for the State of Emergency and Re-Opening Plans, the Applicant would have been serving the Clerkship in the State of Delaware; and (c) the service outside of the State of Delaware satisfies each of the other requirements of Rule 52(a)(8).

2.      Service outside of the State of Delaware in accordance with paragraph 1 of this Order may count for no more than 10 of the 21 forty-hour work weeks required to satisfy Rule 52(a)(8).

3.      For any service outside of the State of Delaware that the Applicant submits to be counted toward the Applicant's Clerkship requirement, the Applicant and the Applicant's Preceptor shall specifically certify: (a) the dates on which the service was performed; (b) that the service meets the requirements of paragraph 1 of this Order; and (c) the identity of the Delaware lawyer(s) who directly and constantly supervised the service performed.

BY THE COURT:


*/s/ Collins J. Seitz, Jr.*
Chief Justice

# **<u>EXHIBIT D</u>**

**BOARD OF BAR EXAMINERS
OF THE DELAWARE SUPREME COURT**

<u>2019 LAW CLERK SCHEDULE OF LEGAL
ASSIGNMENTS</u>

Applicant Name:_____        Date: _____

Address: _____

Phone Number:_____        Email: _____

Preceptor's Name: _____

      Performance of the following assignments is to be considered the minimum requirement for each applicant for admission to the Delaware Bar. These assignments must be performed in the State of Delaware after matriculation at law school and before admission to the Delaware Bar. Responsibility for scheduling rests on the applicant; making these arrangements is regarded as an important part of the clerkship training. Either your preceptor or a "Qualified" member of the Delaware Bar must supervise each completed assignment.

      For purposes of this Schedule, "Attend" means in person appearance at the proceeding until completion of the proceeding, or one-half day, whichever is shorter, except as specified in assignments 9 and 10 below. Note that if an assignment permits you to review a transcript or listen to/watch a recording in lieu of attending in person, attendance in person is strongly preferred and you must make a good faith effort to attend the proceeding in person. It is important to note that court cases often settle at the last minute. Therefore, you should begin your efforts to complete these assignments early in your clerkship.

      For each assignment, you must list the date you complete it and provide a brief description of the project. For example, for hearings or other court proceedings or any review of papers from a court case, you should include at least the case name and number. For proceedings that may involve multiple matters (e.g., arraignments and sentencings), include the name of the judge presiding and the start and end time of the proceedings. For any review of papers relating to the formation of an entity, include at least the name of the company and the name(s) of the person(s) who formed it. You may be asked about specific assignments at your character and fitness interview, so it is advisable to include brief notes that may help you recall the nature of each assignment if asked. You must also include the name of the qualified member of the Delaware Bar who supervised each completed assignment.

      Once you have completed the Schedule, please execute the certification on page 4

and submit the Schedule to the Board of Bar Examiners, <u>along with</u> the fully-executed Certificate of Preceptor.

<u>ASSIGNMENT</u>

1.    Attend one civil trial in a Justice of the Peace Court.

      Date Completed _____

      Description:

      Supervisor:

2.    Attend one weekly session of Protection from Abuse ("PFA") hearings in Family Court.

      Date Completed _____

      Description:

      Supervisor:

3.    Attend one Guardianship or Dependency/Neglect hearing in Family Court.

      Date Completed _____

      Description:

      Supervisor:

4.    Attend (or listen to a recording of) one civil trial in Court of Common Pleas.

      Date Completed _____

      Description:

      Supervisor:

5.    Attend one criminal trial in the Court of Common Pleas.

      Date Completed _____

      Description:

      Supervisor:

6.      Attend one ADR Proceeding in Delaware under the Rules of any Delaware State or Federal Court or, alternatively, attend one arbitration or mediation in Delaware under the Rules of the American Arbitration Association or any similar ADR organization.

Date Completed _____

Description:

Supervisor:

7.      Attend one session of arraignments in Superior Court.

Date Completed _____

Description:

Supervisor:

8.      Attend one session of sentencing in Superior Court.

Date Completed _____

Description:

Supervisor:

9.      Attend one complete jury selection in Superior Court or District Court.

Date Completed _____

Description:

Supervisor:

10.     Attend a criminal trial in Superior Court or District Court.  This must include (i) either a complete opening statement or a complete closing argument; and (ii) direct and cross examinations of one witness.

Date Completed _____

Description:

Supervisor:

11.  Attend a civil trial in Superior Court or District Court.  This must include (i) either a  complete opening statement or a complete closing argument; and (ii) direct and cross  examinations of one witness.

     Date Completed _____

     Description:

     Supervisor:

12.  Attend a pre-trial conference in District Court, Court of Chancery or Superior Court.
     Date Completed _____

     Description:

     Supervisor:

13.  Attend an argument of a motion in Superior Court after reviewing the applicable motion papers and reviewing the principal authorities relied upon by the parties.

     Date Completed _____

     Description:

     Supervisor:

14.  Attend a trial or a complete hearing in the Court of Chancery.  For a trial, this must include (i) either a complete opening statement or a complete closing argument; and (ii) direct and cross examinations of one witness.

     Date Completed _____

     Description:

     Supervisor:

15.  Review papers relating to an appeal of a final judgment to the Delaware Supreme Court, including designation of the record on appeal.

     Date Completed _____

     Description:

     Supervisor:

16.     Review papers relating to a recent certification of a question of law or interlocutory appeal to the Delaware Supreme Court.

Date Completed _____

Description:

Supervisor:

17.     Attend an argument in the Delaware Supreme Court after reviewing applicable briefs, and reviewing the principal authorities relied upon by the parties.

Date Completed _____

Description:

Supervisor:

18.     Attend an interview of a client, witness or litigant.

Date Completed _____

Description:

Supervisor:

19.     Review papers relating to a recently commenced Superior Court civil action, including Complaint, Praecipe, Summons and Civil Information Sheet.

Date Completed _____

Description:

Supervisor:

20.     Attend one contested deposition.

Date Completed _____

Description:

Supervisor:

21.     Review and summarize three recently closed, fully and formally probated estates at the Register of Wills, at least two of which must have been distributed under a will.

