## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

Brooks M. Witzke,                                )                    C.A. No. _____
                                                 )
        Plaintiff,                             )
                                                 )
    v.                                         )
JUSTICES OF THE SUPREME COURT OF DELAWARE,
Collins J. Seitz, Jr.,                           )
James T. Vaughn, Jr.,                            )
Tamika R. Montgomery-Reeves,                     )
Gary F. Traynor,                                 )
Karen L. Valihura,                               )
           and,
MEMBERS OF THE DELAWARE BOARD OF BAR EXAMINERS
Jennifer C. Wasson,                              )
Randolph K. Herndon,                             )
                                                 )
        Defendants.                            )

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR AN IMMEDIATE TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION AND HEARING AS SOON AS PRACTICABLE

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................ i

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS .........................................................................................3

STANDARD OF REVIEW .........................................................................................3

ARGUMENT ................................................................................................................5

I.   **PLAINTIFF IS ENTITLED TO A TRO ORDERING DEFENDANTS TO STOP THEIR HARASSMENT AND ISSUE A FINAL DECISION ON PLAINTIFF'S ADMISSION TO THE DELAWARE BAR**……………………………………………5

   1.  **Plaintiff Has A Reasonable Likelihood Of Success On The Merits Of His Procedural Due Process Claim Because Defendants Were Required To Adhere To The Most Stringent Form Of Due Process And They Knowingly Failed to Do So**……………..5

      A.  Plaintiff Has Not Only A Liberty Interest, But A Property Interest Triggering The Strictest Adherence to Procedural Due Process…………………………………………………………………7

      B.   Plaintiff Was Entitled To A Hearing At A Meaningful Time And In A Meaningful Manner And He Was Also Entitled To A Prompt Decision On His Professional License—His Very Livelihood—and Defendants Continue That Deprivation To The Present…………………………………………………..…………………………..9

   2.  **Denial of The TRO Will More Likely Than Not Result in Irreparable Harm to the Plaintiff**……………………………………………………………………15

   3.  **Granting The Injunction Will Not Result In Irreparable Harm To The Defendant--The Balance Of Hardships Tips In Plaintiff's Favor** …………………………...16

   4.  **Granting The Injunction Is In The Public Interest Because Protecting Constitutional Rights Is Always In The Public Interest**…………………………...16

II.   **THIS COURT SHOULD ISSUE A PRELIMINARY INJUNCTION RESTRAINING DEFENDANTS FROM ENFORCING THE BAR ADMISSIONS RULES BECAUSE THEY DISCRIMINATE AGAINST NON-RESIDENTS IN VIOLATION OF U.S. Const. art. IV, §2, cl. 1**……………………16

i

**1. Plaintiff Has A Reasonable Likelihood of Success On The Merits Because He Can Show That The Rules Are Invalid Under Strict Scrutiny**……………..…………..17

    A. The Admissions Rules Facially Discriminate Against Nonresidents Because The Rules Require—As A Prerequisite to Gain Admission--Physical Presence In The State For At Least 50 Hours A Week For At Least 5 Months…………………19

    B. The Admissions Rules Violate The Privileges and Immunities Clause Because There Is A Discriminatory Impact and A Discriminatory Intent—The Rules Were Enacted For The Purpose of Economic Protectionism…………………………22

    C. The Admissions Rules Violate the Privileges and Immunities Clause Because The Rules Have a Longstanding History of Discriminatory Application and Arbitrary Waiver……………………………………………………………………………25

**2. The Denial of A Preliminary Injunction Will More Likely Than Not Result in Irreparable Harm to The Plaintiff**……………………………………………………27

**3. Granting The Injunction Will Not Result In Irreparable Harm To The Defendant-- The Balance Of Hardships Tips In Plaintiff's Favor**………………………..………..28

**4. Granting The Injunction Is In The Public Interest Because Protecting Constitutional Rights Is Always In The Public Interest**……………………………..28

**III.  THIS COURT SHOULD ISSUE A PRELIMINARY INJUNCTION RESTRAINING DEFENDANTS FROM ENFORCING THE BAR ADMISSIONS RULES BECAUSE THEY DISCRIMINATE AGAINST NON- RESIDENTS IN VIOLATION OF U.S. Const. art. I, § 8, cl. 3**……………………...29

**1. Plaintiff Has A Reasonable Likelihood of Success On The Merits Because He Can Show That The Rules Violate the Dormant Commerce Clause By Interfering with or Imposing Burdens on Interstate Commerce For Purposes of Economic Protectionism**………………………………………………………………………29

    A. The Defendants Cannot Dispute That Their Bar is The Backbone of Interstate Commerce And That Defendants Have Protectionist Objectives Motivated by Financial Self-Interest In Maintaining Local Control of "American Corporation Law"……………………………………………………………………………...32

    B. The Defendants' Admissions Rules Interfere With Interstate Commerce By Imposing Burdensome Regulation on the Interstate Legal Market …………….35

**2. The Denial of A Preliminary Injunction Will More Likely Than Not Result in Irreparable Harm to The Plaintiff**……………………………………………………36

**3.  Granting The Injunction Will Not Result In Irreparable Harm To The Defendant--The Balance Of Hardships Tips In Plaintiff's Favor**………………………..………..37

**4.  Granting The Injunction Is In The Public Interest Because Protecting Constitutional Rights Is Always In The Public Interest**……………………………..38

**IV.   THE COURT SHOULD WAIVE THE BOND REQUIREMENT OR SET BOND AT A NOMINAL AMOUNT**……………………………………………………………..38

**V.   THIS COURT IS REQUIRED TO HOLD A HEARING ON THE PRELIMINARY INJUNCTION**……………………………………………………………………..39

**CONCLUSION**………………………………………………………………………39

**CERTIFICATE OF SERVICE**………………………………………………………..40

**TABLE OF AUTHORITIES**

Cases

*Abbott v. Mette*, Civil Action
   No. 20-cv-131-RGA, 2021 U.S. Dist. LEXIS 58015 (D. Del. Mar. 26, 2021)…………...1

*Adarand Constructors, Inc. v. Pena,*
   515 U.S. 200, 227-36, (1995)………………………………………………………18

*Alvin v. Suzuki,*
   227 F.3d 107, 116 (3d Cir. 2000)……………………………………………………5

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
   526 U.S. 40, 59, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999)…………………………5

*American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,*
   42 F.3d 1421, 1427 n.8 (3d Cir. 1994)………………………………………………5

*Anderson v. Davila,*
   125 F.3d 148, 156 (3d Cir. 1997)…………………………………………………...39

*Armstrong v. Manzo,*
   380 U.S. 545,  (1965)………………………………………………………………..9

*Baldwin v. Fish & Game Comm'n,*
   98 S. Ct. 1852, 1859 (1978)………………………………………………………..17

*Board of Regents of State Colleges v. Roth,*

408 U.S. 564, (1972)………………………………………………………………..7

*Boretsky v. Corzine*,
2009 U.S. Dist. LEXIS 39744, at *15–17 (D.N.J. May 11, 2009)……………………...4

*Boretsky v. Corzine*,
No. 08-2265 (GEB), 2009 U.S. Dist. LEXIS 43604, at *12
(D.N.J. Jan. 15, 2009)……………………………………………..………………… 27, 37

*Brown v. Smith (In re Poole)*,
222 F.3d 618, 620 (9th Cir. 2000)……………………………………….…………6

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
476 U.S. 573 (1986)………………………………………………………………..30

*C &A Carbone, Inc. v. Town of Clarkstown*,
511 U.S. 383, 392 (1994)…………………………………………………………...30

*Chalker v. Birmingham & N. R. Co.*,
249 U.S. 522, 525 (1919)…………………………………………………………...22

*Comptroller of the Treasury v. Wynne*,
575 U.S. 542, 599 (2015)…………………………………………………………..30

*Connelly v. Steel Valley Sch. Dist.*,
706 F.3d 209, 213 (3d Cir. 2013)…………………………………………………...18

*Cornette v. Graver*,
473 F. Supp. 3d 437, 478 (W.D. Pa. 2020)………………………………………..5

*Dunn v. Blumstein*,
405 U.S. 330, 342 (1972)………………………………………………………18, 38

*Gershenfeld v. Justices of Supreme Court*,
641 F. Supp. 1419, 1423 (E.D. Pa. 1986)…………………………………6, 9, 10, 12, 13

*Goldfarb v. Virginia State Bar*,
421 U.S. 773, 787-88 (1975)……………………………………………………...30, 35

*Hicklin v. Orbeck*,
437 U.S. 518, 524 (1978)…………………………………………………………..28

*Hillside Dairy, Inc. v. Lyons*,
539 U.S. 59, 61 (2003)……………………………………………………...19, 22, 25

*Hope v. Warden York Cty. Prison*,

956 F.3d 156, 160 (3d Cir. 2020)…………………………………………………………..3

*In re Dreier*,
258 F.2d 68, 69 (3d Cir. 1958)…………………………………………………………….6

*In re Gordon*,
422 N.Y.S.2d 641, 645, 397 N.E.2d 1309, 1312 (1979)………………………………20

*In re Horwitz*,
276 A.D. 918, 94 N.Y.S.2d 490 (App. Div. 1950)………………………………………19

*In re McGrath*,
243 A.D. 803, 278 N.Y.S. 135 (App. Div. 1935)………………………………………..19

*In re Stevens*,
355 P.2d 164, 165 (Alaska 1960)………………………………………………………...19

*In re Tang*,
39 A.D.2d 357, 333 N.Y.S.2d 964 (App. Div. 1972)……………………………………19

*Janssen Prods., L.P. v. Lupin Ltd.*,
109 F. Supp. 3d 650, 696 (D.N.J. 2014)…………………………………………………4

*Kos Pharm., Inc. v. Andrx Corp.*,
369 F.3d 700, 727 (3d Cir. 2004)…………………………………………………………4

*Kyphon, Inc. v. Disc-O-Tech Med. Techs. Ltd.*,
2004 U.S. Dist. LEXIS 25170, at *16–17 (D. Del. Dec. 10, 2004)………………………4

*Law Students Civ. Rights Research Council, Inc. v. Wadmond*,
91 S. Ct. 720, 731 (1971)……………………………………………………..6, 7, 15

*M. Rae, Inc. v. Wolf*,
509 F. Supp. 3d 235, 244 (M.D. Pa. 2020)………………………………………………4

*Mallet & Co. v. Lacayo*,
Civil Action No. 19-1409, 2020 U.S. Dist. LEXIS 218750, at *24
(W.D. Pa. Nov. 23, 2020)……………………………………………………………27, 37

*Mathews v. Eldridge*,
424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)………………………...5, 11, 15

*McBurney v. Young*,
569 U.S. 221, 225 (2013)………………………………………………………17, 18, 23, 29

*Michael v. Del. Bd. of Nursing*, No.

N17A-02-003-JRJ, 2017 Del. Super. LEXIS 446, at *8
(Super. Ct. Sep. 8, 2017)……………………………………………………………9

*Miller v. Mitchell*,
598 F.3d 139, 147 (3d Cir. 2010)…………………………………………………..5

*Moneyham v. Ebbert,*
723 F. App'x 89, 92 (3d Cir. 2018)……………………………………………………3

*Nat'l Assoc. for the Advancement of Multijurisdiction Practice (NAAMJP) v. Castille*,
799 F.3d 216, 224 (3d Cir. 2015)…………………………………………………..17

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519, 520 (2012)…………………………………………………………..19

*Nat'l Revenue Corp. v. Violet*,
807 F.2d 285, 289 (1st Cir. 1986)……………………………………………31, 38

*Noll v. Alaska Bar Ass'n*,
649 P.2d 241 (Alaska 1982)………………………………………………………..21

*Paul v. Virginia*,
75 U.S. (8 Wall.) 168, 180, 19 L. Ed. 357 (1868)…………………………………17

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970)……………………………………………………………30-31

*Potts v. Honorable Justices of Supreme Court*,
332 F. Supp. 1392, 1397 (D. Haw. 1971)…………………………………………..19

*Ramsay v. Nat'l Bd. of Med. Exam'rs*,
968 F.3d 251, 262 (3d Cir. 2020)…………………………………………………..4

*Sargus v. W. Va. Bd. of Law Exam'rs*,
294 S.E.2d 440 (W. Va. 1982)…………………………………………………...21

*SCHWARE v. Bd. OF BAR Exam'rs OF N.M.*,
77 S. Ct. 752, 753 (1957)…………………………………………………..6, 7, 26

*Schwartz v. Judicial Ret. Sys.*,
584 F. Supp. 711, 723 (D.N.J. 1984)………………………………………………...6

*Shaw v. Reno*,
509 U.S. 630 (1993)………………………………………………………………18-19

*Sheley v. Alaska Bar Ass'n*,

620 P.2d 640 (Alaska 1980)………………………………………………………..21

*Slawik v. State*,
480 A.2d 636, 645 (Del. 1984)……………………………………………………..9

*Stalland v. S.D. Bd. of Bar Exam'rs*,
530 F. Supp. 155, 157 (D.S.D. 1982)…………………………………………..20-21

*Stana v. Sch. Dist.*,
775 F.2d 122, 126 (3d Cir. 1985)…………………………………………………..7

*Steinberg v. Supreme Court of Pa.*,
Civil Action No. 09-86, 2009 U.S. Dist. LEXIS 49980, at *20
(W.D. Pa. June 10, 2009)…………………………………………………………6

*Strauss v. Ala. State Bar*,
520 F. Supp. 173, 175 (N.D. Ala. 1981)…………………………………………21

*Supreme Court of N.H. v. Piper*,
105 S. Ct. 1272, 1278 (1985)…………………………………………...17, 21

*Supreme Court of Va. v. Friedman*,
108 S. Ct. 2260, 2267 (1988)……………………………………………………17

*Sync Labs LLC v. Fusion Mfg.*
No. 11-3671 (WHW)(CLW), 2016 U.S. Dist. LEXIS 65169, at *27
(D.N.J. May 18, 2016)……………………………………………………………3

*T.W. v. S. Columbia Area Sch. Dist.*,
2020 U.S. Dist. LEXIS 176429, at *6–7 (M.D. Pa. Sep. 25, 2020)………………………3

*Temple Univ. v. White*,
941 F.2d 201, 220 (3d Cir. 1991)………………………………………………..38

*Thorstenn v. Barnard*,
842 F.2d 1393 (3d Cir. 1988)………………………………………………2, 21

*United Bldg. & Constr. Trades Council of Camden & Vicinity v. Mayor & Council of Camden*,
465 U.S. 208, 217 (1984)………………………………………………………..22

*United States v. Marzzarella*,
614 F.3d 85, 99 (3d Cir. 2010)…………………………………………………..18

*Valle v. Stengel*,
176 F.2d 697, 703 (3d Cir. 1949)………………………………………………17, 39

*Victory v. Berks Cty.*,
No. 18-5170, 2020 U.S. Dist. LEXIS 6528, at \*72
(E.D. Pa. Jan. 15, 2020)……………………………………………………16, 28, 38

*W. & S. Life Ins. Co. v. State Bd. of Equalization of Cal.*,
451 U.S. 648, 652 (1981)……………………………………………………...29

*Warren v. Naugle*,
No. 18-4921, 2019 U.S. Dist. LEXIS 210676, at \*11-12
(E.D. Pa. Dec. 6, 2019)……………………………………………………………7

*Washington v. Davis*,
426 U.S. 229 (1976)……………………………………………………………...18

*Willner v. Comm. on Character & Fitness*,
83 S. Ct. 1175, 1179-80 (1963)…………………………………………6, 7, 26

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886)………………………………………………………18, 25

## Constitutions and Statutes

Del. BR 53…………………………………………………………………………...8

U.S. Const. art. IV, § 2, cl. 1…………………………………………………16, 17

U.S. Const. art. I, § 8, cl. 3…………………………………………………………29

28 U.S.C. §453…………………………………………………………………….2

FED. R.CIV. P. 65…………………………………………………………………39

## <u>INTRODUCTION</u>

Plaintiff respectfully requests that this Court enter an immediate temporary restraining order to restrain the Defendants from inflicting more needless and unconstitutional delay on Plaintiff's admission to the Delaware Bar and that this Court issue an order compelling Defendants to issue a final decision on Plaintiff's admission to the Delaware Bar within five (5) days of the order.

Plaintiff also respectfully requests that this Court issue a preliminary injunction prohibiting the Defendants from enforcing four (4) of their bar admissions rules and that it schedule a hearing as soon as practicable so that both parties can be heard.

For simplification, this case can be broken down into two (2) parts:

i.   Plaintiff brings an action for various procedural due process violations, including brutal harassment and needless delay, that has occurred repeatedly over the past two years and is continuous to the present day; and

ii.  Plaintiff brings a challenge to the constitutionality of four bar admissions rules that are intended to burden non-resident attorneys. The Defendants enacted these rules for the purpose of economic protectionism, and Defendants also apply these rules in a discriminatory manner to advance their protectionist purposes.

With all due respect to this Honorable Court as well as the law clerks that serve it, Plaintiff is merely going through the motions and is not expecting the judge to conduct the neutral analysis he or she took an oath to do. Plaintiff has spent the past two years amassing an arsenal of evidence and caselaw for this very day. Plaintiff has also interviewed dozens of different practicing attorneys and has learned that the Defendants stock this Court with judges that are not neutral to the facts of this case, and are complicit in the type of conduct this cause of action will address. Plaintiff had hope for this suit up and until the decision in *Abbott v. Mette*, Civil Action No. 20-cv-131-RGA, 2021 U.S. Dist. LEXIS 58015 (D. Del. Mar. 26, 2021) was

1

issued by Judge Andrews a couple months back. In *Mette*, Judge Richard Andrews rubber-stamped a boilerplate defense of the *Younger* abstention doctrine without conducting basic legal analysis.

Additionally, Plaintiff's misanthropic view of this Court is also grounded in the fact that this Court has aided and abetted the very corruption that is being challenged in this case. This Court requires, as a pre-requisite to admission, that an attorney be licensed in Delaware. Because Delaware has a durational residency requirement, this Court has one too. And, this Court has maintained its durational residency requirements despite the fact that the American Bankruptcy Institute—a segment of the American Bar Association—published a detailed article informing this Court that its admissions requirements are akin to an unconstitutional durational residency requirement. **Exhibit A[1]**.

Although the words are commonly forgotten or are otherwise meaningless to a large majority of federal judges, Plaintiff will nevertheless provide this Court with a refresher on the oath of office each federal judge takes when they assume office:

> Each justice or judge of the United States shall take the following oath or affirmation before performing the duties of his office: "I, ___ ___, do solemnly swear (or affirm) that I will administer justice without respect to persons, and do equal right to the poor and to the rich, and that I will faithfully and impartially discharge and perform all the duties incumbent upon me as ___ under the Constitution and laws of the United States. So help me God."