Date Completed _____

Description:

Supervisor:

22. Review papers relating to the formation of a Delaware corporation, Limited Partnership, Limited Liability Corporation (LLC) or Limited Liability Partnership (LLP).

Date Completed _____

Description:

Supervisor:

23. Attend a hearing of the Delaware Alcoholic Beverage Control Commission, Industrial Accident Board, or other adversarial hearing before a Delaware state administrative agency.

Date Completed _____

Description:

Supervisor:

24. Attend a half day of omnibus chapter 13 bankruptcy hearings. *Note: These hearings are typically held only once per month.*

Date Completed _____

Description:

Supervisor:

25. Attend (or review a transcript of) a "First-Day" hearing in a chapter 11 bankruptcy case  where the assets or liabilities exceed $20 million after reviewing the "First-Day"  pleadings and the principal authorities relied upon in those pleadings.

Date Completed _____

Description:

Supervisor:

26.     Attend an omnibus hearing in a chapter 11 bankruptcy case where at least one unresolved contested matter is presented.

Date Completed _____

Description:

Supervisor:

* * * * * * * * * *

I_____, hereby certify that I have completed a clerkship in the State of Delaware under the supervision of a Delaware attorney aggregating substantially full-time service for at least five months' duration (21 weeks) in full compliance with Delaware Supreme Court Rule 52(a)(8) and have completed all of the items so indicated on this Law Clerk Schedule.

_____
Signature

_____
Date

# **EXHIBIT E**

## PRECEPTOR'S CERTIFICATE
*(due on or before September 1)*


I, _____, a member of the Bar of the Supreme Court of the State of Delaware, and preceptor for _____ ("Applicant"), who has filed an Application for Admission to the Bar of the Supreme Court of the State of Delaware ("Application"), do hereby certify as follows:

(1)     I have been admitted to practice before the courts of this State for at least ten (10) years prior to undertaking my duties as preceptor;

(2)     I have studied carefully Supreme Court Rule 52 and Rule 10 of the Rules of the Board of Bar Examiners of the Delaware Supreme Court;

(3)     Within the past three years I have attended a meeting of preceptors held on a date and time designated by the Board;

(4)     I am or will be mentoring Applicant with respect to civility, legal ethics, professionalism, and the expected conduct and obligations of a member of the Delaware Bar; and

(5)     I have personally reviewed and discussed with Applicant the Application and First Affidavit of Completeness, as well as all documents and forms submitted in connection with the Application and First Affidavit of Completeness, except that I have not reviewed or discussed with Applicant Questions 26, 27, or 28 on the Application, nor have I reviewed or discussed with Applicant any documents and forms Applicant is submitting in connection with Questions 26, 27, or 28.

(6)     I have complied with the requirements of Board Rule 10(c).


Date: _____          _____
                                                              Preceptor

MEMORANDUM

TO:          ALL PRECEPTORS

FROM:      The Board of Bar Examiners

DATE:       July 14, 2015

RE:           PRECEPTOR DUTIES AND CLERKSHIP REQUIREMENTS

   As a Preceptor, you have a unique opportunity to be a guiding force and mentor to an applicant. Your frequent meetings with your applicant provide an opportunity to impart principles of appropriate lawyer conduct as a member of the Delaware Bar. By your own example, you can demonstrate the professionalism that is a hallmark of the Delaware Bar – professionalism that embodies a dedication to the principles of ethics, civility, skill, businesslike practice and a focus on service to the public, the Court and the Bar (see Supreme Court Rule 71). Our legacy as Delaware lawyers will be judged in part by the effectiveness with which we communicate the expectations of our profession to those who follow us, and you are in a unique position to impart those expectations at the earliest stage of a Delaware lawyer's career.

   Each Preceptor should carefully study all Rules of the Delaware Supreme Court relating to the admission process (Rules 51-56); rules 5-15 of the Board of Bar Examiners (the "Board"); and Board of Professional Responsibility rules 8.1 and 8.3.

   The rules relating to Preceptors and clerkships are designed to accomplish three primary objectives:

   1.  Character and Fitness of the Applicant. The duties imposed upon a Preceptor under BR-10 are designed to make the Preceptor's sponsorship of the applicant a meaningful part of the admission process rather than a pro forma exercise. BR-10 requires Preceptors to provide a supporting role in the character and fitness investigation process.

   2.  Review Bar Application for Completeness. BR-10 requires a Preceptor to review and discuss with the applicant the Bar Application and an applicant's affidavits of completeness. In connection with this review, Preceptors must **reasonably conclude** that the Applications and affidavits of completeness (a) are factually accurate and do not omit any facts required to be disclosed, and (b) have provided all required information and documents or a reasonable explanation why they have not been provided. We note that Preceptors are not guarantors of completeness, but Preceptors must **reasonably conclude** that Applications and affidavits are complete and accurate.

   3.  Practical training of the applicant. The clerkship requirements are intended to make the clerkship a meaningful teaching mechanism to help ensure that an

applicant's preparation for admission includes a bona fide exposure to the practical aspects of law practice and the traditions of the Delaware Bar.  This training can only be accomplished if the Preceptor is actively and closely involved in the process.  Thus, Supreme Court Rule 52(8)(i) requires **"direct and constant"** supervision of the applicant, to which the Preceptor must certify.  If the Preceptor delegates this supervisory role, the other attorney must be satisfactory to the Preceptor and such attorney must be a member of the Delaware Bar for at least 5 years.  In addition, if the Preceptor delegates supervision to such qualified attorney, communication between and among the Preceptor, supervising attorney and applicant should be frequent and substantive.

Delaware's five-month clerkship requirement has been highly praised by the Boards of several larger states.  The preceptor's close association with the applicant also affords the preceptor the opportunity to expose the applicant at the outset of his or her career to this Bar's high standards of professionalism and civility.  Indeed, BR-10(d) provides that the preceptor "shall confer on a frequent and regular basis . . . to advise the applicant of the expected conduct and obligations of a member of the Bar."