28 U.S.C. §453.

---

[1] *See Thorstenn v. Barnard* , 842 F.2d 1393, 1394 (3d Cir. 1988) ("A district court is not empowered to adopt its local rules to require members of a state bar who apply for admission to its bar to live in or maintain an office in the state where the court sits if the reasons given for the residency requirement are unnecessary and irrational").

2

## STATEMENT OF FACTS

This Memorandum will be voluminous due to the complexity of this case, and Plaintiff does not wish to weigh this Court down with unnecessary verbiage. Plaintiff has provided to this Court a Verified Complaint that he drafted and signed under oath. The Complaint pled the facts of this case with particularity. Plaintiff therefore re-alleges and adopts all allegations and paragraphs set forth in his Complaint as if fully set forth herein.

## STANDARD OF REVIEW

Although the Court is ordinarily obligated to construe *pro se* pleadings liberally, when a plaintiff is a law school graduate, he may not be entitled to the special solicitude usually granted to *pro se* litigants. *Sync Labs LLC v. Fusion Mfg.* No. 11-3671 (WHW)(CLW), 2016 U.S. Dist. LEXIS 65169, at *27 (D.N.J. May 18, 2016). A preliminary injunction is an extraordinary remedy that should be granted only if (1) plaintiff has a reasonable likelihood of success on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant (aka "the balance of hardships"); and (4) granting the injunction is in the public interest." *Moneyham v. Ebbert,* 723 F. App'x 89, 92 (3d Cir. 2018). The same elements also apply to temporary restraining orders ("TROs"). *Hope v. Warden York Cty. Prison,* 956 F.3d 156, 160 (3d Cir. 2020). TROs are reserved for circumstances in which the applicant can show he or she faces a real and immediate threat of irreparable injury before the court can consider and hear a noticed-motion for a preliminary injunction. *Id.* A movant need only establish a prima facie case demonstrating a reasonable probability of success; they are not required to prove that success is more likely than not. *T.W. v. S. Columbia Area Sch. Dist.*, 2020 U.S. Dist. LEXIS 176429, at *6–7 (M.D. Pa. Sep. 25, 2020). The court generally does not go into the merits any farther than is necessary to determine whether the moving party established a

3

likelihood of success. *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010). To show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial; the harm must be likely to occur in the absence of an injunction. *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 262 (3d Cir. 2020). To show irreparable harm, "the movant must show that it is 'more likely than not' to suffer irreparable harm absent the requested relief." *M. Rae, Inc. v. Wolf*, 509 F. Supp. 3d 235, 244 (M.D. Pa. 2020). Economic loss does not constitute irreparable harm; irreparable harm must be of a peculiar nature and incapable of pecuniary measurement. *Boretsky v. Corzine*, 2009 U.S. Dist. LEXIS 39744, at *15–17 (D.N.J. May 11, 2009). Irreparable injury encompasses different types of losses that are often difficult to quantify; price erosion, loss of goodwill, damage to reputation, lost market share and sales, and loss of business opportunities are all valid grounds for finding irreparable harm. *Janssen Prods., L.P. v. Lupin Ltd.*, 109 F. Supp. 3d 650, 696 (D.N.J. 2014).

Regarding the balance of hardships, the question is whether, and to what extent, the defendant will suffer irreparable harm if the preliminary injunction is issued; if temporary relief would irreparably harm a defendant pending final disposition of the case, the court should balance the hardships to ensure that the issuance of an injunction would not harm the defendant more than a denial would harm the plaintiff. *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 727 (3d Cir. 2004). The injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself. *Id.* at 728. The focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief. *Kyphon, Inc. v. Disc-O-Tech Med. Techs. Ltd.*, 2004 U.S. Dist. LEXIS 25170, at *16–17 (D. Del. Dec. 10, 2004). As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and

irreparable injury, it almost always will be the case that the public interest will favor the plaintiff. *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). Protecting constitutional rights which are fundamental "unquestionably serves the public interest." *Cornette v. Graver* , 473 F. Supp. 3d 437, 478 (W.D. Pa. 2020).

## ARGUMENT

## I.    PLAINTIFF IS ENTITLED TO A TRO ORDERING DEFENDANTS TO STOP THEIR HARASSMENT AND ISSUE A FINAL DECISION ON PLAINTIFF'S ADMISSION TO THE DELAWARE BAR

The first part of Plaintiff's case involves an egregious procedural due process violation which has been ongoing for the past two years and continues to the present day. As this Memorandum will demonstrate, this Court is required to issue a TRO because Defendants are inflicting harm in bad faith and with the intention of harming Plaintiff, and because Plaintiff's claim involves procedural due process regarding a professional license; Plaintiff's livelihood.

### 1.    Plaintiff Has A Reasonable Likelihood Of Success On The Merits Of His Procedural Due Process Claim Because Defendants Were Required To Adhere To The Most Stringent Form Of Due Process And They Knowingly Failed to Do So

Analysis of a procedural due process claim proceeds with two inquiries: (1) whether "the asserted individual interests are encompassed within the fourteenth amendment's protection of 'life, liberty, or property'; and (2) whether the procedures available provided the plaintiff with 'due process of law.'" *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000). "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty,' [o]nly after finding the deprivation of a protected interest do we look to see if the State's procedures comport with due process." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999) (citing *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)).

Irrespective of whether the practice of law is a "right" or "privilege," a person cannot be prevented from practicing law except for valid reasons, such practice not being a matter of the state's grace. *SCHWARE v. Bd. OF BAR Exam'rs OF N.M.*, 77 S. Ct. 752, 753 (1957). When "[a] claim of a present right to admission to the bar of a state and a denial of that right is a controversy . . . the requirements of procedural due process must be met." *Willner v. Comm. on Character & Fitness*, 83 S. Ct. 1175, 1179-80 (1963)[2]. "[A] State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment . . . [t]he right is not a matter of grace and favor." *Id.* (internal citations and quotations omitted).

> It must be remembered that the right of a lawyer or Bar applicant to practice his profession is often more valuable to him than his home, however expensive that home may be. Therefore . . . when a State seeks to deny an applicant admission or to disbar a lawyer, it must proceed according to the most exacting demands of due process of law. This must mean at least that the right of a lawyer or Bar applicant to practice cannot be left to the mercies of his prospective or present competitors. When it seeks to deprive a person of the right to practice law, a State must accord him the same rights as when it seeks to deprive him of any other property. Perhaps almost anyone would be stunned if a State sought to take away a man's house because he failed to prove his loyalty or refused to answer questions about his political beliefs.

*Law Students Civ. Rights Research Council, Inc. v. Wadmond*, 91 S. Ct. 720, 731 (1971).

---

[2] Many practicing attorneys—and unscholarly judges—do not realize that the source of all due process rights that exist in attorney discipline/disbarment cases derive from *bar admissions* cases where the applicant took their case to the United States Supreme Court *pro se*. Many assume that these rights came into existence when seasoned attorneys took their discipline cases to the Supreme Court on a due process challenge armed with top-gun counsel, but this is a common misconception made by those unsophisticated.

In fact, *Schware* and *Willner* are the historic source of procedural due process rights for both attorney discipline cases and for judicial discipline cases in the Third Circuit where this Court sits. *See In re Dreier,* 258 F.2d 68, 69 (3d Cir. 1958); *Steinberg v. Supreme Court of Pa.*, Civil Action No. 09-86, 2009 U.S. Dist. LEXIS 49980, at *20 (W.D. Pa. June 10, 2009); *Schwartz v. Judicial Ret. Sys.*, 584 F. Supp. 711, 723 (D.N.J. 1984);*Gershenfeld v. Justices of Supreme Court* , 641 F. Supp. 1419, 1423 (E.D. Pa. 1986). And, *Schware* is the source of due process rights for attorney admissions and discipline in the federal courts. *See Brown v. Smith (In re Poole)*, 222 F.3d 618, 620 (9th Cir. 2000)(The power of federal courts to disbar or otherwise discipline attorneys must be exercised consistent with the requirements of the Due Process Clause as established by *Schware*).

### A.  Plaintiff Has Not Only A Liberty Interest, But A Property Interest Triggering The Strictest Adherence to Procedural Due Process

Under the holdings of *Schware*, *Willner*, and *Wadmond*, it is obvious that Plaintiff has a liberty interest as a Bar applicant triggering procedural due process, that conclusion has been unanimously upheld in each case that hit the Supreme Court. Although Plaintiff could technically stop there, Plaintiff wants to take it a step further and really hit his case home by also proving a property interest.  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it." *Warren v. Naugle* , No. 18-4921, 2019 U.S. Dist. LEXIS 210676, at *11-12 (E.D. Pa. Dec. 6, 2019). He must, instead, have a legitimate claim of entitlement to it. *Id*. Such entitlements are, of course, not created by the Constitution. *Id*. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law. *Id*. "Property interests are often expressly created by state statutes or regulations, but they can also arise from written or unwritten state or local government policies or from "mutually explicit understandings" between a government employer and employee." *Stana v. Sch. Dist.*, 775 F.2d 122, 126 (3d Cir. 1985). "In all cases, the relevant inquiry is whether the claimant has a 'legitimate claim of entitlement.'" *Id.* (citing *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972)).

In this case, Plaintiff has not only a well-established liberty interest, he also has a property interest for several reasons.

First, Plaintiff has a property interest because his name was published publicly by Defendants on the list of applicants who passed the Delaware Bar Exam, and his removal from this eligibility list without adequate procedural due process deprived him of a property interest for purposes of this case. *See Stana,* 775 F.2d at 125, 132 (Citing *Willner*, the Third Circuit

found that the plaintiff's retention on the eligibility list, which was a *sine qua non* for her placement in a teaching position with the Pittsburgh School District, implicated a constitutional "property" interest created by state law).

Second, Plaintiff has a property interest created by the Rules for the Board of Bar Examiners. The rules provide that delay can be imposed only by the applicant, and only after a written finding of good cause is made by the Board. *See* Del. BR 53.

Third, Plaintiff has a legitimate claim of entitlement because he has invested **two years** of his time and over $100,000.00 to gain admission to the Bar. Plaintiff had to complete all of Defendants' unconstitutional admissions rules, including the five-month durational residency requirement and the clerkship hurdles. After completing all of the admissions requirements, the Defendants engaged in a prolonged game of needless delay and mental torture where they would promise Plaintiff a prompt hearing and decision and would then renege on it last second. The Defendants created mutually explicit understandings when they promised Plaintiff a prompt show cause hearing and decision and then failed to follow through with it. Plaintiff clearly had a vested interest after giving two years of his life and all the finances he had to become a member of the Delaware Bar. The Defendants cannot impose years of hurdles and barriers, expressly promise a prompt hearing and decision, and then refuse to provide due process for no reason other than the fact that they want to see Plaintiff suffer. Defendants clearly created with Plaintiff a property interest when they had him jump through hoops for two freaking years and then refused to provide Plaintiff with the most basic procedural due process rights.

Plaintiff reminds this Court that the Defendants strung Plaintiff along for two years and only provided Plaintiff with a hearing when the Delaware Attorney General forced their hand to do so. Now, Defendants simply refuse to issue a decision.

8

**B.  Plaintiff Was Entitled To A Hearing At A Meaningful Time And In A Meaningful Manner And He Was Also Entitled To A Prompt Decision On His Professional License—His Very Livelihood—and Defendants Continue That Deprivation To The Present**

Due process affords a professional licensee the right to receive timely notice and to be heard "at a meaningful time and in a meaningful manner" prior to being deprived of any liberty and/or property interest. *Slawik v. State*, 480 A.2d 636, 645 (Del. 1984) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965)); *Michael v. Del. Bd. of Nursing* , No. N17A-02-003-JRJ, 2017 Del. Super. LEXIS 446, at *8 (Super. Ct. Sep. 8, 2017).

If the judge presiding over this case (and his/her law clerks) read no other case in relation to Plaintiff's procedural due process claim, please read the case of *Gershenfeld v. Justices of Supreme Court* , 641 F. Supp. 1419 (E.D. Pa. 1986). In *Gershenfeld*, the judge presiding over the case was severely bothered by acts of the Pennsylvania Bar—acts which are miniscule in comparison to what the Defendants have done in our case. *Id*. at 1423. In *Gershenfeld*, the Pennsylvania Bar suspended the law license of an attorney without argument or a hearing. *Id*. at 1420. After two weeks, the attorney filed a federal action seeking declaratory and injunctive relief from the state court order, which was granted because the suspension rule did not provide for a prompt postdeprivation disposition of the disciplinary charges against him. *Id*. After a series of other events transpired, including the state bar's failure to have the district court change its decision and then crying foul to the Third Circuit, the injunction was stayed for thirty (30) days in a vague order issued by the appellate court so that the State of Pennsylvania could hold a hearing. *Id*. However, the bar took the position that the appellate court only required that it hold a hearing on an interim suspension and not a final disposition of the allegations leading to the attorney's suspension. *Id*. Optimism prevailed over common sense, and the bar took the liberty of declaring that the appellate court's vague order empowered it to disregard the rulings of the

9

trial judge presiding over the case in the federal district court. *Id*. at 1421. The judge apparently did not appreciate this, and he found that "it is inconceivable that [the Third Circuit] intended such a limited hearing as the state contends. To do so affronts the clear command of *Barry v. Barchi*, which requires a prompt dispositional hearing on the merits of the underlying allegations against the plaintiff in circumstances such as this." *Id*.

The bar disregarded the federal judge and held a hearing for an interim suspension held by a member of the bar that recommended reinstatement. *Id*. at 1422. Fifteen days later, the bar reinstated the attorney pending final disposition of the matter. *Id*. The bar then asked the judge to continue the final hearing on the issues of permanent injunction and declaratory relief on the primary ground that it should await disposition of the defendants' appeal before the court of appeals. *Id*.  The trial judge apparently took great issue with the defendants' attempts to cause further delay to the attorney, despite the fact that the attorney had been reinstated by that point and was practicing his livelihood. *Id*. at 1423. The judge made it apparent that the requirement for a prompt hearing as well as a prompt final disposition for matters involving ones' livelihood is a "serious constitutional due process issue." *Id.* Before he even delved into his legal analysis, the judge stated:

> In light of the serious constitutional due process issues which underlie the plaintiff's complaint here (as opposed to the merits of the underlying charges of professional misconduct which are before the state court), this court is *astonished* that defendants would seek to further delay that which plaintiff is clearly entitled to, namely a prompt disposition by the state supreme court of the charges against him. As a matter of fact, as will be seen later in this opinion, there is some doubt that the final detailed complaint against Gershenfeld has even been finally prepared by the Office of Disciplinary Counsel.

*Id*. The court found that "the Supreme Court of the United States has made it clear that when the state deprives an individual of a property right without a hearing it must assure a 'prompt [postdeprivation] proceeding and prompt disposition of the outstanding issues between [the

10

individual] and the state.'" *Id*. at 1424. (internal citations omitted). The court then went on to

state that even a temporary deprivation can be severe and that the courts have held that the

opportunity to be heard must be "at a meaningful time and in a meaningful manner." *Id*. at 1425.

The court then determined that the disciplinary rules were unconstitutional because the rules had

no time restrictions governing (i) when the bar must hold a hearing; and (ii) when the bar must

issue a final decision following the hearing. *Id*.

Although the court did not impose a bright line rule on what was appropriate, the court

stated that a statute that allowed the bar to take thirty (30) days to issue a final decision following

a hearing would be unconstitutional. *Id*. The court ruled that "[p]lainly, Rule 208(f) is

unconstitutional on its face." *Id*. In further analysis, the court noted the following:

> The Fourteenth Amendment to the United States Constitution will not allow a
> disciplinary system charged with adjudicating and punishing professional
> wrongdoing to fiddle, while constitutionally protected property interests burn on
> the pyre of accusation.
>
> The delay is in large part <u>unreasonable because of the severe and irreparable
> effect on the plaintiff each day he is suspended</u>. The first factor to be considered
> under *Mathews v. Eldridge*, *supra*, is "the private interest that will be affected by
> the official action." <u>In the case at bar, plaintiff is deprived of his very livelihood</u>.
> Here the plaintiff has spent 35 of his 65 years practicing law. <u>The damage
> plaintiff suffers is incalculable and irreparable.</u>
>
> The due process violations which the Supreme Court was concerned about in
> Barchi has unfortunately already been realized in the present case. <u>Plaintiff has
> been expelled from the legal profession for nearly three months</u>, and yet, to date
> no petition has been served on plaintiff -- no procedure associated with finality
> has been formally scheduled or commenced.
>
> Defendants have taken the position that the Due Process Clause only requires a
> prompt hearing before the Disciplinary Board but not a final disposition by the
> Pennsylvania Supreme Court. (See Transcript of Stay Hearing at pp. 9-13). The
> Due Process Clause, however, requires a "meaningful" opportunity to be heard.
> *See Cleveland Board of Education v. Loudermill*, *supra*, 470 U.S. 105 S. Ct. at
> 1495. As previously noted, on August 1, 1986, following a special 4-day hearing
> ordered by the state supreme court, Disciplinary Board member Helwig
> determined that plaintiff's emergency interim suspension was inappropriate and
> recommended that he immediately be allowed to resume the practice of law. It

took the Supreme Court of Pennsylvania <u>fifteen days to act upon this recommendation -- an additional fifteen days in which plaintiff was needlessly and unreasonably denied his right to practice his profession</u>.

This court can envision no possible reasonable explanation for this delay. Clearly, a prompt hearing before the Disciplinary Board is not a "meaningful" opportunity for the plaintiff to be heard. "To be meaningful, an opportunity for a full hearing and determination must be afforded at least at a time when the potentially irreparable and substantial harm caused by a suspension can still be avoided." Despite the Board member's recommendation, plaintiff could remain suspended indefinitely because the Pennsylvania Supreme Court is under no time constraint within which it must act. Due process, therefore, unquestionably requires a prompt final disposition of the issues upon which the state has deprived the plaintiff of his property right.

Id. at 1426-1428. (Emphasis added)(Internal citations omitted). The court then concluded in a

beautifully written closing:

The charges against this attorney have not yet even been agreed upon by his accusers and the prospect of the state's cumbersome machinery operating to determine if the charges are true <u>or not will reach into future months and possibly years by the state's own admission</u>. While the state supreme court may be compelled to embrace a system that produces such a result for reasons that it believes are sound, this court, in obedience to solemn pronouncements of constitutional necessity by the United States Supreme Court, cannot allow the state system to operate once the plaintiff has made a proper showing in this court of constitutional deprivation, as plaintiff has preliminarily shown. The time to learn if plaintiff is able to fully satisfy his burden of proof is now. This court cannot and will not allow any further delay in the prompt disposition of the constitutional questions before this court. The defendants' motion to stay the final hearing will be denied.