A.     Preceptor's Responsibility – Preceptor Certificate

Under BR-10 a Preceptor is required to submit a Preceptor's Certificate on or before September 1 certifying that the Preceptor has complied with the requirements of BR-10.  In making BR-10 certifications, a Preceptor represents to the Court and the Board that the duties imposed by the Rule  have been satisfied, including (by way of example only) that the Preceptor has:

- Studied carefully Supreme Court Rule 52 and BR-10;
- Mentored an applicant with respect to civility, legal ethics, professionalism and expected conduct and obligations of a member of the Bar; and
- Reviewed the applicant's Application and Affidavit of Completeness as further discussed below.

B.     Preceptor's Responsibility – Duty to Review Application and Affidavits of Completeness

The applicant is required to file two affidavits certifying the completeness of the Application: First Affidavit of Completeness and Second Affidavit of Completeness.  The First Affidavit of Completeness is submitted when the applicant files the Application.  It requires the applicant to certify under oath or affirmation that the applicant has, among other things, (1) accurately and completely answered all questions on your applications, (2) submitted true and correct copies of all documents required in the Application or provided a detailed explanation why not, (3) sent a request to complete a Certification of Employment to each employer identified in the Application, and (4) submitted full payment of the Application fee.

The applicant is also required to file a Second Affidavit of Completeness on or before September 1.  This Affidavit serves as a follow-up to the First Affidavit and is designed to identify which passing applicants will be reviewed by the Board's character and fitness members after the July Bar Examination is announced.  This Affidavit requires the applicant to certify under oath or affirmation

2

that, among other things, (1) the applicant has submitted true and correct copies of all documents the applicant is required to submit with the Application or provided a detailed explanation of why not (including describing all efforts the applicant made to obtain those documents since the applicant filed the First Affidavit of Completeness), and (2) each employer identified in the Application has completed and returned a Certification of Employment (and, if not, you must describe all efforts you have made since you filed your First Affidavit of Completeness to follow up with those employers to have them complete a Certification of Employment.)

The Preceptor's duty to review the applicant's affidavits of completeness modifies past practice. A Preceptor is now required to be more involved in reviewing the completeness of the Application. In the years since the Board went to an online/electronic application process, the Board found that many applicants took a surprisingly casual view of what it means to have a "complete" application and to certify its completeness. When Board members reviewed applicant files during their character and fitness investigation, it was all too common to come across files that were missing information in the Application and/or the applicant failed to provide any explanation of why information was missing. This year BR-10 was amended to require applicants to sign under oath that the Application is complete **and** to require Preceptors to **reasonably conclude** that the applicants complied with these requirements.

Under BR-10, a Preceptor must personally review with the applicant the Application and applicant's affidavits of completeness to the extent necessary to allow the Preceptor to **reasonably conclude** that the (1) the applicant has either (i) provided all information and documents required to be submitted with the Application or (ii) provided a reasonable explanation why missing information and/or documents have not been submitted and identified. If information and/or documents are missing, the Preceptor is required to make sure that the applicant has informed the Board when he/she expects the Board will receive them.

As stated above, the Preceptor's Certificate must be filed by September 1. In it, the Preceptor must certify to (1) having personally reviewed and discussed with the applicant the applicants' affidavits of completeness, (2) determining that the applicant has either provided all information and documents required to be submitted with the Application or (ii) provided a reasonable explanation why missing information and documents have not been submitted and identified when the applicant expects the Board will receive that information or documents, (3) determining that the information and documents in or submitted with the Application are factually accurate, and (4) determining that the affidavits of completeness are factually accurate and contain no omission of any fact required to be disclosed.

C.    Preceptor's Responsibility – Training of the Applicant.

Supreme Court rule 52(a)(8) requires that each applicant must have ". . . served a clerkship in the State of Delaware aggregating substantially full-time service for at least 5 months' duration . . ." of a member of the Delaware Bar qualified under the Rule. The 5 month period need not be continuous, but must have been served after the applicant began law school. Supreme Court Rule 52(a)(8)(iv).

Each Preceptor has an affirmative duty to be satisfied that the requirements of the Rule have been met fully. The Court and the Board recognize that compliance with this

3

requirement may be difficult to determine in some instances.  However, the Court and Board rely on you to make sure this requirement is satisfied.

The Board cannot issue guidelines which will cover each case.  Each Preceptor will have to rely on his or her own conscience and professional judgment.  Some of the following Board guidelines may be helpful in interpreting the Rule in specific instances.

- Time spent studying for the Bar Examination (whether it is in a bar review course or in individual study) will not count.
- Only **practical** work done **in the State of Delaware** "in the office of or under the direct and constant supervision" of a qualified member of the Bar will count.
- Five months is approximately 21 five-day work weeks.  It may be aggregated over a period of time by reasonably combining full working days (8 hours) with partial working days (4 hours).  The Board has received inquiries as to whether an applicant can 'stack hours' if he or she works more than 40 hours in a week.  The Board has taken the position that 'stacking hours' is not permitted.
- There is not rigid opinion held by the Board that a full day must be at least 8 hours or that a half day must be at least 4 hours or that partial day of less than 4 hours may not be aggregated or that bona fide clerkship time may not be served outside normal business hours.  The preceptor as an officer of the Court must make a judgment in good faith that the total aggregate time has been fully served in a meaningful and practical clerkship in  Delaware.
- The Law Clerk Schedule of minimum requirements must also be completed as a separate and independent requirement under Supreme Court rule 52(a)(8)(v).  Please review with the applicant the schedule carefully.  It has come to the Board's attention that some applicants are attending sessions of Court for a limited amount of time.  As a Preceptor, you should counsel the applicant to complete each item in a meaningful and substantive manner.  The Law Clerk Schedule requires applicants to attend one "complete civil trial in JP court."  The applicants are also required to 'attend' trials in Court of common Pleas, Superior Court and other Courts.  What constitutes "attendance" is a frequent question.  The Board has taken the position and Preceptors should so advise applicants that to the extent a trial lasts one day or less, the applicant should attend the complete trial.  To the extent trials exceed one day (other than the Justice of the Peace trial), attendance beyond one day is not required.
- Although under supreme Court Rule 52(8)(i), a Preceptor may delegate personal supervision to another member of the Bar who qualifies under the rule and has been admitted in Delaware for at least five years, the Preceptor remains ultimately responsible for and must certify compliance with the supervision requirement to

4

the same extent as if the Preceptor had not delegated the supervision.