*Id*. at 1428. (Emphasis added)

After reading the thoughtful opinion set forth in *Gershenfeld*, a federal judge would have

to have lost their marbles to not find that Defendants have and are violating Plaintiff's procedural

due process rights. Both cases share striking similarities and distinctions, but the distinctions

demonstrate that the due process violation suffered by Plaintiff is significantly more egregious

than that in *Gershenfeld*.  In both cases, the state bar has inflicted delay both: (a) in holding a

hearing; and (b) in issuing a final decision following the hearing. In *Gershenfeld*, the judge was

disgusted and disturbed that an attorney was held out of his profession for three months. And, the

12

judge completely overhauled the Pennsylvania Supreme Court's rules that enabled it to take up to two years to issue a decision. Well guess what? Plaintiff *has* been denied the ability to practice in his profession for *over* two years without receiving adequate due process. Regardless of whether Plaintiff has a property right in his law license, he clearly has a liberty interest requiring the same level of procedural due process. What is sickening is that the court in *Gershenfeld* had a conniption when a 65-year-old lawyer who had been practicing law for 35 years was suspended for three months without a prompt disposition, where Plaintiff has been blocked from his profession for over two years and the judge presiding over this case will undoubtedly abandon his or her neutral role to shield the Defendants. The plaintiff in *Gershenfeld* had indulged himself with over three decades of practicing law and earning an income commensurate with his education, he likely was not driven to destitute by a three month vacation. Where in this case Plaintiff has been held out of his profession for over two years and has never been able to work in his profession or earn an income commensurate with his education. Plaintiff went to four years of college, three years of law school, and expended everything he had for the past two years to become a member of the Delaware Bar.

There are other distinctions that support Plaintiff's argument that his deprivation is more severe than the plaintiff in *Gershenfeld.* The plaintiff in *Gershenfeld* was a member of the Pennsylvania Bar. The PA Bar is an easy bar to get into in comparison to Delaware. Delaware requires a copious number of burdensome requirements that the State of Pennsylvania does not impose on its applicants. Plaintiff had to expend many times the efforts to become a member of the Delaware Bar than the plaintiff did in *Gershenfeld* to become a member of the PA Bar. It is important to remember that Plaintiff was required to complete five (5) months of full-time

employment in Delaware (which took over a year due to Defendants' sabotaging) and has now had to expend two years of his time and substantial resources just to get his denial.

What is similar in both cases is that the plaintiffs shared the same procedural due process protections, whether they derive from a liberty or property interest. Just like the plaintiff in *Gershenfeld*, each day that goes by Plaintiff suffers harm that is incalculable and irreparable because he is being kept out of a profession that he worked his whole life to achieve. Something else that is the same in both cases is that the supreme court rules in question do not have any time restrictions governing (i) when the bar must hold a hearing; and (ii) when the bar must issue a final decision following the hearing. In both cases, the bar of each state can take months or years to issue a final decision. The judge in *Gershenfeld* was amazing in both his legal writing and in his research and legal analysis. One must wonder if judges of this degree and caliber still exist in the federal judiciary. However, even if this Court conducts the most basic of legal analysis it will find that Defendants have and are violating Plaintiff's procedural due process rights.

What is extremely frustrating is that the Defendants are all incumbents (Plaintiff's would-be competitors) who have deprived Plaintiff of everything he has worked for and have placed him through absolute turmoil for the past two years while each have spent the past two years lining their pockets with hundreds of thousands of dollars per year. The Defendants have not a morsel of regret or contrition, nor do they care about what they have done and continue to do. The way Defendants see it, the judge presiding over this case will adopt any defense raised by them without thought (or proper legal analysis) so none of them have the slightest degree of concern for Plaintiff's constitutional rights or for the harm Plaintiff has suffered and continued to suffer.

14

2.  **Denial of The TRO Will More Likely Than Not Result in Irreparable Harm to the Plaintiff**

To show irreparable harm, "the movant must show that it is 'more likely than not' to suffer irreparable harm absent the requested relief." *M. Rae, Inc.*, 509 F. Supp. 3d at 244. Looking back at *Gershenfeld,* the judge made unmistakably clear that the delay of a final decision determining whether one can practice law is "a serious constitutional due process issue." *Id.* at 1425. The judge further elaborated by stating that "[t]he delay is in large part unreasonable because of the severe and irreparable effect on the plaintiff each day he is suspended." *Id.* at 1426 (Emphasis added). "The first factor to be considered under *Mathews v. Eldridge*, *supra*, is 'the private interest that will be affected by the official action[,]' [i]n the case at bar, plaintiff is deprived of his very livelihood." *Id.* (Emphasis added).

Just like the plaintiff in *Gershenfeld*, each day that goes by Plaintiff is suffering irreparable injury. In fact, as the judge described it "[t]he damage plaintiff suffers is incalculable and irreparable." *Id.* It must be remembered that "the right of a lawyer or Bar applicant to practice his profession is often more valuable to him than his home, however expensive that home may be." *Wadmond*, 91 S. Ct. at 731. This is true for Plaintiff, as he has given up everything for the past two years for the mere prospect of obtaining the privilege—a privilege he worked his entire adult life to achieve. Due the fact that Plaintiff's harm is incalculable and irreparable each day that goes by without a final disposition, Plaintiff faces a real and immediate threat of irreparable injury before the court can consider and hear a notice motion for a preliminary injunction.

Although irreparable harm may be presumed due to the seriousness of the constitutional deprivation, Plaintiff also points out that in the absence of court-ordered relief Plaintiff will lose his job. Plaintiff must be licensed within six months of his start date at his present job, and he

starts that position in less than a month. Plaintiff needs a prompt decision on his law license so that he can start the process of appealing it or reapplying for the Delaware Bar and hope he can get licensed before his six months expires.

### 3. Granting The Injunction Will Not Result In Irreparable Harm To The Defendant-- The Balance Of Hardships Tips In Plaintiff's Favor

Plaintiff can think of no harm the Defendants will suffer by being made to issue a prompt final decision on Plaintiff's admission to the Bar. This should have been done two years ago. They need to issue him a piece of paper telling him he is denied and then move on to their next victim.

### 4. Granting The Injunction Is In The Public Interest Because Protecting Constitutional Rights Is Always In The Public Interest

Vindicating constitutional rights and preventing future violation is always going to be in the public interest. *See Victory v. Berks Cty.*, No. 18-5170, 2020 U.S. Dist. LEXIS 6528, at *72 (E.D. Pa. Jan. 15, 2020) ("When we weigh the public interest in denying an injunction against the strong public interest in vindicating constitutional rights and preventing future constitutional violations, we find an injunction defined in the accompanying Order serves the public interest.").

## II.   THIS COURT SHOULD ISSUE A PRELIMINARY INJUNCTION RESTRAINING DEFENDANTS FROM ENFORCING THE BAR ADMISSIONS RULES BECAUSE THEY DISCRIMINATE AGAINST NON-RESIDENTS IN VIOLATION OF U.S. Const. art. IV, §2, cl. 1

Plaintiff has adequately alleged facts in his Complaint that, if true, show that the admissions rules in question are unconstitutional under the Privileges and Immunities Clause of U.S. Const. art. IV, §2, cl. 1.

1.  **Plaintiff Has A Reasonable Likelihood of Success On The Merits Because He Can Show That The Rules Are Invalid Under Strict Scrutiny**

The Privileges and Immunities Clause states that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1. "The United States Supreme Court has held that the words "privileges and immunities" of U.S. Const. art. IV, § 2, protects the right of a citizen to engage in lawful commerce, trade or business without molestation or harassment." *Valle v. Stengel* , 176 F.2d 697, 703 (3d Cir. 1949). "The 'privileges and immunities' clause also guarantees the right of the individual citizen to engage in the pursuit of happiness." *Id*.  The Clause operates to "place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those states are concerned." *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 180, 19 L. Ed. 357 (1868). The Clause "prevents a State from discriminating against citizens of other States in favor of its own." *Baldwin v. Fish & Game Comm'n* , 98 S. Ct. 1852, 1859 (1978). The Supreme Court has long held that the Privileges and Immunities Clause protects only those privileges and immunities that are "fundamental." *McBurney v. Young ,* 569 U.S. 221, 225 (2013). The Supreme Court also recognizes that the practice of law is a "fundamental right" for the purposes of the Privileges and Immunities Clause of Article IV, Section 2. *Supreme Court of N.H. v. Piper*, 105 S. Ct. 1272, 1278 (1985); *Nat'l Assoc. for the Advancement of Multijurisdiction Practice (NAAMJP) v. Castille* , 799 F.3d 216, 224 (3d Cir. 2015). "[A] nonresident's interest in practicing law on terms of substantial equality with those enjoyed by residents is a privilege protected by the Clause." *Supreme Court of Va. v. Friedman* , 108 S. Ct. 2260, 2267 (1988). To burden a right under the privileges and immunities clause, there is no requirement that the state totally exclude nonresidents; the plaintiff only has to make a showing that a state law burdens the right. *Id*. at 2265.

17

A classification that trammels fundamental personal rights or is drawn upon inherently suspect distinctions must meet the strict scrutiny standard. *Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 213 (3d Cir. 2013). "For a law to pass muster under strict scrutiny, it must be narrowly tailored to serve a compelling state interest." *United States v. Marzzarella*, 614 F.3d 85, 99 (3d Cir. 2010). "Narrow tailoring requires that the regulation actually advance the compelling interest it is designed to serve." *Id*. at 100. "The law must be the least-restrictive method of serving that interest, and the burdening of a significant amount of protected conduct not implicating the interest is evidence the regulation is insufficiently tailored." *Id*. "And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference[,] [i]f it acts at all, it must choose 'less drastic means.'" *Dunn v. Blumstein*, 405 U.S. 330, 342 (1972).

The mere fact that legislation or governmental action has a discriminatory effect is not sufficient to trigger strict scrutiny or intermediate scrutiny; there must be intent to discriminate on the part of the government. *McBurney*, 133 S. Ct. at 1715. Intent can be shown in three ways: (i) facial discrimination; (ii) discriminatory motive; or (iii) discriminatory application. *Shaw v. Reno*, 509 U.S. 630 (1993); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Washington v. Davis*, 426 U.S. 229 (1976).  As the Supreme Court has recognized in some contexts, burdensome effects can sometimes admit an inference of proscribed intent. *Davis*, 426 U.S. at 241. In most circumstances, a facial classification is enough, by itself, to manifest a proscribed intent. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227-36, (1995).

### A.  The Admissions Rules Facially Discriminate Against Nonresidents Because The Rules Require—As A Prerequisite to Gain Admission--Physical Presence In The State For At Least 50 Hours A Week For At Least 5 Months

The first thing Plaintiff will address is that mere labels attached to a challenged government action—a label affixed by persons seeking to escape culpability—does not control whether that action passes constitutional muster. *See Nat'l Fed'n of Indep. Bus. v. Sebelius* , 567 U.S. 519, 520 (2012) ("That label cannot control whether the payment is a tax for purposes of the Constitution"). Having said that, although the words "residency" and or "domicile" are not mentioned anywhere in the challenged rules, they do not have to expressly mention these words to be facially invalid. *Shaw v. Reno*, 509 U.S. 630 (1993) (the Supreme Court held that a law used a racial classification "on its face" even though the language of the law did not include racial language); *See also Hillside Dairy, Inc. v. Lyons* , 539 U.S. 59, 61 (2003). ("the absence of an express statement in the California laws and regulations identifying out-of-state citizenship as a basis for disparate treatment is not a sufficient basis for rejecting [a Privileges and Immunities Clause] claim").

In this case, the Defendants will likely try to draw a distinction between terms "Preceptorship" "5 Month Clerkship" and "residency." However, the magic term Plaintiff will add is the term "physical presence." For purposes of a Privileges and Immunities Clause analysis, a court does not equate the term "residence" with the address listed on one's driver's license. Rather, a court looks to whether an offending statute requires *physical presence* within the state; physical presence is residency and/or domicile for purposes of a constitutional analysis. *See Potts v. Honorable Justices of Supreme Court*, 332 F. Supp. 1392, 1397 (D. Haw. 1971); *In re Stevens*,355 P.2d 164, 165 (Alaska 1960); *In re McGrath*, 243 A.D. 803, 278 N.Y.S. 135 (App. Div. 1935); *In re Horwitz*, 276 A.D. 918, 94 N.Y.S.2d 490 (App. Div. 1950); *In re Tang* ,

39 A.D.2d 357, 333 N.Y.S.2d 964 (App. Div. 1972). This is not a situation where Delaware requires of its practitioners an in-state office requirement for service of process. Rather, this is a situation where a person must be physically present on Delaware soil for a durational period prior to gaining the right to practice their calling. Such an extreme restriction—which was enacted for the protectionist purpose of excluding nonresidents—burdens nonresidents by the plain language of the Rules' text.

The Rules would require an out-of-state attorney to give up his or her law practice for at least five months if they wanted to be admitted in Delaware. Similarly, the Rules would also inhibit the right of a nonresident attorney to engage in a multistate law practice, as an attorney from Idaho, by relevant example, would be unable to expand his or her multi-state law practice into Delaware absent the surrendering of the out-of-state law practice and relocation to Delaware for at least five months. In either instance, the Rules facially discriminate in violation of the Privileges and Immunities Clause. *See In re Gordon* , 422 N.Y.S.2d 641, 645, 397 N.E.2d 1309, 1312 (1979) ("An attorney admitted to practice in one State who desires to practice in New York must often give up an established practice and residence, move to New York and forfeit the right to engage in his or her chosen occupation for at least six months and often appreciably longer. One who desires to engage in a multistate practice, concentrating on a particular area of expertise, is effectively foreclosed from doing so. . . ."); *See also Stalland v. S.D. Bd. of Bar Exam'rs* , 530 F. Supp. 155, 157 (D.S.D. 1982) ("The residency requirement denies a nonresident attorney, who might be otherwise eminently qualified, the right to practice law on a multistate basis, perhaps specializing in a narrow area of the law. Further, S.D.C.L. 16-16-2 burdens the practice of law by attorneys employed by multistate corporations.").

20

It is important to remember that the admissions Rules in question require physical presence on Delaware soil for at least 50 hours per week for at least 5 months prior to gaining admission. The courts have repeatedly held that 30-day residency requirements were unconstitutional. *See Noll v. Alaska Bar Ass'n* , 649 P.2d 241 (Alaska 1982); *Sheley v. Alaska Bar Ass'n* , 620 P.2d 640 (Alaska 1980); *Sargus v. W. Va. Bd. of Law Exam'rs* , 294 S.E.2d 440 (W. Va. 1982). The courts have held three-week durational residency requirements to be invalid. *See Strauss v. Ala. State Bar*, 520 F. Supp. 173, 175 (N.D. Ala. 1981). And, the courts have held simple residency requirements (that is, residence or intent to establish residence in-state at time of application, examination or admission to the bar) to be invalid regardless of there being no durational period of physical presence. *See Piper,* 470 U.S. at 275; *Thorstenn v. Barnard*, 842 F.2d 1393 (3d Cir. 1988); *Stalland*, 530 F. Supp. at 157.

The Defendants can call their durational residency requirements whatever their hearts so desire, but merely calling an action a certain name does not change its practical effect. No more than one can steal the car of another and avoid culpability by claiming later that he was only borrowing it. Names and labels aside, when this Court looks to the face of the Rules' text, there is no doubt that the Rules require physical presence on Delaware soil for a durational period prior to obtaining admission to the Bar. Additionally, it will see that the Rules impose disproportionate burdens on nonresidents by requiring relocation and the surrendering of one's livelihood for at least five months. Finally, the Rules discriminate facially because they erect barriers for lawyers seeking to engage in multistate law practices. This Court should find that the Rules facially discriminate in violation of the Privileges and Immunities Clause.

**B. The Admissions Rules Violate The Privileges and Immunities Clause Because There Is A Discriminatory Impact and A Discriminatory Intent—The Rules Were Enacted For The Purpose of Economic Protectionism**

Plaintiff has adequately pled facts showing that the Rules in question have both a discriminatory impact and a discriminatory intent. A regulation need not discriminate on its face against out-of-state citizens in order to violate the Privileges and Immunities Clause. *Chalker v. Birmingham & N. R. Co.*, 249 U.S. 522, 525 (1919). Furthermore, a statute can be unconstitutional under the Privileges and Immunities Clause even if the statute could disadvantage both out-of-staters and long-time state citizens. *Id.*; *see also United Bldg. & Constr. Trades Council of Camden & Vicinity v. Mayor & Council of Camden*, 465 U.S. 208, 217 (1984) (holding that an "ordinance is not immune from constitutional review [under the Privileges and Immunities Clause] at the behest of out-of-state residents merely because some instate residents are similarly disadvantaged"). The Supreme Court has more recently affirmed this reasoning in *Hillside Dairy, Inc. v. Lyons*. Relying heavily on *Chalker*, the Court held that "the absence of an express statement in the California laws and regulations identifying out-of-state citizenship as a basis for disparate treatment is not a sufficient basis for rejecting [a Privileges and Immunities Clause] claim." *Hillside Dairy*, 539 U.S. at 61.

Despite the holdings in *Hillside* and *Chalker*, the Court has not decided what a plaintiff must specifically establish in order to invalidate a statute that does not expressly discriminate on its face. The *Hillside* Court recognized two possibilities: that the Privileges and Immunities Clause applies (i) "to classifications that are but proxies for differential treatment against out-of-state residents, or (ii) [alternatively, that it applies to] . . . classification[s] with the practical effect of discriminating against such residents." *Id*. at 62. To compound the already murky caselaw, in 2013 the Court imposed an additional requirement on plaintiffs bringing privileges

22

and immunities clause challenges to state regulations under the discriminatory impact + discriminatory intent test. *McBurney v. Young,* 569 U.S. 221, 228 (2013). Now, a plaintiff must allege in their complaint that the discriminatory intent existed at the time of the regulations' enactment; that is, that it was enacted for the purpose of burdening nonresidents for economic protectionism. *Id*.

Plaintiff has adequately pled a discriminatory impact and a discriminatory intent that was the driving force behind the Rules' enactment. The Rules disproportionately impact out of staters (*i.e.* they have the practical effect of discriminating against nonresidents) by requiring them to leave their state of residency for at least five months and to give up their livelihoods (and possibly their homes) in other states. Very few law school graduates and practicing attorneys who have their livelihoods and homesteads in states other than Delaware are in the position to forego income for at least five months, relocate to Delaware, obtain housing, and fulfill Defendants' admissions requirements. The only persons in a position to do this are those who have residential ties to the State or those who have accepted positions in one of Defendants' "home-grown" corporate law firms. A recent law school graduate being offered a starting salary of $175,000.00 is in a position to relocate, but this scenario advances Defendants' protectionist purposes by limiting their Bar to those employed by one of their "home grown" corporate law firms. None of this is not speculation; it is an irrefutable fact. Someone from Montana, Wyoming, New York, Washington, or Utah who wanted to obtain Delaware licensure could not just come to Delaware, pass the bar exam, and obtain a law license to practice. The attorney would be required to fulfill all of Defendants' extensive admissions requirements and would have to relocate to the area.