<u>Law Clerk Schedule</u>

Each assignment must be completed in Delaware under the direct and constant supervision of the Preceptor or other qualified Delaware lawyer.

5

# **EXHIBIT F**

# THE DELAWARE CLERKSHIP REQUIREMENT: A LONG-STANDING TRADITION

*by Hon. Randy J. Holland*

A clerkship requirement has long been a part of Delaware's bar admission procedures. A two-volume treatise on Delaware practice written more than a century ago by Judge Victor Woolley describes admission to the bar as follows:

> **Admission to the Bar**. Upon application for the admission of a student to practice as an attorney, it is required that he be a resident of this State, of full age, that he shall have studied the law at least three years after the filing of his certificate as a student of law, under the direction of a member of the bar of this State who has been in practice for at least ten years theretofore; that he be a person of integrity and good character, and that he shall have been privately and fully examined by the Board of Bar Examiners.[1]

Once graduation from an approved law school and taking the bar examination became conditions for admission to the bar, the Delaware clerkship requirement reduced over time and is now a term of five months. In 2008, 165 applicants were admitted to the Delaware Bar, all of whom completed the clerkship process.

The Delaware clerkship requirement is part of a valuable and venerable professional training tradition for lawyers, and can trace its roots back to the legal system of England. The four English Inns of Court in London have been mentoring lawyers for centuries. In fact, the idea for the American Inns of Court (a voluntary mentoring organization with six chapters in Delaware) originated with Chief Justice Warren Burger following an Anglo-American exchange program.[2] He was impressed with the mentoring structure at the English Inns of Court for barristers prior to their being called to the bar. Chief Justice Burger was particularly impressed with how the English Inns of Court had preserved and perpetuated integrity, civility, ethics, and legal excellence.

The requirements for admission to the bar of the Delaware Supreme Court are set forth in its rules. Rule 52(a)(8) provides that no applicant shall be admitted to the bar unless the applicant has passed the bar examination and served a clerkship in the State of Delaware aggregating substantially full-time service for at least five months' duration as follows:

> **(i) Law Office.** In the office of or under the direct and constant supervision of the applicant's Preceptor, or under the direct and constant supervision of such other member of the Bar of this State who is satisfactory to the applicant's Preceptor and has been in practice for at least 5 years theretofore;

**(ii) Law Clerk.** As a law clerk of a justice or judge of the courts of this State <u>or of a United States judge residing in Delaware;</u>

**(iii) Public Office.** In the office of the Department of Justice of the State of Delaware, the office of the Public Defender of the State of Delaware, the office of the United States Attorney for the District of Delaware, the office of the City Solicitor of the City of Wilmington, the office of Community Legal Aid Society, Inc., the office of Delaware Volunteer Legal Services, Inc., or in the office of a related or similar organization approved by the Board, under the direct and constant supervision of a member of the Bar of this State qualified under these Rules.[3]

The five-month clerkship period does not have to be continuous. <mark>The clerkship period can only commence, however, after the applicant has matriculated at an approved law school.</mark> During the clerkship, the applicant <mark>must complete a list of legal activities related to the practice of law that is prepared and furnished by the Delaware Board of Bar Examiners</mark> (see Delaware Clerkship Checklist on pages 31–33). The legal activities include the following:

- attendance at specific courts for various trials and hearings, arbitration or mediation, motion, arraignment, sentencing, jury selection, pretrial conference, argument, client/witness/litigant interview, deposition, real estate closing

- participation in the preparation of papers, memoranda of law, draft will and/or trust instrument

- participation in the administration of an estate and incorporation of a new company

- review of rules, case records, briefs

- complete title search

<mark>THE CLERKSHIP CAN BE PERFORMED DURING OR AFTER THE CONCLUSION OF LAW SCHOOL. ALMOST ALL APPLICANTS ACCOMPLISH THE MAJORITY OF THE ACTIVITIES DURING ONE OR MORE SUMMERS WHILE THEY ARE IN LAW SCHOOL AND FINISH ANY REMAINING ACTIVITIES IN THE MONTHS IMMEDIATELY AFTER THEY HAVE TAKEN THE BAR EXAMINATION.</mark>

<mark>The clerkship can be performed during or after the conclusion of law school.</mark> <mark>Almost all applicants accomplish the majority of the activities during one or more summers while they are in law school and finish any remaining activities in the months immediately after they have taken the bar examination. There</mark> is no time limit on the length of any activities, and applicants can be compensated while they are completing the clerkship requirements; in fact, most applicants perform the clerkship requirements during the course of their employment with a private law firm or in the public sector. The activities can be completed in any order and are usually done based upon the availability of the particular task (e.g., attendance at a deposition or trial when such is scheduled).

Each applicant for admission to the bar <mark>must be vouched for by a member of the Delaware Bar who has been in practice for at least 10 years and who has been designated by the board to be the applicant's preceptor or mentor.</mark> The definition of *mentor* in WEBSTER'S COLLEGIATE DICTIONARY is "a trusted counselor or guide." The Delaware Board of Bar

Examiners' memorandum of instructions to preceptors starts with the following paragraph:

> As a preceptor, you have a unique opportunity to be a guiding force and mentor to an applicant. Your frequent meetings with your applicant provide a wonderful opportunity to impart principles of appropriate lawyer conduct as a member of the Delaware Bar. By your own example, you can demonstrate the professionalism that is a hallmark of the Delaware Bar—professionalism that embodies a dedication to the principles of ethics, civility, skill, businesslike practice and a focus on service to the public, the Court and the Bar (*see* Supreme Court Rule 71). Our legacy as Delaware lawyers will be judged in part by the effectiveness with which we communicate the expectations of our profession to those who follow us, and you are in a unique position to impart those expectations at the earliest stage of a Delaware lawyer's career.[4]

There is only one preceptor for each applicant. Generally, either the applicant knows a Delaware attorney with 10 years of experience, or one of the attorneys or judges where he or she plans to work agrees to be the preceptor. If an applicant is not able to locate a preceptor, the Board of Bar Examiners assigns one from the "preceptor bank" of volunteers.