23

Plaintiff, an Idahoan, was one of those personally impacted by this regulatory scheme. Plaintiff had to give up his life in Idaho and relocate to Delaware to satisfy Defendants' unconstitutional mandates. There was no way Plaintiff could had satisfied the Defendants' requirements absent relocation to Delaware.

Plaintiff has also adequately pled in his Verified Complaint that the Rules were enacted for the express purpose of burdening nonresidents and frustrating their ability to become admitted to the Delaware Bar. In fact, the Rules were enacted to prevent corporate law attorneys from New York and Philadelphia from competing with the local regime. As the Complaint demonstrates, the Five Members openly advertise via-publication that their longstanding practice of limiting the influx of nonresident attorneys and fostering "home-grown" law firms is integral to the $2.6 billion it receives each year in blood money. The Five Members have even gone as far as using their past efforts at economic protectionism as justification to be given more money at the expense of the Delaware taxpayers. The Defendants' very own words reflect that in the absence of their efforts at economic protectionism, the State of Delaware could lose billions of dollars per year. It makes sense, think about what would happen if any qualified attorney from anywhere in the United States could simply take the bar exam and become licensed in Delaware. We would see hundreds of professionals each year from states like New York and Montana that would come and obtain professional licensure. Corporations from all 50 states would be able to send their in-house counsels in to become licensed and there would no longer be a requirement for the retainment of the corporate law giants in Wilmington Delaware. Qualified professionals would have the ability to be retained and handle disputes from entirely outside the State, and Defendants would lose their cozy $2.6 billion a year cash cow.

### C. The Admissions Rules Violate the Privileges and Immunities Clause Because The Rules Have a Longstanding History of Discriminatory Application and Arbitrary Waiver

In some instances, a law that appears to be neutral on its face will be applied in a different manner to different classes of persons. If the persons challenging the governmental action can prove that the government officials applying the law had a discriminatory purpose (and used discriminatory standards based on traits such as race or gender), the law will be invalidated. *Yick Wo*, 118 U.S. at 356. This doctrine appears analogous to the first of the two possibilities the *Hillside* Court recognized for alleging a violation of the Privilege and Immunities Clause-- that the Privileges and Immunities Clause applies "to classifications that are but proxies for differential treatment against out-of-state residents." *Hillside Dairy, Inc.*, 539 U.S. at 62.

In this case, Plaintiff alleged that the Rules were proxies for differential treatment and discrimination based upon residency. The Rules serve no legitimate (much less compelling) government purpose. Instead, the Defendants keep the Rules in place not only as a way to burden nonresidents but as dangerous instruments they can use to sabotage the admission of otherwise qualified applicants in ways that violate the Constitution. The Preceptorship requirement is about as useful as a chocolate teapot for a woman wearing a bride's dress. No person who graduates from an ABA accredited institution and passes the hardest bar exam in the world needs to have their bar application looked over and approved by a third party; a ten-year veteran of Defendants' exclusive club. For the same reasons, that applicant does not need to be supervised by a Preceptor as they complete their Clerkship and Clerkship Checklist requirements. Furthermore, no passing applicant should be made to engage in a prolonged relationship with a 10-year incumbent of the bar sufficient to build a relationship where that person is comfortable

vouching—with the risk of professional discipline should they do so wrongly—for the applicant's moral character and understandings of the Delaware Way. The practice of law is not a college fraternity, and the Supreme Court has reiterated several times, the practice of law is *not* a matter of the state's grace and favor[3]. *SCHWARE,* 77 S. Ct. at 753; *Willner*, 83 S. Ct. at 1179-80.

The admissions Rules serve as a sinister tool that the Defendants use to sabotage the admission of qualified applicants on the basis of residency. The Defendants have a longstanding practice of using the 5-Month Clerkship as a way to gauge whether the applicant has ties to the area, whether they plan to practice in Delaware after their admission, and whether the applicant will be serving one of Defendants' "home grown" corporate law firms. The Defendants also have a longstanding practice of using the Preceptorship as the emergency destruct button once the Defendants make a subjective determination that the nonresident fails to meet their preferences. The Defendants routinely take measures to scare off an applicant's preceptor and then prohibit the applicant from being able to get a replacement. The Defendants then refuse to process the applicant's application because neither the application, the 5-Month Clerkship, nor the Clerkship Checklist are considered complete until a Preceptor signs off on them. It is the Defendants' objective to have the applicant either give up or have their passing score expire before they can complete the requirements. Plaintiff was one of the victims unfortunate enough to be targeted

---

[3] Last time I checked, this was America, where persons of adult age are answerable only for themselves and can pursue their life's dreams in a free country. The Constitution does not, and will not, tolerate a situation where the ability for one to practice their calling—their very profession—is contingent upon their ability to kiss up to and beguile a 10-year incumbent—and would be competitor—into opening the final gate to a profession for which the applicant has invested over 6 years of their adult life in order to attain. The ability for a state to regulate the practice of law is not a vestigial survival of the prerogative of the Crown.

with this ploy. Plaintiff can prove that Defendants have used this ploy unremittingly for the past quarter-century. Plaintiff was not their first victim, and he was not their last.

Plaintiff's Verified Complaint also demonstrates that the Rules have a history of arbitrary waiver—that is, the Preceptorship, 5-Month Clerkship and Clerkship Checklist have been waived entirely—for those long-term residents with cushy ties to the Defendants' elite club.

### 2. The Denial of A Preliminary Injunction Will More Likely Than Not Result in Irreparable Harm to The Plaintiff

To show irreparable harm, "the movant must show that it is 'more likely than not' to suffer irreparable harm absent the requested relief." *M. Rae, Inc.,* 509 F. Supp. 3d at 244. Plaintiff has asserted in his Verified Complaint that, once the Defendants get a copy of this lawsuit, they will immediately issue Plaintiff a denial for admission to the Bar. This is not conjectural or hypothetical but based upon Defendants' own statements. Plaintiff has stated an immediate intention and plan to reapply for admission to the Delaware Bar where he will once again be subjected to the Rules subject to this suit. Plaintiff does not want to give up his livelihood and life in beautiful Idaho to return to Delaware. Plaintiff's immediate intention and plan is more than sufficient to show immediate irreparable harm. *See Mallet & Co. v. Lacayo*, Civil Action No. 19-1409, 2020 U.S. Dist. LEXIS 218750, at *24 (W.D. Pa. Nov. 23, 2020) ("Even just an intention to make imminent or continued use of [a procedure subject to the litigation] will almost certainly show immediate irreparable harm.").

In addition, all of Plaintiff's claims involve the vindication of fundamental constitutional rights. In these circumstances, irreparable harm will be presumed. *See Boretsky v. Corzine*, No. 08-2265 (GEB), 2009 U.S. Dist. LEXIS 43604, at *12 (D.N.J. Jan. 15, 2009) ("when alleged

deprivation of constitutional right is involved, most courts hold no further showing of irreparable injury is necessary").

**3. Granting The Injunction Will Not Result In Irreparable Harm To The Defendant-- The Balance Of Hardships Tips In Plaintiff's Favor**

The only harm the Defendants will suffer if the relief is granted is loss of revenue from its $2.6 billion dollar a year money spinner. But this should not be a factor that this Court considers because the Defendants are swindling this money via illegitimate means. This would be equivalent to a prosecutor failing to bring a bank robber to justice in fear that the bank robber might lose some of the cash he stole from innocent parties. Once the floodgate opens, the Defendants will see a flow of other benefits as attorneys from all over will be applying to sit for the bar exam. Defendants will derive substantial benefit from this as persons will be paying the hefty application fees. Additionally, the influx of out-of-state attorneys will not be immediate but will likely be subtle and occur over the next few years.

**4. Granting The Injunction Is In The Public Interest Because Protecting Constitutional Rights Is Always In The Public Interest**

Vindicating constitutional rights and preventing future violation is always going to be in the public interest. *See Victory*, No. 18-5170, 2020 U.S. Dist. LEXIS 6528, at *72 ("When we weigh the public interest in denying an injunction against the strong public interest in vindicating constitutional rights and preventing future constitutional violations, we find an injunction defined in the accompanying Order serves the public interest.").

In conclusion, Plaintiff's Verified Complaint represents the paradigm of the type of governmental interference that the Privileges and Immunities Clause was intended to protect against, and he is entitled to preliminary injunctive relief. *See Hicklin v. Orbeck*, 437 U.S. 518, 524 (1978) (the right to pursue one's chosen occupation free from discriminatory interference is

28

the very essence of the personal freedom that the privileges and immunities clause was intended to secure).

### III. THIS COURT SHOULD ISSUE A PRELIMINARY INJUNCTION RESTRAINING DEFENDANTS FROM ENFORCING THE BAR ADMISSIONS RULES BECAUSE THEY DISCRIMINATE AGAINST NON-RESIDENTS IN VIOLATION OF U.S. Const. art. I, § 8, cl. 3

The Court should issue a preliminary injunction prohibiting Defendants from enforcing the admissions rules subject to the Complaint because the admissions rules in question could not possibly violate the Dormant Commerce Clause to an extent greater than they already do. In fact, where Delaware is the "corporate capital of the world," it would be hard to imagine a set of regulations that interfere with interstate commerce more than the ones here.

#### 1. Plaintiff Has A Reasonable Likelihood of Success On The Merits Because He Can Show That The Rules Violate the Dormant Commerce Clause By Interfering with or Imposing Burdens on Interstate Commerce For Purposes of Economic Protectionism

"Our dormant Commerce Clause jurisprudence significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce." *McBurney*, 569 U.S. at 235. "It is driven by a concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id*. "The 'common thread' among those cases in which the Court has found a dormant Commerce Clause violation is that the State interfered with the natural functioning of the interstate market either through prohibition or through burdensome regulation." *Id*. By way of background, the Supreme Court has found that the Commerce Clause not only expressly authorizes Congress to regulate interstate commerce, but it also contains "an implied limitation on the power of the States to interfere with or impose burdens on interstate commerce." *W. & S. Life Ins. Co. v. State Bd. of Equalization of Cal*., 451 U.S. 648, 652 (1981). Strict scrutiny must be applied by a

federal court when the Plaintiff alleges in his or her complaint that the relevant law discriminates against interstate commerce "either on its face or in practical effect." *Maine v. Taylor*, 477 U.S. 131, 138 (1986). When a plaintiff alleges that a law discriminates against interstate commerce either on its face or in practical effect, then it "is *per se* invalid, save in a narrow class of cases in which the [defendant] can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *C &A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994). If the law does not discriminate on its face or in practical effect, the Court has applied a balancing test, often referred to as the *Pike* balancing test, where the law survives unless "the burden imposed on . . . [interstate commerce] is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc*., 397 U.S. 137 (1970). Unfortunately, the Supreme Court has acknowledged that the line between these two methods of analysis is not entirely clear. *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth*., 476 U.S. 573 (1986) (acknowledging that "there is no clear line" between the different levels of scrutiny that are applicable in dormant Commerce Clause cases).

A very important distinction between the Dormant Commerce Clause and the Privileges and Immunities Clause of Article IV Sect. 2 is that the plaintiff need not allege—or prove—that the law was enacted for the purposes of economic protectionism. *See Comptroller of the Treasury v. Wynne*, 575 U.S. 542, 599 (2015) (the "Commerce Clause regulates effects, not motives," and does not require court inquiry into "reasons for enacting a law that has a discriminatory effect"). Legal services constitute interstate commerce, even when the representation only has a modest connection to another state. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 787-88 (1975). Furthermore, bar admissions rules that impose restrictions on out-of-

state lawyers directly affect interstate commercial activities, regardless of whether the lawyer is moving to a new state or seeking admission in the state while living elsewhere. *Id*. at 783-788.

The First Circuit's decision in *National Revenue Corp. v. Violet* found that a Rhode Island statute, which defined debt collecting as law practice and limited such collecting to licensed Rhode Island lawyers, was unconstitutional under both the dormant Commerce Clause's strict level of scrutiny and under the *Pike* balancing test. *Nat'l Revenue Corp. v. Violet*, 807 F.2d 285, 289 (1st Cir. 1986). Particularly instructive was the court's reasoning. It explained that:

> By defining all debt collection as the practice of law, and limiting this practice to members of the Rhode Island bar, Rhode Island effectively [barred] out-of-staters from offering a commercial service within its borders and confer[red] the right to provide that service—and to reap the associated economic benefit—upon a class largely composed of Rhode Island citizens.

*Id*. at 290. This decision is helpful for two reasons. First, it suggests that rules affecting the ability of out-of-state lawyers to practice in a state impact interstate commerce and implicate the dormant Commerce Clause. Moreover, *Violet* suggests that such rules give rise to strict dormant Commerce Clause scrutiny even when they do not explicitly discriminate against out-of-state citizens. According to the First Circuit, it is enough that the challenged rule grants privileged status to a group composed "largely" of in-state citizens.

In the same way, the Defendants' bar admissions rules implicate strict scrutiny because they grant a privilege—not being required to relocate or forfeit livelihood—to a class composed largely of in-state citizens. It is important to remember that a regulation can violate the dormant Commerce Clause if it forces nonresident attorneys to do what residents need not do. *See Pike,* 397 U.S. at 137(Arizona agricultural regulation requiring grower to build packing facilities in state, rather than use nearby California plant, held to violate commerce clause of the Constitution).

### A. The Defendants Cannot Dispute That Their Bar is The Backbone of Interstate Commerce And That Defendants Have Protectionist Objectives Motivated by Financial Self-Interest In Maintaining Local Control of "American Corporation Law"

In this case, there is no disputing that the Delaware Bar has a direct connection to the natural functioning of interstate commerce. In fact, the Defendants published a study where they touted themselves as the "Corporate Capital of the World" because their legal system makes decisions impacting the health and welfare of the interstate economy:

> Delaware is the corporate capital of the world because of its sophisticated business laws and highly respected judicial system. . . .
>
> The Delaware legal industry is part of, and prospers from, the state's "Corporate Franchise," Delaware's historic and unique role as the situs for the formation of public corporations. <u>Over 60% of Fortune 500 companies are in Delaware, and Delaware courts serve as a center of corporate, bankruptcy, and intellectual property disputes</u> . . .
>
> Comparing the legal industry in Delaware to that in other jurisdictions, the study also details the presence of Delaware offices for the world's top law firms, as well as the per capita employment created by the Delaware legal industry compared to that of other states . . .
>
> Delaware's success in **<u>fostering home-grown firms</u>** and attracting national firms and prominent co-counsel provides benefits that go beyond the legal sector and back-office industries . . .

*See* Verified Complaint Exhibit A. The Defendants have long professed from the mountaintops that they are the lifeblood of interstate commerce and that they control the American economy. In fact, the Defendants even published a study where they admitted (i) that Delaware Corporation Law is by all means "American Corporation Law"; (ii) that Defendants and Congress rival over control of the interstate market; (iii) that Delaware takes proactive steps to maintain itself as the hub of interstate commerce for purposes of economic protectionism at the exclusion of both Congress and nonresidents; and (iv) that American interstate commerce is controlled only by members of the Delaware State Bar Association who are Delaware residents:

Because of the special importance of our corporation law, amendments to the corporation code must pass with a super-majority vote. In practice, our legislature and governor <u>defer in the making of statutory law to the corporate law council of the Delaware State Bar Association</u>. That council consists of corporate lawyers of all kinds, not just the transactional lawyers who represent corporate managers, but also plaintiffs' lawyers who represent stockholder interests. **The council is comprised entirely of Delawareans,**

For a state of our size, the corporate franchise taxes and legal jobs that our corporate law advantage brings in are a substantial reason why Delaware is among the most prosperous of the fifty stat states . . . But for us, a small state,<u> it is vital that we remain the leader in corporation law. That leadership produces thousands of Delaware jobs and nearly a quarter of our state's budget revenues. For that reason, our state will not tilt its corporation law to favor a corporation</u> . . . [w]e cannot afford to do so.

 . . . the key takeaway point is that Delaware's **financial self-interest** in legal excellence leads to a productive dynamic for the creation and maintenance of an efficient and fair corporation law.

. . . in most takeover battles filed in our court,<u> one Delaware corporation headquartered somewhere else is seeking to take over another Delaware corporation headquartered elsewhere,</u> not atypically because that second Delaware corporation has signed a friendly merger agreement with yet a third Delaware corporation also headquartered outside of Delaware.

. . . Although the Delaware system is not perfect**, the value it generates for the United States is considerable** and would be difficult for the federal government to replicate.

. . . Even for firms not chartered in Delaware, the teachings of Delaware courts are likely to be more important than their own state's law, as a practical matter. **Delaware law is, in essence, American corporation law for most purposes**.

. . . the issue to consider is what it might mean for the U.S. system if this sort of <u>creeping intrusion continues</u> . . . What will be more troubling is if the federal government continues to veer out of its traditional lane in the American corporate governance system. <u>Whether Congress likes it or not-and in its heart of hearts Congress does secretly like it-Delaware has a well-thought-out perspective on corporate law.</u>

That vision, as I understand it, recognizes the need for a large sphere of life that is immunized from government intrusion. Importantly, for present purposes, that sphere includes the **realm of commerce**, which should largely be free to be conducted through the voluntary operation of markets.

*See* **Exhibit B** at 7-8, 11-12, 14-15, 23. What is really disturbing is that Delaware Corporation

Law is, by the description Defendants provide, not controlled by the legislature—or even

impartial judges—but by the Delawareans composing the Delaware State Bar Association ("DSBA"). The DSBA is not a branch of government subjected to the checks and balances system or even the Constitution; it is a private entity, an exclusive club composed only of Delaware residents who are members of the Delaware State Bar. The organization is a <u>for-profit corporation</u> that uses some of its profits to provide a cozy malpractice insurance for its members:



This proves that the Nation's corporate economy—interstate commerce—is controlled by a Delaware for-profit corporation which is secretive, exclusive[4], and comprised solely of self-interested Delawareans whose primary objective is to keep the state earning that $2.6 billion a year. To add insult to injury, the reader might remember paragraph 83 of the Verified Complaint where Plaintiff referenced that, for reasons which are unclear, an attorney named Dennis Schrader aided Defendants to scare away Plaintiff's Preceptor, despite having no connection

---

[4] As a part of Plaintiff's two-year investigation, he emailed the DSBA posing as a member of the public and requested to have access to some of the publications made available to DSBA members. Plaintiff was told that, because he was not a member, he would not be given access to the publications and records made available to members. This organization is a group of exclusive, self-interested Delawareans overseeing a for-profit corporation that controls the national economy and does so in ways that advance Delaware's financial self-interests—that earns them $2.6 billion a year.

with Plaintiff's bar application. Dennis Schrader is an overseer of the shady DSBA! *See* **Exhibit C.**

### B.  The Defendants' Admissions Rules Interfere With Interstate Commerce By Imposing Burdensome Regulation on the Interstate Legal Market

It is well-established that legal services constitute interstate commerce, even when the representation only has a modest connection to another state. *Goldfarb*, 421 U.S. at 787-88 (1975). Furthermore, bar admissions rules that impose restrictions on out-of-state lawyers directly affect interstate commercial activities, regardless of whether the lawyer is moving to a new state or seeking admission in the state while living elsewhere. *Id*. at 783-788. In this case, there has never been a bar regulation—in the history of the United States Jurisprudence—that has burdened the flow of interstate commerce more than the Rules subject to this case. It is undisputed in this case that the Delaware Courts of Chancery handle the legal disputes impacting 60% of the Nation's Fortune 500 Companies as well as disputes involving the corporations that hold 80% of all the Nation's indexed monies[5]. Defendants admit that Delaware Corporation Law is, in essence, American Corporation Law.