Prior to admission to the bar, both the applicant and the applicant's preceptor must certify to the Board of Bar Examiners that the applicant has completed the five-month clerkship and the list of legal activities. The preceptor must also represent to the Delaware Supreme Court "that the applicant is a person of good moral character and reputation and that the applicant possesses such qualities, aptitudes

and disposition as fit the applicant for the practice of law."[5] The character and fitness assessment by the preceptor is in addition to the character and fitness investigation by the Board of Bar Examiners.

Under Board of Bar Examiners Rule 10, a preceptor has an affirmative duty to base all certifications upon specific personal knowledge and/or investigation and supervision. In making those certifications, a preceptor represents to the Delaware Supreme Court and the Board of Bar Examiners that the duties imposed by the rules have been satisfied, including (by way of example only):

- personal knowledge of or reasonable investigation of the character and fitness of the applicant,

- factual accuracy and completeness of the candidate's application for admission, and

- full compliance with the clerkship requirements set forth in Supreme Court Rule 52(a)(8).[6]

A preceptor may be held accountable to the Delaware Supreme Court for failure to perform adequately the duties and obligations of a preceptor.

The rules of the Delaware Supreme Court and the Board of Bar Examiners relating to preceptors and the five-month clerkship are designed to assess and instruct the applicant to the bar in two important areas, as stated in the board's memorandum of instructions to preceptors:

**1. Character and fitness of the applicant.** The duties imposed upon a preceptor under Board Rule 10 are designed to make the preceptor's sponsorship of the applicant a meaningful part of the admission process rather than a *pro forma* exercise. Board Rule 10(d)(1)

(Continued on page 34)

# Delaware Clerkship Checklist

Revised 5/09

Clerk's Name: _____          Date: _____

Address: _____

Phone Number: _____

Preceptor's Name: _____

LAW CLERK SCHEDULE OF LEGAL ACTIVITIES

     The following items are to be considered minimum requirements for each law clerk, to be completed during the five months' clerkship and prior to admission to the Bar, whether that clerkship is performed during or after the conclusion of law school. Responsibility for scheduling rests on the clerk; making these arrangements is regarded as an important part of the clerkship training. Either the preceptor or a qualified member of the Bar of this state must sign each completed assignment. See Supreme Court Rule 52(a)(8) and Board of Bar Examiners Rule 10.

ASSIGNMENT

1.  Attendance at one complete civil trial in a Justice of the Peace Court.
    Date Completed _____ Supervised by/Bar ID _____

2.  One half-day visit to Family Court, including attendance at a Trial or a Dependency and Neglect hearing if permitted by the sitting judge.
    Date Completed _____ Supervised by/Bar ID _____

3.  Review of the Rules of Family Court.
    Date Completed _____ Supervised by/Bar ID _____

4.  Attendance at (or audit of a tape recording of) one civil trial in Court of Common Pleas. (Warning: These cases often settle at the last minute. Therefore, you should begin your efforts to meet this requirement early in your clerkship.)
    Date Completed _____ Supervised by/Bar ID _____

5.  Attendance at one criminal trial in the Court of Common Pleas.
    Date Completed _____ Supervised by/Bar ID _____

6.  Attendance at one ADR Proceeding under Superior Court Civil Rules or, alternatively, attendance at one arbitration or mediation in Delaware under the Rules of the American Arbitration Association or any similar ADR organization.
    Date Completed _____ Supervised by/Bar ID _____

7.  Attendance at one session of arraignments in Superior Court.
    Date Completed _____ Supervised by/Bar ID _____

8.  Attendance at one session of sentencing in Superior Court.
    Date Completed _____ Supervised by/Bar ID _____

9.  Attendance at one selection of a jury in Superior Court.
    Date Completed _____ Supervised by/Bar ID _____

10. Attendance at a criminal trial in Superior Court.
    Date Completed _____ Supervised by/Bar ID _____

*(Continued)*

<u>ASSIGNMENT</u>

11. Attendance at a pre-trial conference in District Court, Court of Chancery or Superior Court.
Date Completed _____ Supervised by/Bar ID _____

12. Participation in the preparation of papers relating to an actual or mock motion in the Superior Court, and attendance at presentation of a Superior Court motion after study of the applicable motion papers and a review of the principal authorities relied upon by the parties.
Date Completed _____ Supervised by/Bar ID _____

13. Attendance at a civil jury trial in Superior Court.
Date Completed _____ Supervised by/Bar ID _____

14. Attendance at a trial or hearing in the Court of Chancery.
Date Completed _____ Supervised by/Bar ID _____

15. Review of record of a case which has been tried and appealed.
Date Completed _____ Supervised by/Bar ID _____

16. Participation in preparation of papers relating to perfecting an actual or mock appeal to the Delaware Supreme Court, including designation of the record on appeal, or preparation of papers relating to a certification of a question of law or interlocutory appeal to the Supreme Court, including designation of the record on appeal.
Date Completed _____ Supervised by/Bar ID _____

17. Attendance at (or audit of a tape recording of) an argument in the Supreme Court after a study of applicable briefs, and a review of some of the principal authorities relied on.
Date Completed _____ Supervised by/Bar ID _____

18. Attendance at a civil or criminal trial in the District Court.
Date Completed _____ Supervised by/Bar ID _____

19. Attendance at one Sheriff's Sale.
Date Completed _____ Supervised by/Bar ID _____

20. Attendance at one interview of a client, witness or litigant with a matter.
Date Completed _____ Supervised by/Bar ID _____

21. Preparation of papers relating to commencement of actual or mock lawsuit including complaint, praecipe, and instruction to Sheriff.
Date Completed _____ Supervised by/Bar ID _____

22. Preparation of three memoranda of law.
Date Completed _____ Supervised by/Bar ID _____

23. Attendance at one deposition.
Date Completed _____ Supervised by/Bar ID _____

24. Preparation of one draft will and/or trust instrument or review and digest of three recently probated wills with the Register of Wills.
Date Completed _____ Supervised by/Bar ID _____

ASSIGNMENT

25. Participation in administration of one estate, or review of the records of two estates recently closed at the Register of Wills.
Date Completed _____ Supervised by/Bar ID _____

26. Attendance at one real estate closing.
Date Completed _____ Supervised by/Bar ID _____

27. Participation in a complete incorporation of a new company or review and digest of a recently filed certificate of incorporation.
Date Completed _____ Supervised by/Bar ID _____

28. Complete title search under supervision.
Date Completed _____ Supervised by/Bar ID _____

29. Attendance at a hearing of the Delaware Alcoholic Beverage Control Commission, Industrial Accident Board, or other administrative agency.
Date Completed _____ Supervised by/Bar ID _____

\* \* \* \* \* \* \* \* \* \*

I, _____, hereby certify that I have completed a clerkship in the State of Delaware under the supervision of a Delaware attorney aggregating substantially full-time service for at least five months' duration in full compliance with Delaware Supreme Court Rule 52(a)(8) and have completed all of the items so indicated on this Law Clerk Schedule.