The Defendants have four different bar admissions rules that were designed for the sole and express purpose of keeping Delaware first and "fostering home-grown law firms." The Delaware Bar has been able to swindle a nation for the past century so that it can profit off a $2.6 billion dollar a year cash cow. The rules have a *pervasive* impact on interstate commerce as it imposes burdens on the ability of non-resident attorneys to get licensed and handle corporate disputes in Delaware. Obviously, this Court is going to thoughtlessly rubber stamp any baseless

---

[5] Plaintiff referenced companies like Vanguard in his Complaint. The Defendants actually reference this company by name in Exhibit B, among other Delaware Corporations, as "huge institutions that manage an enormous amount of equity for many Americans." *See* **Exhibit B** at p. 15.

defense raised by the Delaware Attorney General and dismiss the case, and the Third Circuit will uphold this misapprehension of law through a "per curiam[6]" opinion where they fail to address arguments raised by either side. However, if and when this case hits the United States Supreme Court, there will be a mass flood of benefits for the interstate economy. Qualified attorneys from all 50 states will come to Delaware and become licensed. No longer will corporations be enslaved to the Delaware elite, they will be able to send their in-house counsels to get licensed and the burden and exorbitant expense of corporate litigation will be a thing of the past. Additionally, nonresidents who want to bring a Delaware corporation to justice will not be prohibited by the barriers currently in place, as there will undoubtedly be numerous attorneys in their own state who have then been able to obtain a Delaware Law license since they would no longer be required to give up their livelihood and relocate to Delaware for five months.

Furthermore, attorneys who practice multijurisdictionally and who practice in nationwide corporate law firms will not be forestalled by the Defendants' admissions rules. When the Supreme Court determines that Plaintiff is right and justice finally prevails, a floodgate will soon open up where the interstate legal market will have new life breathed into it, full of opportunity. This lawsuit is going to wipe the corrupt organization we know as the DSBA off the face of the earth and the Defendants' reign of terror will come to an end their corruption will leave with them.

### 2. Denial of A Preliminary Injunction Will More Likely Than Not Result in Irreparable Harm to the Plaintiff

To show irreparable harm, "the movant must show that it is 'more likely than not' to suffer irreparable harm absent the requested relief." *M. Rae, Inc.,* 509 F. Supp. 3d at 244.

---

[6] "The practice [of writing per curiam opinions] is certainly convenient for the lazy, the modest, & the incompetent."—Thomas Jefferson

36

Plaintiff has asserted in his Verified Complaint that, once the Defendants get a copy of this lawsuit, they will immediately issue Plaintiff a denial for admission to the Bar. This is not conjectural or hypothetical but based upon Defendants own statements. Plaintiff has stated an immediate intention and plan to reapply for admission to the Delaware Bar where he will once again be subjected to the Rules subject to this suit. Plaintiff does not want to have to give up his career and relocate to Delaware. Plaintiff's immediate intention and plan is more than sufficient to show immediate irreparable harm. *See Mallet & Co.*, Civil Action No. 19-1409, 2020 U.S. Dist. LEXIS 218750, at *24 ("Even just an intention to make imminent or continued use of [a procedure subject to the litigation] will almost certainly show immediate irreparable harm.").

In addition, all of Plaintiff's claims involve the vindication of fundamental constitutional rights. In these circumstances, irreparable harm will be presumed. *See Boretsky,* No. 08-2265 (GEB), 2009 U.S. Dist. LEXIS 43604, at *12 ("when alleged deprivation of constitutional right is involved, most courts hold no further showing of irreparable injury is necessary").

### 3. Granting The Injunction Will Not Result In Irreparable Harm To The Defendant-- The Balance Of Hardships Tips In Plaintiff's Favor

The only conceivable harm the Defendants will suffer if the relief is granted is the loss of revenue from its $2.6 billion dollar a year money spinner and perhaps the administrative burden of a higher number of bar applicants each year. But the first harm should not be a factor that this Court considers because the Defendants are swindling this money via illegitimate means. As exampled previously, this would be equivalent to a prosecutor failing to bring a bank robber to justice in fear that the bank robber might lose some of the cash he stole from innocent parties. Additionally, the increase in bar applicants will not be immediate, and even if it was, the Defendants will be able to put the $2.6 billion dollars a year that have been pocketing at the

exclusion of nonresidents to good use in accommodating those nonresidents in becoming admitted to the Bar.

Lastly, even if it would severely burden administrative resources, an increase in the number of applicants cannot be a factor this Court considers. *See Dunn v. Blumstein*, 405 U.S. 330, 343 (1972); *Violet*, 807 F.2d at 290 (finding that administrative inconveniences do not excuse a state from dormant Commerce Clause scrutiny).

### 4. Granting The Injunction Is In The Public Interest Because Protecting Constitutional Rights Is Always In The Public Interest

Vindicating constitutional rights and preventing future violation is always going to be in the public interest. *See Victory*, No. 18-5170, 2020 U.S. Dist. LEXIS 6528, at *72 ("When we weigh the public interest in denying an injunction against the strong public interest in vindicating constitutional rights and preventing future constitutional violations, we find an injunction defined in the accompanying Order serves the public interest.").

## IV.   THE COURT SHOULD WAIVE THE BOND REQUIREMENT OR SET BOND AT A NOMINAL AMOUNT

While Federal Rule of Civil Procedure 65 provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined," it is well established that the district court retains discretion to waive the security requirement. In exercising its discretion, a district court should consider (1) "the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant"; and (2) "the impact that a bond requirement would have on enforcement" of an important federal right. *Temple Univ. v. White*, 941 F.2d 201, 220 (3d Cir. 1991). Here, the Plaintiff seeks to protect his fundamental right to pursue a calling in

another jurisdiction free from discrimination and harassment. *See Valle,* 176 F.2d at 703.

Defendants will not suffer costs and damages from the proposed restraining order and injunction,

so Plaintiff should not be required to post security, or should be required to post only a nominal

amount.

## V.   THIS COURT IS REQUIRED TO HOLD A HEARING ON THE PRELIMINARY INJUNCTION

The standard for granting a preliminary injunction is the same as the standard for granting

a temporary restraining order, except that for a preliminary injunction a hearing is necessary.

*Anderson v. Davila*, 125 F.3d 148, 156 (3d Cir. 1997); FED. R.CIV. P. 65. Plaintiff exercises his

right to a hearing in front of the Court and requires of this Court that it schedule a hearing as

soon as possible.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that this Court:

(1) Enter a Temporary Restraining Order ordering the Defendants to stop their needless delays and harassment and to issue a final decision on Plaintiff's application to the Delaware Bar within 5 days of this Court's Order;

(2) Enter a preliminary injunction restraining Defendants from enforcing the four bar admissions rules subject to the Complaint because the rules violate the Privileges and Immunities Clause of U.S. Const. art. IV, §2, cl. 1and/or the Dormant Commerce Clause of U.S. Const. art. I, § 8, cl. 3; and

(3) That this Court schedule a hearing for both the Temporary Restraining Order and the Preliminary Injunction as soon as possible.

SIGNATURE LINE BELOW

Respectfully Submitted,

DATE: November 22, 2021

                                    _____/S/_____

Brooks M. Witzke, *Pro Se*
LAWMAN LLC*
211 CIRCLE INN #57
CHUBBUCK, ID 83211
302-604-4925
BrooksWitzke@Witzkelaw.com

                           *Please note this is a law firm accepting service

## CERTIFICATE OF SERVICE

       I hereby certify that on the day that Plaintiff's Complaint and initial pleadings were filed and accepted by this Court, November 22, 2021, I caused the foregoing document to be filed electronically with the Clerk of the Court through the CM/ECF System for filing and served on counsel registered to receive CM/ECF notifications in this case. I also caused the foregoing document to be e-mailed to the following counsel for Defendants at the email address identified below and if no such email address is identified to be mailed, via First Class mail, to the mailing addresses identified below:

*Counsel for All Defendants*

**Kathleen Jennings, Esquire (**DE Bar ID: 000913)
Delaware Attorney General
Delaware Department of Justice
Carvel State Building
820 N. French St.
Wilmington, DE 19801
Kathleen.jennings@delaware.gov

**Alexander S. Mackler, Esquire** (DE Bar ID: 006095)
Chief Deputy Attorney General
Delaware Department of Justice
Carvel State Building

820 N. French St.
Wilmington, DE 19801
alexander.mackler@delaware.gov

**Patricia A. Davis, I.D. #3857**
**George T. Lees, III, I.D. #3647**
**Allison McCowan, I.D. #5931**
Deputy Attorneys General
820 N. French Street, 6th Floor
Wilmington, Delaware 19801
(302) 577-8400
PatriciaA.Davis@delaware.gov
George.Lees@delaware.gov
Allison.McCowan@delaware.gov

_____/S/_____
Brooks M. Witzke, *Pro Se*
LAWMAN LLC*
211 CIRCLE INN #57
CHUBBUCK, ID 83211
302-604-4925
BrooksWitzke@Witzkelaw.com

*Please note this is a law firm accepting service

# EXHIBIT A

# AMERICAN BANKRUPTCY INSTITUTE
# JOURNAL

### *The Essential Resource for Today's Busy Insolvency Professional*

## Affairs of State

### By Patricia B. Tomasco and Emilio Nicolas

## "Let My People Go…to Delaware"
### *Paupers, Vagabonds and Fugitives from Justice Excepted*



*Patricia B. Tomasco*
Jackson Walker LLP
Austin, Texas



*Emilio Nicolas*
Jackson Walker LLP
Austin, Texas

Patricia Tomasco
is a partner and
Emilio Nicolas is an
associate at Jackson
Walker LLP in
Austin, Texas.

Delaware Local Bankruptcy Rule 9010-1 governs bar admissions and limits unfettered practice before its courts to those attorneys "admitted to practice in the District Court and those [attorneys] who may hereafter be admitted in accordance with these Rules."[1] It denies admission *pro hac vice* for those who are "regularly employed in Delaware" or "regularly engaged in business, professional, or other similar activities in Delaware."[2] It also requires attorneys who are admitted *pro hac vice*, but "not admitted to practice by the District Court and the Supreme Court of the State of Delaware," to associate with a Delaware-licensed attorney "who maintains an office in the District of Delaware for the regular transaction of business," unless otherwise ordered by the court.[3]

In turn, the U.S. District Court for the District of Delaware limits full admission to its bar to attorneys who are not members of the Delaware Bar,[4] while Delaware Supreme Court Rule 52 goes on to impose its own restrictive bar admission rules. Rule 52 includes a requirement that the applicant have a "preceptor"—a member of the Delaware Bar for at least 10 years—who can vouch for the applicant and a requirement that the applicant complete a five-month clerkship for a law firm, judge or public attorneys' or legal aid office *within the state of Delaware*.[5]

In addition, 28 U.S.C. § 1408 places permissible venue of title 11 cases in the state where a corporation is domiciled—namely, their state of incorporation. In turn, Fed. R. Bankr. P. 7004(d) provides for nationwide service of process, forcing defendants in related adversary proceedings to travel to distant courts to defend themselves. This expense increases because of Rule 9010-1's aforementioned local counsel requirement for admission *pro hac vice*. This requirement, when coupled with nationwide service of process, leads to potential constitutional infirmities for nonresident attorneys and their defendant-clients, particularly in noncore adversary proceedings based on non-Delaware state law.[6]

For the defendant's nonresident attorney, the constitutional analysis occurs at two levels. First, are the state's bar admission rules discriminatory against nonresidents? Second, are the district court's local rules consistent with established jurisprudence? This analysis becomes more elastic because the profession as a whole is becoming more mobile and more accessible as a result of advances in online communication technologies.[7] Historical concerns about communicating with attorneys, filing papers and attorneys' availability for hearings are lessened with the availability of the Internet, telephonic hearings and ECF.

## Nonresident Discrimination Violates Privileges and Immunities Clause

The U.S. Constitution's Privileges and Immunities Clause provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."[8] This clause "echoes" the privileges and immunities clause from the Articles of Confederation: "[T]he free inhabitants of each of these States, paupers, vagabonds and fugitives from justice excepted, shall

---

1  Del. Bankr. L.R. 9010-1(a).
2  Del. Bankr. L.R. 9010-1(b)(ii)-(iii).
3  Del. Bankr. L.R. 9010-1(c); *see* Del. Bankr. L.R. 9010-1(e)(ii).
4  Del. Bankr. L.R. 83.5(b). This local rule also imposes restrictions on the admission of attorneys *pro hac vice* similar to those imposed by Rule 9010-1. *See* Del. Bankr. L.R. 83.5(c)(2)-(3), (d); *but see* Del. Bankr. L.R. 83.5(f).
5  Del. Sup. Ct. R. 52(a)(2) and (8).

6  Jackie Gardina, "The Bankruptcy of Due Process: Nationwide Service of Process, Personal Jurisdiction and the Bankruptcy Code," 16 *ABI Law Review* 37, 41 (2008) (arguing that due-process concerns arising from nationwide service of process are heightened when nature of claim is purely state law and not federally created right).
7  Stephen Gillers, "A Profession, If You Can Keep It: How Information Technology and Fading Borders Are Reshaping the Law Marketplace and What We Should Do About It," 63 *Hastings L. J.* 953, 957 (2012) ("Even a rule that may appear wise at adoption can become unrealistic, inefficient or toothless as the world changes but the rule does not.").
8  U.S. Const. art. IV, § 2.

be entitled to all privileges and immunities of free citizens in the several States."[9] Whether a state regulation violates the Privileges and Immunities Clause depends on whether the restrained activity falls in the protected category. If so, then the analysis turns to whether the regulation has a "substantial" rationale and the discrimination bears a "substantial relationship" to the state's objective.[10]

In *Supreme Court of New Hampshire v. Piper*,[11] the U.S. Supreme Court held that the right of a nonresident attorney to practice law in a state was a "privilege and immunity" subject to protection. In that case, a Vermont resident wanted to practice law in New Hampshire. New Hampshire's rules limited admission to New Hampshire residents. On appeal, the New Hampshire Supreme Court proffered the rationale that nonresident members were less likely to be familiar with the local rules, behave ethically, be available for court proceedings and do *pro bono* work. The Court rejected these justifications, finding that none met the test of "substantiality," and the means chosen did not bear the necessary relationship to the state's objectives.[12] Notably, the Court found that the state's rationale was akin to "economic protectionism," which is the primary target of the Privileges and Immunities Clause.[13] Further, the state's concern with unavailability for hearings set on short notice could be overcome by either designating local counsel or conducting a telephonic hearing.[14]

Other restrictions on out-of-state admissions can implicate the Privileges and Immunities Clause. Recently, a federal district court considered New York's requirement that nonresident attorneys maintain an office or Of Counsel relationships within the state.[15] In *Schoenefeld v. State*,[16] a New York-licensed attorney living and working in New Jersey challenged the requirement. The state argued that the requirement was necessary to facilitate service of process, to allow the state to observe and discipline nonresident attorneys, and to provide assets within the state to effectuate the remedy of attachment.[17] In reviewing the statute's legislative history, the court found that the intent was to effectuate a limited exception to a prior attorney residency requirement, and not to address the stated justifications. Further, the in-state office requirement was not substantially related to the state's interests, and the state's concerns could all be remedied with less restrictive means, such as requiring the attorney to designate an in-state agent for process, carrying malpractice insurance instead of having attachable assets in the state and appearing for emergency hearings by telephone.[18]

Central to this analysis is the fact that the *Schoenefeld* decision did not involve a residency requirement *per se*, but focused on the disparate requirements of resident vs. nonresident attorneys. New York admits nonresidents and has one of the broadest reciprocity admissions in the nation. Does Delaware's five-month in-state clerkship requirement operate as a *de facto* residency requirement? Does the fact that it applies equally to both resident and nonresident attorneys make it nondiscriminatory?

## District Local Rules Cannot Require Residency

Regulation of nonresident attorneys under federal district court local rules must also meet rational, nondiscriminatory standards or "principles of right and justice." Although the courts have not specifically imposed a "privileges and immunities" standard on these federal, nonstate actors, they have done so by analogy.

> **Reliance on *pro hac vice* admissions may provide a bandage, but they do not provide a real solution for the many clients and attorneys seeking effective participation in cases filed in Delaware.**

Early jurisprudence in this area arose out of the civil rights cases of the 1960s where various district courts in the southern states imposed onerous requirements on out-of-state attorneys representing in-state civil rights plaintiffs. In *Sanders v. Russell*,[19] the U.S. Court of Appeals for the Fifth Circuit granted *mandamus* to determine the validity of district court local rules limiting *pro hac vice* appearances to two per year. The Fifth Circuit noted that the authority for a district court's promulgation of local rules is 28 U.S.C. § 1654, adding that "their rules must 'be consistent with Acts of Congress.'"[20] In *Russell*, the district court denied *pro hac vice* admission to two out-of-state attorneys bringing civil rights cases. The Fifth Circuit issued *mandamus* on the grounds that limiting *pro hac vice* admission to a certain number of appearances per year contravened the congressional intent embodied in the Civil Rights Act. It also noted that the "two appearances per year" rule was particularly onerous when admission to the district court was itself conditioned on a lengthy residency requirement.[21]

Like state bar rules invalidated under the Privileges and Immunities Clause, admission to a district court cannot be premised on residency within a state. In *Frazier v. Heebe*, the Supreme Court invalidated local rules of the Eastern District of Louisiana that required attorneys admitted to that court to reside or maintain an office in Louisiana.[22] Although the challenge to the rule was based on the Equal Protection and the Privileges and Immunities Clauses, the Court declined to undertake a constitutional analysis. Instead, it analyzed the local rules under its inherent supervisory power to ensure that the rules were consistent with "the principles of right and justice."[23] Unlike the concerns for litigants advanced in *Russell*, the Court in *Frazier* focused on the relationship of the attorney to the district court. In doing so, the Court relied

---

9   Brannon P. Denning, *The "Dormant" Commerce Clause: Restrictions on State Regulatory Powers, Bittker on Regulation Interstate & Foreign Commerce* § 6.09 [A] (2012), quoting Art. Confed. art. IV, § 1 (U.S. 1781).