_____
Signature

_____
Date

I, _____, preceptor for _____, an applicant for admission to the Bar of the State of Delaware, do hereby certify pursuant to the Board of Bar Examiners Rule BR-10(d)(2) that said applicant has served a clerkship in the State of Delaware, aggregating substantially full-time service for at least five months' duration in full compliance with Delaware Supreme Court Rule 52(a)(8) and has completed the items indicated on the Law Clerk Schedule.

_____
Signature of Preceptor

_____
Date

*Source:* Board of Bar Examiners of the Supreme Court of Delaware, Clerkship Checklist, http://courts.state.de.us/ forms/download.aspx?id=28478 (last visited Sept. 22, 2009).

explicitly recognizes that the Court and the Board rely on the preceptor's certification. [The] preceptor [has] an affirmative duty to investigate the character and fitness of the applicant and to examine carefully the truthfulness and completeness of the application that provides needed assistance to the Board in making its investigation.

**2. Practical training of the applicant.** The clerkship requirements are intended to make the clerkship a meaningful teaching mechanism to help insure that an applicant's preparation for admission includes a bona fide exposure to the practical aspects of law practice and the traditions of the Delaware Bar. This training can only be accomplished if the Preceptor is actively and closely involved in the process. Thus, Supreme Court Rule 52(8)(i) requires "**direct and constant**" supervision of the applicant, to which the Preceptor must certify. . . . Board Rule 10(d) provides that the preceptor "shall confer on a frequent and regular basis . . . to advise the applicant of the expected conduct and obligations of a member of the Bar."[7]

The strength of Delaware's clerkship program has been the voluntary participation of judges and senior lawyers as preceptors. The Delaware Supreme Court continues to believe that it is important for senior members of the bar to supervise practical and substantive legal training for new lawyers, while at the same time mentoring them about civility, legal ethics, and professionalism.

The Delaware clerkship requirement has worked well and continues to be a very important part of Delaware's legal landscape for two reasons. First, it has been embraced by the preceptors, who welcome the opportunity to pass on Delaware's best practices,

and it is appreciated by the applicants as a valuable complement to their formal legal education. Second, it gives the Supreme Court confidence that the public will be well served by the men and women who are admitted to the Delaware Bar. Delaware continues to believe in the timeless tradition of mentoring as a crucial factor in ensuring professional excellence. ◼

## ENDNOTES

1. Victor Baynard Woolley, PRACTICE IN CIVIL ACTIONS AND PROCEEDINGS IN THE LAW COURTS OF THE STATE OF DELAWARE (WOOLLEY ON DELAWARE PRACTICE) (Star Printing Company 1906).

2. The American Inns of Court is a national organization with more than 400 chapters throughout the United States. Each chapter meets monthly for educational programs focusing on ethics and civility. Senior members of the bench and bar serve as mentors to new lawyers. Delaware has six American Inns of Court. They are all logical voluntary extensions of the pre-admission clerkship experience.

3. DEL. SUP. CT. R. 52(A)(8).

4. Memorandum to Preceptors from the Board of Bar Examiners, "RE: Preceptor Duties and Clerkship Requirements," April 5, 2006.

5. DEL. SUP. CT. R. 52(A)(1).

6. DEL. SUP. CT. R. 10.

7. Memorandum to Preceptors from the Board of Bar Examiners, "RE: Preceptor Duties and Clerkship Requirements," April 5, 2006.



HON. RANDY J. HOLLAND has served on the Delaware Supreme Court since 1986. Justice Holland is a past president of the American Inns of Court Foundation. He chaired the National Advisory Committee for the American Judicature Society's Center for Judicial Ethics and also chaired the American Bar Association's National Joint Committee on Lawyer Regulation. Justice Holland is a member of the American Law Institute and is an adjunct professor at several law schools.

# **<u>EXHIBIT G</u>**

Re: March ceremony

Brooks Witzke <bwitzke@mail2.cu-portland.edu>
Mon 1/27/2020 8:16 PM
**To:** Phillips Parker, Kelly (Courts) <Kelly.Phillips.Parker@delaware.gov>
**Cc:** Ashley Bickel <ambickel@gonserlaw.com>

Ms Phillips,

From my understanding by the email that went out to every other bar passer, the deadline for all
requirements to be met is something like February 19, 2020. My second character interview is
scheduled for February 7, 2020—twelve (12) days before the cutoff. I have completed the clerkship list
just like the other candidates and I have just as much a right to participate in the March ceremony as
the rest of them. I'm not participating in the later ceremonies, as my admission has been delayed long
enough for arguably vexatious reasons.

My preceptor and I sent *numerous* correspondences to the bar investigator(s) for them to conduct a
second character interview—which was requested only at the spontaneous instance of themselves—
and they delayed significantly in getting back to us. The fact that they waited this long to reschedule
the second interview should not jeopardize my ability to participate in the same ceremony as all the
other candidates.

So I will politely ask you once again, can you please send me the same information packet for the
March ceremony which was made available to the other candidates? It would be most appreciated.

Brooks

Get Outlook for iOS

---

**From:** Phillips Parker, Kelly (Courts) <Kelly.Phillips.Parker@delaware.gov>
**Sent:** Monday, January 27, 2020 5:30:37 PM
**To:** Brooks Witzke <bwitzke@mail2.cu-portland.edu>
**Cc:** Ashley Bickel <ambickel@gonserlaw.com>; Tsantes, Stephanie A. (PDO) <Stephanie.Tsantes@delaware.gov>
**Subject:** RE: March ceremony

Brooks,

That informa on was sent to applicants who are eligible for admission to the Delaware Bar at this  me.  Your
2019 applica on is s ll under review therefore you are not eligible to be included in the March admission
ceremony at this  me.