10  *Toomer v. Witsell*, 334 U.S. 386 (1948).

11  470 U.S. 274 (1984); *but see Martin v. Walton*, 368 U.S. 25, 29 (1961) (rejecting Fourteenth Amendment challenge to local counsel requirement on equal protection grounds for out-of-state attorney, finding regulations were not beyond allowable range of state action).

12  *Id.* at 285.

13  *Id.* at 285 n.18.

14  *Id.* at 287.

15  N.Y. Judiciary Law § 470. Notably, the section has not been modified or removed.

16  1:09-CV-00504, 2011 WL 3957292 (E.D.N.Y. Sept. 7, 2011).

17  *Id.* at *9.

18  *Id.* at *12.

19  401 F.2d 241 (5th Cir. 1968).

20  *Id.* at 245 (quoting 28 U.S.C. § 2071).

21  *Id.* at 246.

22  482 U.S. 641 (1987).

23  *Id.* at 645-46.

---

*Piper*, which, again, had dismissed a state bar's provincial concerns using the "substantiality" analysis.[24]

The Supreme Court again declined to specifically impose the constitutional overlay to all district court rules in *Barnard v. Thorstenn*.[25] In this case, the District Court of the Virgin Islands promulgated a rule requiring that any applicant to the district court bar reside in the Virgin Islands for one year prior to applying for admission. Rather than exercising its supervisory authority under title 28, the Court decided the case under the Privileges and Immunities Clause because the district court acted as an instrumentality of the Government of the Virgin Islands. Under the *Piper* "substantiality" standard, the Court upheld the nullification of the residency requirement.

Although the Privileges and Immunities Clause applies to state regulations, the Supreme Court applied the rationale from *Piper* in both *Frazier* and *Barnard* to analyze federal district court local rules. Each of those challenges was upheld when it was based on in-state residency. Arguably, the same result would be reached for an in-state office requirement, which was found to be unconstitutional in *Schoenefeld*.

Attorneys do not fare well when the challenged condition in the district court rule is based on admission to the state bar, as opposed to residency. For example, in *Maynard v. U.S. Dist. Court for the Cent. Dist. of California*,[26] California-resident attorneys admitted in other states attempted to gain admission to the federal courts in California even though they had not passed the California bar exam. The district court denied the attorneys' challenge to the district court local rule requiring admission to the California Bar as a condition precedent, noting that the federal government is incapable of violating the Equal Protection or Privileges and Immunities Clauses because both require state, not federal, action.

If Rule 52's in-state clerkship requirement is a *de facto* residency requirement much like the one struck down in *Barnard*, then does Rule 9010-1 operate to exclude nonresident attorneys by requiring that they be admitted to the Delaware State Bar? Certainly, other federal district courts provide for the admission of an attorney who is a member of the bar of any state or the District of Columbia.[27] Those courts should function equally as well.

## Limitations of Serial *Pro Hac Vice* Admissions

Many nonresident attorneys practice regularly before the Delaware federal courts. Indeed, the Delaware local rules allow for the courts to dispense with local counsel requirements,[28] and research did not locate any case in a Delaware court that limited the number of *pro hac vice* admissions. Nonetheless, the Delaware local rules limit *pro hac vice* admissions to attorneys who do not regularly engage in professional activities in Delaware, and it still leaves the courts with discretion in deciding whether to dispense with local counsel requirements. This places an unnecessary burden on nonresident attorneys and clients who must answer Delaware

bankruptcy proceedings following nationwide service of process where the attorney is barred from full admission to the Delaware State Bar—and consequently, the Delaware federal courts—by the five-month clerkship requirement and must rely on *pro hac vice* admission.

In *Piper*, the Court noted that *pro hac vice* admission was not an equal substitute for full admission because of the local counsel requirement and the district court's discretion in granting admission.[29] Habitual reliance on *pro hac vice* admission may not ensure the ability to practice in any particular bankruptcy court. One recent district court decision, *Mateo v. Empire Gas Co. Inc.*, denied *pro hac vice* admission based on only 12 and 14 appearances in the district and six pending cases, finding that it was "'unreasonable for an attorney to request *pro hac vice* admission repeatedly as a way to avoid admission to the bar of this Court.'"[30]

Given the number of instances where bankruptcy counsel must file claims or defend preference suits in Delaware, it is likely that many have exceeded the 12- and 14-appearance limitation found to be excessive in *Mateo*. In turn, the *Mateo* court justified its ruling on the basis of state bright-line limitations on *pro hac vice* admissions of five per year in Alabama, five per year in the District of Columbia, three per year in Florida and two per year in Montana.[31]

## Conclusion

Delaware's clerkship requirement incorporated by reference into the local rules of the district and bankruptcy courts makes it difficult, if not impossible, for nonresident bankruptcy attorneys to gain admission to the Delaware federal district court, and effectively taxes those attorneys and their clients through the cost of local counsel. Reliance on *pro hac vice* admissions may provide a bandage, but they do not provide a real solution for the many clients and attorneys seeking effective participation in cases filed in Delaware. **abi**

*Reprinted with permission from the ABI Journal, Vol. XXXII, No. 2, March 2013.*

*The American Bankruptcy Institute is a multi-disciplinary, non-partisan organization devoted to bankruptcy issues. ABI has more than 13,000 members, representing all facets of the insolvency field. For more information, visit ABI World at www.abiworld.org.*

---

24 *Id.* at 647-48.
25 489 U.S. 546 (1989).
26 701 F.Supp. 738, 741 (C.D. Cal. 1988), *aff'd*, 915 F.2d 1581 (9th Cir. 1990).
27 *E.g.*, E.D. Mich. R. 83(c)(1).
28 Del. Bankr. L.R. 9010-1(c); Del. Bankr. L.R. 83.5(d); *see Frazier v. American Airlines Inc.*, 434 F.Supp.2d 279, 280 (D. Del. 2006) (plaintiff's counsel was admitted *pro hac vice* without requirement of local counsel).

---

29 *Piper*, 470 U.S. at 277, n.2.
30 841 F.Supp.2d 574, 576 (D.P.R. 2012).
31 *Id.* at 580, n.11.

# **<u>EXHIBIT B</u>**

# THE DELAWARE WAY: HOW WE DO CORPORATE LAW AND SOME OF THE NEW CHALLENGES WE (AND EUROPE) FACE

## By Leo E. Strine, Jr.[*]

### Abstract

*In this article, originally addressed to the European Policy Forum, Vice Chancellor Strine provides an overview of Delaware's approach to corporate law and identifies some of the challenges that approach now faces. These challenges include: the potential threat to economic efficiency that might result if the federal government further expands its role in corporate governance; the difficulties presented by the increasing separation of capital from capital, i.e., the reality that more and more of the stock of operating corporations is held by institutional investors, whose interests are not entirely aligned with those of the individuals whose capital they control; and, finally, the pressures that globalization presents not only for the United States, but for all advanced liberal democracies, seeking to preserve the societal benefits obtained through the corporate form in their humane approach to capitalism while simultaneously seeking to include the developing nations in an international market for goods and services.*

## I. Introduction

Ladies and Gentlemen, I am honored to have this opportunity to speak to the European Policy Forum.

In the following moments, I intend to take some of the mystery out of Delaware's role in the governance of American public corporations. To accomplish that, I will describe for you the central principles that animate our corporate law. I will then explain a bit about how our corporate law is made. In particular, I will focus on an underappreciated fact about Delaware's small—indeed, some have called "pygmy-sized". Our petite territory is not coincidental to the supple and balanced nature of our corporate law; rather, our size is a useful force in maintaining our corporation law's contractarian nature. Indeed, it is arguable that the United States' system of federalism, which permits corporations to govern their internal affairs through the laws of a state of their choosing, has enabled the evolution of a "national corporate law—i.e., that of

---

[*]Vice Chancellor, Delaware Court of Chancery. Lecture originally presented in slightly different form to the European Policy Forum, in London, England, on July 5, 2005.

Delaware—that better facilitates wealth creation than would the type of corporation law that Congress would likely produce.

In the concluding minutes of this talk, I will tee up for the ensuing panel a few hot issues that have potentially large implications for the future of American-chartered corporations. Perhaps most relevantly to you, I finish with one issue—the challenge presented by the globalization of the world's product, services, and capital markets—that poses interesting questions for corporate and economic law makers in all the advanced liberal democracies. That broad issue, if unaddressed in an effective international fashion, threatens to cause nationally-chartered corporations to pursue, by economic necessity, business practices that are inimical to the principles of the very nations that gave them birth.

## II. THE DELAWARE MODEL OF CORPORATION LAW

I start with the narrow and mundane: a basic description of Delaware's corporation law. Delaware's corporation law is not what, in a European context, might be called a broad-based company law. Aspects of company law like competition law, labor law, trade, and requirements for the filing of regular disclosures to public investors, are not part of Delaware's corporation law. Instead, those matters are primarily governed at the national level by regulatory regimes originating in congressional enactments and administered through agencies of our federal government, like the Federal Trade Commission and the Securities and Exchange Commission (SEC).

Delaware corporation law governs only the internal affairs of the corporation. In that sense, our law is a specialized form of contract law that governs the relationship between corporate managers—the directors and officers—of corporations, and the stockholders. Consistent with a contractarian vision, our statute is, by design, a broad enabling one that permits and facilitates company-specific procedures. In other words, our statute is much different than one might find in a civil law nation, which would more likely have a prescriptive corporation law chock full of mandatory terms specifying exactly how corporations must conduct their business.

By contrast, the Delaware approach to corporate law keeps statutory mandates to a minimum. And even some of the mandatory terms are subject to being overridden through charter and bylaw provisions. In particular, our law gives corporate planners tremendous power to use the charter—the equivalent of the corporate constitution—to vary otherwise mandatory terms. The charter, which is formally known as the certificate of incorporation, can only be amended upon recommendation by the board

of directors and with stockholder approval. Because the charter reflects a contract that is agreed upon by both the managers and the stockholders, our statute permits that more specific manifestation of contractual assent to override most of the statutory default terms.

The Delaware statute is flexible in another way. It provides transactional planners with multiple routes to accomplish identical ends. Under the doctrine of independent legal significance, a board of directors is permitted to effect a transaction through whatever means it chooses in good faith. Thus, if one method would require a stockholder vote, and another would not, the board may choose the less complicated and more certain transactional method.

In emphasizing the enabling nature of the Delaware statute, it is important to make two related points. First, and too often ignored, is that efficiency and flexibility are values that do not just serve the interests of corporate managers, they are also vital to stockholders. It is useful for stockholders to have the freedom to craft charter provisions that address their company-specific needs. But there is an even more important reason why stockholders are benefitted by a broad, enabling statute.

The central idea of Delaware's approach to corporate law is the social utility of an active, engaged central management. That idea is expressed by our statute, which states the fundamental principle that the "business and affairs of the corporation are managed by or under the direction of a board of directors."[1] It is managerial ingenuity that creates stockholder wealth through the invention and exploitation of new products, the development and more efficient provision of services, and sound financial management. Delaware corporate law recognizes that reality by investing central management with wide discretion to make business decisions and a wide choice of means to effect those decisions. Those investments facilitate creativity and risk-taking.

The so-called business judgment rule, which requires that the judiciary not second-guess business decisions made in good faith and with due care, even if they turn out badly, is also designed to protect the economic value served by centralized management. The rule does so by insulating managers from fear that pursuit of an attractive, but risky, business venture will leave them liable to the stockholders if the venture fails.

But Delaware's broad grant of power to management leads to a second point, which also deserves emphasis. Delaware corporate lawmakers recognize that managers can abuse their clout, and have

---

[1] DEL. CODE ANN. tit. 8, § 141(a) (2005).

therefore deployed means to prevent and remedy disloyalty. The statutory means are several, and include the requirement that stockholders meet annually to elect directors.[2] Although the analogy can be pushed too far, elections in the corporate republic have the same purpose as in real polities: they are designed to promote before-the-fact responsiveness and guarantee after-the-fact accountability to the electorate.

In the Delaware corporate republic, stockholders also get other ballot box opportunities that promote managerial fidelity. Our statute identifies certain transactions that may not be implemented by the directors without stockholder approval. These include sales of substantially all the assets of the corporation, mergers, and charter amendments. The requirement of stockholder approval permits stockholders to decide for themselves whether an important initiative of central management deserves support. The obvious goal is to provide, by the requirement of a stockholder vote, a before-the-fact incentive for management only to present transactions that management believes to be in the best interests of the corporation.

The other major check on managerial abuse is where Delaware's Court of Chancery and its Supreme Court comes in. Delaware's broad investiture of legal—i.e., statutory and contractual—authority in corporate management is policed by courts of equity, who review claims by stockholders that corporate fiduciaries have breached their fiduciary duties of loyalty and care. The intensity of that review varies in a sensible way correlated with the probability that the managers' business decisions might have been impermissibly influenced by self-interest, rather than a proper concern for the corporation's interests.

For example, when a corporate board decides to approve next year's natural gas supply contract, and none of the directors has an ownership interest in any of the competitors bidding to be the supplier, there is virtually no chance that a stockholder would be able to prove a claim that the directors breached their fiduciary duties by striking a bad deal. Because there was no conflict of interest, the business judgment of the board is sacrosanct, unless, at the extreme, no person of rational mind could think the deal fair to the corporation.

But, assume a different scenario, when a board is responding to an unsolicited takeover bid. Assume further that the board is comprised of a majority of independent directors. Unlike the situation in the United Kingdom, the directors of a Delaware corporation may thwart even an all-shares, all-cash bid if they believe that the offer is not in the best interests

---

[2]The default rule under Delaware law is that all directors stand for election annually. By charter, a classified board system may be implemented whereby a third of the board is elected every year.

of the corporation and its stockholders. But when the directors decide to take a defensive stance, our law scrutinizes their actions closely.

Under our law, the concern that the directors might be influenced by their desire to keep their positions, and to keep the company independent, justifies a tightened form of equitable review. Therefore, the court may overturn the defensive actions of the board if those actions are not reasonably proportionate to any threat the bid poses to proper corporate interests. In our jurisprudential lexicon, a "reasonableness" standard legitimates far more searching judicial scrutiny than exists under the business judgment rule. Yet, even here, our law does something that is consistent with the business judgment rule. In assessing the reasonableness of a board's defensive reactions to a takeover, we give more credit to a board that is comprised of a majority of independent directors.

Why? Because we intuit that the independent directors, although not immune from a desire to protect their positions, will be more likely than inside directors to impartially decide whether a bid is in the stockholders' best interest. The inside managers, in the ordinary course, have more at stake, both financially and reputationally. Therefore, our law encourages board processes that give a strong hand to the independent directors in responding to takeover bids and, even more generally, in handling M & A transactions, such as mergers of equals.

In other words, we do not wish to maximize judicial rulings finding board actions unreasonable; we wish to provide an incentive for boards to use good processes that can be trusted to reduce the role of self-interest and promote a focus on what is in the best interests of the stockholders. Notably, the heightened scrutiny the directors face in this context does not work in isolation; the voting rights I earlier described often come into play in M & A deals, requiring directors to face not only heightened judicial scrutiny, but also the need to convince the stockholders to ratify their actions. This combined pressure has led, in general, to boards who are far more willing to consider unsolicited bids and to abandon friendly mergers, if demonstrably preferable alternatives come along. As a result, most M & A battles are decided in boardrooms, and not by judicial injunctions.

Delaware reserves the most intrusive form of scrutiny for actual conflict of interest transactions. These transactions occur when a fiduciary—a director, a manager, or a controlling stockholder—is on the other side of the deal from the corporation. When a conflict transaction is effected, the burden is on the proponents to demonstrate that the deal is entirely fair to the corporation. In the absence of such proof, the fiduciary interested in the transaction—i.e., the one on the other side of the deal—must disgorge any profits or pay whatever damages are necessary to make the corporation whole. The interested fiduciary must do that

regardless of whether or not she acted with the intention to take unfair advantage of the corporation; in other words, even if she acted in utmost good faith.

Even here, however, Delaware tries to respect the business judgment of disinterested directors and stockholders. How? By invoking the protection of the business judgment rule if an interested transaction is approved by a majority of the independent directors or by a majority of the disinterested stockholders, after full disclosure. The idea, of course, is that the investment of ultimate power over the transaction in impartial directors or stockholders suffices to police the conflict. By this instrumental means, Delaware law can protect the resulting business decision without any loss of integrity, because the decision was made or ratified by persons whose interests were aligned with those of the corporation and its stockholders.

Consistent with the nuance that infuses our common law, Delaware is more suspicious when the fiduciary who is interested is a controlling stockholder. When that is so, there is an obvious fear that even putatively independent directors may owe or feel a more-than-wholesome allegiance to the interests of the controller, rather than to the corporation and its public stockholders. For that reason, when a controlling stockholder is on the other side of the deal from the corporation, our law has required that the transaction be reviewed for substantive fairness even if the transaction was negotiated by independent directors or approved by the minority stockholders. To encourage the use of these protections, however, when these protections are deployed, the burden of proving that the transaction is fair falls not on the controlling stockholder or the corporation, but on the stockholders who sue, who must show that the transaction is unfair.[3]

As this surface level overview shows, Delaware's scrutiny of managerial conduct gets tighter the more we have rational reason to suspect that a conflict of interest exists. Similarly, because Delaware gives great deference to decisions made by the stockholders' elected representatives, our law is extremely vigilant about policing abuse of the director election process. The heightened scrutiny given to defensive actions is applied even

---

[3]Currently, much thought is being given in our law to providing a stronger incentive for boards to condition transactions with controlling stockholders on both: (1) negotiation and approval by a special committee of independent directors and (2) a majority of the minority vote. By replicating the process of a third party merger (i.e., the combination of an active, disinterested negotiating agent—the board—combined with ratification by the ultimate, disinterested principals—the stockholders), this combination of protections is a powerful one for minority stockholders. Because it shifts the authority over the transaction's procession to impartial managers and stockholders, there is increasing sentiment in favor of granting full business judgment rule deference when this transaction structure is employed. *See, e.g., In re* Cox Commc'ns, Inc. Shareholders Litig., 879 A.2d 604 (Del. Ch. 2005) (advocating this change).

more intensively when the court suspects that incumbents are taking actions that have the effect of preventing a fair election.

### III.  HOW DELAWARE MAKES CORPORATE LAW AND WHY WE ARE WELL POSITIONED TO CONSTRUCT A FAIR AND EFFICIENT CORPORATION LAW

That brisk tour of our law leads to the next logical topic, which is how Delaware breathes life into its corporate law.  As we shall later see, by historical happenstance, our English heritage plays an important continuing role in that ongoing process.