Please make sure to keep your e-mail address in your bar applica on up to date.  You will receive future no ces of
admission ceremonies once you are eligible for admission.

Regards,

Kelly Phillips Parker, Esq.
Deputy Court Administrator
Execu ve Director
Board of Bar Examiners

Supreme Court of the State of Delaware

The Renaissance Centre

405 North King Street, Suite 420

Wilmington, DE 19801

Telephone: (302) 651-3940


Please note my new e-mail address below:


e-mail: kelly.phillips.parker@delaware.gov


This email message from the Board of Bar Examiners of the Delaware Supreme Court is for the sole use of the intended recipient(s) and may contain confiden al and privileged informa on. Any unauthorized review, use, disclosure or distribu on is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

---

**From:** Brooks Witzke <bwitzke@mail2.cu-portland.edu>
**Sent:** Monday, January 27, 2020 5:11 PM
**To:** Phillips Parker, Kelly (Courts) <Kelly.Phillips.Parker@delaware.gov>
**Cc:** Ashley Bickel <ambickel@gonserlaw.com>
**Subject:** March ceremony

Ms. Phillips Parker,

I learned today from another bar applicant that on Friday, January 24, 2020 noce w  as sent out to all the remaining bar passers (who had not parcipa  ted in the December ceremony) regarding the informaon f  or the March 3, 2020 admission ceremony; including the deadline to submit all clerkship acvies.

I did not receive this nofic  aon, and I also c  annot locate the informaonal pack  et in my junk or spam email. Can you please send me the informaon pack  et for the March 3, 2020 ceremony? Also, can you please explain why I was apparently not on the email list?

Thank you,

Brooks

**Brooks M. Witzke**
J.D. (2019)
Concordia University School of Law
501 W Front Street,
Boise Idaho 83702



"The Court will allow the cape but will draw the
line at the word machine."

# EXHIBIT H

**VIA EMAIL**
Jennifer C. Wasson, Esquire
Board of Bar Examiners
405 N King St #509,
Wilmington, DE 19801
1313 N Market St # 6,
Wilmington, DE 19801
jwasson@potteranderson.com

**DATE: April 9, 2020**
**RE: Request to Waive Preceptor Requirement and Proceed with Next Phase of The**
**Admissions Process**

Ms. Wasson,

I hope you are staying safe and healthy in the current state of our nation. I'm contacting

you in reference to my pending application for admission to the Delaware Bar. As you are

already aware, the Delaware Bar requires a passing applicant to complete the following three (3)

requirements prior to being eligible for admission: (1) complete a 5-Month Clerkship; (2)

complete a Clerkship Checklist; and (3) be vouched for by a "Preceptor" who attests that the

applicant's application to the bar is complete and contains no omissions. I have successfully

completed the 5-Month Clerkship and the Clerkship Checklist, however, my application has not

been "vouched as complete" by a Preceptor.

As you surely remember, my former Preceptor—who was acting as both my Preceptor

and my 5-Month Clerkship Supervisor—covertly withdrew from my bar application process

merely three (3) days before my 5-Month Clerkship was to be completed. I have since completed

the remaining three days under another attorney and, upon completion, uploaded the certificate

of completion for both the 5-Month Clerkship and the Clerkship Checklist to my online

1

application. However, the Preceptor Certificate—vouching for my application's completeness— remains unsatisfied[1].

I have endured the utmost level of difficulty in finding a new preceptor due to my situation, and not even the Preceptor Bank has been able to secure a Preceptor willing to "take on" my application[2]. It is my current understanding that *only after* the Preceptor requirement is deemed fulfilled will my application be considered complete. After which, the Delaware Board of Bar Examiners ("the Board") could choose to either: (a) allow me to proceed with admission to the Delaware Bar; or (b) send me a notice denying my admission to the Delaware Bar on character and fitness grounds. In the case of the latter, any applicant would then have fifteen (15) days to petition the Board for a hearing where he/she would have the burden of proving their good moral character and fitness to practice law in the State of Delaware[3].

I understand that the Preceptorship requirement is one of Delaware's "longstanding traditions[4]," however, due to the current state of our nation—and particularly our State itself—it appears as though this process will only continue to be delayed and frustrated. Please understand that I passed the Delaware Bar in July of 2019, completed the Clerkship Checklist in February 2020, and completed the 5-Month Clerkship in March 2020. The delay in my bar admissions

---

[1] The replacement attorney for the 5-Month Clerkship was Anthony Dohring, Esquire, and he completed the required employment survey(s). Mr. Dohring could not act as my Preceptor, however, because he has not been licensed in Delaware for ten (10) years.

[2] The Preceptor Bank has not been able to successfully assign a replacement Preceptor despite copious efforts for the past thirty plus (30+) days. At one point, a replacement Preceptor was in fact assigned, however, she too requested to abstain after Applicant candidly disclosed to her the voluminous nature of his application and how time consuming an adequate review would be.

[3] *See* Del. BR 37 ("The burden of proof shall always be on the applicant").

[4] See *The Delaware Clerkship Requirement: A Long-Standing Tradition by Hon. Randy J. Holland* (The Bar Examiner, November 2009-Published on the Delaware Supreme Court Board of Bar Examiners Website https://courts.delaware.gov/forms/download.aspx?id=103428)

2

process has caused me, and continues to cause me, irreparable harm both financially and professionally.

I would like to respectfully request that—due to the extraordinary circumstances—the Delaware Board of Bar Examiners grant to me the following relief:

1)  waive the remaining Preceptor requirement and allow my application to the Delaware Bar to proceed to the next phase of the application process—whatever phase that may be.