Delaware's statutory law is made, of course, by our elected legislature, subject to veto by our Governor.  Because of the special importance of our corporation law, amendments to the corporate code must pass with a super-majority vote.  In practice, our legislature and governor defer in the making of statutory law to the corporate law council of the Delaware State Bar Association.  That council consists of corporate lawyers of all kinds, not just the transactional lawyers who represent corporate managers, but also plaintiffs' lawyers who represent stockholder interests.  The council is comprised entirely of Delawareans, but it regularly seeks out and receives national input from the only two constituencies involved in shaping Delaware's corporation law—corporate managers and stockholders.

I say they are the only two constituencies because that is what I mean.  And that is where our small size comes in as, in my view, an important part of the story.  Delaware is a state of fewer than one million residents.  We have important industries headquartered here, such as chemicals (you might have heard of that little company called DuPont), pharmaceuticals (Astra Zeneca's U.S. headquarters, e.g.), banking (like MBNA[4]), and agriculture (think chickens, corn, and soybeans).  But the corporate law industry is as important, or more important, than any of those industries.  For a state of our size, the corporate franchise taxes and legal jobs that our corporate law advantage brings in are a substantial reason why Delaware is among the most prosperous of the fifty states.

For other states, the integrity of their corporation law is of far less moment than the fate of a particular corporation facing a takeover bid or a major claim for damages.  From sea to shining sea, we have witnessed examples of this phenomenon.  For example, when Wachovia bank faced a takeover battle within the last five years, the North Carolina legislature

---

[4]MBNA's sale to Bank of America was announced just this week in July 2005. Interestingly, MBNA, although headquartered in Delaware, is chartered in Maryland.

passed a bill changing the state's corporation law precisely in order to help its home-based Wachovia avoid accepting a hostile bid from SunTrust. The legislatures of Massachusetts and Ohio have acted similarly, intervening to make changes in their corporate codes to address specific corporate feuds that they believed threatened the independence of corporations headquartered in their states. For these state legislators, the jobs and collateral community benefits that would be lost if a home-state headquartered firm was taken over far outweighed any concern about having a responsible corporation law that facilitates long-term wealth creation. The political calculus for them was not difficult. Their states receive a trivial portion of their revenue from corporate franchise taxes or their equivalent. Indeed, even if Delaware's advantage was wholly dissipated and all of our corporation business was distributed over the fifty states, the other states would barely notice.

But for us, a small state, it is vital that we remain the leader in corporation law. That leadership produces thousands of Delaware jobs and nearly a quarter of our state's budget revenues.

For that reason, our state will not tilt its corporation law to favor a corporation that happens to have its headquarters here. We cannot afford to do so. Even if the DuPont Company faced a hostile bid, we could not change the rules of the game to favor DuPont. The cost to our integrity and our ability to preserve our advantage in the corporation law field would be too high.

Because of that reality, corporation law in Delaware is influenced by only the two constituencies whose views are most important in determining where entities incorporate: managers and stockholders. Over time the relative power of these constituencies has changed, and it is now fair to say that both groups have a lot of clout, and that Delaware corporate lawmakers seriously consider each group's perspective on all key issues. Given the increasing flow of capital from individual investors into institutional investors, this rough equality of voice is likely to be preserved, and may at some point tilt heavily towards stockholder interests.

For now, the key takeaway point is that Delaware's financial self-interest in legal excellence leads to a productive dynamic for the creation and maintenance of an efficient and fair corporation law. That law is essentially a specialized body of contract law that governs the relations between the managers and stockholders of firms incorporated in Delaware. That is not to say that Delaware itself does not have laws protecting the environment, ensuring the fair treatment of workers, and guarding consumers against fraud. We do have such laws, but they only govern actual business operations that are conducted within our borders.

The corporation law itself does not address these issues. It only governs the internal affairs of the corporation. Within that domain, our law emphasizes that the goal of the corporation is to advance the interests of the stockholders. But we do not require boards to measure their success against the moment-to-moment impulses of the stock market. Rather, our law gives central management a strong hand to chart a course for the corporation that it believes will, in the end, produce the greatest increase in stockholder wealth. A good faith business judgment that does not maximize current payoffs to stockholders—such as a decision to grant pay increases to the workers, increase the corporation's involvement in charitable giving, or to sacrifice current dividend payments in order to make capital investments—will be respected if it is rationally related to a plan to enhance the corporation's long-term profitability.

Furthermore, our statutory corporation lawmaking process is not only careful, it is continuous. We do not look at the corporation law every five or ten or fifteen years as Congress might do with our national securities laws. Our corporation council meets regularly and the General Assembly makes modest adjustments at its instance annually to make sure our law remains as efficient as possible.

## IV. THE ROLE OF DELAWARE'S ENGLISH HERITAGE

Because our statute is an enabling statute, the enforcement of the managers' fiduciary duties is arguably the most important check Delaware imposes on managerial abuse. When a stockholder believes a fiduciary breach has occurred, he can bring suit in the Delaware Court of Chancery, the court on which I am privileged to serve.

The Delaware Court of Chancery's original jurisdiction explicitly included all the jurisdiction vested in the English Court of Chancery as of 1776. By happy historical evolution, the English Court of Chancery had jurisdiction over fiduciary relations, like those between executors and estates and between trustees and trusts. The Delaware Court of Chancery kept that jurisdiction and other traditional equity jurisdiction, all of which involved exclusively civil as opposed to criminal law.

When Delaware moved beyond the specific legislative chartering of particular corporations and adopted a back-bone, general corporation law that enabled entrepreneurs freely to create corporations, it was natural to vest jurisdiction over corporate law disputes in the court of chancery. Directors were thought to be a species of fiduciary. Thus, it was fitting for the court that enforced equitable duties to oversee suits against corporate directors.

Because chancery did not use juries, other advantages flowed to corporate managers and stockholders. The Chancellor issued written decisions that, unlike a jury verdict, provided useful guidance for future analogous situations. Until shortly after World War II, chancery had only one judge. Even if I assume that the raging internal debates that go on in my own head are characteristic of the inner ruminations of past Chancellors, it's fair to say that having a single judge promoted a certain consistency in application. And because the Chancellor heard many business cases, he developed a good feel for business dynamics and fashioned commercially practical rulings.

Not only that, the Chancellor was often called on, as part of his equitable duties, to consider emergency applications for injunctions to stop action that, if not enjoined, might cause irreparable injury. Injunction rulings must be issued with dispatch in order to serve their intended purpose.

The capacity and willingness of chancery judges to act with speed fit well with the business community's needs. In many instances, once a transaction is completed, there is no way for the judiciary to, as we say in Delaware, "unscramble the eggs," leaving the parties who effected it in danger of facing a huge damages suit. Therefore, it is often the case that the proponents and opponents of certain corporate action agree on one thing, which is that they would like to get an up-front ruling on whether the transaction should be preliminarily enjoined. Chancery judges were well-equipped by disposition and training to provide such answers with the alacrity that modern commerce demanded.

In fact, as a matter of judicial culture, chancery developed a deep commitment to the timely resolution of disputes, however big or small, and whether expedited or not. As a result, corporate constituencies knew that they would receive well-written, practical, and timely decisions from chancery. If they did not like those decisions, they could appeal directly to the court with the final say, the Delaware Supreme Court, an appellate court that took business cases equally seriously, and that also has historically had a very practical bent.

Although there were occasional controversial decisions, all in all the system produced predictable, efficient results that balanced the needs of managers for flexibility and consistency with those of stockholders in policing self-dealing and managerial sloth.

The small size of Delaware was again not coincidental to these results. Because our state is small, we could devote a Chancellor, and now four Vice Chancellors as well, substantially to the expert resolution of corporation law cases and other exclusively civil matters. Because corporation law became materially important to our state, the chancery and

supreme court judges who handle corporate cases take them very seriously and are motivated to produce a law that fairly balances the interests of managers and stockholders. Each generation of corporate law judges truly feels invested with a sacred trust, and behaves accordingly.

And because most corporate cases involve corporations that are chartered, but not headquartered, in Delaware, our courts are not subject to hometown bias. To put a point on that, in most takeover battles filed in our court, one Delaware corporation headquartered somewhere else is seeking to take over another Delaware corporation headquartered elsewhere, not atypically because that second Delaware corporation has signed a friendly merger agreement with yet a third Delaware corporation also headquartered outside of Delaware.

The use of a specialized court that issues written rulings has other advantages. By its very nature, equitable review is situationally-specific and proceeds in the common law fashion. The case at hand is decided and the law is thereby evolved incrementally. Although that can lead to what some scholars like to call indeterminacy—i.e., some residual uncertainty—it also allows space for the judiciary to pull back in future cases if a prior decision turns out, in the wake of experience, to have been unwise. And the overall body of case law coherently fills in a map that guides transactional and corporate governance advisors in charting a course for their clients that is relatively risk free.

Although the Delaware system is not perfect, the value it generates for the United States is considerable and would be difficult for the federal government to replicate. Unlike Congress, our legislature attends to the corporation law every year and does so thoughtfully. Unlike what would be the case in Congress, our corporation law is solely focused on the relations between stockholders and managers, and is not heavily influenced by other constituencies. And unlike the federal judiciary, consisting of over one thousand judges, ten Delaware chancellors and supreme court justices devote a considerable amount of time to fashioning sensible, fair corporate law decisions in a timely way. Also unlike the federal judiciary, the Delaware judiciary is, by the state's Constitution, evenly balanced between the major political parties, resulting in a centrist group of jurists committed to the sound and faithful application of the law.[5]

Through this means, the United States realizes the benefits of a virtual national company law, but more efficiently. Even for firms not chartered in Delaware, the teachings of Delaware courts are likely to be

---

[5]Moreover, for the past thirty years, Delaware governors have employed a bipartisan judicial nominating commission comprised of distinguished lawyers and laypersons to screen nominees for fitness.

more important than their own state's law, as a practical matter. Delaware law is, in essence, American corporation law for most purposes. The balanced approach it embraces facilitates managerial innovation and creativity, while preventing managerial self-dealing and entrenchment.

## V. THE ROAD AHEAD: CHALLENGES FOR DELAWARE, GREAT AND EVEN GREATER

With that overview in mind, I will finish by highlighting a few emerging issues that pose challenges to Delaware's approach to corporation law, and even more broadly, to all the advanced liberal democracies that have chartered private corporations as instruments for creating wealth for their societies.

I will not pretend to give you a comprehensive description of any of the issues or of my views regarding them. An *amuse bouche*, or at most a *tapas*, rather than a heavy meal, is what I will serve up for you.

## VI. WILL THE FEDERAL GOVERNMENT STAY IN ITS LANE?

The first of the issues I'll discuss is the federal regulatory authorities' and the stock exchanges' increasing imposition of specific mandates on American corporate boards. As I noted previously, the federal government's role in regulating corporate conduct towards investors has centered on demanding that public corporations give investors certified financial statements and other materially accurate periodic disclosures about their condition, and on providing remedies when those disclosures are materially inaccurate. The articulation and enforcement of the substantive duties owed by corporate managers to stockholders has largely been the province of state corporation law. And the U.S. Supreme Court has, through its jurisprudence, kept the federal judiciary out of the internal affairs of corporations.

After the first wave of corporate scandals involving, among others, Enron, the stock exchanges and Congress began to consider whether reforms at their level were advisable. For their part, the exchanges began considering extensive new listing standards that had the practical effect of mandating numerous board committees and specific duties that had to be staffed and carried out by independent directors. The exchanges had hoped that these new standards might head off the need for Congress to adopt onerous new mandates of its own, once the initial heat from the Enron debacle cooled. But after the exchanges were too far along to abandon their initiatives, the WorldCom mess floated to the surface of public and, therefore, congressional consciousness.

Soon, the sour scent of hypocrisy wafted from some important congressional chambers. Federal legislators who had played a leadership role in stymieing efforts at increasing the integrity of public accounting standards during the late Clinton years began to support rapid congressional action. Several of these legislators were no doubt hoping that their current drive for new federal regulation would cover for their prior efforts to hamper the SEC's initiatives to prevent improper overstatements of corporate earnings.

For others, the moment was one they had long been anticipating. These members of Congress genuinely desired a stronger federal role in corporate governance, and sensed an opening to advance their ideas.

What resulted was what might be fairly called an odd tasting "jumblaya" of ideas, which came to be known as Sarbanes-Oxley. That strange stew coupled sensible ideas—like the idea of a strengthened independent body to enforce genuinely meaningful accounting standards—with narrow provisions of dubious value—such as an outright ban on the making of loans to managers by public corporations. When combined with the new stock exchange rules, Sarbanes-Oxley had the effect of requiring corporate boards—and particularly independent directors—to spend a huge portion of their time fulfilling regulatory mandates. Characteristic of the bachelor's fridge of ingredients that make up the jumble, many of these mandates were unrelated to the core problems that gave rise to a legitimately perceived need for reform.

Those core problems primarily involved financial fraud, and the incentive systems that led gatekeepers like independent directors, public accountants, and corporate lawyers to fail to stop it, and, on occasion, sadly, even to actively facilitate accounting chicanery. Instead of a focused initiative addressing the financial integrity of publicly listed firms—which in fairness parts of Sarbanes-Oxley do speak to in useful ways that deserve credit—Congress and the exchanges generated an unwieldy set of mandates that have the perverse effect of impinging on the time that independent directors have to spend on monitoring their corporation's legal compliance.

For today, the issue to consider is what it might mean for the U.S. system if this sort of creeping intrusion continues. For all their costs, the new exchange rules and Sarbanes-Oxley are survivable, and, indeed, may be modestly beneficial, so long as the responsible regulators are flexible about giving boards leeway to implement the new mandates in a cost-effective manner.

What will be more troubling is if the federal government continues to veer out of its traditional lane in the American corporate governance system. Whether Congress likes it or not—and in its heart of hearts Congress does secretly like it—Delaware has a well-thought out

perspective on corporation law. We do not tie down all boards with a prescriptive set of procedural mandates. We do not create a thousand boxes to check. Instead, we give managers broad flexibility to chart the course that they believe is best for their corporations, using the stockholder franchise and the potency of fiduciary duty review to ensure managerial fidelity.

I freely admit that Delaware's system of corporate law relies heavily on the federal government for its overall integrity. We need the federal government to vigorously enforce national laws mandating accurate and sound accounting of corporate health, and the routine disclosure of material information to stockholders. When the federal government plays that role well, and when Delaware enforces fiduciary duties expertly, investors are well served.

What investors do not need, however, is for the federal government to undercut the valuable space for innovation and flexibility that Delaware's approach to corporation law creates. Delaware's approach recognizes that what works for one corporation might not be optimal for another. This approach recognizes that boards might perform more effectively if they contain a mix of not only independent directors, but also of directors who might have industry-specific knowledge that would actually be useful in crafting a business strategy.

Already, the new federal reforms are making it difficult for boards to include a blend of inside and outside expertise, as the multiple tasks required of independent directors generates a need for more of them. Meanwhile, the labeling by the exchanges of any director having company affiliations as "non-independent" has led potential "outside, inside directors" to rethink whether continued board service makes sense for them personally. The emerging model is a board comprised of one insider—the CEO, who knows everything about the corporation and has a keen interest in its future—and ten independent directors selected precisely because they have no affiliation with, or any historical or current interest in, the corporation's business or its fate. That is an odd group to help develop a business strategy, and seems likely to function largely as a monitor, with strategy being left to be decided by the CEO and her subordinates outside of the board's presence.

The present rules are not so deeply planted as to prevent some rethinking of this new model, thus enabling the creation of boards that combine strong independent majorities with several inside directors who have the acumen and experience to help fashion an innovating and successful strategy, too. The risk I highlight is that even more so-called "federal reforms" could emerge with costs that far outweigh their protective benefits.

The goal of corporations, after all, is to create societal wealth. That means creating new products and services, and delivering them in efficient ways. Corporate governance is a means, not an end.

Going forward, Congress needs to be mindful of these considerations and avoid stifling the wealth-creating potential of corporations through costly mandates that not only do little to protect investors, but also distract boards from their fundamental duties to develop and oversee the implementation of an effective corporate strategy, to select excellent managers, and to monitor the corporation's compliance with its legal and ethical responsibilities.

## VII. WHAT DOES IT MEAN TO BE A STOCKHOLDER?: THE RAPIDLY ACCELERATING "SEPARATION OF CAPITAL FROM CAPITAL"

Compounding these regulatory pressures is the next issue I'll highlight: what I call the "separation of capital from capital." This separation is well-developed in the United States and is rapidly emerging in Europe, as well. Those of us who are corporate law junkies are of course familiar with the phrase the "separation of capital from management," which encapsulates the key idea behind the public corporation. But, it has become increasingly common for individual investors to not directly own stock in operating corporations. They instead own shares in mutual or pension funds, which in turn own shares in the operating companies.

These institutional intermediaries have interests that are not perfectly aligned, to state it mildly, with those of their own stockholders. Mutual funds make money through fees, and do not have a profit motive to undertake efforts at shareholder activism at the operating company level. A mutual fund family knows that whatever benefits its activism generates for the operating company will not be exclusively or even primarily theirs, but will be spread among the operating company's diverse investor base, including the mutual fund's own industry competitors. For that reason, the huge institutions that manage an enormous amount of equity for many Americans—like Vanguard, Fidelity, and Barclay's—have been relatively docile stockholders in the United States.

In relative contrast, pension funds under the control of elected state officials and affiliated with labor unions have been more vociferous, but these institutions have their own agency costs. The agendas of these institutions have often seemed quixotic and not rationally designed to promote the long-term creation of wealth. These institutions focus almost obsessively on corporate takeover policy. Meanwhile, they were for too

long tolerant of accounting and disclosure practices that masked real corporate rot.

More recently, institutions of these kinds have been looking to increase the competitiveness of the corporate election system. They desire access to the company's proxy card in seeking votes and corporate reimbursement for their campaign expenses if their preferred candidates attain a substantial, but not winning, show of support from the electorate. But, many investors, and most managers, fear that these institutions have less-than-optimal incentives and expertise to select corporate directors who have the experience and wisdom to guide corporations towards sound business strategies.

The purpose is not to single this class of institutional investors out for undue criticism. By comparison to the mutual funds, these institutions were at least not inert.

To address institutional inertia, the U.S. Department of Labor, which governs pension funds for many purposes, now requires institutional investors who manage pension money to vote their shares in an informed manner. And the SEC is now forcing mutual funds to disclose how they vote. But these are not panaceas leading to rational voting behavior.

Many institutional investors have, as I mentioned, little desire to do any thinking of their own, particularly about investments that they often hold for nanoseconds.[6] Into this opportunistic breach has stepped an organization called Institutional Shareholders Services (ISS), which provides institutions with recommendations as to how to vote on corporate governance issues. Following ISS constitutes a form of insurance against regulatory criticism, and results in ISS having a large sway in the affairs of American corporations.