The United States Supreme Court once said: ***"[i]t must be remembered that the right of a lawyer or Bar applicant to practice his profession is often more valuable to him than his home, however expensive that home may be*.**" *Law Students Civil Rights Research Council, Inc. v. Wadmond*, 401 U.S. 154, 174 (1971) (Black, J. dissenting). I can honestly attest—sincerely and wholeheartedly—that this statement is one which I hold true. Conveying to you the inner examinations of my own perspective—after performing a distillation of my own essence—the right to practice law is not just a tool which one utilizes to derive financial or economic advantage; it is a privilege more valuable and precious than anything which could possibly be matched with pecuniary value. More simply put, the ability to practice law is more valuable to me than any amount of money on this earth.

In the end, after I graduated law school in May of 2019, I relocated all the way back to Delaware from Idaho just to sit for the Delaware Bar. Prior to my decision to sit for the Delaware Bar, I had no guaranteed—or even prospective—employment opportunities available. Rather, I chose to relocate my domicile, attempt the Delaware Bar Exam, and endure the copious/challenging admissions requirements simply because I had that much respect for the Delaware Bar and its members that I was willing to make the required sacrifices just to be afforded the *mere opportunity* to become an affiliate of this most illustrious group of

3

professionals. When considering that the lone reason for the continued delay in my admissions process exists only as a result of my inability to obtain a "Preceptor" to vouch for the completion of my bar application—a hurdle which the Board itself has been unable to ameliorate through its Preceptor Bank—the subsequent continuation of this harmful delay lacks an even thin veneer of being necessary to further a legitimate state interest.

Thank you for your consideration, I look forward to hearing from you soon,

____/S/_____
Brooks M. Witzke
8137 Delmar Road,
Delmar Delaware 19940
302-604-4925
bwitzke@mail2.cu-portland.edu

cc. Patrick K. Gibson, Esquire

4

# **EXHIBIT I**

RE: Ms. Wasson

Wasson, Jennifer C. <jwasson@Potteranderson.com>
Wed 4/15/2020 5:08 PM
To: Brooks Witzke <bwitzke@mail2.cu-portland.edu>
Cc: Phillips Parker, Kelly (Courts) <Kelly.Phillips.Parker@delaware.gov>; Tsantes, Stephanie A. (PDO)
<Stephanie.Tsantes@delaware.gov>

Dear Mr. Witzke,

The Board of Bar Examiners has reviewed your April 9, 2020 le er and considered your request that the
Board "waive the remaining Preceptor requirement and allow [your] applicaon t o the Delaware bar to
proceed to the next phase of the applicaon pr ocess." The Delaware Supreme Court established the
preceptor requirement in Rule 52(a), including the condion tha t a preceptor "vouch for" each
applicant. The Board has neither the discreon nor the authority t o modify the qualificaons f or
admission set forth in the Supreme Court Rules, so we are unable to grant your request for a waiver. If
the Board determines that you sas fy the other prerequisites for admission to the bar, you will need to
idenf y a preceptor who can meet the requirements of Rule 52(a). Notwithstanding your current lack of
a preceptor, the Board is connuing t o review your applicaon, so please be mindful of y our ongoing
obligaon t o supplement. Thank you.

Regards,
Jennifer Wasson



**Jennifer C. Wasson | Partner**
Potter Anderson & Corroon LLP | 1313 N. Market Street, 6th Floor | Wilmington, DE 19801-6108
**T** 302.984.6165 | **F** 302.658.1192
jwasson@potteranderson.com | potteranderson.com

The information contained in this email message and any attachments is intended only for the addressee and is privileged, confidential, and may be
protected from disclosure. Please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to
legal restriction or sanction. If you think that you have received this email message in error, please do not read this message or any attached items.
Please notify the sender immediately and delete the email and all attachments, including any copies. This email message and any attachments have
been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which they are received and
opened. However, it is the responsibility of the recipient to ensure that the email and any attachments are virus-free, and no responsibility is accepted by
Potter Anderson & Corroon LLP for any loss or damage arising in any way from their use.

**From:** Brooks Witzke <bwitzke@mail2.cu-portland.edu>
**Sent:** Thursday, April 9, 2020 6:19 PM
**To:** Wasson, Jennifer C. <jwasson@Po eranderson.com>
**Subject:** [EXT] Ms. Wasson

Hello Ms. Wasson,

I hope you are well and are safe in this current pandemic. Please see the a ached le er for your review
which seeks waiver from the remaining preceptor requirement so that my bar applicaon can proceed

to the next phase of the admissions process.

I hope that you can give this le er your full consideraon.

Thank you for your me,

Brooks

**Brooks M. Witzke**

J.D. (2019)

# **<u>EXHIBIT J</u>**

**BOARD OF BAR EXAMINERS**
**OF THE DELAWARE SUPREME COURT**
**420 N. King Street, Suite 420**
**Wilmington, DE 19801**

October 29, 2021

<u>**CONFIDENTIAL – SENT VIA U.S. MAIL AND E-MAIL**</u>

Charles Slanina
P.O. Box 1556
Hockensin, DE 19707
cslanina@delawgroup.com

      RE:   **Applicant Brooks Witzke**

Mr. Slanina:

      On June 7, 2021, a Panel of the Board of Bar Examiners ("Board Panel") conducted a hearing concerning Brooks Witzke's fitness to practice law in Delaware in connection with his 2019 Application for Admission in the Delaware Bar ("Application").  At the conclusion of the hearing, the Board requested the Presenter and Applicant to submit sproposed findings of fact and conclusions of law ("Proposed Findings and Conclusions").  The Board set forth a schedule which provided the Presenter to submit a Proposed Findings and Conclusions within 30 days of the preparation of the June 7 hearing transcript and the Applicant would then have 30 days to submit a response to the Proposed Findings and Conclusions.

      The Presenter submitted to the Board Panel a Proposed Findings and Conclusions on August 27, 2021. However, to date, the Board Panel has not received Applicant's response. Please advise the Board Panel whether Applicant intends to continue to pursue his Application, and if so, provide the reason/s that the Applicant did not submit the response.

      Respectfully,

      /s/ *Randolph K. Herndon*

      Randolph K. Herndon
      Board Panel Chair

1

cc:    Mackenzie Wrobel, Esquire (by email)
       Kelly Phillips Parker, Esquire (by email)
       Brooks Witzke (by U.S. mail and email)
       Patricia Winston, Esquire (by email)
       Donna Culver, Esquire (by email)

2