Moreover, powerful CEOs come on bended knee to Rockville, Maryland, where ISS resides, to persuade the managers of ISS of the merits of their views about issues like proposed mergers, executive compensation, and poison pills. They do so because the CEOs recognize that some institutional investors will simply follow ISS's advice rather than do any thinking of their own. ISS has been so successful that it now has a California rival, Glass Lewis.

---

[6]In a private conversation, the managers of a large mutual and pension fund complex confessed that, even in funds that were invested relatively equally in Compaq and Hewlett-Packard, they voted on the controversial merger between those companies as follows: they voted the Compaq shares for the merger because the premium Hewlett-Packard was paying was attractive. But, they voted the Hewlett Packard shares against the merger because they thought the combination would not create good value in the long run. For a diversified investor represented by this complex, who therefore indirectly held relatively equal positions in both companies, this form of "thinking" is, to put it mildly, not financially savvy.

Institutional investors now hold over half the stock in most American corporations. They are duty bound to vote it. But they often have interests that diverge from those of a hypothetical investor who has entrusted his capital to an operating firm in exchange for shares.

As a result, we face a world in which stockholders of operating companies are both more active and more conflicted. Those institutions most inclined to help set the corporate governance agenda—public and union affiliated pension funds—are probably least suited to evaluate what ideas make the most business sense. Those institutions better positioned to act on sound business logic—mutual funds—are the least inclined to be active stockholders. Mutual funds have a profit motive to be torpid, and also have business reasons to not upset corporate managers, even if upsetting managers is best for their own clients. Most frustratingly, those mutual funds whose stockholders have the most to gain from an overall increase in corporate integrity—index funds—are often the ones with the most interest in avoiding activism, in order to keep their management fees down.

Not only that, but institutional investors face incentives that can lead them to act in a way that is bad in the long-run for a particular operating company whose shares they hold if that act would benefit their overall portfolio. If a takeover bid for a healthy operating company involves only a twenty-five percent premium, instead of a forty percent premium, an institution whose overall portfolio for the quarter is suffering will often be willing to accept a low-ball bid rather than supporting the board's demand for independence until a full-priced bid comes along. Why? Because the profits from the underpriced bid will help mask the overall weakness of the portfolio's performance in the quarter. Likewise, when considering between alternative strategic stock-for-stock merger bids for a target, institutions are often more focused on which offers the highest immediate premium, rather than on which combination is more likely to produce stockholder wealth in the long run.

Short-term thinking of that kind should come as no surprise to any of you who own an actively managed mutual fund. Just what does it mean to be an investor when mutual fund portfolio turns over 300% or more of its holdings in a year? Is that rational? And what sort of monitoring does such an "investor" perform and to what end?

An increasingly popular form of investment fund is putting even more confounding pressure on corporations. So-called "hedge funds" now sometimes hold voting rights in corporations in which they hold net short positions. Rather than having an incentive to vote their shares in the manner that will increase the value of those corporations, these hedge funds

often have an economic incentive to vote in a manner that will impair corporate value.

These and other related factors are making it difficult for corporate law makers to avoid a fundamental look at the system. Questions of the following kind are surfacing: Should mutual fund boards face the same kind of fiduciary duty review that operating boards do? And just precisely what are the duties that institutional investors owe to their beneficiaries? Must they be intelligent and active monitors of the operating companies in which they invest? What mechanisms should, or feasibly can, be implemented to prevent the casting of votes designed to injure, rather than help, the corporation? Are there means by which the influence of long-term stockholders with a demonstrated commitment to particular operating firms can be enhanced, while the ability of transient, short-term profit seekers to disrupt sound corporate planning is limited?

I have grave doubt that corporate law alone can engender greater rationality. Without tax and other policy changes designed to reform the incentives of these institutions and to check their agency costs, it is unlikely their behavior will change. For example, most of us think the market's preoccupation with quarter-to-quarter profits is stupid. Anyone who is honest will admit that this obsession contributed to wrongdoing at corporations like Enron and HealthSouth. But, as presently constituted, the institutions who most shape the market's movements and focus are not designed with the goal of patient, fundamentally sound wealth creation in mind. These institutions respond to, and thus behave in ways that further fuel, short-term pressures for immediate payoffs. Meanwhile, these institutions suffer little—compared to their clients, corporate workers, and society as a whole—if that myopia contributes to corporate debacles, which have deep roots in hypersensitivity to the production of so-called "accounting profits." The divergence in interests between institutions, particularly mutual funds, and their stockholders (i.e., individual investors) is likely to become even starker. As more and more "mom and pops" (individual investors) are forced to depend on equity investments as a means to finance a secure retirement, the chasm between the institutions' incentives to focus on the very short-term and their typical stockholders' need and desire for responsible, durable portfolio growth will widen further.

That said, corporate law bears its share of responsibility. It must continue to provide space for well-intentioned boards to conceive and execute long-term strategies. Where it can, corporate law should facilitate a greater voice for true long-term investors, willing to put patient capital at risk in pursuit of plans to produce wealth, not through accounting gimmickry, but through the provision of new products and services.

In Europe, the phenomena I have described are probably in a somewhat more nascent state, but seem to be evolving rapidly in the same directions we have experienced.   But watch out—the outbursts of institutional investor pressure your companies now occasionally face are likely to become more commonplace than unusual.

### VIII.  BEYOND STOCKHOLDERS AND MANAGERS— THE CHALLENGE OF GLOBALIZATION: CAN THE BLESSINGS OF A HUMANE CAPITALIST SYSTEM BE PRESERVED WHILE SPREADING PROSPERITY TO THE DEVELOPING WORLD?

As I close, I want to widen the lens even further.  In Delaware, those who know me recognize that corporation law is not my primary public passion.   Rather, what primarily animates my commitment to public service, now as a Vice Chancellor and even more directly in my prior role as Counsel and Policy Director to Delaware Governor Thomas R. Carper,[7] is the continued worthiness of the liberal vision of a just society.[8]  That vision, as I understand it, recognizes the need for a large sphere of life that is immunized from government intrusion.   Importantly, for present purposes, that sphere includes the realm of commerce, which should largely be free to be conducted through the voluntary operation of markets.

The liberal vision is not an irrationally rosey one, that pretends that the unfettered pursuit of private advantage inevitably leads to optimal outcomes.  Instead, that practical, realistic vision recognizes that there is no such thing as a free market in the state of nature, and that the unrestrained operation of markets does not maximize either societal wealth or happiness.  Without appropriate regulation by the citizenry's duly elected representatives, the least ethical of businessmen will trash the environment, exploit workers, and steal from investors—thereby creating inexorable pressures for others to follow suit in order to survive.  Just as the existence of government without a larger realm of private ordering leads to tyranny and oppression, so does private ordering without restraint lead to poverty, sharp class inequalities, and poor stewardship of our natural resources.

Much of what is most admirable about Europe, Canada, Japan, and the United States—what we might call the advanced, liberal

---

[7] Governor Carper is now a U.S. Senator.

[8] I risk the term liberal, trusting that those capable of reading thus far are also capable of differentiating between the actual western tradition of liberalism and the caricature of the term drawn by some for electoral purposes (an unfortunate practice that, of course, is also used as to other appellations, like the term conservative).   I use the term in a wholly non-partisan and descriptive sense as describing a broader philosophy embraced by most in the mainstream in the United States and Europe.

Case 1:21-cv-01637-CFC   Document 4   Filed 11/22/21   Page 75 of 83 PageID #: 3

democracies[9]—rests in the balance we have struck between the need to allow market forces to operate with due freedom so as to generate innovation and wealth, with a commitment to protecting other, even more important, human values. We all went through a phase of economic development when smokestacks and open pipes fouled the air and water, when workers were grossly underpaid and overworked, when we exploited children for labor, and when there was no protection for those, who by misfortune or market cycles, found themselves unable to provide a dignified living for themselves. Despite our cultural diversity, all of our societies eventually came to the consensus view that those conditions had to be ameliorated through appropriate government action. To move to a more sustainable and humane capitalist model, our societies have, among other things, protected workers by guaranteeing their right to form unions, to be paid minimum wages, and to have reasonable working hours; by banning child labor; and by requiring that they be afforded safe working environments. To include the many in the blessings of prosperity, our societies have provided assistance to the unemployed, the working poor, the disabled, and the elderly. To protect the planet we are fortunate to inhabit, environmental laws were adopted to ensure that we can breathe clean air, swim in and drink clean water, and honor our duty to the other species that inhabit our planet.

If these measures fall short of the ideal, they have, over time, helped produce societies that, by any human measure, are remarkably decent. The many, and not the few, enjoy comfortable lives. There is a great deal of personal freedom and liberty.

But these achievements are now under threat. Many of those protections were adopted with the expectation that our domestically chartered corporations would largely compete with each other. Or, at most, that our home chartered corporations would compete with corporations in other nations operating under similar, humanitarian restraints. This did not necessarily mean that some nations, such as Japan, would not emerge with substantial comparative advantages.

But the gap was not so large, or so we hoped, that it would cause us to abandon our evolved standards. If we worked smarter, we could, or so we said, keep the high-margin, high-skilled work, and still maintain our impressive standards of living. But the hopeful notion that, through skills development alone, we will not sacrifice the social and economic progress our societies have made is now less obviously sound.

---

[9]I do not mean to slight Australia, New Zealand, South Korea, or other nations that have earned this moniker. The nations cited are illustrative of what I ardently hope will be an ever-growing club.

As the nations of the developing world legitimately struggle to attain the same level of success as the liberal nations, they are putting pressure on our own standards of living. And when a nation whose government combines many of the predatory qualities of both mercantilism and communism—think China—sets out to dominate our markets, even the most efficient manager amongst us has reason to fear.

No matter how ingenious the manager or however productive the worker, it is virtually impossible to compete against workers who are paid pitiful wages, who work in factories that are not required to meet responsible environmental standards, and whose products (on top of those advantages) are deeply subsidized by their governments. And these workers are not just making low-end, simple products. They are making high value-added products using complicated manufacturing processes.

Recently, I read an article touting how wage inflation in China has increased wages at some factories to nearly $150 per month. Somehow, I didn't find that at all comforting. When I told that to a group of high-powered lawyers and investment bankers, they told me that U.S. and European workers simply needed to acquire better skills so as to be able to hold jobs that couldn't be exported into low wage nations. But, the blitheness of this response is belied by the fact that many X-rays taken in the United States are now read abroad by physicians who are paid a mere fraction of what American doctors make. As I speak, high rises in India are filled with Indian lawyers writing legal briefs and performing other legal work for American corporations at a pittance of what an American lawyer would charge. DuPont, my state's flagship science-based company, is moving research jobs to India, China, and Russia. For better ideas and to better serve customers abroad who need specific applied research tailored to their needs? To some degree. For cheaper access to high-powered brains? To be sure.

I raise the issue of globalization and its ramifications for the liberal experiment because it is a topic that should unite the United States and Europe. Neither of us can tackle it in isolation, or, indeed, without working with Canada, Japan, South Korea, and others to formulate a responsible path forward.

How, you might ask, does this relate to corporation law? Well, let me return to first principles. Our nations did not charter corporations to benefit solely investors. We chartered corporations for the interests of our societies as a whole.

The corporations our nations now charter increasingly face competition that plays by rules of the game that we, as a result of our enlightenment, no longer tolerate domestically—e.g., rules that tolerate manufacturers who pay substandard wages and immunize them from the

need to protect the environment or their workers' safety. In the face of this pressure, corporations chartered in our lands are increasingly choosing to move jobs from places that require protections of these kinds to places that do not. More and more, our corporations lack any sense of commitment to their nations of origin.

In this respect, American corporations are probably on the leading edge of being emotionally and ethically untethered from their home nation.

America's sharper focus on the best interests of stockholders helps explain this. If the way to become more profitable is to shift production from an environmentally sound plant paying relatively low wages in the United States to an unsafe plant, paying extremely low wages in China, American corporate boards will increasingly support that decision on the grounds that it is in the stockholders' best interest. If their companies want to sell to Wal-Mart, they might have no choice other than to do so.

In twenty years, when these companies have little domestic production left, the obvious question will arise as to why they need a U.S. CEO, U.S. lawyers, U.S. investment bankers, or even a U.S. charter. Already, many of the leading brand names in the United States are owned by non-U.S. firms. That is no doubt true in Europe, as well. As more and more corporations lose their special ties to particular nations and communities—through shifts in their regions of production and multiple mergers—the practicability of the advanced liberal democracies to demand that the corporations they have chartered adhere to evolved standards of corporate responsibility may wither.

The big picture economic returns in the United States over the last few decades already show cause for alarm. Returns to capital and CEOs have grown enormously, a reality reflected in the growing percentage of American wealth held by the wealthiest one percent of our nation's populace. Meanwhile, median family income has grown in a trifling way, and has probably fallen on a per worker basis, when the huge increase in two wage-earner households is considered. Overall, economic inequality is growing.

In this more than slightly digressive, some might say Fezziwiggian manner, I therefore pose the final big question which I commend for your consideration. That is this: Can the liberal democracies combine together to create a rational economic structure that protects our hard-fought achievements, while facilitating the increasing inclusion of other nations in our markets? I have no doubt that none of our nations will be better off operating behind closed economic walls—I am no protectionist—but I also

have little doubt that it is not in our best interests to sacrifice our humanitarian principles in the pursuit of cheap consumer goods.[10]

Working together, we have some chance of all going forward at the same time. Will the liberal democracies forge a path that simultaneously permits their citizenry to continue to enjoy the blessings of an enlightened approach to capitalism and that affords the developing world the chance to substantially increase its wealth? Or will we resign ourselves to the notion that the progress we seemed to have made must be abandoned in order to facilitate the flow of goods from wherever they can be most cheaply made?

What current sacrifices are we prepared to make to secure the prosperity of all of our children? Are the liberal democracies (particularly, the United States) prepared to reduce our use of the world's resources by operating more efficiently, in exchange for the enforcement of real labor and environmental standards that enable our workers to remain competitive, while being paid good wages?[11] Are we willing to relent on our protectionist ways in areas like agriculture, in order to facilitate the adoption of more enlightened standards by our trading partners? Should there be escalating tiers of trading blocks, access to the markets of which requires a progressively more rigorous adherence to enlightened labor and environmental standards? Are there other, non-protectionist means by which the advanced liberal democracies can exert concerted leverage to spread the bedrock labor and environmental standards we all have independently determined are a necessary component of a humane capitalist economy to the nations that want access to our markets?[12]

---

[10]As a matter of history, it is of course true that so-called "free trade" has never existed. A truly "free" trade zone among the advanced liberal democracies would be the hugest in human history. I, personally, favor an ever-widening realm for free trade, but recognize that there are other important values at stake. We should aim for us all to go forward with the sunny optimism of a Reagan, but also with the vision of Franklin Roosevelt, who combined Reagan's high hopes for human progress with a keen understanding of the necessary role for regulation in a capitalist system, and the need for international cooperation in shaping a better future.

[11] The United States and Europe must lead by example. Our societies obviously went through periods when we callously disregarded the rights of labor and the integrity of the environment. We therefore must help the developing world make the same progress we did but with fewer externalities. In the case of the environment, for example, it is not clear that the earth can suffer the same degree of environmental spoilage (on a per capita basis) from the emerging nations as the United States and Europe committed in the nineteenth and twentieth centuries.

[12]The precise domestic and international means by which the advanced, liberal democracies should address the globalization of the world economy are obviously matters of great complexity and legitimate debate, and are beyond the scope of this address. The only core contention I advance here is the evident reality that the advanced, liberal democracies cannot address these phenomena effectively in isolation and that effective international collaboration on these issues of obvious concern to our societies is essential. Relatedly, I also venture the notion that our own experiences in developing capitalist systems that correct for market externalities and spread prosperity a bit more evenly should not be forgotten as we expand the world trading community.

These are the real fundamental issues on which the vibrancy of the liberal vision's future rests.

Never has the human race had more capacity to shape a prosperous future working together. And no person of sound mind can, in my judgment, believe that we have a rational alternative to doing so. We can have diverse approaches to handling the relationships between corporations and their stockholders—i.e., to corporation law as it is narrowly conceived in Delaware. But our corporations cannot serve the societal purposes for which they were originally chartered unless the liberal democracies collectively take a truly international approach to ensuring that the provision of decent, middle class wages and the responsible treatment of the environment are not death knells for corporate profitability. Just as we should globalize the world's economy in order to spread prosperity as widely as possible, so too must we globalize those policies that reflect our best ideals.

# **EXHIBIT C**



NEED A LAWYER ?    FAQs    Join / Renew    CLE    Login

CART ⌄

ABOUT    FOR ATTORNEYS    FOR THE PUBLIC

SECTIONS & COMMITTEES    PUBLICATIONS    🔍

Sections & Committees

Legislative Matters

Standing Committees >

Awards

Professional Ethics

Professional Guidance & Lawyers Assistance

Fee Dispute

Diversity

# The Fee Dispute Committee

The Fee Dispute Committee (the "Committee") of the Delaware State Bar Association has been established to resolve controversies:

- between a lawyer and the client, and
- between lawyers who succeed each other in the representation of a client.

This Committee enables Comment 14 to Rule 1.5 (Fees) of the Rules of Professional Conduct. Comment 14 states:

> *"Disputes over fees. If a procedure has been established for resolution of fee disputes, such as an arbitration*



Rules of the Fee Dispute Committee:

## Initiating a Dispute:

To initiate a fee dispute, the initiating party should complete and sign the Petition, and complete and sign the Agreement to Arbitration.

These completed documents should be delivered to (DO NOT MAIL TO DSBA):

Fee Dispute Committee Chair
c/o Dennis L. Schrader, Esq.

Judicial
Appointments

Sections of
the Bar ›

*or mediation procedure
established by the bar, the
lawyer must comply with the
procedure when it is
mandatory, and, even when it is
voluntary, the lawyer should
conscientiously consider
submitting to it."*

P.O. Box 690
Georgetown, DE 19947-690

After receipt of these documents,
the Fee Dispute Committee will
follow up in accordance with the
Committee Procedures.

The Committee does **NOT**:

- offer clients or former clients
  with legal advice with respect
  to fee agreements or
  representational issues.
- advise clients or former clients
  as to what is "customary" or
  "legitimate" with respect to fee
  agreements or reimbursement
  of expenses.

The Complete Rules of the
Committee are available here.

**Rules of the Fee
Dispute Committee**

**(CLICK TO REVIEW)**



DELAWARE STATE BAR
ASSOCIATION

405 North King
Street
Suite 100
Wilmington, DE
19801

LOGIN

JOIN /
RENEW

STAY CONNECTED

Fee Dispute | Delaware State Bar Association

Phone: (302) 658-5279

Fax: (302) 658-5212